James S. Lowrie
    jlowrie@joneswaldo.com
Andrew G. Deiss
    adeiss@joneswaldo.com
Billie J. Siddoway (ISB# 6628)
    bsiddoway@joneswaldo.co m
JONES WALDO HOLBROOK & MCDONOUGH PC
170 South Main Street, Suite 1500
Salt Lake City, UT 84101
Telephone: (801) 521-3200
Facsimile: (801) 328-0537

Steven B. Andersen (ISB #2618)
    sandersen@hollandhart.com
HOLLAND & HART LLP
101 S Capital Boulevard, Suite 1400
Boise, ID  83701-2527
Telephone: (208) 342-5000
Facsimile: (208) 343-8869

James E. Hartley
    jhartley@hollandhart.com
HOLLAND & HART LLP
555 Seventeenth St., Suite 3200
Denver, CO  80201-8749
Telephone: (303) 295-8000
Facsimile: (303-295-8261

Donald M. Barnes
    dbarnes@porterwright.com
Salvatore A. Romano
    sromano@porterwright.com
PORTER WRIGHT
1919 Pennsylvania Ave, N.W., Ste 500
Washington, D.C. 20006
Telephone: (202) 778-3056
Facsimile: (202) 778-3063

*Counsel for United Potato Growers of Idaho, Inc.; United Potato Growers of America, Inc.; United II Potato Growers of Idaho, Inc.; Albert Wada; Wada Farms, Inc.; Wada Farms Potatoes, Inc.; Wada-Van Orden Potatoes, Inc.; Wada Farms Marketing Group, LLC; Michael Cranney; Keith Cornelison; Cornelison Farms, Inc.; Snake River Plains Potatoes, Inc.; Lance Funk; and Raybould Brothers Farms, LLC*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IN RE: FRESH AND PROCESS POTATOES ANTITRUST LITIGATION | Case No. 4:10-md-02186-BLW |
| THIS DOCUMENT RELATES TO: | **MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE INDIRECT PURCHASERS' CLAIMS** |
| *Simon v. United Potato Growers of Idaho, Inc., et al.* | |
| *Heiden et al v. United Potato Growers of America, Inc., et al.* | Case No. 4:10-cv-520 Case No. 4:10-cv-546 Case No. 4:10-cv-576 |
| *Rizzo, et al. v. United Potato Grower of America, Inc., et al.* | |

969433\15

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................................1

II. ARGUMENT ......................................................................................................................2

   A.  FEDERAL LAW PRE-EMPTS THE IP PLAINTIFFS' STATE LAW CLAIMS ............2

   B.  THE IP PLAINTIFFS DO NOT HAVE STANDING UNDER THE LAWS OF
      THE STATES WHERE THEY HAVE NOT BEEN INJURED.........................................6

   C.  THE IP PLAINTIFFS DO NOT HAVE STANDING TO PURSUE ANTITRUST
      CLAIMS ............................................................................................................................7

        1.  THE IP PLAINTIFFS HAVE NOT ADEQUATELY PLEADED
           ANTITRUST INJURY – THE FIRST FACTOR....................................................12

        2.  THE IP PLAINTIFFS HAVE NOT ADEQUATELY PLEADED THAT
           THE INJURIES THEY ALLEGEDLY SUSTAINED AND THE
           ANTICOMPETITIVE CONDUCT AT ISSUE ARE SUFFICIENTLY
           CAUSALLY RELATED – THE SECOND FACTOR. .......................................14

        3.  THE DAMAGES THE IP PLAINTIFFS' ALLEGEDLY SUFFERED
           ARE SPECULATIVE AND DIFFICULT TO CALCULATE – THE
           THIRD AND FOURTH FACTORS....................................................................16

        4.  PERMITTING THE IP PLAINTIFFS TO GO FORWARD WITH THEIR
           CLAIMS UNREASONABLY RAISES THE RISK OF DUPLICATIVE
           DAMAGES – THE FIFTH FACTOR. .................................................................18

III. CONCLUSION..................................................................................................................19

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Am. Ad Management v. General Tel. Co.*, 190 F.3d 1051 (9th Cir. 1999) ............................ 12, 14

*Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519 (1983)................................................................................... *passim*

*Ass'n of Washington Public Hosp. Districts v. Philip Morris, Inc.* 241 F.3d 696 (9th Cir. 2001) ................................................................................................................ 12

*Bahn v. NME Hospitals, Inc.*, 772 F.2d 1467 (9th Cir. 1985) .................................................. 12

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696 (9th Cir. 1990)............................................ 2

*Barnett Bank of Marion Cty, N.A. v. Nelson*, 517 U.S. 25 (1996).............................................. 3

*Bradbury Co., Inc. v. Teissier-duCros*, 2004 WL 3059542 (D. Kan. 2004) ................................ 9

*California v. ARC Am. Corp.*, 490 U.S. 93 (1989) ...................................................................... 9

*Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072 (N.D.Cal. 2007)............................................................................................... 8, 13, 16, 17

*Geir v. Am. Honda Motor Co., Inc.*, 529 U.S. 861 (2000)......................................................... 3

*Gen-Probe, Inc. v. Amoco Corp., Inc.*, 926 F.Supp. 948 (S.D. Cal. 1996)................................ 12

*Griffen v. Dugger,* 823 F.2d 1476 (11th Cir. 1987).................................................................... 7

*Hines v. Davidowitzs*, 312 U.S. 52 (1941)...................................................................... 3, 5, 6

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)................................................................ 8, 18

*In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......................................................................................................................... 7

*In re Microsoft Corp. Antitrust Litig.*, 2003 WL 22070561 (D. Md. Aug. 22, 2003) ................ 6

*In re Online DVD Rental Antitrust Litig.*, Case No. M 09-2029, 2009 WL 4572070 (N.D. Cal. Dec. 1, 2009) ................................................................................................ 16

*In re Potash Antitrust Litigation*, 667 F. Supp. 2d 907 (N.D. Ill. 2009) .............................. 14, 15

*In re Terazosin Hydrochloride Antitrust Litig.,* 160 F. Supp. 2d 1365 (S.D. Fla. 2001) ............................................................................................................................. 7

*In re Wellbutrin XL Antitrust Litig.,* 260 F.R.D. 143 (E.D. Pa. 2009)......................................... 7

*Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979 (9th Cir. 2000) .................................... 9

