Philip Gordon, Esq. (ISBN 1996)
Bruce S. Bistline, Esq. (ISBN 1988)
GORDON LAW OFFICES
623 W. Hays Street
Boise, Idaho 83702
Phone: (208) 345-7100
Fax: (208) 345-0050
pgordon@gordonlawoffices.com
bbistline@gordonlawoffices.com

[Additional Counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## EASTERN DIVISION

| | |
|---|---|
| IN RE FRESH AND PROCESS POTATOES ANTITRUST LITIGATION<br><br>———————————————<br><br>THIS DOCUMENT RELATES TO:<br><br>*Brigiotta's Farmland Produce and Garden Center, Inc. v. United Potato Growers of Idaho, Inc., et al.*; Case No. 4:10-cf-00307 BLW | Civil Case No. 4:10-md-02186 BLW<br><br>MDL No. 2186<br><br>**PLAINTIFF BRIGIOTTA'S FARMLAND PRODUCE AND GARDEN CENTER, INC.'S MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS NOS. 72 (R.D. OFFUT CO.), 73 (PLEASANT VALLEY POTATO, INC.), 75 (BLAINE LARSEN, BLAINE LARSEN FARMS, INC., DRISCOLL POTATOES, INC. AND RIGBY PRODUCE INC.), 76 (POTANDON PRODUCE L.L.C.), 77 (IDAHOAN FOODS, LLC), 79 (CERTAIN DEFENDANTS AND DEFENDANT ASSOCIATIONS) AND 88 (DOLE FOOD COMPANY, INC. AND DOLE FRESH VEGETABLES, INC.) DATED MARCH 18, 2011** |

## TABLE OF CONTENTS

Table of Authorities ....................................................................................................... iii

I.      Introduction ............................................................................................................1

II.     Statement Of Facts ................................................................................................2

        A.      The Formation, Creation And Purpose Of UPGI – A Regional Vehicle For The
                Conspiracy .................................................................................................5

        B.      UPGI Supply Manipulation Schemes ........................................................7

                1.      Acreage Management And Bid Buy-Down Program ..................7

                2.      Secondary Market Strategies ......................................................8

                3.      The Dehydration Scheme – Specialized Supply Diversion ........9

        C.      Nationwide Expansion Of The Conspiracy:  The Creation Of UPGA ..................9

        D.      UPGA Supply Manipulation Schemes.....................................................11

        E.      Policing The Conspiracy And Doling Out Punishment ...........................13

        F.      The Success Of The Conspiracy ..............................................................13

III.    Legal Argument ...................................................................................................15

        A.      The Complaint States A Claim Against Each Defendant That Challenges The
                Sufficiency Of The Allegations Under The Applicable Legal Standards.............15

        B.      The Complaint States A Claim Against Each "Grower Defendant" ....................20

        C.      The Dehydration Defendants Used A Joint Venture To Illegally Raise Prices And
                Manage Supply As Part Of The Overall Conspiracy..............................26

                1.      The Establishment and Operation Of The Dehydration Scheme..............26

                2.      The Complaint States A Claim Against Each "Dehydration
                        Defendant" .................................................................................28

                        a.      United II .............................................................................28

                        b.      R.D. Offutt .........................................................................30

                        c.      Idahoan Foods....................................................................32

        D.      Potandon Produce LLC, The Sales And Marketing Defendant...........................35

i

        1.      Potandon Is Not Peripheral To The Conspiracy ........................................35

        2.      The DPP Has Plausibly Alleged That Potandon Directly Violated The Prohibitions Of The Sherman Act...............................................................37

        3.      Potandon Conspired As An Agent Of Its Owner-Growers......................38

                a.      Knowledge, Intention and Material Contribution To The Conspiracy ...................................................................................39

                b.      Control By Six Grower-Owners ...................................................39

                c.      The Single Entity Theory...............................................................42

        4.      Neither The CVA Nor The CMA Exempt Potandon From Section One Liability......................................................................................................43

    E.      The Dole Defendants' Liability Arises Out Of Their Long Term, Cooperative Relationship With The Wada Defendants............................................................46

        1.      The Dole-Wada Relationship.....................................................................46

        2.      The DPP Has Sufficiently Pled The Dole Defendants' Participation In The Antitrust Conspiracy ................................................................................48

        3.      Assuming, *arguendo*, That The Dole Defendants Are Not Primarily Liable For The Conspiracy, They Are Vicariously Liable For The Conspiratorial Acts Of The Wada Defendants ...............................................................50

IV.    Conclusion .....................................................................................................53

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Dairy Farmers of America, Inc*., 748 F. Supp. 2d 323 (D. Vt. 2010) ................ 45, 50, 51

*Agitronics Corp.*, Civ. No. 94-0066, 1994 WL 542203 (N.D.N.Y. Sept. 22, 1994) ................... 45

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982).......................... 58, 59

*Ariz. v. Maricopa County Medical Soc.*, 457 U.S. 332 (1982) ..................................................... 39

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ................................................................. 25, 34, 40, 59

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................ *passim*

*Bowoto v. Chevron Texaco Corp.*,
    312 F. Supp. 2d 1229 (N.D. Cal. 2004) ..................................................................................... 49

*Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306 (D.C. Cir. 2010)................................................. 38

*City of Livonia Employees' Retirement Sys.v. Syeth*,
    No. 07 Civ. 10329(RJS), 2010 WL 3910265, (S.D.N.Y.Sept. 29, 2010)................................ 56

*Copperweld Corp.* v. *Independence Tube Corp.*, 467 U.S. 752 (1984)................................. 42, 43

*County of Stanislaus v. Pacific Gas & Elec. Co.*,
    No. CV-F-93-5866-OWW, 1994 WL 706711 (E.D. Cal. Aug. 25, 1994) ............................... 49

*Dauven v. U.S. Bank Nat. Ass'n*, CV 09-1471-PK, 2010 WL 5141275 (D. Or. Nov. 8, 2010),
    *report and recommendation adopted* at 2010 WL 5128256 (D. Or. Dec. 9, 2010) ................ 60

*Dextone Co. v. Building Trades Council*, 60 F.2d 47 (2d Cir. 1932) ........................................... 39

*Dion LLC v. Infotek Wireless, Inc.*,
    No. C 07-1431 SBA, 2007 WL 3231738 (N.D. Cal. Oct. 30, 2007)........................................ 50

*Dunlap v. BellSouth Telecommunications, Inc.*,
    431 F.Supp.2d 1210 (M.D. Ala. 2006) ................................................................................... 56

*E.I DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resmin Intermediates, S.A.S.*, 269
    F.3d 187 (3d Cir. 2001)............................................................................................................ 59

*Edwards v. Thompson*, 336 N.W.2d 612 (N.D. 1983)................................................................. 41

*Federal Election Comm'n v. NRA Political Victory Fund,* 513 U.S. 88 (1994) .......................... 58

*Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996)........................................... 61

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir.), *cert. denied*, 540 U.S. 940
    (2003).................................................................................................................. 51, 52

*Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948 (S.D. Cal. 1996)......................................... 35

*Gilbert v. Concerta Health Servs., Inc.*,
    No. 03:07-CV-00264-LRH-VPC, 2008 WL 318356 (D. Nev. Jan. 31, 2008) ......................... 50

*Greenberg v. Sala,*
822 F.2d 882 (9th Cir. 1987) ............................................................................ 50

*GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 274 (D.D.C. 1998) ................ 37

*Hamm v. United States*, 483 F.3d 135 (2d Cir. 2006) .................................................. 58

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*,
328 F.3d 1122 (9th Cir. 2003) ............................................................................ 49

*Hernandez v. Hilltop Fin. Mortgage, Inc.*, 622 F.Supp.2d 842 (N.D. Cal. 2007). ...................... 50

*Hinds County, Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378 (S.D.N.Y. 2010) ........... 25, 26

*Howard v. GAP, Inc.*,
No. C 06-06773 WHA, 2007 WL 164322,  (N.D.Cal. Jan. 19, 2007) ...................................... 56

*In re ATM Fee Antitrust Litig.*,
233 F.R.D. 542 (N.D. Cal. 2005) .......................................................................... 56

*In re Blood Reagents Antitrust Litig.*,
No. 09-2081, 2010 WL 3364218 (E.D. Pa. Aug. 23, 2010) .................................................. 28

*In re Cathode Ray Tube Antitrust Litig.*,
No. CV 07-5944 SC, 2010 WL 3632775 (N.D. Cal. March 30, 2010) ............................ 27, 37

*In re Fine Paper Antitrust Litig.*, 82 F.R.D. 143 (E.D. Pa. 1979) .................................. 37

*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) ...................... 25, 34

*In re Flat Glass Antitrust Litig. (II)*, No. 08-mc-180, 2009 WL 331361 (W.D. Pa. Feb. 11, 2009)
............................................................................................................ 34

*In re OSB Antitrust Litig.*,
Master File No. 06-826, 2007 WL 2253419 (E. D. Pa. Aug. 3, 2007) ................................... 25

*In re Pa. Title Antitrust Litig.*, 648 F. Supp. 2d 663 (E.D. Pa. 2009) ............................ 43

*In re Potash Antitrust Litig.*,
667 F.Supp.2d 907 (N.D. Ill. 2009), ..................................................................... 28

*In re Pressure Sensitive Lablestock Antitrust Litig.*, 566 F.Supp.2d 363 (M.D.Pa.2008) ........... 28

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
587 F.Supp.2d 27 (D.D.C. 2008) ........................................................................... 28

*In re Rubber Chemicals Antitrust Litig.*,
504 F. Supp. 2d 777 (N.D. Cal. 2007) ..................................................................... 25

*In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777 (N.D. Cal. 2007) ...................... 25

*In re South African Apartheid Litig.*,
617 F. Supp. 2d 228 (S.D.N.Y. 2009) ...................................................................... 49

*In re Southeastern Milk Antitrust Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008) .................................................................... 28

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D.
Cal. 2008 .......................................................................................... 26, 27, 37

*In re Wholesale Grocery Prods. Antitrust Litig.*,
No. 09-MD-2090 ADM/AJB, 2010 WL 2710680 (D. Minn. July 7, 2010) ............................ 28

*Industrial Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336 (9ᵗʰ Cir. 1970) .............. 39

*Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1263 (11th Cir. 2004) ...................................... 35

*Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042 (9th Cir. 2008) ................................ 26, 27, 34, 35, 46

*Kline v. Coldwell Banker & Co.*, 508 F.2d 226 (9th Cir. 1974) ................................................. 34

*Knevelbaard Dairies v. Kraft Foods*, 232 F.3d 979 (9th Cir. 2000) ........................................... 29

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) .......................................................... 47

*Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877 (2007) ......................................... 29

*Lucas v. Citizens Comm. Co.*, 409 F. Supp. 2d 1206 (D. Haw. 2005), *aff'd*, 244 F. Appx. 774
(9th Cir. 2007) .......................................................................................................................... 57

*Magluta v. Samples*, 256 F.3d 1282 (11th Cir. 2001) ................................................................ 35

*Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011) ......................................... 10, 47

*McIntosh v. Monsanto Co.*, 462 F. Supp. 2d 1025 (E.D. Mo. 2006) .......................................... 59

*Mitchael v. Intracorp, Inc.*, 179 F.3d 847 (10th Cir. 1999) ............................................... 42, 43

*Monsanto Co. v Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984) .................................................. 59

*Morningstar Holding Corp. v. G2, LLC*, No. CV-10-439-BLW, 2011 WL 864300
(D. Idaho Mar. 10, 2011) ............................................................................................. 25, 34, 40

*Movie 1 & 2 v. United Artists Comm., Inc.*, 909 F.2d 1245 (9th Cir. 1990) .............................. 47

*NCAA v. Bd. Of Regents*, 468 U.S. 85, 100 (1984) .................................................................... 30

*Nobody in Particular Presents, Inc. v. Clear Channel Comms.*, 311 F. Supp. 2d 1069 (D. Colo.
2004)). ....................................................................................................................................... 43

*Northern California Supermarkets, Inc. v. Central California Lettuce Producers Coop.*, 413 F.
Supp. 984, 994 (N.D. Cal. 1976), *aff'd per curiam*, 580 F.2d 369 (9th Cir. 1978) .................. 53

*Palmer v. BRG of Georgia, Inc*., 498 U.S. 46 (1990) ................................................................ 29

*Rick-Mik Enters. v. Equilon Enters.*, 532 F.3d 963 (9th Cir. 2008) ............................................ 42

*Robertson v. Sadjak*, No. CV-09-136-S-BLW, 2010 WL 1418393 (D. Idaho Apr. 7, 2010) ...... 29

*Rollins v. Maui Dreams Dive Co.*, Civ. No. 10-00336, 2011 WL 1299688 (D. Haw. Mar. 31,
2011) ) ...................................................................................................................................... 49

*Ross v. Coleman Co.*, 761 P.2d 1169 (Idaho 1988) ................................................................... 41

*SPW Assocs. v. Anderson**, 718 N.W.2d 580 (N.D. 2006) ......................................................... 43

*Standard Iron Works v. ArcelorMittal*, 639 F.Supp.2d 877 (N.D.Ill. 2009) .......................... 28, 34

*Starr v. Sony BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010), *cert. denied*, 131 S.Ct.
901 (2011) ................................................................................................................... 25, 27, 46

*Stecyk v. Bell Helicopter Textron., Inc.*, No. 94-cv-1818, 1998 U.S. Dist. Lexis 17668 (E.D. Pa.

Nov. 9, 1998) ............................................................................................................. 41

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166 (N.D. Cal. 2009)
............................................................................................................................... 47, 49

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co.*, 370 U.S. 19 (1962) ..................... 38

*The Jeanery, Inc. v. James Jeans, Inc.*, 849 F. 2d 1148 (9th Cir. 1988) ...................................... 59

*Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978 (9th Cir. 2001 ................................................... 41

*Treasure Valley Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203 (9th Cir.), *cert. denied*,
419 U.S. 999 (1974) .................................................................................................... 44

*U.S. ex rel. McCurdy v. Gen. Dynamics Nat. Steel & Shipbuilding (NASSCO)*, 07CV982 BTM
CAB, 2010 WL 3463675 (S.D. Cal. Aug. 31, 2010) ......................................................... 60, 61

*U.S. ex rel. Thomas v. Siemens AG*, Civ. No. 09-4414, 2010 WL 1711775 (E.D. Pa. Apr. 26,
2010) ........................................................................................................................ 59

*United States v. Andreas*, 216 F.3d 645 (7th Cir.) ....................................................................... 30

*United States v. Hilton Hotels Corp.*,
467 F.2d 1000 (9th Cir. 1972) ................................................................................... 49

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) ................................................... 30

*v. E\*Trade Mortg. Corp.*, 514 F.3d 1001 (9th Cir. 2008) ........................................................ 28

*Visa U.S.A., Inc. v. First Data Corp.*, Civ. No. 02-01786, 2006 WL 516662 (N.D. Cal. Mar. 2,
2006) .............................................................................................................. 26, 51, 52

*Wheat v. Kinslow,* 316 F. Supp. 2d 924 (D. Kan. 2003) .............................................................. 40

**Statutes**

7 U.S.C. §§ 291-92 ....................................................................................................................... 52

7 U.S.C. § 455 ............................................................................................................................... 52

7 U.S.C. § 457 ............................................................................................................................... 54

15 U.S.C. § 1 ................................................................................................................................. 28

**Other Authorities**

Buzz Shahan, *The facts about supply management*, UPGA, Mar. 4, 2011,
http://www.unitedpotatousa.com/publications_and_news/. ..................................................... 13

Christine Varney (Assistant Attorney General of the Antitrust Division at the U.S. Department of
Justice), *The Capper-Volstead Act, Agricultural Cooperatives and Antitrust Immunity*
ANTITRUST SOURCE, Dec. 2010, at 2 n.10 .............................................................................. 53

Dole 2010 10-K........................................................................................................................ 56, 59

Kim Wahlen Works Hard in Industry He Grew Up In," *Spudman Magazine* (Jan. 2006)
(available at http://spudman.com/ index.php/magazine/article/Kim-Wahlen-Works-Hard-In-
Industry-He-Grew-Up-In) .................................................................................................... 33

The Full Story, http://www.potandon.com/fullstory.htm) ......................................................... 46

WEBSTER'S NEW COLLEGIATE DICTIONARY, 1953 ed. ................................................... 44

www.dole.com/CompanyInformation/AboutDole/Philosophy/tabid/1294/Default.aspx ....... 56, 58

www.wadafarms.com/dole.html ............................................................................................... 56

**Rules**

Fed. R. Civ. P. 8 ................................................................................................................. 24, 26

Fed. R. Civ. P. 12(b) ............................................................................................................... 59

**Treatises**

11 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1910 (3d ed. 2006) ................ 30

7 Herbert Hovenkamp & Phillip E. Areeda, FUNDAMENTALS OF ANTITRUST LAW ¶ 1474c (3d ed. Supp. 2009) ...................................................................................................................... 48

RESTATEMENT (THIRD) OF AGENCY § 7.01 (2006) ...................................................................... 58

W. Keeton, PROSSER & KEETON ON TORTS, § 72 at 518 (5th ed. 1984) ....................................... 41

## I.   __INTRODUCTION__

This action involves a nationwide conspiracy that has transformed the multi-billion dollar potato industry into a monolithic price-fixing cartel.  Beginning in 2004, potato growers and shippers came together to form cooperatives, not to sell or market potatoes, but to unlawfully manipulate their supply and increase profits.  *See generally* Direct Purchaser Plaintiff's "First Amended Class Action Complaint" (Dec. 13, 2010) (Dkt. No. 39) ("Complaint" or "CAC").  The conspiracy quickly spread to nearly the entire potato industry.  Remarkably, Defendants do not deny the conspiracy; instead, in statements detailed in the Complaint and in their moving papers, Defendants admit to participating in many of the conspiracy's main components.