*Lewis v. Casey*, 518 U.S. 343 (1996)......................................................................................... 6

*Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291 (S.D. Cal. 2009) ........................................ 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................. 7

*Michigan Canners and Freezers Association v. Agricultural Marketing and Bargaining Board*, 467 U.S. 461 (1984)........................................................... 2, 3, 4, 5, 6

*Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.,* 185 F.3d 957 (9th Cir. 1999) ......................................................................................... 11

*Orr v. Beamon*, 77 F.Supp.2d 1208 (D. Kan. 1998)................................................................... 9

*Temple v. Circuit City Stores, Inc.*, 2007 WL 2790154 (E.D.N.Y. 2007)...................................... 7

## STATE CASES

*Annheuser-Busch, Inc. v. Abrams,* 71 N.Y.2d 327 (N.Y. Super. Ct. 1988)............................ 9, 10

*Bunker's Glass Company v. Pilkington, PLC,* 75 P.3d 99 (Ariz. 2003) ........................ 9

*Beckler v. Visa U.S.A., Inc.,* Case No. 04-cv-320, 2004 WL 2115144 (N.D. Dist.
      Ct., Aug. 23, 2004)................................................................................................. 10

*Cornelison v. Visa U.S.A., Inc.,* No. Case No. 03-cv-1350 (S.D. Cir. Ct., Sept. 29,
      2004) ...................................................................................................................... 10

*Crouch v. Crompton Corp.,*  Case No. 02-cv-4375, 2004 WL 2414027 (N.C. Super.
      Ct., Oct. 28, 2004)............................................................................................ 16, 17

*Fucile v. Visa U.S.A., Inc.,* No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Ct.,
      Dec. 27, 2004)........................................................................................................ 10

*Harrah's Vicksburg Corp. v. Pennebaker,* 812 So. 2d 163 (Miss. 2001) .................................... 10

*Ho v. Visa U.S.A. Inc.,* 787 N.Y.S.2d 677 (N.Y. Super. Ct. 2004).............................................. 10

*Kanne v. Visa U.S.A., Inc.,* 723 N.W.2d 293 (Neb. 2006)........................................................ 10

*Kessel v. Monongalia County General Hosp. Co.,* 648 S.E.2d 366 (W. Va. 2007) .................... 10

*Leech v. Levi Strauss & Co.,* 1980-2 Trade Case (CCH) ¶ 63,558 (Tenn. Ch. Ct.
      1980) ...................................................................................................................... 10

*Lorix v. Crompton Corp.,* 736 N.W.2d 619 (Minn. 2007)............................................................ 11

*Luscher v. Bayer AG,*  CV-2004-014835 (Ariz. Super. Ct., Maricopa Cty.,
      Sept. 14, 2005) ........................................................................................................ 9

*Peterson v. Visa U.S.A. Inc.,* 2005 WL 1403761 (D.C. Super. Ct., Apr. 22, 2005) ...................... 9

*Southard v. Visa U.S.A., Inc.,* 734 N.W.2d 192 (Iowa 2007) ..................................................... 9

*Stark v. Visa U.S.A., Inc.,* 2004 WL 1879003 (Mich. Cir. Ct., July 23, 2004)............................. 9

*Strang v. Visa U.S.A., Inc.,* 2005 WL 1403769 (Wis. Cir. 2005) ................................................ 10

*Teague v. Bayer AG,* 671 S.E. 2d 550 (N.C. App. 2009) .......................................................... 11

*Vinci v. Waste Mgmt., Inc.,* 36 Cal. App. 4th 1811 (Cal. App. 1995) .......................................... 9

## FEDERAL STATUTES

Capper-Volstead Act (7 U.S.C. § 291) .......................................................................... *passim*

Clayton Act, Section 6 (15 U.S.C. § 17) .................................................................................. 4

Sherman Act, Section 1 (15 U.S.C. § 1) .............................................................................. 1, 2, 8, 10

## STATE STATUTES

Ariz. Rev. Stat. § 44-1402 .......................................................................................... 7

D.C. Code § 28-4502 .................................................................................................. 7

Donnelly Act, N.Y.G.B.L. § 340-347 .............................................................................. 10

Iowa Code § 53.2 ....................................................................................................... 11

N.C. Gen. Stat. § 75-1 ............................................................................................... 7

N.D. Cent. Code § 51-08.1-01, -02................................................................................. 7

N.H. Rev. Stat. § 356:14 ................................................................................. 10

N.M. Stat. Ann. § 57-1-1 ................................................................................. 7

N.M. Stat. Ann. § 57-1-15 ............................................................................... 11

Neb. Rev. Stat. Ann. § 59.801 ......................................................................... 7

Nev. Rev. Stat. Ann. § 598A.50 ...................................................................... 10

Nev. Rev. Stat. Ann. § 598A.60 ...................................................................... 7

S.D. Cod. Laws § 37-1-3.1 .............................................................................. 7

Utah Code Ann. § 76-10-926 ........................................................................... 10

Vt. Stat. Ann. t. 9 § 2451 ................................................................................ 10

Vt. Stat. Ann. t. 9 § 2461 ................................................................................ 10

W.Va. Code § 47-18-3 ..................................................................................... 7

W.Va. Code § 47-18-16 ................................................................................... 10

## COURT RULES & OTHER AUTHORITIES

Federal Rules of Civil Procedure, Rule 12 ....................................................... 2

62 Cong. Rec. 2057 (1922) .............................................................................. 5

62 Cong. Rec. 2259 (1922) .............................................................................. 5

Pursuant to Federal Rules of Civil Procedure, Rule 12(b)(6), defendants United Potato Growers of Idaho, Inc.; United Potato Growers of America, Inc.; United II Potato Growers of Idaho, Inc.; Albert Wada; Wada Farms, Inc.; Wada Farms Potatoes, Inc.; Wada-Van Orden Potatoes, Inc.; Wada Farms Marketing Group, LLC; Michael Cranney; Keith Cornelison; Cornelison Farms, Inc.; Snake River Plains Potatoes, Inc.; Lance Funk; and Raybould Brothers Farms, LLC (collectively the "defendants"), respectfully submit this memorandum in support of their *Motion to Dismiss the Indirect Purchasers' Claims*.  In addition to the arguments set forth herein, the defendants fully incorporate by reference the arguments set forth in their *Motion to Dismiss Based on the Capper-Volstead Act and Related Statutes* and supporting memorandum (the "*Capper-Volstead Memorandum*").