Nevertheless, by improperly isolating allegations in the Complaint and misconstruing applicable case law, each Defendant argues that it should be dismissed from this case.[1] Defendants do so through misreading the Complaint and misconstruing applicable case law.  The Complaint describes the conspiracy in explicit detail and provides factual allegations that allow this Court to draw the reasonable inference that each Defendant has indeed participated in the conspiracy.  This is sufficient to defeat each Defendant's motion to dismiss.

Defendants also argue that recent Supreme Court decisions and related case law have substantially raised the bar for surviving a motion to dismiss.  Defendants are mistaken.  As a unanimous Supreme Court recently stated, in order to defeat a motion to dismiss, a plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 n.12 (2011) ("*Matrixx*") (quoting *Bell Atlantic*

---

[1] All Defendants except Pleasant Valley Potato, Inc. also move to dismiss based on the erroneous belief that they are entitled to immunity under the Capper-Volstead Act (7 U.S.C. §§ 291-92) ("Capper-Volstead" or the "Act").  The Complaint, in paragraphs 249-322, and the concurrently-filed brief in opposition to Defendants' motion, detail and explain why Defendants are not entitled to the limited protection of the Act.

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("*Twombly*")).[2]  The Complaint comfortably meets this threshold and sufficiently alleges that each Defendant agreed to fix the price of potatoes.

## II.   <u>STATEMENT OF FACTS</u>

The Complaint describes in extraordinary detail how the potato cartel successfully raised prices by limiting supply, leaving little to the imagination.  Beginning in 2004, the conspiracy united industry members first in Idaho and soon after across North America.  ¶¶ 162-76.[3] Defendant-participants include two extremely powerful cooperatives, United Potato Growers of Idaho, Inc. ("UPGI") and United Potato Growers of America, Inc. ("UPGA"), which created and continue to effectuate the conspiracy through frequent meetings and hands-on coordination of production and marketing to stringently control potato supply.  ¶¶ 12-26.  Defendants also include individual growers and national produce companies, as well as marketing and shipping agencies that work as agents of these growers and produce companies.  ¶ 1.

The potatoes conspiracy constitutes a classic cartel and a *per se* violation of Section 1 of the Sherman Act's prohibition on conspiracies "in restraint of trade," 15 U.S.C. ¶1.  ¶ 329.  The conspiracy employs numerous methods to manage potato supply in order to manipulate prices.  ¶ 200.  The primary method involves yearly acreage reduction rules, wherein cooperatives tell members to cut production by an agreed-upon percentage.  ¶¶ 162, 183, 187, 228.  Defendants' acreage reduction program is bolstered by an acreage buy-down program, where growers agree to limit their crop in exchange for compensation.  ¶ 183, 188, 201, 205.  The conspiracy also employs secondary market schemes, including "donations" of potatoes to charities, "shipping holidays," and controlling the flow to market of potato supply (called "flow control").  ¶¶ 22,

---

[2] The Court has stated that it is fully familiar with the *Twombly* standard (transcript of Hearing of December 14, 2010 at 37), so this memorandum endeavors to keep concise its discussion of *Twombly* in the pages that follow.
[3] All paragraph citations are to the Complaint unless otherwise indicated.

186, 189, 214.  Punitive measures are used to punish members who defy these instructions.  ¶ 215, 223.

The conspiracy, from its inception, has been remarkably successful.  ¶ 7.  It has enjoyed near industry-wide participation (¶¶ 222, 266), and potato prices have soared since it began in 2004.  ¶¶ 7, 239-43.  By 2009, prices had remained constant or increased for four consecutive growing seasons, something that had never happened since the United States Department of Agriculture ("USDA") began keeping such records more than a century ago.  ¶ 237.

Defendants, believing erroneously that Capper-Volstead grants them full immunity from the antitrust laws, have participated in the conspiracy in a manner that has been both open and notorious.  ¶ 4.  Defendants admit to engaging in collusion, monitoring and policing the cartel, the impact on prices from the cartel's activities, and applying pressure, such as punitive measures, on co-conspirators who do not go along with the supply management schemes.  ¶ 5. In particular, Defendants' own documents and statements show the following:

- "The law of ECONOMICS will always win and growers will lose if production and supplies are not managed . . . . [Our] STRATEGY?  THE WHOLE PILE OF POTATOES HAS TO BE MANAGED!"  ¶ 211 (quoting a 2006 PowerPoint presentation by Defendant Albert Wada to UPGA) (emphasis in original).

- Pursuant to the Articles of Incorporation of UPGI, the stated purpose of the organization is "to stabilize potato prices and supplies in the State of Idaho and to work with similar cooperatives in other states having similar purposes."  ¶ 171.

- UPGA's stated mission is to "manage national potato supply so as to positively affect grower profitability."  ¶ 14.

- "UPGA has many initiatives and programs in place to manage supply."  ¶ 200 (quoting UPGA's website, although content has since been removed).

- "[T]he [UPGA's] strict code of conduct allows for the use of what its members artfully refer to as 'punitive measures' against anyone who violates the rules."  ¶ 215 (quoting an August 2007 article in *High Country News*).

- "Q. How can you prove that UPGA's efforts to manage supply influenced last year's price?  A. While many factors influence supply, there is no doubt that UPGA's acreage

reduction, acre buy-down, flow-control, and information sharing programs impacted the market." ¶ 238 (quoting a question-and-answer from UPGA's website, although content has since been removed).

- "The primary issue [in this litigation] is whether supply management by [defendant] growers and their cooperatives is covered by the immunities provided by the Capper-Volstead Act." "Potandon Produce L.L.C.'s Motion to Dismiss Amended Class Complaints" at 1 (Mar. 18, 2011) (Dkt. No. 76-1) ("Potandon Mem.").

- "Confronted with the consequences of over-production, unstable prices and the inevitable unpredictability of growing conditions and crop yields, potato growers in Idaho and elsewhere followed the template established by the Capper-Volstead Act and subsequent cases. They formed cooperatives and established a 'supply management' program to address over-production and fluctuating prices in the potato markets – all as permitted by the Clayton Act, the Capper-Volstead Act, and related statutes." "Memorandum In Support of Motion to Dismiss Based on the Capper-Volstead Act And Related Statutes" at 11-12 (Mar. 18, 2011) ("CVA Mem.") (Dkt. No. 85-1).

The potato cartel continues open and unabated, increasing profits for the industry while imposing higher prices on direct purchasers and consumers. ¶¶ 7, 244-45. Indeed, as recently as March of 2011, Buzz Shahan, Chief Operating Officer of Defendant UPGA, bragged on UPGA's website about their success in increasing profits through coordinated supply management:

> Since United Potato Growers of America's inception six years ago with its data-focused supply management, fresh potato growers have enjoyed five profitable years out of the last six. This record is unprecedented. Prior to United's data approach to the market, only once in the last 50 years have fresh potato growers linked together more than two profitable years in a row.
>
> As United has demonstrated, implementing a strong, supply management strategy works. Whenever our members have aggressively managed their plantings and supplies, potato grower profit follows.[4]

Direct-Purchaser Plaintiff Brigiotta's Farmland Produce and Garden Center, Inc. ("DPP" or "Plaintiff") brings this action individually and on behalf of a class consisting of United States

---

[4] Buzz Shahan, *The facts about supply management*, UPGA, Mar. 4, 2011, http://www.unitedpotatousa.com/publications_and_news/.

purchasers of fresh and process potatoes[5] from Defendants from June 18, 2006 until the present.

¶ 1.  DPP has been injured by directly purchasing potatoes at supra-competitive prices from Defendants and unnamed co-conspirators. [6]

A.  THE FORMATION, CREATION AND PURPOSE OF UPGI - A REGIONAL VEHICLE FOR THE CONSPIRACY

Defendant UPGI is a regional cooperative that was founded in November 2004 for the express purpose of "stabiliz[ing] potato prices and supplies in the State of Idaho and to work with similar cooperatives in other states having similar purposes."  ¶¶162-164, 171.

Initially conceived by Defendant Albert Wada[7] in response to declining prices, *id.*, Mr.

---

[5] Process potatoes are those potatoes used for, *inter alia,* processing into french fries, potato chips, canned potatoes, and dehydrated potatoes.  ¶ 147.

[6] The Complaint names 22 Defendants, and each has moved to dismiss.  They include: Cooperative Defendants:  (1) UPGA, (2) UPGI, and (3) United II Potato Growers of Idaho, Inc. ("United II").  Potato Growers, Packers, Marketing Agents, and Licensors Defendants, which most broadly are the Wada Co-Conspirators and the Larsen Farms/Potandon Co-Conspirators. The Wada Co-Conspirators include the Wada Defendants and the Dole Defendants.  The Wada Defendants are (4) Wada Farms, Inc., (5) Wada Farms Potatoes, Inc., (6) Wada-Van Orden Potatoes, Inc., (collectively Defendants 4-6 are "Wada Farms"), (7) Wada-Farms Marketing Group, LLC ("Wada Farms Marketing"), and (8) Mr. Wada (collectively Defendants 4-8 are the "Wada Defendants").  The Dole Defendants are (9) Dole Fresh Vegetables, Inc. ("DFV") and (10) Dole Food Company, Inc. ("DFC").  The Larsen Farms/Potandon Co-Conspirators are (11) Blaine Larsen Farms, Inc. ("Larsen Farms") and (12) Potandon.  Other Grower Defendants:  (13) Michael Cranney (doing business as "d/b/a") Cranney Farms), (14) Cornelison Farms, Inc. ("Cornelison Farms"), (15) Snake River Plains Potatoes, Inc. ("Snake River Plains Potatoes"), (16) Driscoll Potatoes, Inc. ("Driscoll Potatoes"), (17) Lance Funk (d/b/a Lance Funk Farms), (18) Rigby Produce, Inc. ("Rigby Produce"), (19) Pleasant Valley Potato, Inc. ("Pleasant Valley"), (20) Raybould Brothers Farms LLC ("Raybould Brothers Farms"), and (21) RD Offutt Co. ("Offut").  Non-Grower Co-Conspirator (22) Idahoan Foods, LLC (formerly known as North American Foods, LLC) ("Idahoan").  Finally, the Complaint names one non-defendant co-conspirator, Bayer CropScience LLC ("Bayer CropScience").  *See* ¶¶ 12-135.

[7] Defendant Albert Wada is the Chairman and former CEO of Defendant Wada Farms, one of the largest growers and packagers in the industry.  ¶ 35, 37.  Wada Farms has its own marketing arm, Defendant Wada Farms Marketing, and has numerous co-packing relationships with other growers.  ¶ 36.

Wada and Keith Cornelison[8] organized a meeting of Idaho potato farmers in September 2004. At this meeting, 23 Idaho potato growers – representing 60% of the fresh potato market in Idaho and 25% of the fresh potato market in the United States – met in Blackfoot, Idaho to discuss how they could "curb production" and "boost prices." ¶ 167, 169. Ultimately, these same 23 Idaho potato growers founded UPGI and explicitly signed onto the supply reduction and price-fixing scheme alleged in the Complaint. ¶ 170. These founding members include the following Defendants:

- Defendant Albert Wada (of Defendant Wada Farms);

- Defendant Michael Cranney (of Cranney Farms);

- Defendant Lance Funk and Paul Duncan (of Lance Funk Farms);

- Mr. Cornelison (of Defendant Cornelison Farms);

- Blaine Larsen (of Defendant Larsen Farms);

- David Beesley (of Defendant Snake River Plains Potatoes);

- Loraine Driscoll (of Defendant Driscoll Potatoes);

- Dale Mickelson (of Defendant Rigby Produce);

- Jeff Raybould (of Defendant Raybould Brothers Farms); and

- Kim Wahlen (of Defendant Pleasant Valley Potato).

*Id*.

Soon after this initial organizational meeting, UPGI began to advertise its agenda in an effort to broaden its effect beyond Idaho. In October of 2004, it issued a press release discussing UPGI's "supply management" goals and asked that potato growers from around the country, not just Idaho, join together to discuss the formation of additional cooperatives to advance the supply

---

[8] Mr. Cornelison owns Defendant Cornelison Farms, Inc., which grows, packages, and ships fresh potatoes. ¶¶ 95-96.

management agenda.  ¶ 172.  Such a meeting took place on November 3, 2004, in Idaho Falls, Idaho.  At that meeting, Mr. Wada announced UPGI's plans to several hundred potato farmers. Many of these growers in attendance, including Defendant Offutt (the country's largest potato grower with farming operations across eight states), signed on to the plan and agreed to pay annual membership dues between $10,000 and $500,000.  ¶¶ 172-73.

By the December 2004 UPGI meeting, the cooperative encompassed 80% of all Idaho acres dedicated to growing fresh potatoes.  ¶ 174.  UPGI had also executed Memorandums of Understanding ("MOUs") with every potato group in Idaho.  ¶ 176.  The MOUs ensured wide-scale collaboration not only among growers of seed and process potatoes but, in addition, among shippers, lobbyists, and a state-wide bargaining unit for frozen process growers.  ¶¶ 176-180. *By February 2005, UPGI was colluding with the owners of 91% of all Idaho fresh potato acreage*.  ¶ 174.

## B.      UPGI SUPPLY MANIPULATION SCHEMES

The Complaint details how UPGI has used a number of different schemes in order to achieve its supply management and price control objectives.  Its principal tools include (1) acreage management rules and a bid buy-down program; (2) secondary market strategies, including supply diversion and "flow control"; and (3) a dehydration scheme.  *See* ¶¶ 183-90.

### 1.      Acreage Management And Bid Buy-Down Program

UPGI's acreage management program was first implemented in the spring of 2005 to manage that year's fall planting.  ¶ 188.  Under this program, the largest potato growers reduced their planted acreage by approximately 15%.  *Id.*  In connection with the acreage reduction mandate, UPGI also instituted a bid buy-down program.  *Id.*  Through the bid buy-down program, growers submitted bids setting forth the amount by which they would propose to be

compensated if they reduced their planted acreage. UPGI would then accept the lowest bids and compensate the "winning" bidders accordingly. UPGI's acre management/bid buy-down program, also adopted by UPGA, is the primary method by which UPGI has managed the supply and pricing of potatoes. *See also* ¶ 207 (November 2005 meeting to discuss 2006 acreage reductions), ¶ 228 (discussing 2007-2008 acreage reduction and bid buy-down program).

### 2.   Secondary Market Strategies

UPGI's secondary strategy allows non-growers, such as potato shippers, packers, and warehouses, to directly contribute to supply reduction efforts through supply diversion and "flow control." To implement supply diversion, UPGI would simply take potatoes out of the market in their entirety. *See* ¶ 189. For example, in January of 2005, UPGI donated 40,000 pounds of potatoes to food banks, thereby diverting 8% of the potato supply away from the market that year, for the expressly-stated purpose of reducing potato supply. *Id.* UPGA has also directed that farmers destroy potatoes. ¶ 217.

As part of the implementation of its "flow control" policy, UPGI institutionalized bi-weekly calls to control the flow of potatoes. ¶ 190. "Flow control" involves a collaboration between UPGI, packers, shippers, and warehouses. ¶¶ 190, 278. In advance of these calls, members would log onto UPGI's system and provide data on growing capacity, stocks, and packaging, which were then discussed during the call and posted in a marketing summary on the internet. ¶ 190. The potato supply flowing to the market would then be adjusted based on the data shared by the particular Defendants on the calls. *Id.* For example, if the calls indicated that the supply of potatoes about to be shipped was too high, then the amount of potatoes shipped to market would be reduced. *See id.*

UPGI has also employed "shipping holidays" as part of its secondary marketing

strategies, wherein UPGI imposes eight-hour shutdowns, or "holidays," on potato packing

operations.  ¶¶ 22, 186.  UPGI's Marketing Committee reviews packers' operations weekly to

decide if a "holiday" is warranted to reduce supply.  ¶ 186.  In Idaho, warehouses participating in

the "flow control" program represented more than 75% of Idaho's potato packing capacity.  ¶

210.

### 3.    The Dehydration Scheme – Specialized Supply Diversion

In yet another scheme, UPGI formed another cooperative, Defendant United II, to

remove surplus fresh potatoes from the market through the use of dehydration plants.  ¶¶ 28-29.