## I.  INTRODUCTION

Fourteen individuals residing in ten different states have asserted claims as indirect purchasers of potatoes in the *First Amended Class Action Complaint* (the "IP Complaint"). Their cases, filed in three separate jurisdictions, allege violations of the laws of twenty-two states, the District of Columbia, and the United States.  The indirect purchaser plaintiffs (the "IP plaintiffs") have attempted to create grounds for recovery where none exist.  All of the IP plaintiffs' claims should be dismissed at this stage of the litigation as a matter of law.

Section A of this memorandum demonstrates that the IP plaintiffs' claims are pre-empted by the Capper-Volstead Act and related statutes (collectively, "Capper-Volstead").  As discussed in the *Capper-Volstead Memorandum*, Capper-Volstead protects a farmer's right to engage in collective activity.  Specifically, Capper-Volstead pre-empts state law claims that are inconsistent with the objective of protecting collective action among farmers.  For these reasons, the defendants move the Court to dismiss ***all*** of the IP plaintiffs' state law claims.

In Section B, the defendants argue that the IP plaintiffs lack standing to bring claims under the laws of twelve states and the District of Columbia.  In order to maintain these claims, at least one IP plaintiff must allege he/she suffered an injury in the jurisdiction at issue resulting from the alleged restraints.  The IP plaintiffs have not alleged they have been injured in the District of Columbia, Kansas, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, Utah or West Virginia.  For that reason, the IP plaintiffs' claims arising out of the laws of those jurisdictions should be dismissed.

Section C seeks dismissal of the IP plaintiffs' antitrust claims, whether asserted under the Sherman Act or state antitrust laws, because the allegations of the IP plaintiffs do not meet the standards recognized by state and federal courts necessary to establish antitrust standing.

## II.  ARGUMENT

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted."  Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

### A.    Federal Law Pre-empts the IP Plaintiffs' State Law Claims

As discussed in the *Capper-Volstead Memorandum*, incorporated fully herein, the IP plaintiffs' federal law claims are barred by Capper-Volstead.  The federal statutory framework protecting the collective action of farmers precludes liability under the federal antitrust law. Likewise, Capper-Volstead precludes and pre-empts all of the IP plaintiffs' state law claims, because all of those claims seek a remedy that would directly conflict with and stand as an obstacle to the letter and objectives of Capper-Volstead.

The federal pre-emption doctrine recognizes three bases for finding that Congress has pre-empted state law.  *Michigan Canners and Freezers Association v. Agricultural Marketing*

*and Bargaining Board*, 467 U.S. 461, 469 (1984) ("*Michigan Canners*").  First, a state statute can be pre-empted by express declaration of Congress.  *Id.*  Second, "even in the absence of express pre-emptive language, Congress may indicate an intent to occupy an entire field of regulation, in which case the States must leave all regulatory activity in that area to the Federal Government."  *Id.*  Third, federal law may "pre-empt state law to the extent that the state law actually conflicts with federal law.  Such a conflict arises when compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (*quoting Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (citations omitted).  At a minimum, permitting the IP plaintiffs' state law claims to go forward would frustrate the purpose of the Capper-Volstead Act and stand as an obstacle to the objectives Congress intended to achieve.[1]

In *Michigan Canners*, the Supreme Court addressed whether a Michigan law that afforded agricultural cooperative associations sole bargaining power for the sale of agricultural products conflicted with the federal Agricultural Fair Practices Act of 1967 ("AFPA").  *Id.* at 469.  The purpose of AFPA was to ensure a farmer's right to choose whether to market his products himself or through a cooperative association.  *Id.* at 476 n.19.  The appellants argued that the Michigan statute deprived producers of that choice, effectively allowing associations to force producers into association membership.  The Supreme Court agreed.  *Id.* at 470; *see also Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25 (1996) (holding that federal law

---

[1]    The Supreme Court, "when describing conflict pre-emption, has spoken of pre-empting state that that 'under the circumstances of th[e] particular case … stands as an obstacle to the accomplishment and execution of the ***full purposes and objectives*** of Congress' – whether that 'obstacle' goes by the name of 'conflicting; contrary to; …repugnance; difference; irreconcilability; inconsistency; violation; curtailment,' or the like."  *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (citations omitted) (emphasis added).

969433\15

affording small town banks the right to sell insurance pre-empted state law prohibiting national banks from selling insurance).

In *Michigan Canners*, the Supreme Court first looked to the language of the statute at issue. *Id.* at 469-470. Likewise, it is instructive here to review the relevant language of the Capper-Volstead Act which reads, in part:

> Persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce such products of persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes.

7 U.S.C. § 291.[2]

The plain language of the statute unequivocally grants to agricultural producers the freedom and right to engage in the practices it enumerates and to fully enjoy the activity it permits. The statute is global in application. It provides protection from ***all*** laws, state and federal, that might limit or contravene it. By definition, the state law claims advanced by the IP plaintiffs seek to conscribe the rights of farmers in contravention of the express text and intent of Capper-Volstead. *See Geier,* 529 U.S. at 874-875 (holding that a federal regulation pre-empted a state tort suit based on failure to install airbags where tort claim would be an "obstacle to the accomplishment of [the federal regulation's] objective."). Thus, all of the IP plaintiffs' claims, if

---

[2]   Section 6 of the Clayton act also demonstrates the scope of the Congressional intent to shield farmers from liability. It provides in pertinent part:

> Nothing in the antitrust laws shall be construed to forbid the existence and operation of . . . agricultural . . . organizations instituted for the purposes of mutual help . . . or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

15 U.S.C. § 17.

permitted to proceed, would be "'obstacle[s] to the accomplishment and execution of the full purposes and objectives of Congress.'" *Michigan Canners*, 467 U.S. at 469 (*quoting Hines*, 312 U.S. at 67). The claims asserted here have the potential to be more than obstacles. By interfering with the rights conferred by Capper-Volstead, they have the potential to render it a nullity.