As admitted by UPGI, this "dehydration strategy" was "critical to United's overall mission of

supply management."  ¶ 319.  To advance this scheme, United II and Defendant Offutt (a

substantial grower and potato dehydrator) formed a joint venture, Defendant Idahoan, which is

comprised of several potato dehydration plants.  ¶ 28.  All UPGI members were eligible to

participate in the dehydration scheme.  In order to do so, a member was required to join the

United II cooperative, as well as commit 100% of its fresh crop to Idahoan. *See* ¶ 321

(dehydration plan as outlined by UPGI President).

### C.    NATIONWIDE EXPANSION OF THE CONSPIRACY:  THE CREATION OF UPGA

Recognizing that the supply management and price control objectives would need to be

instituted on a larger scale in order to be truly effective, UPGI, in December 2004, began to meet

with growers in other states to aid in the formation of other regional cooperatives.  ¶¶ 191-92.

Mr. Wada was instrumental in this process.  ¶ 41.  Regional cooperatives were formed in

Colorado, Wisconsin, central California and other areas of the Southwest, Midwest, and West.

In March 2005, UPGA was born. [9]

---

[9] Not content to stop at the borders of the United States, Mr. Wada, UPGI, and UPGA have
expanded their supply management and price-fixing conspiracy beyond the United States. *See*

According to its website, UPGA's "vision" is to "manage national potato supply so as to positively affect grower profitability."  ¶ 198.  Its mission statement provides:  "We bring order and stability to the North American potato growing industry and increase our member potato growers' economic potential by the effective use of cooperative principles."  ¶ 196.  Among its self-described initiatives is the implementation of "strategic supply management programs."  ¶ 199.  On a page that has since been deleted by UGPA from its website, UPGA explained:

> By joining United Potato Growers of America, ***you can help bring stability to the industry***. A stable industry is good for your operation and for the entire industry.
>
> UPGA provides the infrastructure so that growers across the country can share information, evaluate and analyze the market, and better communicate and cooperate for the good of all. ***By working together, we can manage supply to meet demand, and influence the market to foster a reasonable return for the grower.***
>
> . . .
>
> ***Our efforts are targeted at supply management in order to help growers receive a reasonable price for their crop.***

¶ 200 (emphasis added).

In addition to UPGA's web statements, Mr. Wada confirmed that the purpose of UPGA was to reduce supply and raise prices:

> [Mr. Wada] said the major benefit of the association is communication. ***Sharing supply management data across a broad growing region has allowed the organization to raise prices by better matching potato supplies with demand.***
>
> . . . .
>
> ***"Without supply management and grower solidarity, we don't have adequate profit margins,"*** [Mr.] Wada added.

¶ 212 (emphasis added).

---

¶¶ 203, 296-98, 302-08.

The founding members of UPGA that are named as Defendants herein include Defendant Mr. Wada[10] (of Defendant Wada Farms), Loraine Driscoll (of Defendant Driscoll Potatoes), and Jeff Raybould (of Defendant Raybould Brothers Farms). Defendant Michael Cranney (of Cranney Farms) was a member of the initial Board of Directors of UPGA, and Defendant Snake River Plains Potatoes is currently a member of the UPGA Board. ¶ 99. ***UPGA's members currently produce approximately 70-80% of the nation's fresh-market potatoes.*** ¶ 13.

### D.  UPGA SUPPLY MANIPULATION SCHEMES

UPGA' supply management strategy is simple: "THE WHOLE PILE OF POTATOES HAS TO BE MANAGED." ¶ 211 (emphasis in original). As part of its strategy, UPGA, like its member cooperative UPGI, engages in ongoing acreage reduction efforts. For example, in April 2005, based on the success of UPGI's efforts, UPGA instituted the first nationwide (not simply regional) acreage reduction scheme facilitated through a bid buy-down program. ¶ 201. According to Mr. Wada, the bid buy-down program was "a great opportunity to bring stability and rationale to our Potato Industry . . . Through cooperation and unity we can and will help ourselves and each other achieve our goals." ¶ 202. Indeed, by June of 2005, UPGA was able to declare its initial program a success. ¶¶ 204, 206. The average potato price was 23% higher in 2005 than it was in 2004, and this increase was attributed directly to UPGA's bid buy-down program. ¶ 205.

UPGA's 2006 national crop reduction guidelines were announced in its January 2006 newsletter. ¶ 208. Shortly after UPGI announced its 2006 reduction plans, UPGA announced that members must reduce their acreage planting by 10% or pay a $50 per acre assessment. ¶¶ 207-08. Those growers who reduced their plantings by more than 10% could submit the

---

[10] Mr. Wada has served as Chairman of the Board of Directors of both UPGI and UPGA, and he has maintained an active leadership role with both cooperatives. ¶¶ 41-42, 49.

additional acres into the bid buy-down program.  *Id.*  In order to reduce acreage and satisfy

UPGA requirements, many farmers had to plow under their "perfectly good potatoes."  ¶ 217

(*Wall Street Journal* article reporting that farmer took three days to plow under $100,000 worth

of potatoes at UPGA's behest).

Another acreage reduction program was announced for 2007-08.  ¶ 228.  The 2007-08

program permitted both members and non-members to participate in the acreage reduction and

bid buy-down components.  It also permitted participants to elect by how much they wanted to

reduce their acreage; those who elected to reduce by less than 15% had to pay a certain fee per

base acre which was calculated on a sliding scale.  ¶¶ 228-29.  The 2007-08 program also had a

punitive measure (a fee of $100/acre) for those participants who expanded beyond their 2004

base acreage amount.  ¶ 229.  This punitive measure was designed to prevent "mindless

expansion," which was considered to be illegitimate and against the mission of the supply

reduction program.  *Id.*  And it worked; according to the Idaho Potato Commission ("IPC"), by

the summer of 2008, a ten pound bag of potatoes cost consumers $15, $6 more than it did in

2007.  ¶ 233; *see also* ¶ 244 (seminars held to communicate UPGA acreage planting guidelines

to members and non-members), ¶ 245 (discussing 2010 Planting Guidelines).

UPGA, like UPGI, also engages in "flow control" and holds weekly calls to discuss data

regarding growing capacity, stocks, and other matters.  *See* ¶¶ 209-10, 213-14.  As described by

Mr. Wada, the UPGA "worked with members to eliminate the potato glut by things like reducing

the amount of potatoes planted and pledging not to send potatoes to market in the event of

oversupply."  ¶ 213.  A former COO of UPGA also stated that UPGA "monitor[s] the flow of

product into the market on a weekly basis and adjust[s] the flow so that we don't create a

periodic glut."  ¶ 214.

### E.   POLICING THE CONSPIRACY AND DOLING OUT PUNISHMENT

The Complaint describes how UPGI and UPGA use a variety of methods to ensure that their supply management scheme is being carried out.  *See, e.g.*, ¶¶ 218-24, 247-48.  For example, UPGI and UPGA require growers to fill out a "Planting Intention Form" at the beginning of each season.  ¶ 219.  The Planting Intention Form, and other confidential documents submitted by the grower to the government, are then used by UPGI and UPGA to evaluate the grower's performance.  ¶¶ 219-20.

UPGI and UPGA conduct audits and use technologies such as GPS, aerial photography and satellite imaging to determine whether members have complied with their quotas.  ¶ 218.  Field representatives of UPGI and UPGA conduct inspections based on the Planting Intention Form and other documents submitted by members.  ¶ 221.  If the members violate their planting agreements, they are subject to punitive measures.  ¶ 223.  For example, UPGI's and UPGA's bylaws entitle the cooperatives to levy fines of $100 per acre against growers who exceed the cooperatives' rules.  *Id.*

Another way in which UPGA polices the conspiracy is to require all attendees at Board of Directors and Committee meetings to execute a "United Confidentiality Agreement."  ¶ 247.  This agreement forbids attendees from disclosing information shared at such meetings.  *Id.*  Any individual who violates the agreement is subject to suit by UPGA for injunctive and monetary relief.  ¶ 248.

### F.   THE SUCCESS OF THE CONSPIRACY

As detailed in the Complaint, the supply management and price-fixing conspiracy orchestrated through UPGA and UPGI was, and continues to be, highly successful.  One reason for this success is that it enjoys the participation and commitment of nearly the entire potato

industry, including powerful industry cooperatives, growers, national produce companies, marketing agencies, and shippers. ¶ 1.[11]  In addition, the potato industry is comprised of a limited number of vertically-integrated enterprises that handle everything from growing to selling, thereby allowing the industry to closely manage supply.  ¶ 158.  Moreover, due to a lack of substitutes and the inelasticity of demand for potatoes, even a small drop in supply translates into substantially higher prices.  ¶ 161.

Numerous studies confirm that the supply manipulation schemes used by the cooperatives have increased the profits of its participants.  *See, e.g.,* ¶¶ 226 (May 2006 *Spudman* reader survey indicates 85% of all respondents have seen an increase in profits since UPGA was formed); 233 (Idaho Potato Commission notes increase of $6/10 lb. bag potatoes from 2007-2008); 234-235 (2008 University of Idaho study confirms that UPGI and UPGA efforts led to increased potato prices between 2005-08).  UPGA's own reports confirm this as well.  *See* ¶¶ 239-43.  For example, until 2004-05, when UPGI and UPGA began their campaign to manipulate supply and prices, the average amount of return that a grower received was on the decline.  Beginning in 2005, the average amount of return more than doubled from the prior year, and remained constant or grew thereafter, something which had not happened in over a century of the USDA keeping such records.   ¶¶ 237, 239-40.

The Complaint shows that the potato cartel continues to the present day.  In September of 2009, UPGI alerted members that its Supply Committee agreed with all UPGA directors in recommending a reduction of 25-30% from growers' 2004 base acres.  ¶ 245.  A May 2010 UPGA newsletter described how 400 fresh and process potato growers attended 16 seminars

---

[11] The cartel enjoys extensive participation and compliance with its supply-reduction schemes.  ¶ 226.  For example, in 2006, UPGI's audits found that all audited fields, which included 65% of UPGI's fresh potato acres and all UPGI Board members, were in compliance with the cooperative's supply reduction and bid buy-down programs.  ¶ 222.

during the year at which they "informally discuss[ed]" issues such as UPGA's "published acreage guidelines before beginning spring planting."   ¶ 244.  The cartel currently has a stranglehold on the U.S. potato industry, and, without judicial intervention, it will continue to enrich Defendants and their co-conspirators at the expense of the direct purchaser and consumer.

## III.  LEGAL ARGUMENT

### A.  THE COMPLAINT STATES A CLAIM AGAINST EACH DEFENDANT THAT CHALLENGES THE SUFFICIENCY OF THE ALLEGATIONS UNDER THE APPLICABLE LEGAL STANDARDS.

Certain Defendants argue that the Complaint fails to allege with sufficient detail their participation in any unlawful activity.[12]  Though these arguments are raised in separate motions, the Defendants rely, incorrectly, on the same authority, *i.e.*, *Twombly* and related cases.

Defendants' reliance on *Twombly* and related case law is misplaced.  In *Twombly*, the Supreme Court reiterated that antitrust claims are assessed under the notice pleading standards of Federal Rule of Civil Procedure 8, and that facts pled are to be taken as true.  Indeed, under *Twombly*, an antitrust conspiracy complaint must include only "enough factual matter (taken as true) to suggest that an agreement was made."  550 U.S. at 556.  The issue raised by Defendants' separate motions, then, is not whether DPP has *proven* a market-wide conspiracy involving Defendants.  That is a question for trial.  The only issue ripe for adjudication is whether DPP has alleged a "plausible" case and put Defendants sufficiently on notice regarding the specific

---

[12] *See* Dkt. Nos. 72 & 72-1 (Motion and Memorandum filed by R.D. Offutt Co. ("Offutt Mem.")); Dkt. Nos. 73 & 73-1 (Motion and Memorandum filed by Pleasant Valley Potato, Inc. ("Pleasant Valley Mem.")); Dkt. Nos. 75 & 75-1 (Motion & Memorandum filed by Blaine Larsen, *et al*. ("Larsen-Driscoll-Rigby Mem.")); Dkt. Nos. 76 & 76-1 at 3-8 (Motion and pertinent portion of Memorandum filed by Potandon Produce LLC ("Potandon Mem.")); Dkt. Nos. 77 & 77-1 at 7-11 (Motion and pertinent portion of Memorandum  filed by Idahoan Foods, LLC ("Idahoan Mem.")); Dkt. Nos. 79 & 79-1 at 17-25 (Motion and pertinent portion of Memorandum filed by United Potato Growers of Idaho, *et al*. ("UPGI Mem.")); Dkt. Nos. 88 & 88-1 at 4-7 (Motion and pertinent portion of Memorandum filed by Dole Food Company, Inc. and Dole Fresh Vegetable, Inc. ("Dole Mem.")).

allegations against them.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ("*Iqbal*") (on

motion to dismiss, court evaluates whether factual allegations "plausibly suggest an illicit

accord").

Moreover, each of the Defendants seeking dismissal under *Twombly* relies on the false

premise that DPP is legally obligated to plead intricate details regarding the involvement of each

named Defendant.  That is not the law.  *See, e.g., In re Flash Memory Antitrust Litig.*, 643 F.

Supp. 2d 1133, 1142 n.7 (N.D. Cal. 2009) ("*Flash Memory*") ("For pleading purposes,

allegations of antitrust conspiracy need not be detailed on a 'defendant by defendant' basis")

(internal citations omitted); *Starr v. Sony BMG Music Entertainment*, 592 F.3d 314, 325 (2d Cir.

2010), *cert. denied*, 131 S.Ct. 901 (2011) ("[P]laintiffs [are] not required to mention a specific

time, place or person involved in each conspiracy allegation.").[13]  It is more than sufficient that

the Complaint places allegations as to each Defendant "in a context that raises a suggestion of a

preceding agreement."  *Twombly*, 550 U.S. at 557.  "Determining whether a complaint states a

plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on

its judicial experience and common sense."  *Iqbal*, 129 S. Ct. at 1950; *Morningstar Holding*

*Corp. v. G2, LLC*, No. CV-10-439-BLW, 2011 WL 864300, at *3 (D. Idaho Mar. 10, 2011)

---

[13] *See also Hinds County, Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 395 (S.D.N.Y. 2010) ("*Hinds*") (plaintiffs are not required to plead details about each individual defendant's conduct in furtherance of the conspiracy); *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 790 (N.D. Cal. 2007) (allegations of defendant's involvement in agreement to implement price increases and other allegations of "general participation" in alleged conspiracy were sufficient to state an antitrust claim); *In re OSB Antitrust Litig.*, Master File No. 06-826, 2007 WL 2253419, at *5 (E. D. Pa. Aug. 3, 2007) ("[a]ntitrust conspiracy allegations need not be detailed defendant by defendant."); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MDL-1775 (JG) (VVP) (E.D.N.Y.), "Report And Recommendation," pp. 16-17 (E.D.N.Y. Sept. 22, 2010; adopted by the district court on November 1, 2010) (even allegations that involve mostly "lump" together "defendants" generally are sufficient when combined with sufficient allegations as to conspiracy), a true and correct copy of which is attached to the Declaration of James J. Pizzirusso as Exhibit A.

("*Morningstar*") (same). In sum, Rule 8 of the Federal Rules of Civil Procedure requires only that the Complaint link each named Defendant to the alleged conspiracy. Plaintiff has done that, but the Defendants take exception to any allegation that does not specifically reference them by name.[14]

To support the argument that the DPP cannot set forth allegations generally against "Defendants," but must instead plead "who, what, where, and when" specifics as to each separate Defendant, Defendants rely on *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042 (9th Cir. 2008) ("*Kendall*") and other cases that are plainly distinguishable. In *Kendall*, even after the court allowed targeted discovery, including depositions of key witnesses, the plaintiffs' complaint contained only ultimate facts and legal conclusions without more. 518 F.3d at 1047-48. The Ninth Circuit affirmed dismissal of the complaint because the plaintiffs, like the *Twombly* plaintiffs, "failed to plead *any evidentiary facts beyond parallel conduct* to prove their allegation of conspiracy." *Id.* at 1048 (emphasis added). The court did *not* hold that a plaintiff must include detailed allegations as to each defendant; rather, it noted that the complaint failed to answer the "basic questions" regarding "who, did what, to whom (or with whom), where, and when?" *Id.* In fact, there were "no facts alleged to support" the allegations of conspiracy. *Id.*

---

[14] For example, Defendant Pleasant Valley Potato, Inc. ("Pleasant Valley") takes issue with ¶ 246 of the Complaint, arguing that it fails to "identify how Pleasant Valley participated in the acreage reductions by alleging dates, ratios, or knowing acquiescence to the acreage reduction programs" and does not include "allegations about Pleasant Valley's specific participation in the bid-buy down program." *See* Dkt. 73-1 at 6. Of course, such specific details are in the hands of Pleasant Valley and cannot be known to DPP at this time. "To state a claim against each Defendant, [DPP] must 'make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.'" *Hinds*, 620 F. Supp. 2d at 513 (quoting *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008) ("*SRAM*")). Unlike *Hinds*, where the plaintiffs "failed to plead facts plausibly suggesting a 'meeting of the minds,'" *id.* (internal quotation omitted), DPP here alleges specific details regarding the formation of the cooperatives and each Defendant's role in the supply reduction scheme. Those allegations are more than sufficient to plausibly suggest that each Defendant, including Pleasant Valley, participated in the alleged conspiracy.