As part of its pre-emption analysis, the Supreme Court typically also examines legislative history to determine congressional intent. *See, e.g., Michigan Canners,* 467 U.S. at 471. As detailed in the *Capper-Volstead Memorandum*, legislative history shows that a clear intent of Congress in passing Capper-Volstead was to allow agricultural producers to control the prices paid for their products without fear of lawsuit.[3]

By way of example, Senator Arthur Capper described the legislation as: "designed to give to the farmer the same right to bargain collectively that is already enjoyed by corporations." 62 Cong. Rec. 2057 (1922). More explicitly, he stated: "While it seems evident that ***Congress intends that the farmer shall not be prosecuted for acting collectively in the marketing of his product,*** yet the Federal law is such that these prosecutions may be threatened or actually brought against him." 62 Cong. Rec. 2059 (1922) (emphasis added). From its inception, the practical and intended effect of Capper-Volstead was to allow agricultural producers to effectuate price control without legal reprisal.

The IP plaintiffs' causes of action, taken in whole or in part, assert claims against agricultural producers for price fixing, controlling production in order to do so, and other

---

[3]   As Senator Norris explained the purpose Capper-Volstead: a farmer "does not have the fortune to back him in fighting through the courts any lawsuit, whether it is justly or unjustly begun; and naturally he is afraid to go into a cooperative organization for fear, not that he will be convicted and sent to jail, but that he will be harassed, that there will be litigation extending through all the courts and through all the years." 62 Cong. Rec. 2259 (1922).

conduct protected by Capper-Volstead.  As such, these claims for relief "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 100 (internal citations omitted).  For these reasons, all of the IP plaintiffs' state law claims should be dismissed as a matter of law.

### B.   The IP Plaintiffs Do Not Have Standing Under the Laws of the States Where They Have Not Been Injured

The IP plaintiffs have not alleged facts sufficient to support any of their claims arising out of the laws of twelve states and the District of Columbia.  The IP Complaint does not allege that any of the IP plaintiffs suffered injury in the District of Columbia, Kansas, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, Utah or West Virginia.[4]

In order to establish standing, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal citations and punctuation omitted).[5]

---

[4]   The IP plaintiffs allege that they reside and purchased potatoes in the following states: Arizona, California, Florida, Iowa, Massachusetts, Michigan, Minnesota, New York, Vermont, and Wisconsin. (IP Compl. ¶¶ 15-28.)

[5]   Relevant state statutes often reflect this requirement by expressly requiring that some part of the injury occur in that forum.  *See, e.g.*, **Arizona**: Ariz. Rev. Stat. § 44-1402 ("A contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce, any part of which is within this state, is unlawful").  **District of Columbia**:  D.C. Code § 28-4502 ("Every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce all or any part of which is within the District of Columbia is declared to be illegal").  **Mississippi**: *In re Microsoft Corp. Antitrust Litig.*, 2003 WL 22070561 *1-2 (D. Md. Aug. 22, 2003) (a plaintiff must allege "at least some conduct . . . which was performed wholly intrastate" in order for claim to come within Mississippi's antitrust statute).  **Nebraska**: Neb. Rev. Stat. Ann. § 59.801 ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce, within this state, is hereby declared to be illegal").  **Nevada**:  Nev. Rev. Stat. Ann. § 598A.60 ("Every activity enumerated in this subsection constitutes a contract, combination

In accord with this principle, courts regularly dismiss state law claims where no named

plaintiff can show injury arising from the law of the particular state at issue.  *See In re Graphics*

*Processing Units Antitrust Litig*., 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007) ("A class cannot

assert a claim on behalf of an individual that they cannot represent").[6]   The IP Complaint fails to

allege that any IP plaintiff suffered injury that might entitle him to maintain claims arising from

the thirteen jurisdictions identified in this Section.  *See Lujan v. Defenders of Wildlife*, 504 U.S.

555, 560-61 (1992).  Thus, the Court should dismiss the IP plaintiffs' claims arising under the

laws of the District of Columbia, Kansas, Mississippi, Nebraska, Nevada, New Hampshire, New

Mexico, North Carolina, North Dakota, South Dakota, Tennessee, Utah, and West Virginia.

## C.    The IP Plaintiffs Do Not Have Standing to Pursue Antitrust Claims

The IP plaintiffs' federal and state law antitrust claims fail because the IP plaintiffs lack

standing under factors utilized by state and federal courts and identified in *Associated General*

---

or conspiracy in restraint of trade, and it is unlawful to conduct any part of any such activity in this State").  ***New Mexico***: N.M. Stat. Ann. § 57-1-1 ("Every contract, agreement, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within this state, is unlawful").  ***North Carolina***:  N.C. Gen. Stat. § 75-1 ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal").  ***North Dakota***:  N.D. Cent. Code § 51-08.1-01, 51-08.1-02 (prohibiting restraints of trade in a "relevant market," "all or any part of which is within this state").  ***South Dakota***: S.D. Codified Laws § 37-1-3.1 ("A contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful").  ***West Virginia***:  W. Va. Code § 47-18-3 ("Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in this State shall be unlawful").

[6]   *See also Temple v. Circuit City Stores, Inc*., 2007 WL 2790154 *8 (E.D.N.Y. 2007); *Griffen v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987); *In re Wellbutrin XL Antitrust Litig.*, 260 F.R.D. 143, 157, 168 (E.D. Pa. 2009) (dismissing "claims arising in states where no named plaintiff is located"); *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 924 (N.D. Ill. 2009); *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1371 (S.D. Fla. 2001) ("[N]amed plaintiffs cannot rely on unidentified persons within those states to state a claim for relief").

*Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 536-39 (1983) ( "*AGC*").

Under federal law, indirect purchasers do not have standing to assert Sherman Act claims for damages arising from price fixing. *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Some states have enacted *Illinois Brick* "repealer" statutes in an effort to remove the *per se* bar on claims by indirect purchasers. *See generally California v. ARC America Corp.*, 490 U.S. 93 (1989). However, even under these statutes, an indirect purchaser must still establish standing to assert antitrust claims. "[T]he question whether indirect plaintiffs have standing under state law, and the question whether antitrust plaintiffs – which may include indirect purchasers – have antitrust standing for a particular claim, are two 'analytically distinct' issues." *Dynamic Random Access Memory (DRAM) Antitrust Litigation,* 516 F. Supp. 2d 1072, 1087 (N.D. Cal. 2007) (holding that the indirect plaintiffs were "required to satisfy general antitrust standing requirement" as enunciated by *AGC*).