*Kendall* has been viewed by several courts as limited to its specific facts.  *See, e.g., Starr*, 592 F.3d at 324; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F.Supp.2d 1011, 1018 (N.D. Cal. 2010) ("*CRTs*"); *In re Packaged Ice Antitrust Litig.,* 723 F.Supp. 2d 987, 1006-07  (E.D. Mich. 2010) ("*Packaged Ice*"); *Babyage.com v. Toys "R" Us, Inc.*, Nos. 05-6769, 06-242, 2008 WL 2644207, at *4 n.4 (E.D. Pa. July 2, 2008).

Here, in contrast, the Complaint uses the term "Defendants" only when referring to all Defendants named and identified in the Complaint; the Complaint also includes numerous specific allegations as to the nature and scope of the conspiracy and the participation of each Defendant in the context of the conspiracy.  Recent case law in this Circuit supports a finding that Plaintiff has satisfied the pleading requirements with respect to each of the moving Defendants when a compliant is pled as it is here.  *See, e.g., SRAM*, 580 F. Supp. 2d at 904 ("Although Plaintiffs will need to provide evidence of each Defendants' participation in any conspiracy, they now only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy.");  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1185 (N.D. Cal. 2009) ("*LCD*") (citing *SRAM* and finding that complaint, taken as a whole, sufficiently alleged each defendant's participation in the conspiracy).[15]

In the end, Defendants' *Twombly* motions seek to improperly parse the Complaint and segregate the DPP's allegations piecemeal (and out of context).[16]  Such an approach runs contrary to the United States Supreme Court's directive that "[t]he character and effect of a

---

[15] An earlier opinion in the *LCD* case, which did not include detailed allegations of any *actual* agreement, granted plaintiffs leave to amend "to more specifically plead how each individual defendant joined the alleged conspiracy."  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008).  The defendants later argued that the amended complaint still failed to distinguish between related corporate entities, but the court concluded otherwise. *See* 599 F. Supp. 2d at 1185.

[16] *See, e.g.*, Dkt. No. 79-1 at 21 ("[h]owever, when the claims are parsed, the allegations as to Wada Marketing are few.").

conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("*Continental Ore*") (internal citation omitted).[17]  As the Third Circuit recently said in *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.2d 85, 98 (3d Cir. 2010), "[w]e conclude that it is inappropriate to apply *Twombly* 's plausibility standard with extra bite in antitrust and other complex cases."

    In assessing the Complaint, the Court should view the complaint in the light most favorable to the plaintiff, with all properly pled factual allegations taken as true.  *See, e.g., Silvas v. E\*Trade Mortg. Corp.,* 514 F.3d 1001, 1003 (9th Cir. 2008) ("All allegations of material fact

---

[17] This principle remains established law, even after *Twombly*.  *See, e.g., In re Wholesale Grocery Prods. Antitrust Litig*., 722 F.Supp. 2d 1079, 1090 (D. Minn. 2010) (rejecting a dismemberment approach to assessing the sufficiency of a complaint); *CRTs*, 738 F.Supp.2d at 1019 ("In complex, multinational, conspiracy cases, courts in this district review specific allegations in the context of the complaint taken as a whole."); *Packaged Ice,* 723 F.Supp. 2d at 1006 (noting other cases where courts have refused to assess allegations in isolation); *In re Potash Antitrust Litig.*, 667 F.Supp. 907, 934 (N.D. Ill. 2009), *appeal pending* ("In determining whether the complaint satisfies the plausibility threshold required by *Twombly*, the allegations must be evaluated as a whole."); *Standard Iron Works v. ArcelorMittal*, 639 F.Supp.2d 877, 902 (N.D.Ill. 2009) ("*ArcelorMittal*") ("Defendants' attempt to parse the complaint and argue that none of the allegations [] support a plausible inference of conspiracy-is contrary to the Supreme Court's admonition [in *Continental Ore*]."); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F.Supp.2d 27, 33 n.4 (D.D.C. 2008) ("*Twombly* did not change this principle: '[T]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts.'") (quoting *In re Southeastern Milk Antitrust Litig.,* 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008)); *In re Pressure Sensitive Lablestock Antitrust Litig*., 566 F.Supp.2d 363, 373 (M.D.Pa.2008) ("Nothing in *Twombly* . . . contemplates this 'dismemberment' approach to assessing the sufficiency of a complaint.  Rather, a district court must consider a complaint in its entirety without isolating each allegation for individualized review."); *In re Blood Reagents Antitrust Litig*., No. 09-2081, 2010 WL 3364218, at \*6 (E.D. Pa. Aug. 23, 2010)  ("Defendants' briefing attempts to dismember plaintiffs' Complaint in order to show how each allegation, in isolation, fails to sufficiently aver plausibility.  However, as defendants ultimately conceded at oral argument, the allegations in the Complaint must be viewed as a whole."); *In re Aftermarket Filters Antitrust Litig*., No. 08 C 4883, 2009 WL 3754041, at  \*3 (N.D. Ill. Nov. 5, 2009) (noting that "defendants may not 'cherry pick' specific allegations in the complaint that might be insufficient standing alone. Nothing in *Twombly* or any other case has diminished the application of these general standards to a § 1 Sherman Act claim.").

are taken as true and construed in the light most favorable to the nonmoving party."). In addition, all reasonable inferences must be drawn in the plaintiff's favor, *Robertson v. Sadjak*, No. CV-09-136-S-BLW, 2010 WL 1418393, at *2 (D. Idaho Apr. 7, 2010), and the court must evaluate the complaint as alleged, not as recast by the defendants. *See Knevelbaard Dairies v. Kraft Foods*, 232 F.3d 979, 989-91 (9th Cir. 2000).

Here, the Complaint describes in great detail how Defendants coordinated and facilitated their supply management conspiracy, including the mechanics of the regional and nationwide "cooperatives" that were formed not for the purpose of marketing and selling potato products, but rather as a vehicle for potato growers and their co-conspirators to reduce output and fix prices. One of the reasons for the conspiracy's success is that it enjoys the participation and commitment of nearly the entire potato industry, from cooperatives, to growers and national produce companies, to marketing and shipping agencies.[18] Each of the Defendants arguing for dismissal under *Twombly* is alleged to have signed on or otherwise participated in the nationwide supply management and price-fixing scheme coordinated via the cooperatives, and cannot credibly contend that the Complaint merely contains "conclusions" or "naked assertions" as to them individually.[19] Viewing the specific factual allegations in the context of the alleged conspiracy, the DPP has plausibly alleged a Section 1 claim against each Defendant.[20]

---

[18] Indeed, the vertically-integrated nature of some of these enterprises (encompassing everything from growing to selling) permits the industry to closely manage supply. ¶ 158.

[19] *See, e.g.,* ¶¶ 30-32, 38, 45, 49, 52, 58, 62-64, 67, 70, 71, 80, 91, 93, 94, 96, 97, 99, 100, 102, 103, 105, 106, 108, 109, 111, 112, 114, 115, 117-119, 124, 170.

[20] In the absence of immunity under Capper-Volstead, the coordinated supply restrictions at issue constitute a *per se* violation of the Sherman Act. *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007) ("A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase prices is, and ought to be, *per se* unlawful."); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48 (1990) (agreement to control supply of commodity "for the purpose and with the effect of raising, depressing, fixing, pegging or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*.") (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150,

B.    THE COMPLAINT STATES A CLAIM AGAINST EACH "GROWER DEFENDANT"

In three separate motions, certain Defendants, identified in the Complaint as "potato growers, packers, marketing agencies and licensors" (the "Grower Defendants"), seek dismissal under *Twombly* and related case law.[21]  Notably, these Grower Defendants all admit or, in the case of Pleasant Valley, do not deny, that theDPP's allegations of an overall antitrust conspiracy are adequate under Federal Rule of Civil Procedure 12(b)(6).[22]  Instead, in their separate motions, these Grower Defendants contend that the Complaint fails to include enough specific detail about their individual conduct or involvement in anticompetitive activity to plausibly state

_____

223 (1940)).  *See also United States v. Andreas*, 216 F.3d 645, 667 (7th Cir.) ("Functionally, an agreement to restrict output works in most cases to raise prices above a competitive level, [] and for this reason, output restrictions have long been treated as *per se* violations."); 11 Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 1910 (3d ed. 2006) (horizontal output limitations "are ordinarily condemned as a matter of law under an 'illegal per se' approach") (quoting *NCAA v. Bd. Of Regents*, 468 U.S. 85, 100 (1984)).  The DPP's detailed allegations of the scheme to restrict the supply of potatoes during the relevant period, and the allegations tying each Defendant's individual involvement in those agreements, are more than sufficient under *Twombly*.

[21] *See* Dkt. Nos. 73, 73-1 (Pleasant Valley Potato, Inc.); Dkt. Nos. 75, 75-1 (Blaine Larsen, Blaine Larsen Farms, Inc., Driscoll Potatoes, Inc. and Rigby Produce, Inc.); and Dkt. Nos. 79, 79-1 at 17-25 (United Potato Growers of Idaho, Inc., United Potato Growers of America, Inc., United II Potato Growers of Idaho, Inc., Albert Wada, Wada Farms, Inc., Wada Farms Potatoes, Inc., Wada-Van Orden Potatoes, Inc., Wada Farms Marketing Group, LLC, Michael Cranney, Keith Cornelison, Cornelison Farms, Inc., Snake River Plains Potatoes, Inc., Lance Funk and Raybould Brothers Farms LLC).

[22] All Grower Defendants other than Pleasant Valley were among the Defendants that filed a Motion to Dismiss Based on the Capper-Volstead Act and Related Statutes (Dkt. Nos. 85, 85-1) ("CVA Mem.").  Those Grower Defendants acknowledge that they "formed cooperatives and established a 'supply management' program to address over-production and fluctuating prices in the potato markets" (Capper-Volstead Mem.  at 11-12), but contend that fixing prices and controlling supply are protected activities under Capper-Volstead.  *See id.* at 14-16.  Pleasant Valley did not join in the Capper-Volstead motion, apparently on the basis that it did not officially become a member of the cooperatives in question.  *See* Pleasant Valley Mem. at 4, 7.  Pleasant Valley does not deny, however, that the sole purpose of the cooperatives was to control supply and fix prices; nor does Pleasant Valley deny that it participated in the supply reduction and price-fixing scheme orchestrated by the cooperatives.  Rather, Pleasant Valley merely argues that the Complaint fails to allege enough specifics about precisely how Pleasant Valley participated in the scheme.  *See id*. at 2-7.

21

an antitrust claim.  In fact, the Complaint does far more than "plausibly suggest" a collusive accord in which the Grower Defendants participated.  The Complaint contains ample details of both: (a) the existence of a collusive agreement – in the form of "cooperatives" *created for the very purpose of restricting supply and fixing prices* of fresh and process potatoes – and (b) each Grower Defendant's participation therein.

In the Complaint, the DPP alleges that the Grower Defendants, along with other named Defendants and unnamed co-conspirators, unlawfully colluded to control the supply of and fix the prices of fresh and process potatoes sold in the United States from June 18, 2006 to the present.  ¶¶ 1-2.  The conspiracy was facilitated via "cooperatives" that were formed "for the sole purpose of creating a national vehicle for potato growers and their conspirators to conspire together to reduce potato output and fix prices."  ¶ 3.  The Complaint describes in great detail the formation of the cooperatives in question (UPGA, UPGI and United II) and their successful efforts to control supply and fix prices for fresh and process potatoes.  *See* ¶¶ 12-29, 162-248.

While the bulk of DPP's detailed factual allegations focus on the cooperatives themselves, the Complaint includes descriptions of all Grower Defendants and discusses their respective roles in the conspiracy that was orchestrated by the cooperatives.  *See* ¶¶ 30-51, 67-70, 91-114, 162-67, 170, 173, 193-94, 202-03, 211-13, 246, 267-69, 290.  More specifically, each of the Grower Defendants is alleged to have "signed on" and "participated in the supply-restriction and price-fixing scheme."  ¶¶ 30-32, 38, 45, 67, 91, 94, 97, 100, 103, 106, 109, 112, 170.  Each Grower Defendant is also alleged to have "followed acreage reductions, participated in the bid-buy-down program, participated in and utilized information obtained from marketing calls and packing reports, and/or reduced the domestic supply of potatoes for the express purposes of fixing, raising, maintaining and/or stabilizing prices."  ¶ 246.  Additional allegations

22

specific to the Grower Defendants include the following:

- Defendant "Albert Wada was one of the masterminds of the price-fixing scheme" and "Wada Farms, through Albert Wada, played a critical role in the formation of UPGI and UPGA and the implementation of the supply reduction conspiracy." ¶ 38. Numerous additional paragraphs in the Complaint reference Albert Wada specifically and discuss his critical role in the conspiracy. *See* ¶¶ 39-44, 162-65, 167, 170, 173, 191, 193-94, 202-03, 211-13, 306.

- "Wada Farms Marketing acts as the agent of and handles the marketing and sales for Wada Farms[.]"   "Albert Wada . . . organized and attended numerous UPGI and UPGA conspiracy meetings on behalf of both Wada Farms and Wada Farms Marketing and was an outspoken advocate for concerted supply restriction."   "Wada Farms controls Wada Marketing and Wada Farms Marketing acted pursuant to that control" and "as Wada Farms' agent."  ¶¶ 46, 49-51.

- "Blaine Larsen of Larsen Farms was one of the founders of UPGI, a UPGI Board Member, and an originator of the price-fixing scheme alleged herein." ¶ 70.

- "Michael Cranney of Cranney Farms is a founding member of UPGI and one of the original incorporators of UPGA. At a January 2008 UPGA meeting, Mr. Cranney, UPGA Supply Management Committee Chairman, reminded grower attendees of UPGA's instruction to reduce potato acreage in the coming year by 5%—and told the audience that UPGA would advise even non-members to do the same." ¶ 93.

- "With Mr. Wada, Keith Cornelison of Cornelison Farms organized the first meeting of growers in September 2004 of what would eventually become the UPGI.  Cornelison Farms is a founding member of UPGI and has long advocated for collective action to reduce potato supplies."  ¶ 96; *see also* ¶ 40 ("In September of 2004, Mr. Wada and Keith Cornelison (of Defendant Cornelison Farms) called a meeting of 23 Idaho potato farmers to discuss how to "curb protection" and "boost prices," and shortly after the meeting the group of farmers agreed to create UPGI.").

- "Snake River Plains Potatoes is a founding member of UPGI and a UPGA member. David Beesley, chief executive officer of Snake River Plains Potatoes, is a member of the UPGA executive committee." ¶ 99.

- "Driscoll Potatoes is a founding member of UPGI, and Loraine Driscoll of Driscoll Potatoes is an original incorporator of UPGA. Loraine Driscoll has served on the UPGA Board of Directors." ¶ 102.

- Lance Funk Farms, Rigby Produce, Pleasant Valley and Raybould Brothers Farm are founding members of UPGI and "Jeff Raybould of Raybould Brothers Farms is an original incorporator of UPGA." ¶¶ 105, 108, 111, 114.

As noted above, *not one* of the Grower Defendants argues that DPP's description of a

conspiracy in the Complaint is insufficient.  Indeed, all Grower Defendants other than Pleasant

Valley effectively *admit* the existence of a collusive agreement, but contend that supply

restrictions and price-fixing are immunized under Capper-Volstead.  *See* CVA Mem. at 14-16.

Nonetheless, these Defendants argue that even if the Capper-Volstead motion is denied, the

Court should dismiss the Complaint for failure to allege enough specifics about each Defendant's

participation in the alleged conspiracy.  *See* Larsen-Driscoll-Rigby Mem. at 3 (Complaint "fail[s]

to allege [Defendants'] particular involvement in illegal activity with the specificity required by

Twombly . . ."); Memorandum In Support of Motion To Dismiss Claims Against Certain

Defendants And Defendant Associations at 18 (March 18, 2011) (Dkt. No. 79-1) ("Certain Defs.

Mem.") ("Absent from [the DPP's] allegations are any facts substantiating wrongful conduct on

the part of [pertinent Grower Defendants].").  For its part, Pleasant Valley also does not deny the

existence of a collusive agreement to limit supply and fix prices, nor does it deny following the

acreage reductions and otherwise complying with the overall purpose of the supply management

scheme orchestrated by the cooperatives.  Instead, Pleasant Valley claims that the Complaint

does not include "the necessary specificity for Pleasant Valley to adequately respond to the

allegations" regarding its participation.[23]  *See* Pleasant Valley Mem. at 6.