Federal antitrust standing is governed by *AGC*, 459 U.S. at 536-44. *AGC* established a five-factor analysis to determine whether a plaintiff has antitrust standing that focuses on:

- the nature of the plaintiff's alleged injury, including whether the plaintiff was a participant in the restrained market;
- whether the injury is a direct product of the restraint alleged;
- whether the injury is too "speculative";
- the complexity of apportioning damages; and
- whether the claims risk duplicative recoveries.

549 U.S. at 536-544.

The IP plaintiffs are pursuing antitrust claims under the laws of twenty-three jurisdictions and of the United States. Courts in at least thirteen of those jurisdictions have applied *AGC* factors in determining whether a plaintiff has standing to assert claims arising from the

969433\15

jurisdiction's antitrust statute.[7]  Eight of the jurisdictions have declared that they use federal law

to guide their interpretation of their state antitrust statutes.[8]  Five states – Iowa, Nevada, New

---

[7]   ***United States***: *AGC,* 459 U.S. at 536-39.  ***Arizona***: *Luscher v. Bayer AG*, CV-2004-014835
at 2-3 (Ariz. Super. Ct. Maricopa County., Sept. 14, 2005) (unpublished); *but see Bunker's
Glass Company v. Pilkington*, PLC, 75 P.3d 99, 102-103 (Ariz. 2003) (declining to adopt
*Illinois Brick* and noting that statute dictates that courts may use interpretations of federal
antitrust statutes as a guide to enforcement).  ***California***: *Knevelbaard Dairies v. Kraft
Foods, Inc.*, 232 F.3d 979, 987-92 (9th Cir. 2000) (*AGC* factors used to determine if plaintiff
had antitrust standing); *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814-17
(1995) (same). ***District of Columbia***: *Peterson v. Visa U.S.A. Inc.*, 2005 WL 1403761 at *4-5
(D.C. Super. Ct., Apr. 22, 2005)  (*AGC* factors used to determine plaintiff had no antitrust
standing).  ***Iowa***: *Southard v. Visa U.S.A.*, Inc., 734 N.W.2d 192, 200 (Iowa 2007) ("Injuries
that are remote under the analysis used in the Associated General Contractors case may not
be recovered under [Iowa's antitrust statute]"). ***Kansas***: *DRAM*, 516 F. Supp. 2d at 1094
(holding the "application of the *AGC* factors is a proper means of determining antitrust
standing" in Kansas)).  *See also Orr v. Beamon*, 77 F. Supp. 2d 1208, 1212 (D.Kan. 1998)
(federal district court in Kansas concluded "that standing under the Kansas antitrust statutes
requires an antitrust injury similar to that required under the Sherman and Clayton Acts");
*Bradbury Co., Inc. v. Teissier-duCros*, 2004 WL 3059542, *7 (D.Kan. 2004) (same).
***Michigan***: *Stark v. Visa U.S.A., Inc.*, 2004 WL 1879003 at *2-3 (Mich. Cir. July 23,
2004) (applying *AGC* factors to determine antitrust standing under Michigan antitrust
statute).  ***Nebraska***: *Kanne v. Visa U.S.A., Inc.*, 723 N.W.2d 293, 299 (Neb. 2006) (Nebraska
Supreme Court affirms use of *AGC* factors to determine plaintiff lacked antitrust standing).
***New York***: *Ho v. Visa U.S.A. Inc.*, 787 N.Y.S.2d 677 (N.Y. Sup. 2004) (*AGC* factors used to
determine plaintiff lacked antitrust standing); *see also Annheuser-Busch, Inc. v. Abrams*, 71
N.Y.2d 327, 339 (N.Y. Super. Ct. 1988) ("the Donnelly Act - often called a 'Little Sherman
Act' - should generally be construed in light of Federal precedent and given a different
interpretation only where State policy, differences in the statutory language or the legislative
history justify such a result"). ***North Dakota***: *Beckler v. Visa U.S.A., Inc.,* 2004 WL
2115144, *2-3 (N.D. Dist. Aug. 23, 2004) (finding indirect purchaser claims too remote and
implying reliance on *AGC* factors in determining lack of standing).  ***South Dakota***:
*Cornelison v. Visa U.S.A., Inc.*, Case No. 03-cv-1350 (S.D. Cir. Ct., Sept. 29, 2004) (hearing
transcript noting state trial court's bench ruling employing *AGC* factors and granting
dismissal based on lack of antitrust standing).  ***Vermont***: *Fucile v. Visa U.S.A., Inc.*, No.
S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Ct., Dec. 27, 2004). ***Wisconsin***: *Strang v.
Visa U.S.A., Inc.*, 2005 WL 1403769 (Wis. Cir. Ct., 2005) ("our appellate courts would look
to [*AGC*] factors for guidance in assessing an indirect or remote purchaser's standing").

[8]   ***Arizona***: Ariz. Rev. Stat. § 44-1412 ("It is the intent of the legislature that in construing this
article, the courts may use as a guide interpretations given by the federal courts to
comparable federal antitrust statutes").  ***Mississippi***: *Harrah's Vicksburg Corp. v.
Pennebaker*, 812 So. 2d 163 (Miss. 2001) (relying on federal interpretation of Noerr-
Pennington Doctrine to determine applicability of same under state antitrust statute); *see also
DRAM*, 516 F.Supp.2d at 1095 (holding that it is appropriate to apply the *AGC* factors to

Mexico, Vermont, and West Virginia – have statutes mandating courts to interpret their antitrust

statutes in accordance with federal law.[9]

Even courts that have declined to adopt the *AGC* test recognize that one does not gain

antitrust standing by virtue of merely being an indirect purchaser.  The Minnesota Supreme

---

determine plaintiffs' antitrust standing under the Mississippi antitrust statute, the court looked
with approval to *Harrah's Vicksburg Corp.,* 812 So. 2d 163).  ***Nevada***: Nev. Rev. Stat. Ann.
§ 598A.050 ('[t]he provisions of this chapter shall be construed in harmony with prevailing
judicial interpretations of the federal antitrust statutes").  ***New Hampshire***: N.H. Rev. Stat. §
356:14 ("In any action or prosecution under this chapter, the courts may be guided by
interpretations of the United States' antitrust laws.").  ***New York***: *Annheuser-Busch, Inc. v.
Abrams*, 71 N.Y.2d 327, 339 (N.Y. Super. Ct. 1988) ("the Donnelly Act - often called a
'Little Sherman Act' - should generally be construed in light of Federal precedent and given
a different interpretation only where State policy, differences in the statutory language or the
legislative history justify such a result").  ***Tennessee***: *Leech v. Levi Strauss & Co*., 1980 WL
4696 *2 n.2 (Tenn. Ch. Ct. 1980) ("[a]uthorities which define the character of private
damages under the federal antitrust statutes, particularly the Sherman Act, are most
persuasive").  ***Utah***: Utah Code Ann. § 76-10-926 ("in construing this act, [courts] will be
guided by interpretations given by the federal courts to comparable federal antitrust statutes
and by other state courts to comparable state antitrust statutes").  ***West Virginia***: *Kessel v.
Monongalia County General Hosp. Co*., 648 S.E.2d 366 (W. Va. 2007) (state courts are to
apply the federal decisional law interpreting the Sherman Act to parallel West Virginia
antitrust statute).