---

[23] The Complaint alleges that Kim Wahlen of Pleasant Valley attended the initial UPGI meeting
and signed on to the price-fixing scheme orchestrated by the cooperatives.  ¶ 170.  Pleasant
Valley is an "integrated potato producer that grows, packs and ships its own potatoes."  ¶ 110.
Publicly available information indicates that Mr. Wahlen is a Pleasant Valley partner and one of
its original owners.  *See* "Kim Wahlen Works Hard in Industry He Grew Up In," *Spudman
Magazine* (Jan. 2006) (available at http://spudman.com/ index.php/magazine/article/Kim-
Wahlen-Works-Hard-In-Industry-He-Grew-Up-In).  Pleasant Valley apparently markets potatoes
that Mr. Wahlen grows.  *See id.*  Moreover, Mr. Wahlen is actively involved in the potato
cooperatives and was quoted in 2006 as saying they had "been successful in trimming the
acreage being grown and in large part are responsible for the good market we are enjoying now."
*Id.*  In its motion, Pleasant Valley raises factual issues regarding the relationship between Kim
Wahlen and Pleasant Valley that are not appropriately resolved on a motion to dismiss.  To the
extent additional evidence in fact shows that Mr. Wahlen should be named as a Defendant in his
individual capacity (and/or that Pleasant Valley is not a proper Defendant), DPP will move

The Grower Defendants' heavy reliance on *Kline v. Coldwell Banker & Co.*, 508 F.2d 226 (9th Cir. 1974) ("*Kline*") and *Kendall*, is misplaced.[24]   In *Kline*, the Ninth Circuit reversed the lower court's class certification ruling in a case involving an alleged conspiracy by the Los Angeles Realty Board and its members to fix brokerage commissions.  508 F.2d at 228, 236.  Of particular note, the Ninth Circuit held that where a trade association is alleged to have engaged in unlawful conduct, "in order for a member of [that] trade association to become guilty in a criminal case or liable in a treble damages case he must have 'knowingly, intentionally and actively participated in an individual capacity in the scheme.'"  *Id*. at 232 (internal citation omitted).

As Defendants note, the Ninth Circuit subsequently applied the holding in *Kline* to affirm dismissal of the complaint in *Kendall*, but both cases are plainly distinguishable here.  Plaintiff does not allege that the Grower Defendants were merely members of a trade association (cooperative) that *happened* to commit unlawful acts – and, as noted above, unlike in *Kendall*, DPP alleges far more than parallel conduct.  Rather, DPP alleges that the potato cooperatives were formed for *the specific purpose* of managing supply and fixing prices.  In the absence of Capper-Volstead immunity, the cooperatives clearly engaged in unlawful anticompetitive conduct proscribed by the Sherman Act.  By signing on to and participating in the supply management scheme orchestrated by the cooperatives, the Grower Defendants necessarily (and

_____

promptly to amend the Complaint accordingly.  *See, e.g., Morningstar*, 2011 WL 864300, at *3 & n.4 (noting that "liberal amendment policy" prevails in Ninth Circuit even after *Iqbal*).  For purposes of Pleasant Valley's motion, Plaintiff stands by the factual allegations in the Complaint and maintains that Mr. Wahlen acted on behalf of Pleasant Valley and that Pleasant Valley participated in the supply management/price-fixing conspiracy.

[24] It is well established that allegations concerning trade association activities can suffice to connect a defendant to an alleged antitrust conspiracy.  *See, e.g., Flash Memory*, 643 F. Supp. 2d at 1148; *ArcelorMittal*, 639 F. Supp. 2d at 897; *In re Flat Glass Antitrust Litig. (II)*, No. 08-mc-180, 2009 WL 331361, at *3 (W.D. Pa. Feb. 11, 2009).

knowingly) engaged in such conduct as well.  *Kline* and *Kendall* offer no protection to the

Grower Defendants under the circumstances of this case.[25]

C.   THE DEHYDRATION DEFENDANTS USED A JOINT VENTURE TO ILLEGALLY
RAISE PRICES AND MANAGE SUPPLY AS PART OF THE OVERALL CONSPIRACY

Defendants R.D. Offutt ("Offutt"), United II Potato Growers of Idaho ("United II") and

Idahoan Foods LLC ("Idahoan") (collectively referred to as the "Dehydration Defendants")

should remain in this litigation because they are the facilitators of yet another scheme by UPGI

to manipulate the supply and price of potatoes.

### 1.   Establishment And Operation Of The Dehydration Scheme

As detailed *supra*, UPGI was established in 2004 to restrict the supply of potatoes in

order to artificially and illegally raise the price of potatoes farmed by its members.  In 2007,

UPGI sought an additional vehicle for the "supply management program."  ¶ 315.  UPGI

facilitated a joint venture with Defendant Offutt who, in addition to growing potatoes, operated

dehydration facilities.  ¶¶ 315-16.  Offutt was familiar with UPGI and its stated objectives,

having attended at least one of UPGI's initial meetings and, ultimately, having signed onto the

conspiracy alleged in the Complaint.  ¶¶ 172-73.  Moreover, Offutt was one of the largest

growers in an industry that had already benefited dramatically from UPGI's supply reduction

efforts. ¶¶ 116, 225.  Defendant Offutt agreed to work with UPGI to establish a dehydration joint

venture in order to advance the UPGI supply management program.  ¶ 315.

UPGI formed a second co-operative, United II, to undertake the further reduction of

---

[25] Other cases cited by the Grower Defendants are inapposite or of marginal relevance.  For example, *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1263 (11th Cir. 2004), *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) and *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 962 (S.D. Cal. 1996) are all pre-*Twombly* opinions cited by the cooperatives and several grower Defendants (Dkt. No. 79-1 at 18, 23), but these cases simply stand for the proposition that conclusory or vague allegations alone are not sufficient to survive a motion to dismiss.

potato supply through the dehydration joint venture. ¶ 29.  United II and Offutt then formed a

joint venture, North American Foods, LLC.  ¶ 316.  Offutt contributed its three dehydration

plants to the joint venture, along with its production agreement with Idaho Supreme Potatoes,

Inc. *Id.*  The joint venture also acquired Idaho Fresh-Pak, Inc., which was the country's third

largest potato dehydration company.  *Id.*  The purchase included Idaho Fresh-Pak's four Idaho

processing plants, along with the "Idahoan" brand names.  *Id.*  The dehydration joint venture

entity is presently operated as Idahoan Foods LLC.  ¶ 119.

     All UPGI members were able to join United II, and were required to do so in order to sell

potatoes into the dehydration venture.  ¶ 316.  United II members were issued stock in the new

entity and agreed to commit "100% of the fresh crop" to Idahoan.  ¶ 321.  In fact, United II

members supply all potatoes for Idahoan's Idaho and Nevada plants. *Id.*  ¶ 28.  United II

members therefore were enticed to participate in United II based on the establishment of a

reliable buyer for dehydration-grade potatoes, as well as the opportunity to have ownership in the

potato processor.  ¶ 318.

     UPGI and United II, in turn, obtained greater control over their members' potato

production.  This enabled UPGI and United II to establish a higher price in the dehydrated potato

market[26] and, more importantly, provided UPGI with the ability to further manipulate the fresh

potato market by providing an outlet for surplus potatoes that otherwise would have been

brought to the fresh market. ¶ 318.

     UPGI president Jerry Wright confirmed the anticompetitive designs of the joint venture,

stating that Idahoan was "another in a series of strategic initiatives by United[,]" which had

already implemented shipping holidays and penalized its members for exceeding potato acreage

---

[26] Idahoan also proceeded to shut some of its processing plants in order to address "excess
capacity in the industry." ¶ 125.

limitations. *Id.*  As Wright explained, Idahoan "provides United with an outlet for surplus potatoes." *Id.*  The dehydration strategy was, therefore, "critical to United's overall mission of supply management," according to a UPGI newsletter.  ¶ 319.  The Dehydration Defendants conspired by entering into this dehydration venture with knowledge that it was designed with an impermissible motive.

### 2.  The Complaint States A Claim Against Each "Dehydration Defendant"

Where, as here, DPP has adequately pled an antitrust conspiracy, a plaintiff need only "make allegations that plausibly suggest that each [d]efendant participated in the alleged conspiracy." *CRT*, 738 F. Supp. 2d at 1019; *SRAM*, 580 F. Supp. 2d at 904 (same).  Plaintiff has surpassed its burden in setting forth allegations that plausibly suggest the participation of United II, Offutt and Idahoan in the dehydration scheme, as part of the overall supply reduction conspiracy.

### a.  United II

United II argues that because the Idahoan dehydration venture established vertical integration for certain potato growers, it cannot be viewed as anticompetitive regardless of its motivations or application. *See* Certain Defs. Mem. at 16.  However, a horizontal conspiracy receives no legal protection by virtue of its incorporation of elements of vertical integration. *See, e.g.*, *In re Fine Paper Antitrust Litig.,* 82 F.R.D. 143, 153 (E.D. Pa. 1979) ("[T]he existence of defendant-owned [vertically-integrated] subsidiaries and the participation by those subsidiaries in an overall horizontal conspiracy … cannot detract from what is basically a single horizontal conspiracy theory."), *aff'd*, 685 F.2d 810 (3d Cir. 1982), *cert. denied sub nom. Alaska v. Boise Cascade Corp.*, 459 U.S. 1156 (1983); *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 44 (D.D.C. 1998) (rejecting defendants' motion to dismiss and holding that

28

"[t]he fact that the alleged anti-competitive acts possessed vertical aspects does not change the ultimate goal of the . . . agreement by horizontal competitors"); *cf. Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.*, 209 F.R.D. 159, 216 (C.D. Cal. 2002) (applying "case law regarding horizontal price-fixing conspiracies" where conspiracy among competitors had some "vertical implications").

In support of its position, United II relies upon the Supreme Court's holding in *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co.*, 370 U.S. 19, 20-21 (1962) ("*Sunkist Growers*"). *Sunkist Growers* is inapposite. There, the Court ruled, based on a full trial record that an antitrust conspiracy could not be established among the Sunkist cooperative, a Sunkist subsidiary, and a subsidiary of a Sunkist member association. *See id.* at 29. The *Sunkist Growers* holding is directly contrary to the facts of this case, where the conspiracy involves an avowed non-member of the relevant cooperatives.

United II also argues that no matter the motivation or details of its conspiracy with Offutt and Idahoan, the joint venture is "presumptively procompetitive" because it amounts to a vertical integration. Certain Defs. Mem. at 16. In support for this position, United II cites the *dissent* from a recent D.C. Circuit ruling on a challenge to cable television regulation. *See id.* at 16 (citing *Cablevision Sys. Corp. v. FCC*, 597 F.3d 1306, 1325 (D.C. Cir. 2010) (Kavanaugh, J., dissenting)). But in *Cablevision*, the court hypothetically considered the impact of exclusive vertical integration on market competition in the cable industry. Here, Plaintiff does not address the impact of the dehydration venture on market competition; rather, it focuses entirely on the use of that venture to reduce potato supply as part of Defendants' horizontal conspiracy. And as the Supreme Court has made clear, a purported procompetitive justification is irrelevant as a defense for a per se antitrust violation. *See Ariz. v. Maricopa County Medical Soc.*, 457 U.S. 332,

351 (1982).

The DPP has sufficiently alleged that the Dehydration Defendants conspired to reduce the supply of potatoes. By describing the nature of the conspiracy and the roles of the participants, and by quoting the UPGI on the purposes of the dehydration scheme, DPP has set forth "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.

### b.    R.D. Offutt

The Court should reject Defendant Offutt's position that, because the company purportedly declined to participate in the UPGI conspiracy from the outset, Offutt was unable to conspire with UPGI and United II at a later date. *See* Offutt Mem. at 4. As an initial matter, Offutt raises issues outside the Complaint that cannot be resolved on a motion to dismiss. If it can prove that it was not involved in the conspiracy despite all the facts alleged in the Complaint, it can file a motion for summary judgment after the close of discovery. And, regardless of whether Offutt participated in UPGI's coordinated acreage reductions from the start, by undertaking a joint venture with United II to reduce potato supply, Offutt definitively joined the conspiracy by 2007 at the latest. [27]

Moreover, "[d]etermining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and

---

[27] The fact that the Dehydration Defendants entered the conspiracy as late as 2007 does not foreclose their being held liable for the prior actions of co-conspirators. *See Industrial Bldg. Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970) ("One who enters a conspiracy late, with knowledge of what has gone before, and with the intent to pursue the same objective, may be charged with preceding acts in furtherance of the conspiracy."); *Dextone Co. v. Building Trades Council*, 60 F.2d 47, 48 (2d Cir. 1932) (agreeing that "every person who participates in a conspiracy is liable for everything done during the period of its existence regardless of the exact time at which he becomes a member or the extent of his participation" at least when the "defendants, knowing of the prior existence of the conspiracy allied themselves with the [other conspirators] in order to promote the object for which it was organized").

common sense." *Iqbal*, 129 S. Ct. at 1950; *Morningstar*, 2011 WL 864300, at *3 (same). Here, the DPP has demonstrated that Offutt possessed knowledge of UPGI's goals as early as 2004.[28] It would be implausible to assume that Offutt's agreement with United II was based on an expectation that UPGI had abandoned its sole objective of reducing potato supply to boost prices. Furthermore, UPGI reiterated its anticompetitive intentions with regard to *the joint venture* contemporaneous with its inception. Thus, the DPP has adequately pled that Offutt reached an agreement with United II to undertake the dehydration joint venture in support of the greater conspiracy to limit potato supply.[29]

Offutt's remaining argument is that the DPP failed to plead that the formation of Idahoan by Offutt and United II "had the effect of reducing the supply of potatoes." Offutt Mem. at 11. At the motion to dismiss stage, however, UPGI's own words regarding the role of the joint venture are more than sufficient to demonstrate that the venture was used to limit the supply of fresh potatoes. UPGI's public statements that Idahoan "provides United with an outlet for surplus potatoes[,]" and that "the current dehy[dration] strategy . . . is critical to United's overall mission of supply management" (¶¶ 318-19), go beyond what is necessary to demonstrate a plausible conspiracy to reduce potato supply.

Finally, Offutt should be held jointly liable with United II for the wrongdoing inherent in the dehydration joint venture. *See Wheat v. Kinslow*, 316 F. Supp. 2d 924, 930 (D. Kan. 2003) ("Each member of a joint venture or joint enterprise is considered the agent of the other(s), and the acts of any one member within the scope of the enterprise may be charged against the

---

[28] Plaintiff does not claim that Offutt joined the conspiracy simply by virtue of attending a UPGI meeting. *See* Offutt Mem. at 10. However, the UPGI meeting provided Offutt with insight into the plans and goals of UPGI insight that would be relevant as Offutt teamed with UPGI in 2007.
[29] Even if Offutt had discovered the intent of United II and UPGI to reduce supply only in the months after establishing the joint venture, Offutt ratified its commitment to the conspiracy by continuing to participate in the Idahoan venture through the present.

other(s).”); *Stecyk v. Bell Helicopter Textron., Inc.*, No. 94-cv-1818, 1998 U.S. Dist. Lexis 17668, at *3 (E.D. Pa. Nov. 9, 1998) (joint venturers “mutually and vicariously liable for injuries or harms caused by their venture”); *Edwards v. Thompson*, 336 N.W.2d 612, 616 n.7 (N.D. 1983) (observing that “legal principles applicable to partnerships also apply to joint ventures” including as to joint liability); *Ross v. Coleman Co.*, 761 P.2d 1169, 1182 n.12 (Idaho 1988) (recognizing joint venture liability under Idaho law)**;** W. Keeton, PROSSER & KEETON ON TORTS, § 72 at 518 (5th ed. 1984) (discussing joint liability for joint venturers).

### c.    Idahoan Foods

Defendant Idahoan’s motion is similarly unpersuasive and should be rejected.

*First*, Idahoan recites the *Twombly* plausibility standards and then eschews those standards in favor of an argument that DPP must, in its complaint, establish a defendant’s “conscious commitment to a common scheme designed to achieve an unlawful objective[.]” *See* Idahoan Mem. at 10-11 (quoting *Toscano v. Prof’l Golfers Ass’n*, 258 F.3d 978, 983 (9th Cir. 2001) (“*Toscano*”) (internal citation omitted)).  *Toscano*, however, was a decision upholding a grant of summary judgment where the plaintiff had failed to meet his burden after conducting discovery.  Here, on a motion to dismiss, the applicable question is whether the DPP has set forth plausible grounds to infer the existence of a claim for relief.  As detailed above, the DPP has plausibly alleged that, separate from its role as purchaser of all of United II’s dehydration-grade potatoes, Idahoan has agreed to take on “surplus” fresh potatoes from UPGI in order to advance the supply reduction conspiracy.  This cooperation with UPGI, United II and Offutt in the interest of reducing *fresh* potato supply plausibly suggests that Idahoan knowingly conspired in contravention of the Sherman Act.

*Second*, Idahoan suggests that its business dealings with co-conspirators United II and

Offutt amounted to nothing more than an "ordinary commercial arrangement" that cannot be actionable.  Idahoan Mem. at 12.  But DPP has pled that Idahoan was not merely an ordinary purchaser; rather it was a co-conspirator in the supply reduction scheme through its acquisition and disposal of "surplus" potatoes.  The fact that Idahoan *purchased* potatoes from the cartel does not lessen the plausibility of DPP's claim.