[9]  ***Iowa***:  Iowa Code § 53.2 ("This chapter shall be construed to complement and be harmonized
with the applied laws of the United States which have the same or similar purpose as this
chapter. This construction shall not be made in such a way as to constitute a delegation of
state authority to the federal government, but shall be made to achieve uniform application of
the state and federal laws prohibiting restraints of economic activity and monopolistic
practice").  ***Nevada***: Nev. Rev. Stat. Ann. § 598A.050 ("The provisions of this chapter shall
be construed in harmony with prevailing judicial interpretations of the federal antitrust
statutes").  ***New Mexico***: N.M. Stat. Ann. § 57-1-15 ("the Antitrust Act shall be construed in
harmony with judicial interpretations of the federal antitrust laws.  This construction shall be
made to achieve uniform application of the state and federal laws prohibiting restraints of
trade and monopolistic practices").  ***Vermont***: Vt. Stat. Ann. t. 9 § 2461(c) (the antitrust
statutes "will be guided by similar terms contained in the federal anti-trust law as construed
by the courts of the United States as amended by Congress"); *see also* Vt. Stat. Ann. t. 9 §
2451 ("the purpose of this chapter is to complement the enforcement of federal statutes and
decisions governing unfair methods of competition…").  ***West Virginia***: W. Va. Code § 47-
18-16 (providing that the Act shall be construed "in harmony with ruling judicial
interpretations of comparable federal antitrust statutes").

Court, for example, has not adopted the *AGC* test, but has made it clear that "[s]tanding under Minnesota antitrust law must be defined by some prudential limits informed by foreseeability, proximate cause, remoteness, and relation of the injury to the purposes of antitrust law; otherwise almost any antitrust violation would provide almost any citizen with a cause of action arising from the resulting ripples of harm throughout the state's economy." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 631 (Minn. 2007).[10]

In view of the substantial case law and statutory support, the Court should analyze the IP plaintiffs' federal and state antitrust claims using factors like those that were used in *AGC*. In considering each of these factors, two of these allegations are critically absent from the IP Complaint: First, the IP plaintiffs fail to identify whether they purchased process potatoes or fresh potatoes or in what form they were purchased; second, the IP Complaint does not identify from whom any of the IP plaintiffs purchased potato products. As discussed below, these omissions are legally significant under each of the applicable factors. Consideration of the factors in this case, leads to the conclusion that the IP plaintiffs' state and federal antitrust claims should be dismissed.[11]

---

[10]   *See also, e.g., Teague v. Bayer AG*, 671 S.E. 2d 550, 556-558 (N.C. App. 2009) (declining to apply *AGC* test, but considering whether the injury is of the type to be prevented by statute; the speculative nature of the damages; and causation).

[11]   When a complaint fails to make allegations sufficient to show standing, dismissal is appropriate. *See AGC*, 459 U.S. at 521 (upholding district court's dismissal of complaint because it failed to sufficiently allege that plaintiffs had been "injured in [their] business or property by reason of anything forbidden in the antitrust laws"); *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957, 964-66 (9th Cir. 1999) (upholding district court's dismissal of complaint on the basis that plaintiffs lacked "standing to bring either a RICO or an antitrust claim for damages").

1.     **The IP Plaintiffs have not adequately pleaded
antitrust injury – the first factor.**

The first *AGC* factor considers the extent to which the named plaintiff's injury is

"the type the antitrust laws were intended to prevent. . ." *Am. Ad Management v.*

*General Tel. Co.*, 190 F.3d 1051,1057 (9th Cir. 1999).  In order to make the requisite

showing of antitrust injury, "'the injured party [must] be a participant in the same market

as the alleged malefactors.'" *Ass'n of Washington Public Hosp. Districts v. Philip*

*Morris, Inc.* 241 F.3d 696, 704-05 (9th Cir. 2001) (*quoting Bahn v. NME Hospitals, Inc.*,

772 F.2d 1467, 1470 (9th Cir. 1985)).

Here, the IP plaintiffs' cookie-cutter allegations are inadequate to determine whether the

IP plaintiffs are participants in the relevant market.  As to each IP plaintiff, the IP Complaint

recites the same mantra:  "Plaintiff [  ] is a resident of [the state].  This Plaintiff purchased fresh

and/or process potatoes in [the state] for [his/her] own personal consumption during the relevant

Class Period and was injured as a result of Defendants' illegal conduct."[12]  These allegations are

too sparse and vague to identify the relevant market.

First, the IP plaintiffs do not plead what they actually purchased.  Instead, the IP

Complaint alleges that each plaintiff purchased "fresh ***and/or*** process potatoes."[13]  The IP

Complaint uses both the conjunctive and the disjunctive.  Thus, from the pleadings, it is

impossible to know if any of the IP plaintiffs bought fresh potatoes.  Likewise, it is impossible to

know whether any of the IP plaintiffs purchased process potatoes.  *See Gen-Probe, Inc. v. Amoco*

*Corp., Inc.*, 926 F.Supp. 948, 962 (S.D. Cal. 1996) ("Filing a patent infringement action pointing

vaguely to 'products ***and/or*** kits' … does not provide adequate notice as required by the Rules,

---

[12]    IP Compl. ¶¶ 15- 28.

[13]    IP Compl. ¶¶ 15- 28 (emphasis added).

and does not reflect the reasonable inquiry required by the Rules") (emphasis added).  Second, the IP Complaint does not allege from whom the IP plaintiffs allegedly purchased the potato products.