Idahoan's citation to *Rick-Mik Enters. v. Equilon Enters.*, 532 F.3d 963 (9th Cir. 2008) ("*Rick-Mik*") is inapposite.  *Rick-Mik* involved an unsupported allegation that the defendant franchisor agreed with various, unnamed banks to fix prices on the credit card processing services that plaintiff franchisees were required to use.  The instant allegation goes far beyond that of a simple sales contract between a buyer and seller.  Here, the DPP has detailed an anticompetitive scheme undertaken by the Dehydration Defendants.  Idahoan's acquisition of potatoes from United II and Offutt was one important element of that scheme.  Plaintiff has, at a minimum, plausibly suggested that Idahoan's arrangement to dispose of UPGI's surplus potatoes amounts to conspiratorial conduct in violation of the antitrust laws.

The DPP has also pled facts plausibly suggesting that United II and Offutt formed Idahoan to facilitate the supply management program, and that Idahoan acted at United II's behest to dispose of surplus potatoes in order to increase fresh potato prices.  Idahoan, therefore, "coordinated" its actions with its parent entity in the same fashion contemplated by the Supreme Court in *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U.S. 752 (1984) ("*Copperweld*").

The decision in *Mitchael v. Intracorp, Inc.*, 179 F.3d 847, 857 (10th Cir. 1999) ("*Mitchael*"), cited by Idahoan, does not support its argument.  *Mitchael* was an appeal of a grant of summary judgment in the Tenth Circuit.  In *Mitchael*, plaintiffs alleged a horizontal antitrust conspiracy among a group of insurers and Intracorp, which was a subsidiary of insurer CIGNA

that conducted utilization reviews of medical procedures.  The case turned on whether Intracorp and CIGNA could be considered as a single insurer entity for purposes of alleging a horizontal conspiracy or, in the alternative, whether Intracorp's contractual relationship with the insurers constituted an agreement in violation of §1 of the Sherman Act.

Citing *Copperweld*, the *Mitchael* court explained that "only . . . 'the *coordinated activity*' of a parent and subsidiary must be viewed as that of a single enterprise for §1 purposes." *Mitchael*, 179 F.3d at 857 (emphasis added).  Thus, the court refused to extend the single entity doctrine to a situation "where there is no evidence that *both were involved in the challenged conduct*." *Id* (emphasis added).  *See also In re Pa. Title Antitrust Litig.*, 648 F. Supp. 2d 663, 689 (E.D. Pa. 2009) ("when a 'parent controls, directs, or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act.' . . . [W]hen a parent directs its subsidiary to carry out the parent's anticompetitive designs, the parent essentially uses its subsidiary to violate antitrust laws, which constitutes sufficient independent participation in the conspiracy by the parent for it to incur § 1 liability.") (quoting *Nobody in Particular Presents, Inc. v. Clear Channel Comms.*, 311 F. Supp. 2d 1069 (D. Colo. 2004)).

Here, the DPP has alleged that Idahoan coordinated with its parent entities, and that Idahoan has been an active participant in the conspiracy at the behest of its parent entities.  As such, DPP should at least be permitted to test the extent of Idahoan's relationship with its parent entities through discovery.  *Cf. SPW Assocs. v. Anderson*, 718 N.W.2d 580 (N.D. 2006) ("[a] joint venturer is an agent of the joint venture . . . [and] knowledge of or notice to one joint venturer is presumed to be knowledge of or notice to the joint venture").

34

D.  POTANDON PRODUCE LLC, THE SALES AND MARKETING DEFENDANT

Potandon argues that it is a downstream entity that is peripheral to the conspiracy alleged herein.  To the contrary, the DPP alleges facts that suggest that Potandon, in its role as the sales and marketing agent for six prominent potato growers, participated in the conspiracy both directly and as an agent of its owner-growers.

### 1.  Potandon Is Not Peripheral to the Conspiracy

Potandon claims that it is tangential to the nationwide conspiracy; however, the Complaint tells a different story.  The CAC details agreements made by marketers,[30] such as Potandon, to reduce supply, including (1) diverting potatoes to charities and food banks (¶ 189), (2) imposing "shipping holidays," whereby shippers and packers are forced to shut down for a certain number of eight-hour shifts (¶ 186), and (3) "flow control," whereby the cooperatives work with shippers and warehouses to adjust the flow of potatoes into the market to prevent over-supply.  ¶¶ 190, 214.  Further, in order to effectuate these secondary market schemes, Potandon passed information on potato capacity and stock to UPGI and UPGA so that these cooperatives could better manage the overall supply that would reach market.  ¶¶ 186, 190, 278 ("UPGI and UPGA conspired with non-exempt, packer and warehouses in implementing flow control measures.").  The DPP has explicitly alleged that *all Defendants* involved in growing and selling operations – including Potandon – were direct participants in the supply reduction scheme detailed in the Complaint.  ¶ 246.

Potandon is part of this conspiracy.  It is the exclusive marketer and shipper for six

---

[30] The Complaint, quoting Potandon's website, describes it as a "marketer," a broad label.  ¶ 77. The Ninth Circuit, in a case addressing the potato industry, described "marketing" as: "'The aggregate of functions involved in transferring title and in moving goods from producer to consumer, including among others buying, selling, storing, transporting, standardizing, financing, risk bearing, and supplying market information.'"  *Treasure Valley Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 215 (9th Cir.), *cert. denied*, 419 U.S. 999 (1974) ("*Treasure Valley*") (quoting WEBSTER'S NEW COLLEGIATE DICTIONARY, 1953 ed.).

prominent potato growers, and it operates as the largest potato marketer in North America, *controlling 25% of the Idaho potato market*. *See* ¶¶ 72, 77. In addition to selling, shipping, and marketing potatoes, Potandon has established an extensive network of over 60 potato and onion co-packers in the United States and Canada. ¶ 76. Potandon is also involved in multiple joint venture growing areas and has several exclusive sales agreements, which gives it a national sourcing network. *Id*. In other words, the conspiracy could not have operated without Potandon's direct and significant involvement given its size and role. The Complaint alleges that marketers, packers, and shippers like Potandon joined the conspiracy to play a specific role identified and orchestrated by UPGI and UPGA. ¶¶ 22, 184-86, 189, 201, 214, 278, 309.

Potandon began operations in 1995 by acquiring the exclusive licensing rights to use the popular Green Giant brand on its potatoes. ¶ 78. Since then, six prominent potato growers/shippers have merged their "sales and marketing activities" into Potandon's operations. ¶¶ 73-75. These growers include Idaho Fresh Cooperative (a 70-grower coop with six packing sheds), Harvest Fresh Produce (for whom Allen Floyd sat on the original UPGA Board of Directors), and Defendant Larsen Farms (whose namesake, Mr. Larsen, helped found UPGI and create the potato cartel). ¶¶ 73, 75, 170, 194. It is notable that Potandon's agreements with Harvest Fresh Produce and Larsen Farms came in 2005 and 2006, years when the conspiracy began and was aggressively expanding. ¶ 75. For example, Allen Floyd helped found UPGA in March of 2005, and shortly thereafter, in June of 2005, transferred his business' sales operations to Potandon. *Id.*, ¶ 194. Likewise, Mr. Larsen of Larsen Farms "merged" with Potandon in October of 2006, only 1-2 years after helping to found UPGI. ¶¶ 75, 170. One of the reasons the conspiracy succeeded is the heavy involvement of marketers, parkers, and shippers—including packers representing 75% of Idaho's packing capacity—a figure that could not have been

achieved without Potandon's involvement.  ¶ 210.

These six growers **own and control** Potandon (¶¶ 72-77), and Potandon acts as the growers' **agent** for the nationwide sales and marketing of the growers' potatoes.  ¶¶ 72, 80. Partnering with Potandon allows these growers to bifurcate their sales and marketing functions, and deliver potatoes to Potandon to sell and market to DPP and other direct purchasers.[31]  Given its exclusive sales agreements, Potandon operates essentially as a marketing subsidiary of its owner-growers.  ¶ 76.[32]  And, given Potandon's admission that the growers participate in a cartel,[33] it has full knowledge of its owners' illegal conduct in which it participates and benefits. ¶ 80.

## 2.   The DPP Has Plausibly Alleged that Potandon Directly Violated the Prohibitions of the Sherman Act

Potandon attempts to elevate the pleading bar.  For instance, Potandon argues that this Court should focus only on the specific allegations that mention "Potandon" and not those allegations against the growers which control and own Potandon.[34]  The allegations against Potandon, however, can only be understood within the context of Potandon's role as the sales arm of various growers participating in the industry-wide conspiracy, *Starr*, 592 F.3d at 329 (Newman, J., concurring), and, as noted above, must not be compartmentalized and considered

---

[31] By comparison, other Defendants, such as the Wada Defendants, handle these processes themselves.  They grow potatoes and then sell and market to direct purchasers.  ¶¶ 30-51. Legally, there is little distinction between the Wada Defendants and the consortium comprised of growers-shippers and their exclusive marketing agent, Potandon.

[32] Potandon touts its "several exclusive sales agreements," not disclosing for whom it exclusively sells. ¶ 76 (quoting The Full Story, http://www.potandon.com/fullstory.htm).  The most plausible inference is that Potandon serves as the exclusive sales agent for the growers that own it.

[33] *See* Potandon Mem. at 1 ("The primary issue is whether supply management by growers and their cooperatives is covered by the immunities provided by the Capper-Volstead Act.").

[34] Potandon twice cites *Kendall* for this point.  Potandon Mem. at 4-6.  As previously discussed, however, *Kendall* did not announce an elevated pleading threshold. Moreover, *Kendall* is factually inapposite, since plaintiffs in that case were allowed discovery but, nevertheless, were unable to plead anything more than parallel conduct.  518 F.3d at 1048.

in isolation.  Because the DPP carefully described the entire conspiracy in intricate detail, there is no additional obligation for the Complaint to provide explicit detail as to the precise involvement of every participant.

Potandon also argues that the DPP "lumps" it into the rest of the conspiracy but fails to allege that each Defendant made a "conscious commitment to a common [unlawful] scheme." Potandon Mem. at 5, 8.  The DPP, however, need not meet this elevated standard.  *See Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1192 (N.D. Cal. 2009) (quoting *Movie 1 & 2 v. United Artists Comm., Inc.*, 909 F.2d 1245, 1251-52 (9th Cir. 1990)). The DPP does not merely "lump" Potandon in with all other Defendants.  Rather, the Complaint alleges Potandon's extensive sales and marketing role, its participation in secondary market schemes to manipulate supply and affect prices, and the ownership and control by the prime participants in the conspiracy for whom Potandon serves as the exclusive sales and marketing agent.  ¶¶ 73-77, 186, 214.

Potandon additionally attempts to shift this Court's attention to what DPP has not alleged. However, what a plaintiff has not alleged has no place in determining the sufficiency of its pleadings.  "[W]hen the legal sufficiency of a complaint's allegations is tested by a motion under Rule 12(b)(6), review is limited to the complaint."  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (internal citation omitted).

Accordingly, "it can reasonably be inferred from the complaint," that Potandon directly participated in the conspiracy.  *Matrixx*, 131 S. Ct. at 1323.

### 3.     Potandon Conspired as an Agent of Its Owner-Growers

In addition to alleging that Potandon directly participated in the potatoes conspiracy, DPP also alleges that Potandon conspired as an agent of its owner-growers.

### a.   Knowledge, Intention, and Material Contribution to the Conspiracy

The Complaint sufficiently alleges agency liability against Potandon pursuant to the three-part test set forth in 7 Herbert Hovenkamp & Phillip E. Areeda, FUNDAMENTALS OF ANTITRUST LAW ¶ 1474c (3d ed. Supp. 2009), and quoted by Potandon in its brief (at 9-10).  The test requires that the agent Potandon:  (1) has "knowledge of its supplier's purpose to restrain trade," (2) "intend[s] to restrain trade itself rather than simply earn its usual and customary commission," and (3) "contribute[s] materially to the restraint."

First, given Potandon's close relationship with its owner-growers, its admission that growers were managing supply, and the openness with which the conspiracy operated in Idaho, it is plausible that Potandon *knew* of its suppliers' purpose to restrain trade.

Second, it can reasonably be inferred from the Complaint that Potandon *intends* to restrain trade itself rather than earn its usual and customary commission.  Potandon serves as an exclusive sales agent for growers and profits from their price-fixing scheme by selling potatoes at higher prices.  ¶ 80.  And, as the nation's leading potato marketer, the Complaint suggests that Potandon does restrain trade itself through several marketing schemes.  ¶¶ 186, 189, 214.

Third, Potandon *contributes materially* to the conspiracy. This is a reasonable inference because of Potandon's prominence in the potato industry, its sales/marketing arrangements with its owner-growers, and its managing supply through marketing schemes.  With all three requirements met, the Complaint sufficiently alleges that Potandon conspires as an agent of its owner-growers.

### b.   Control by Six Owner-Growers

The Complaint states that Potandon was "controlled" by its owner-growers. "'An agent is one who acts on the principal's behalf and subject to the principal's control.'"  *Rollins v. Maui*

*Dreams Dive Co.*, Civ. No. 10-00336, 2011 WL 1299688, at *5 (D. Haw. Mar. 31, 2011)

(quoting Restatement (Third) Agency § 1.01)).  "An entity can incur antitrust liability for the acts

of its employees or agents, when acting within the scope of their apparent authority, despite the

agent's desire to benefit only him or herself."  *County of Stanislaus v. Pacific Gas & Elec. Co.*,

No. CV-F-93-5866-OWW, 1994 WL 706711, at *31 (E.D. Cal. Aug. 25, 1994).  *See Harris*

*Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134-35 (9th Cir. 2003)

("the subsidiary represents the parent corporation by performing services 'sufficiently important

to the [parent] corporation that if it did not have a representative to perform them, the [parent]

corporation . . . would undertake to perform substantially similar services'") (citations omitted);

*United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1007 (9th Cir. 1972) ("as a general rule a

corporation is liable under the Sherman Act for the acts of its agents in the scope of their

employment, even though contrary to general corporate policy and express instructions to the

agent.").

        Moreover, "the question of agency is . . . highly fact specific," and should not be decided

at the pleading stage.  *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890,

900-01 (N.D.Cal. 2009) (denying summary judgment because of materially disputed facts on the

question of agency).  *See Weinstein v. Saturn Corp.*, 303 Fed. App'x 424, 426 (9th Cir. 2008)

(upholding agency allegations at pleading stage); *Bowoto v. Chevron Texaco Corp.*, 312 F. Supp.

2d 1229, 1241 (N.D. Cal. 2004) ("[w]hether an agency relationship exists between a parent

corporation and its subsidiary is normally a question of fact."); *In re South African Apartheid*

*Litig.*, 617 F. Supp. 2d 228, 272 (S.D.N.Y. 2009) (holding that the level of control necessary to

form a principal-agent relationship between a parent company and subsidiary defies resolution

by mechanical formulae because the inquiry is "inherently fact-specific").[35]

The DPP submits that, based on the allegations in the Complaint and the relevant legal standard, it is plausible that Potandon is controlled by and acts on behalf of its owner-growers in effecting the conspiracy to manage supply.  ¶ 80.

Even the case on which Potandon principally relies for its agency argument – *Allen v. Dairy Farmers of America, Inc*., 748 F. Supp. 2d 323 (D. Vt. 2010) ("*Allen*") – demonstrates that Potandon is an agent of its owner-growers in participating in the potatoes conspiracy.  In *Allen* (detailed in Potandon Mem. at 12-14), dairy farmers brought antitrust claims against four principal entities in the milk industry:  the Dairy Farmers of America ("DFA"), the country's largest dairy cooperative; Dairy Marketing Services ("DMS"), which sells milk to bottlers as DFA's *exclusive marketing agent*; and Dean and Hood, two large milk bottlers.  Potandon compares itself to Hood, whose motion to dismiss was granted.  However, it is the DPP that is more analogous to Hood since both are customers of their respective defendants.[36]  And it is Potandon that is more similar to DMS, the marketing agent, whom the court did not dismiss.

The court in *Allen* concluded that DMS, the exclusive marketing agent of DFA, acted as the agent of DFA, a cooperative of milk producers, in both entities' violating Sections One and

---

[35] Plaintiff is not required to plead specific factual allegations of agency or control at this stage. *Gilbert v. Concerta Health Servs., Inc.*, No. 03:07-CV-00264-LRH-VPC, 2008 WL 318356, at *2 (D. Nev. Jan. 31, 2008) ("[b]ecause the specific facts will be revealed through discovery, it is not necessary for Plaintiff's amended Complaint to set forth detailed allegations of agency. Arguments as to whether the evidence supports the allegations are more appropriately considered in a motion for summary judgment."); *Dion LLC v. Infotek Wireless, Inc*., No. C 07-1431 SBA, 2007 WL 3231738, at *4 (N.D. Cal. Oct. 30, 2007) (plaintiff need only place the defendant on notice that its claim is based on an agency theory).  In fact, it is unnecessary to allege agency or vicarious liability to survive a Rule 12(b)(6) motion because "[a] person legally responsible for an act may be alleged to have committed it without going into the theories which support that ultimate fact." *Greenberg v. Sala*, 822 F.2d 882, 886 (9th Cir. 1987) ("as a matter of law, allegations of agency, vicarious liability, and/or respondeat superior are not required").  *Accord Hernandez v. Hilltop Fin. Mortgage, Inc*., 622 F.Supp.2d 842, 852-53 (N.D. Cal. 2007).