Thus, one is left to imagine whether they purchased french fries from McDonald's as a component of a Happy Meal, potato chips from 7-11, fresh potatoes from Walmart, hash-browns accompanying a breakfast from a main street cafe, or a baked potato as a "side" at a steakhouse. These omissions are legally significant.  If, for instance, an IP plaintiff purchased a potato product as part of a meal at a fast food restaurant, it is likely he/she paid a bundled price for a meal that included not only the potato product, but also a sandwich, a beverage, and possibly even a children's toy.  In other words, the potato product would merely be a component of the meal as a whole.  By purchasing the potato product as a side to a meal, the IP plaintiff would not be participating in the allegedly restrained market; rather he/she would be participating in a secondary market.  *See Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1299-1300 (S.D. Cal. 2009) (indirect plaintiff's action dismissed because of failure to allege injury sufficient to confer standing when basis for injury was passing costs as component of the product down to vendors and eventually to consumers); *DRAM*, 516 F. Supp. 2d at 1090-91 (finding first *AGC* factor weighed against standing because plaintiffs "who are purchasing products in which DRAM is a component, rather than DRAM itself, are participating in a secondary market that is incidental to the primary price-fixed market…").

Without allegations detailing the IP plaintiffs' alleged purchases, the IP Complaint does not adequately allege that they are market participants, precisely because a market is not adequately identified.  "Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."

969433\15

*Am. Ad Mgmt. Inc.,* 190 F.3d at 1057.  The IP plaintiffs' allegations are simply too ambiguous to tell whether they are market participants, and, therefore, they have not alleged antitrust injury. Accordingly, the first factor favors dismissal.

> **2.     The IP plaintiffs have not adequately pleaded that the injuries they allegedly sustained and the anticompetitive conduct at issue are sufficiently causally related – the second factor.**

The second factor examines the directness of the alleged harm to the supposed antitrust violation.  In performing this analysis, a court should focus on the chain of causation.  Where links in the chain are only "vaguely defined," the claim is suspect.  *AGC*, 459 U.S. at 540.

*In re Potash Antitrust Litigation* is instructive. 667 F. Supp. 2d 907 (N.D. Ill. 2009) ("*Potash*").  In *Potash*, purported classes of direct and indirect purchasers sued producers for price-fixing.   Potash is used principally as an agricultural fertilizer, but is also used in the production of glass, ceramics, soaps, and animal feed supplements.  *Id*. at 915.  The indirect purchaser plaintiffs alleged that they had been injured by paying more for products purchased indirectly from the co-conspirators.  However, the court held that because the illegal ends of the conspiracy could be achieved without injury to the indirect purchasers, the alleged injury to the indirect purchasers was too remote to sustain a claim.  *Id*. at 939.  The court explained:  "the injury suffered by the Indirect Purchaser Plaintiffs is not alleged to be an integral part of the alleged price-fixing conspiracy.  *Id*. "At most," the court continued,

> Indirect Purchaser Plaintiffs alleged a general causal relationship between their injury and the alleged anticompetitive activity.  Any injury they have suffered in the fertilizer market is not alleged to be a necessary step in furthering the ends of the conspiracy involving the market itself.  Thus, Indirect Purchaser Plaintiffs have failed to show they are participants in the relevant market, and, as a result, have not satisfied the antitrust injury requirement.

*Id.* at 939-40.

Even if the IP plaintiffs in this case had alleged that their purported injury was a necessary step, they would still have to show sufficient "directness" between their injury and the alleged conspiracy.  *Id*. at 940.  In determining directness, the Court should consider two factors: "(1) the chain of causation alleged by the plaintiffs; and (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement."  *Id*. at 940 (*citing AGC*, 459 U.S. at 540-42).

In the present case, the IP plaintiffs have not alleged that their injury is necessary to the alleged conspiracy.  They have failed to plead ***any*** links to the relevant direct purchaser market. They have failed to identify whether they purchased fresh or process potatoes and in what form they were purchased.  They have failed to identify who produced the potato products that they allegedly purchased and even, whether the producer is a defendant.  Instead, they draw a straight line from the defendant growers' farms to their tables without identifying any intermediate or intervening economic actors.  The IP Complaint makes no allegations from which one could reasonably infer the number, nature, and variety of production, processing, distribution, and sales channels between the may have been involved in a potato's journey from seed to plaintiffs' stomachs.

Whether the product actually purchased was the subject of the alleged restraint is a significant factor.  As discussed above, based on the IP plaintiffs' pleadings, one is left to surmise which products they allegedly purchased -- be it potato chips, fresh potatoes, potato vodka, french fries, gnocchi, or *au gratin* potato mix --  and whether they were purchased in isolation or as a mere component of a meal containing other products.  "Purchasers who buy the product which is subject of the restraint are more likely to show sufficiently direct injury than those who purchase a product with a component which is the subject of the restraint." *Crouch v.*

*Crompton Corp.,* 2004 WL 2414027 at *19 (N.C. Super. Ct., Oct. 28, 2004); *see also DRAM*, 516 F. Supp. 2d at 1092.[14]

The IP plaintiffs in this case are not a necessary object of the alleged scheme.  The IP plaintiffs do not allege a chain of causation sufficient to demonstrate the link between the alleged anticompetitive conduct and their injury.  Moreover, the indirect purchasers are not the appropriate class of interested persons to vindicate the public interest in prosecuting the alleged scheme.  The IP plaintiffs have not alleged direct injury in the relevant market sufficient to sustain their claims.  The second factor favors dismissal.

### 3. The damages the IP plaintiffs' allegedly suffered are speculative and difficult to calculate – the third and fourth factors.

The next two factors evaluate whether a plaintiff's damages are speculative and whether it would be unduly difficult to calculate the alleged damages.  These two factors can be examined together.  *See, e.g., In re Online DVD Rental Antitrust Litig.*, 2009 WL 4572070 *8 (N.D. Cal. Dec. 1, 2009) ("The remaining *AGC* factors at issue here--the speculative nature of plaintiff's harm, and the complexity of apportioning damages--also tilt decidedly against standing.); *DRAM*, 516 F. Supp. 2d at 1092 ("The final three factors can be considered together-- the speculative nature of the harm, the risk of duplicative recovery, and the complexity in apportioning damages").  Damages may be speculative or difficult to apportion either because

---

[14] As *DRAM* observed with respect to the product at issue in that case: "It requires no leap of logic to conclude that each product in which DRAM is a component, contains numerous other components, all of which *collectively* determine the final price actually paid by plaintiffs for the final product. In other words, the price for the actual product paid by plaintiffs is reflective of much more than just the component price for DRAM. Yet plaintiffs' complaint sets forth no allegations that demonstrate that, within the final purchase price of a given product purchased by plaintiffs for 'end use,' the ultimate cost of the DRAM component is somehow directly traceable and/or distinguishable. Seen from this viewpoint, ***the directness of plaintiffs' injury-with respect to those who purchased DRAM as a component product-is too remote to warrant tipping this factor in favor of standing.*** *Id.* at 1092 (emphasis added).  That logic applies here.