[36] *Allen* held that allegations against Hood were "wholly conclusory" in granting its motion to dismiss.  748 F. Supp. 2d at 334.

Two of the Sherman Act.  748 F. Supp. 2d at 342-43.  The court based this holding on the relationship between DFA and DMS being one of control and exclusivity, as well as one that punishes its competitors and harms competition.  *Id.*  In the case at hand, DPP alleges growers' ownership and control over Potandon (¶¶ 72, 80) and Potandon's exclusive sales agreements with its owners (¶ 76). The DPP also alleges that this arrangement, within the context of a national conspiracy, punishes competitors and harms competition by imposing punitive measures for non-compliance and charging higher prices to direct purchasers.  ¶¶ 215, 223.  Based on *Allen*, the Complaint alleges that Potandon acted as its owner-growers' agent in conspiring to limit potato supply.

### c.      The Single Entity Theory

The Complaint presents a fact issue as to whether Potandon and its owner-growers function as a single entity, further supporting the inference that Potandon conspired with its owners.[37]  *See Visa U.S.A., Inc. v. First Data Corp.*, Civ. No. 02-01786, 2006 WL 516662, at *2 (N.D. Cal. Mar. 2, 2006) ("*Visa*") ("The single entity inquiry is fact-specific and is dependent on the circumstances of each case.").  The single entity here is comprised of growers as principal and Potandon as its agent.  *See Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1147 (9th Cir.), *cert. denied*, 540 U.S. 940 (2003) ("*Freeman*") ("[t]he single-entity rule . . . . applies to principal-agent relationships").

Courts consider a number of factors to determine whether a particular corporate structure functions as a single entity.[38]  Most important is whether participants share a "common, single

---

[37] As part of a single entity, Potandon could be acting as an agent of its growers in conspiring, or it could be directly conspiring with other potatoes entities, just not with fellow members of the single entity.  Only discovery of facts can determine the precise nature of Potandon's conspiring and price fixing.

[38] Although Potandon briefs the concept of piercing the corporate veil, it is immaterial to the question of whether Potandon and its owners have conspired or whether they function as

and unified economic interest." *Visa*, 2006 WL 516662, at \*2.  In determining a single economic interest, the Ninth Circuit explained, "Where there is substantial common ownership, a fiduciary obligation to act for another entity's economic benefit or an agreement to divide profits and losses, individual firms function as an economic unit and are generally treated as a single entity." *Freeman*, 322 F.3d at 1148.  Potandon and its owner-growers share common ownership, and, given their exclusive sales agreements, they are fiduciaries that act for each other's economic benefit.  ¶¶ 72, 76, 80.  More generally, they share a common economic interest—to manage supply to boost prices and for Potandon to sell its suppliers' potatoes for as much as the market will bear.[39]

Two other characteristics which favor single entity status are lack of competition among the entity's members and these members' effective control of the entity's decisions.  *Visa*, 2006 WL 516662, at \*4-6.  Because Potandon acts as a marketing agent of its owner-growers, there is no competition among Potandon and its owners.  Together, they all participate in a conspiracy to reduce supply and maximize their profits.  With respect to decision-making, Potandon is owned and controlled by its suppliers, ¶ 80, who act at the behest of UPGI and UPGA and follow their supply-management instructions, ¶¶ 183, 198.

### 4.  Neither Capper-Volstead nor the Cooperative Marketing Act Exempt Potandon from Section One Liability

Potandon adds one final unsuccessful attempt to dismiss the Complaint, *i.e.*, its participation in the alleged conspiracy is excused by both Capper-Volstead as well as the Cooperative Marketing Act (7 U.S.C. § 455) ("CMA").  With regard to the Capper-Volstead Act,

---

agent/principals or as a single entity.  *See, e.g.*, *Freeman*, 322 F.3d at 1147-48 ("The single-entity rule is relevant in a variety of contexts," not only for companies and subsidiaries.).

[39] Potandon admits to receiving compensation from its operating as a marketing agent for its six owner-growers.  *See* Potandon Mem. at 10.

Potandon argues that Capper-Volstead immunity extends not only growers and their cooperatives, but also to marketing agents like itself.  Potandon Mem. at 16.  Although the CVA allows associations to "have marketing agencies in common," this only applies to associations that qualify for CVA immunity.  7 U.S.C. § 291.  Potato associations, such as those comprised of the growers that own Potandon, do not qualify for CVA immunity.

Potandon does not qualify for CMA exemption either.  Enacted in 1926, the CMA expands what farmers were permitted to exchange under the Capper-Volstead Act and "authorizes *Capper-Volstead-type cooperatives* to acquire and exchange 'past, present, and prospective crop, market, statistical, economic, and other similar information.'"[40]  Potandon argues that the CMA provides limited immunity for growers to exchange competitively-sensitive information through a common agent, and that such agents are not required to comply with the Capper-Volstead Act.  Potandon Mem. at 17-18 (citing *Northern California Supermarkets, Inc. v. Central California Lettuce Producers Coop.*, 413 F. Supp. 984, 994 (N.D. Cal. 1976), *aff'd per curiam*, 580 F.2d 369 (9th Cir. 1978) ("*Cal. Supermarkets*")).[41]  According to Potandon, then, its actions are immunized under the CMA because it is a common agent.

But Potandon's status as a "common agent" does not immunize it from liability when both itself, as well as the owner-growers that were feeding it information, were directly involved in the conspiracy.  As discussed above, the Complaint alleges that packer/shippers like Potandon shared marketing information with growers.  But the Complaint also alleges that the

---

[40] Christine Varney (Assistant Attorney General of the Antitrust Division at the U.S. Department of Justice), *The Capper-Volstead Act, Agricultural Cooperatives and Antitrust Immunity* ANTITRUST SOURCE, Dec. 2010, at 2 n.10 (citing the CMA) (emphasis added).

[41] This case offers no support for Potandon since it held that defendants' activities were exempt pursuant to the Capper-Volstead Act and, therefore, concluded "[i]t is unnecessary to rule on [defendants'] claim for exemption [under the CMA] in light of the above holdings."  *Northern Cal. Supermarkets*, 413 F. Supp. at 994.

packer/shippers participated in shipping holidays and flow control to the tune of 75% of the potato packing capacity of the State of Idaho.  Even if the CMA allowed the growers to use the packer/shippers to exchange information, nothing in the CMA even hints at immunizing either the growers or the packer/shippers from liability for their blatantly anticompetitive shipping holiday and flow control schemes.

Moreover, there is simply no evidence that Congress intended to grant a common marketing agent *carte blanche* antitrust immunity so long as it shares competitive information. Importantly, 7 U.S.C. § 457, passed the same day as the CMA, provides that "nothing contained in this [Cooperative Marketing] chapter is intended ***nor shall be construed, to modify or repeal any of the provisions of sections 291 and 292 of [the Capper-Volstead Act]***."  7 U.S.C. § 457 (emphasis added).  Thus, all the CMA does is permit growers to utilize an agent to facilitate the exchange of information.  Again, Potandon fails to qualify for immunity under the CMA for the same reasons thoroughly detailed in DPP's Capper-Volstead Opposition, such as collusive output restrictions and collaborating with non-exempt entities.  *See Agitronics Corp.*, Civ. No. 94-0066, 1994 WL 542203, at *6 (N.D.N.Y. Sept. 22, 1994) (citing *Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 395 (1967)) (referring collectively to provisions of the Clayton Act, Capper-Volstead, and the CMA as the "exemption statutes" and holding that conspiracies between an association of dairy farmers and those outside of its membership are "not protected under the exemption statutes.").

Potandon and its owner-growers collaborated together in a common scheme to reduce supply to raise potato prices.  Potandon also directly participated with other non-exempt entities through secondary market schemes to manipulate supply.  The claimed CMA exemption is of no moment.  The DPP has sufficiently alleged that Potandon both directly participated in the

45

potatoes conspiracy and participated as an agent of its owner-growers.

E.   THE DOLE DEFENDANTS' LIABILITY ARISES OUT OF THEIR LONG TERM, COOPERATIVE RELATIONSHIP WITH THE WADA DEFENDANTS

The Dole Defendants' motion to dismiss rests on two arguments.

*First*, the Dole Defendants assert that the DPP has not pled a plausible conspiracy because the allegations asserted against them are "conclusory." Dole Br. at 4-7. But, when one considers the lengthy, intensely cooperative nature of the Dole Defendants' relationship with the Wada Defendants, and the Wada Defendants' (particularly Mr. Wada's) involvement in the orchestration of a conspiracy that continues to impact the potato market, it is certainly plausible that the Dole Defendants "were aware of, endorsed and profited from" the conspiracy.  ¶ 61.

*Second*, the Dole Defendants assert that they are not vicariously liable for the acts of the Wada Defendants.  Dole Mem. at 7-13. Given, however, the 15-year relationship of these Defendants for the marketing and sale of potatoes (and onions and sweet potatoes), the public representations made by the Wada Defendants about the nature of their relationship, and that the Dole Defendants invested authority in the Wada Defendants to act on Dole's behalf, including by reducing the supply of Dole-branded potatoes, the DPP has satisfied this pleading requirement.

1.   **The Dole-Wada Relationship**

Defendant Dole Fresh Vegetables, Inc. ("DFV") is a division of Defendant Dole Food Company, Inc. ("DFC") (collectively, "Dole Defendants").  ¶ 53.  The Dole Defendants source, harvest, distribute, market over 35 varieties of fresh vegetables, and are collectively the largest fruit and vegetable enterprise in the world.  ¶¶ 54, 59.  With respect to potatoes, DFV is an authorized out-of-state potato broker with the Idaho Potato Commission and participates in various trade organizations frequented by potato marketers, growers, and potato growing companies.  ¶¶ 56-57.  These trade organizations include the United Fresh Produce Association

and the Produce Marketing Association.  ¶ 56.

The Wada Defendants possess the exclusive right to market and sell potatoes (as well as

onion and sweet potatoes) under the national "Dole" label, and they have held this license for

more than 15 years. ¶¶ 47, 55, 61.  Beyond the licensor-licensee relationship, the Dole

Defendants "had control over many aspects of the marketing, selling, packaging, quality and

branding of . . . potatoes" and had frequent contact with and supervised the Wada Defendants.  ¶

61.  *See also* Dole 2010 10-K, at *5 ("[u]nder arrangements with independent growers, we

purchase fresh produce at the time of harvest and are generally responsible for harvesting,

packing and shipping the product to our central cooling and distribution facilities").[42]

A co-branded Wada Farms web page featuring the "Wada Farms" and "Dole" logos

describes the mutuality of the Dole-Wada relationship:

> Our relationship with Dole started approximately 15 years ago
> based on a ***mutual commitment*** to provide the highest quality
> products and service to every customer. The Dole brand has been
> around for over a century and means the finest, high-quality
> products. ***Through Wada Farms Marketing Group, Dole will***
> ***continue to meet customers' expectations*** by consistently
> providing potatoes and onions that meet the highest standard. ***With***
> ***the combined program and experience of Wada Farms,*** there are
> unlimited opportunities with the National Dole label for potatoes,
> onions, and sweet potatoes. For Wada and Dole, anything less is
> unacceptable.

¶ 47 (emphasis added); www.wadafarms.com/dole.html (co-branded web page).  *Cf.*

www.dole.com/CompanyInformation/AboutDole/Philosophy/tabid/1294/Default.aspx ("[t]he

DOLE brand means the finest, high-quality products. Dole will continue to meet customers'

---

[42] The Court may take judicial notice of both these documents and of Defendants' annual reports
and similar corporate documents not referenced in the Complaint. *See, e.g., Dunlap v. BellSouth*
*Telecommunications, Inc*., 431 F.Supp.2d 1210, 1211 n.1 (M.D. Ala. 2006); *In re ATM Fee*
*Antitrust Litig*., 233 F.R.D. 542, 544 (N.D. Cal. 2005) (Walker, C.J.); *City of Livonia Employees'*
*Retirement Sys.v. Syeth*, No. 07 Civ. 10329(RJS), 2010 WL 3910265, at *1 n.2 (S.D.N.Y. Sept.
29, 2010); *Howard v. GAP, Inc*., No. C 06-06773 WHA, 2007 WL 164322, at *5 (N.D.Cal. Jan.
19, 2007).

expectations by consistently providing products that meet the highest standard -- the Dole standard. For Dole, anything less is unacceptable.").

Consistent with their long-standing and "mutual commitment" to provide the highest quality products, the Dole Defendants and the Wada Defendants have also made other representations to the public and to third parties concerning the nature of the long-term and close association. ¶ 64.  By way of example, the Wada Defendants "issued releases to the press and on the Wada website detailing the Dole/Wada relationship and confirming that Wada was acting on Dole's behalf and as Dole's agent in the production, marketing and sales of Dole potatoes."  *Id.*

Moreover, the Dole Defendants specifically invested authority in the Wada Defendants to act on Dole's behalf.  ¶ 63.  The Complaint alleges:

> Throughout the Class Period, the Dole Defendants exercised actual or apparent authority over the Wada Defendants as those Wada entities publicly and repeatedly announced their intentions to reduce potato supplies nationwide and encouraged competitors to do the same.  The Dole Defendants invested authority in the Wada Defendants to act on Dole's behalf, including by reducing the supply of Dole-branded potatoes, despite knowing of the Wada Defendants' efforts to restrict potato supplies and fix prices nationwide with their co-conspirators.

*Id*.

## 2.   The DPP Has Sufficiently Pled The Dole Defendants' Participation In The Antitrust Conspiracy

In challenging the plausibility of the DPP's Complaint, the Dole Defendants claim that the allegations against it are "conclusory," *i.e.*, that the Dole Defendants are simply licensors of the Dole brand name and do not even grow potatoes.[43]  Dole Mem. at 1, 4-7.  However, the facts

---

[43] The Dole Defendants' suggestion that they cannot conspire to restrain competition over a product they do not "grow or sell" should be rejected on its face.  *Compare* Dole Br. at 5 *with Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 577 (1982) ("*Hydrolevel*") (affirming a jury verdict against a trade association for violating Section 1 of the Sherman Act concerning a product the association did not manufacture, sell, or ever possess).  *See also* Dole

alleged plausibly suggest that the Dole Defendants' relationship with the Wada Defendants goes well beyond that of the traditional licensor-licensee.[44]

For example, the Wada Defendants have clearly expressed that the Dole Defendants and Wada Defendants have a "***mutual commitment*** to provide the highest quality products and service." ¶ 47 (emphasis added); www.wadafarms.com/dole.html (co-branded web page). Through Wada Farms Marketing Group, "***Dole will continue to meet customers' expectations*** by consistently providing potatoes . . . that meet the highest standard." ¶ 47 (emphasis added). "***With the combined program and experience of Wada Farms***, there are unlimited opportunities with the National Dole label for potatoes . . . . *Id.* (emphasis added). "For Wada and Dole, anything less is unacceptable." *Id.* Dole reiterates the sentiments regarding high quality, meeting customers' expectations and high standards on its website. *See* www.dole.com/CompanyInformation/AboutDole/Philosophy/tabid/1294/Default.aspx.

Common law principles of vicarious liability apply to claims under the antitrust laws. *Hydrolevel*, 456 U.S. at 565-66.[45] Viewing the long-standing association of the Dole Defendants

---

Br. at 8 (making same argument). *Accord Lucas v. Citizens Comm. Co.*, 409 F. Supp. 2d 1206, 1221 n.6 (D. Haw. 2005), *aff'd*, 244 F. Appx. 774 (9th Cir. 2007) (recognizing that a Sherman Act claim "can be successfully alleged against entities, like Defendants, who are not direct participants in the relevant product market. Defendants have never directly sold or directly profited from the sale of [the product in question.]").

[44] The DPP does not contend that the licensing agreement is itself anticompetitive as the Dole Defendants seem to suggest. Dole Mem. at 5-6.

[45] A principal is subject to vicarious liability to a third party harmed by an agent's conduct when the agent commits a tort while acting within the scope of employment or the agent commits a tort when acting with apparent authority in dealing with a third party on or purportedly on behalf of the principal. *See Restatement (Third) of Agency* § 7.01 (2006). Even if a purported agent lacks actual authority, a principal also "is liable if it ratified the illegal acts." *See generally Federal Election Comm'n v. NRA Political Victory Fund,* 513 U.S. 88, 98-99 (1994) (recognizing the doctrine of ratification under common law agency principles) "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him. " *Hamm v. United States,* 483 F.3d 135, 140 (2d Cir. 2006) (quoting *Restatement (Second) of Agency* § 82 (1958)).

and the Wada Defendants with regard to the marketing, selling, packaging, quality and branding of potatoes, ¶ 61 (*see also* Dole's 10-K, *supra*), against the very public backdrop of the Wada Defendants' (particularly Mr. Wada's) involvement in and orchestration of the conspiracy, it is certainly *plausible* that the Dole Defendants were "aware of, endorsed, and profited from" the price-fixing conspiracy at issue in this Action. ¶ 61. And plausibility, not absolute proof,[46] is the standard by which a pleading is measured. *See, e.g., Iqbal*, 129 S. Ct. at 1950 (on motion to dismiss, court evaluates whether factual allegations "plausibly suggest an illicit accord."). *See also McIntosh v. Monsanto Co.*, 462 F. Supp. 2d 1025, 1030 (E.D. Mo. 2006), (denying summary judgment under Section One because "patent holders can, under certain circumstances, be liable for antitrust violations in connection with the scope of licensing agreements.").