(1) the alleged antitrust violation is only indirectly related to the alleged injury, or (2) because independent factors other than the overcharge far upstream from the product purchased by the plaintiff influence the price that the plaintiff paid.  *AGC*, 459 U.S. at 542-544.

Both problems are present here.  Because the IP plaintiffs do not identify what products they purchased, or from whom, their alleged damages could be based on innumerable factors other than the alleged misconduct including, for instance, whether the potato product was sold by a restaurant as a component of a meal whose price included other costs, including other food, packaging, and service, to name a few.  In some, if not most, of such cases, the potato product – say, a side of potato chips – may comprise only a small portion of the cost to the restaurant to make the meal.  It is left to pure speculation as to whether a rise in potato product prices generally would be passed on to consumers inasmuch as other portions of the meal could be cost-determinative.  *See Crouch*, 2004 WL 2414027 at *24 ("[t]he smaller the component, the less likely there will be impact on the final price").

Such speculation makes it all but impossible to reasonably calculate damages.  This is all the more evident when one considers the fact that within the states identified in the IP plaintiffs' would-be class action, there are undoubtedly many thousands of restaurants -- many with their own business and operational models.  *AGC*, 459 U.S. at 542 (damages speculative where alleged injury was indirect and alleged damages "may have been produced by independent factors"); *DRAM,* 516 F. Supp. 2d. at 1092-93 (describing injury as unduly speculative and damages difficult to apportion where plaintiffs purchased allegedly price-fixed product was a component of a variety of finished products).   Because the IP plaintiffs' alleged damages are so speculative and too difficult to calculate, these factors support dismissal.

**4.      Permitting the IP plaintiffs to go forward with their claims unreasonably raises the risk of duplicative damages – the fifth factor.**

Finally, the IP plaintiffs' claims should not be allowed to proceed because the risk of duplicative recoveries is too great.  If the IP plaintiffs are allowed to proceed with their claims and in the unlikely event that they prevail, duplicative recovery is a near certainty because the direct purchaser plaintiffs already have an action pending before this Court arising out of the same putative "bad" acts.  *AGC*, 459 U.S. at 542 ("The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party" to recover).

Under *Illinois Brick,* 431 U.S. at 746, the direct purchaser plaintiffs would seek to recover the full amount of any overcharge proven at trial regardless of whether they absorbed the full amount.  Thus, any damages awarded to the IP plaintiffs would be duplicative.  The potential for an excessive and unwarranted recovery is magnified by the fact that the claims of the IP plaintiffs' state antitrust claims have treble damage provisions.  Conceivably, the defendants could face exposure to "sextuple" damages.  *AGC*, 459 U.S. at 551 (*citing* II P. AREEDA & D. TURNER, ANTITRUST LAW § 337d (1978)) ("Permitting two recoveries based on the very same injuries would be contrary to the basic statutory scheme governing damage actions, for the result would be to subject antitrust defendants to sextuple-damage awards rather than the treble-damage awards that Congress contemplated").  The risk of duplicative recovery strongly supports the conclusion that the IP plaintiffs' antitrust claims should be dismissed.

In sum, all of the factors discussed above militate towards dismissal.  The IP Complaint's allegations concerning antitrust standing establish that the causal connection between the defendants' alleged unlawful activity and the IP plaintiffs' injury is too attenuated and remote. In addition, the IP plaintiffs' damages are speculative and too difficult to calculate.  Finally,

allowing the IP plaintiffs' claims to go forward poses a serious risk of duplicative and grossly excessive recovery.  Because all of the *AGC* factors favor the defendants, the IP plaintiffs' state and federal antitrust claims should be dismissed.

### III.  CONCLUSION

The important statutory policy which establishes the rights of farmers to engage in collective activity is global in application.  It does not just exempt farmers from federal antitrust liability.  It is a shield to all of the IP plaintiffs' state law claims.  By definition, the state law claims advanced by the IP plaintiffs seek to restrict the rights of farmers in contravention of the express meaning of Capper-Volstead.  Because they run afoul of federal law, all of the IP plaintiffs' state law claims are barred by the Supremacy Clause.

The IP plaintiffs' claims are barred on additional grounds.  The claims asserted under the laws of District of Columbia, Kansas, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, Utah and West Virginia should be dismissed.  Plaintiffs are not citizens of those states, did not suffer injury in those states, and have no standing to recover damages under the laws of those states.

Finally, the IP plaintiffs' antitrust claims are barred because their claims are far too remote and speculative to establish standing.  Under the factors analysis, the IP plaintiffs cannot establish standing for their state or federal antitrust claims.

For these reasons, the defendants respectfully request that the Court dismiss the all of the IP plaintiffs' state and federal law claims asserted against the defendants.

969433\15

Respectfully submitted on this 18th day of March, 2011.


By:      /s/ James S. Lowrie
         JONES WALDO HOLBROOK & MCDONOUGH PC
         James S. Lowrie
         Andrew G. Deiss
         Billie J. Siddoway

         HOLLAND & HART LLP
         James E. Hartley
         Steven B. Andersen

         PORTER WRIGHT
         Donald M. Barnes
         Salvatore A. Romano

         *Counsel for United Potato Growers of Idaho, Inc.;*
         *United Potato Growers of America, Inc.; United II*
         *Potato Growers of Idaho, Inc.; Albert Wada; Wada*
         *Farms, Inc.; Wada Farms Potatoes, Inc.; Wada-Van*
         *Orden Potatoes, Inc.; Wada Farms Marketing Group,*
         *LLC; Michael Cranney; Keith Cornelison;*
         *Cornelison Farms, Inc.; Snake River Plains Potatoes,*
         *Inc.; and Raybould Brothers Farms LLC*