### 3. Assuming, *Arguendo*, That The Dole Defendants Are Not Primarily Liable For The Conspiracy, They Are Vicariously Liable For The Conspiratorial Acts Of The Wada Defendants

The Dole Defendants, ignoring *Twombly*, *Iqbal*, and their progeny, essentially assert that a "plaintiff must *demonstrate* that the agent was acting on behalf of the principal and that the cause of action arises out of that relationship." Dole Br. at 8 (emphasis added).[47] To the

---

[46] The Dole Defendants seem to suggest that the DPP must prove its involvement in the conspiracy at this stage of the litigation. *See* Dole Mem. at 4. However, the cases that the Dole Defendants rely upon--*Monsanto Co. v Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) and *The Jeanery, Inc. v. James Jeans, Inc.*, 849 F. 2d 1148 (9th Cir. 1988)--were not only decided decades before *Twombly* and *Iqbal*, but were adjudicated after jury trials and, thus, have no relevance to the standard by which DPP's Complaint must be measured.

[47] None of the Dole Defendants' primary authority supports this contention. *See* Dole Br. at 8 *citing E.I DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resmin Intermediates, S.A.S.*, 269 F.3d 187 (3d Cir. 2001) (involving an appeal from a denial to compel arbitration) and *Hydrolevel*, 456 U.S. 556 (based upon an appeal to overturn a guilty verdict in a Sherman Act case due to an improper jury charge); *U.S. ex rel. Thomas v. Siemens AG*, Civ. No. 09-4414, 2010 WL 1711775, at *6 (E.D. Pa. Apr. 26, 2010) (vicarious liability claim added as last-gasp attempt to third amended complaint found insufficient since plaintiff directed no allegations towards relationship between parent and subsidiary).

contrary, in order to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a plaintiff need only plead facts sufficient to "suggest" that a defendant is vicariously liable for the conduct of a separate defendant. *Dauven v. U.S. Bank Nat. Ass'n*, CV 09-1471-PK, 2010 WL 5141275, at *9 (D. Or. Nov. 8, 2010), *report and recommendation adopted* at 2010 WL 5128256 (D. Or. Dec. 9, 2010) (finding vicarious liability claim properly pled even though plaintiff failed to articulate what theory of liability he was proceeding under because the "allegations suffice to provide enough additional facts to suggest" an agency relationship); *U.S. ex rel. McCurdy v. Gen. Dynamics Nat. Steel & Shipbuilding (NASSCO)*, 07CV982 BTM CAB, 2010 WL 3463675, at *4 (S.D. Cal. Aug. 31, 2010) ("*NASSCO*") (denying motion to dismiss because plaintiff's allegations were "sufficient to show that [d]efendant could be" found vicariously liable for the conduct of others).  Moreover, the plaintiff is not required to prove or demonstrate that each element of a particular theory of liability is satisfied on a motion to dismiss – just that the claim is itself plausible and that enough facts are alleged to raise a reasonable expectation that discovery will reveal evidence of liability. *See Twombly,* 550 U.S. at 570.

Fundamentally, vicarious liability is no more than imputing the acts of one actor (here, the Wada Defendants) to that of another (the Dole Defendants).  Restatement (Third) of Torts § 13, Vicarious Liability (June 2010).  Whether vicarious liability attaches is determined by the "'relationship between the two parties.'"  *Calpine Corp. v. Ace Am. Ins. Co.*, Civ. No. 2007 WL 3010570, at *5 (N.D. Cal. Oct. 12, 2007) (quoting Black's Law Dictionary, 8th ed. (2004)).  *See also United States v. Cyberheat*, Civ. No. 05-457 TUC-DCB, 2007 WL 686678, at *7 n.9 (D. Ariz. Mar. 2, 2007) ("[t]he doctrine of vicarious liability is based on the relationship between the parties").  The relationship must be substantial, but it need not pass a high threshold – particularly at the pleadings stage.  For instance, the relationship need not rise to the level of

51

agency.  *See Ellis v. Pennsylvania Higher Educ. Assistance Agency*, Civ. No. 07-4498 DDP(CTx), 2008 WL 4351746, at *5 (C.D. Cal. Sept. 23, 2008) (holding that there was a genuine issue of material fact as to whether parties had a relationship giving rise to vicarious liability even though the court did not hold that parties formed an agency relationship).

Of particular import is the parties' authority and degree of control, *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 262-63 (9th Cir. 1996), as well as knowledge.  For instance, in *NASSCO*, the court, in considering a *respondeat superior* claim under the False Claims Act, provided that the principal inquiry was whether the alleged agent's knowledge of the unlawful activity could be imputed to the principal.  2010 WL 3463675, at *3.  Acknowledging that the standard for *respondeat superior* liability was somewhat unsettled in the Ninth Circuit and giving every reasonable inference to the plaintiff, as it was obligated to do, the court held that the complaint sufficiently alleged liability against the principal.  *Id.* at *4.

Here, contrary to the Dole Defendants' assertions, the Complaint adequately alleges that the Dole Defendants are vicariously liable for the Wada Defendants' anticompetitive conduct. As alleged in the Complaint:

> Throughout the Class Period, ***the Dole Defendants exercised actual or apparent authority over the Wada Defendants*** as those Wada entities publicly and repeatedly announced their intentions to reduce potato supplies nationwide and encouraged competitors to do the same.  ***The Dole Defendants invested authority in the Wada Defendants to act on Dole's*** behalf, including by reducing the supply of Dole-branded potatoes, despite knowing of the Wada Defendants' efforts to restrict potato supplies and fix prices nationwide with their co-conspirators.

¶ 63 (emphasis added).

These allegations, when combined with other facts set forth in the Complaint within the context of an industry-wide conspiracy, plausibly suggest that the Dole Defendants are

vicariously liable for the conspiratorial acts of the Wada Defendants. *See, e.g.*, ¶¶ 47, 61.[48]

## IV.  CONCLUSION

For the foregoing reasons, the DPP respectfully requests that each of the motions to dismiss filed by Defendants be denied.

Dated: May 6, 2011_____                    Respectfully submitted,

                              /S/  Philip Gordon_____
                              Philip Gordon, Esq. (ISBN 1996)
                              Bruce S. Bistline, Esq. (ISBN 1988)
                              GORDON LAW OFFICES
                              623 W. Hays Street
                              Boise, Idaho 83702
                              Phone: (208) 345-7100
                              Fax: (208) 345-0050
                              pgordon@gordonlawoffices.com
                              bbistline@gordonlawoffices.com

                              Michael D. Hausfeld, Esq
                              James J. Pizzirusso, Esq.
                              Sathya Gosselin, Esq.
                              HAUSFELD LLP
                              1700 K Street, N.W.
                              Suite 650
                              Washington, DC 20006
                              Phone: (202) 540-7200
                              Fax: (202) 540-7201
                              mhausfeld@hausfeldllp.com
                              jpizzirusso@hausfeldllp.com
                              sgosselin@hausfeldllp.com

                              Michael Lehmann, Esq.
                              Jon King, Esq.
                              Art Bailey, Jr., Esq.
                              HAUSFELD LLP
                              44 Montgomery Street, Suite 3400
                              San Francisco, CA 94104
                              Phone: (415) 633-1908

---

[48] The Dole Defendants argue, in Footnote No. 9 (Dole Mem. at 10), that DPP has failed to impute the licensing agreement between Dole Fresh Vegetables and the Wada Defendants to Dole Food, and, therefore, argue that Dole Food cannot be held liable for any conduct arising out of the licensing arrangement.  Dole Food, however, conveniently ignores that the Wada Defendants market and promote the "Dole" name, not that of Dole Fresh Vegetables alone.  *See* ¶¶ 46-48, 66.

Fax: (415) 358-4980
mlehmann@hausfeldllp.com
jking@hausfeldllp.com
abailey@hausfeldllp.com

**Counsel for Plaintiff and the Proposed Class**

| | |
|---|---|
| Stanley D. Bernstein, Esq.<br>Ronald J. Aranoff, Esq.<br>Christian Siebott, Esq.<br>Gabriel G. Galletti, Esq.<br>BERNSTEIN LIEBHARD LLP<br>10 East 40th Street, 22nd Floor<br>New York, NY 10016<br>Phone: (212) 779-1414<br>Fax: (212) 779-3218<br>bernstein@bernlieb.com<br>aranoff@bernlieb.com<br>siebott@bernlieb.com<br>galletti@bernlieb.com | Eugene A. Spector, Esq.<br>Jay S. Cohen, Esq.<br>Jeffrey L. Spector, Esq.<br>SPECTOR ROSEMAN KODROFF AND<br>WILLIS, P.C.<br>1818 Market Street, Suite 2500<br>Philadelphia, Pennsylvania 19103<br>Phone: (215) 496-0300<br>Fax: (215) 496-6611<br>espector@srkw-law.com<br>jcohen@srkw-law.com<br>jspector@srkw-law.com |
| Bruce L. Simon, Esq.<br>PEARSON SIMON WARSHAW PENNY,<br>LLP<br>44 Montgomery Street<br>Suite 1200<br>San Francisco, CA 94104<br>Phone: (415) 433-9000<br>Fax: (415) 433-9008<br>bsimon@pswplaw.com | Daniel L. Warshaw, Esq.<br>PEARSON SIMON WARSHAW PENNY.<br>LLP<br>15165 Ventura Boulevard<br>Suite 400<br>Sherman Oaks, CA 91403<br>Phone: (818) 788-8300<br>Fax: (818) 788-8104<br>dwarshaw@pswplaw.com |
| Steven A. Asher, Esq.<br>Mindee J. Reuben, Esq.<br>Jeremy S. Spiegel, Esq.<br>WEINSTEIN KITCHENOFF & ASHER LLC<br>1845 Walnut Street<br>Suite 1100<br>Philadelphia, PA 19103<br>Phone: (215) 545-7200<br>Fax: (215) 545-6535<br>asher@wka-law.com<br>reuben@wka-law.com | Stephen G. Larson, Esq.<br>GIRARDI KEESE<br>1126 Wilshire Boulevard<br>Los Angeles, CA 90017<br>Phone: (213) 977-0211<br>Fax: (213) 481-1554<br>slarson@girardikeese.com |

| | |
|---|---|
| Bonny E. Sweeney, Esq.<br>ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Phone: (619) 231-1058<br>Fax: (619) 231-7423<br>bonnys@rgrdlaw.com | Hollis Salzman, Esq.<br>LABATON SUCHAROW LLP<br>140 Broadway<br>New York, NY 10005<br>Phone: (212) 907-0717<br>Fax: 212-818-0477<br>HSalzman@labaton.com |
| Allan Steyer, Esq.<br>STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH LLP<br>One California Street, Third Floor<br>San Francisco, CA 94111<br>Phone: (415) 421-3400<br>Fax: (415) 421-2234<br>asteyer@steyerlaw.com | Steven A. Kanner, Esq.<br>Douglas A. Millen, Esq.<br>FREED KANNER LONDON & MILLEN LLC<br>2201 Waukegan Road, Suite 130<br>Bannockburn, IL 60015 USA<br>Phone: (224) 632-4500<br>Fax: (224) 632-4521<br>skanner@fklmlaw.com<br>dmillern@fklmlaw.com |
| G. Scott Emblidge, Esq.<br>Sylvia Sokol, Esq.<br>MOSCONE EMBLIDGE & SATER LLP<br>220 Montgomery Street<br>Suite 2100<br>San Francisco, CA 94104<br>Phone:  (415) 362-3599<br>Fax:  (415) 362-2006<br>emblidge@mesllp.com<br>sokol@mesllp.com | Kimberly A. Kralowec, Esq.<br>THE KRALOWEC LAW GROUP<br>188 The Embarcadero, Suite 800<br>San Francisco, CA 94105<br>Phone: (415) 546-6800<br>Fax: (415) 546-6801<br>kkralowec@kraloweclaw.com |
| Arthur N. Bailey, Sr., Esq.<br>ARTHUR N. BAILEY & ASSOCIATES<br>111 West Second St., Suite 4500<br>Jamestown, NY 14701<br>Phone: (716) 483-3732<br>Fax: (716) 664-2983<br>artlaw@windstream.net | |

**Additional Counsel for Plaintiff and the Proposed Class**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 6th Day of May, 2011, a true and correct copy of the foregoing was caused to be filed with CM/ECF with service by electronic mail to the following:

Albert P. Barker
abp@idahowaters.com

Allen Steyer
asteyer@steyerlaw.com

Andrew G. Weiss
adeiss@joneswaldo.com

Andrew H. Stone
astone@joneswaldo.com

Arthur N. Bailey, Jr.
abailey@hausfeldllp.com

Bart M. Davis
bmdavis@bmdlaw.net

Benjamin Andrew Schwartzman
bschwartzman@bwslawgroup.com

Billie Jean Siddoway
bsiddoway@joneswaldo.com

Bonny E. Sweeney
bonnys@rgrdlaw.com

Brad P. Miller
bmiller@hawleytroxell.com

Bruce S. Bistline
bbistline@gordonlawoffices.com

Carmen A. Medici
cmedici@rgrdlaw.com

Chad V. Bonanni
chad@essex.bpflegal.com

Daniel G. Swanson
dswanson@gibsondunn.com

Daniel M. Cohen
danielc@cuneolaw.com

David T. Biderman
dbiderman@perkinscoie.com

David J. Syrios
dsyrios@ademilaw.com

Donald Amamgbo
Donald@amamgbolaw.com

Douglas A. Millen
dmillen@fklmlaw.com

Elizabeth McKenna
emckenna@milberg.com

Eric P. Enson
epenson@jonesday.com

Eugene A. Spector
espector@srkw-law.com

Gregort L. Crockett
gregcrockett@hopkinsroden.ocm

Guri Ademi
gademi@ademilaw.com

Hollis Salzman
hsalzman@labaton.com

James A. Wilson
jawilson@vorys.com

James E. Hartley
jhartley@hollandhart.com

James S. Lowrie
jlowrie@joneswaldo.com

James Pizzirusso
jpizzirusso@hausfeldllp.com

Jay L. Himes

jhimes@labaton.com

Jay S. Cohen
jcohen@srkw-law.com

Jeffrey Alan LeVee
jlevee@jonesday.com

Jeffrey L. Spectorjspector@srkw-law.com

Jon T. King
jking@hausfeldllp.com

Joseph Michael Barton
jbarton@glancylaw.com

Julio Joaquin Ramos
ramosfortrustee@yahoo.com

Kimberly A. Kralowec
kkralowec@kraloweclaw.com

Lionel Z. Glancy
lglancy@glancylaw.com

Loren Block
lblock@milberg.com

Mark A Griffin
mgriffin@kellerrohrback.com

Matthew S. Wild
mwild@wildlawgroup.com

Michael M. Goldberg
mmgoldberg@glancylaw.com

Michael Hausfeld
mhausfeld@hausfeldllp.com

Michael D. Gaffney
gaffney@beardstclair.com

Michael P. Lehmann
mlehmann@hausfeldllp.com

Mindee J. Reuben
reuben@wka-law.com

Monte N. Stewart
stewart@belnaplaw.com

Neil D. McFeeley
nmcfeeley@eberle.com

Paul Novak
pnovak@milberg.com

Peter Safirstein
psafirstein@milberg.com

Philip Howard Gordon
pgordon@gordonlawoffices.com

Reginald Von Terrell
Reggie2@aol.com

Richard C. Boardman
rboardman@perkinscoie.com

Robert Rosenfeld
rrosenfeld@orrick.com

Ronald J. Aranoff
aranoff@bernlieb.com

Samuel G. Liversidge
sliversidge@gibsondunn.com

Shpetim Ademi
sademi@ademilaw.com

Stephen R. Thomas
srt@moffatt.com

Steven A. Asher
asher@wka-law.com

Steven A. Kanner
skanner@fklmlaw.com

Steven B. Anderson
sandersen@hollandhart.com

Steven Bomse
sbomse@orrick.com

Susan G. Kupfer
skupfer@glancylaw.com

Wade L. Woodard
wwoodard@bwslawgroup.com

William Greene
William.greene@leonard.com

William V. Reiss
wreiss@labaton.com

Winston Beard
winston@beardstclair.com

In addition, a true and correct copy of the foregoing was caused to be sent by electronic mail to the following attorneys not registered to receive electronic notice via CM/ECF:  None.

/s/ James Pizzirusso
Hausfeld LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
202.540.7200 Phone
202.540.7201 Fax