David R. Lombardi (ISB No. 1965)
Patrick J. Miller (ISB No. 3221)
GIVENS PURSLEY LLP
601 W. Bannock
P.O. Box 2720
Boise, Idaho 83701
Telephone Number: (208) 388-1200
Facsimile: (208) 388-1300
drl@givenspursley.com
patmiller@givenspursley.com

Brian E. Robison (*pro hac vice*)
GIBSON DUNN & CRUTCHER LLP
2100 McKinney Avenue, Suite 1100
Dallas, Texas 75201-6912
Telephone Number: (214) 698-3100
Facsimile: (214) 571-2928
brobison@gibsondunn.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IN RE: FRESH AND PROCESS POTATOES ANTITRUST LITIGATION | Case No. 4:10-md-02186-BLW |
| THIS DOCUMENT RELATES TO: | **REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS CLAIMS AGAINST UNITED POTATO GROWERS OF CANADA** |
| *Vander Heiden, et al v. United Potato Growers of America, Inc., et al.* | |
| *Rizzo, et al. v. United Potato Growers of America, Inc., et al.* | Case No. 4:10-cv-546 Case No. 4:10-cv-576 |

# TABLE OF CONTENTS

I.      The Foreign Sovereign Immunities Act Bars Plaintiffs' Claims against UPGC ............ 4

    A.   UPGC Is an Organ of the Canadian Provincial Governments ........................................ 4

    B.   UPGC Did not Engage in Commercial Activity ............................................................ 9

    C.   Plaintiffs Should Not Be Allowed to Burden UPGC with Discovery ......................... 11

II.     The Act of State Doctrine Bars Plaintiffs' Claims against UPGC ............................... 12

    A.   The Requirements of the Act of State Doctrine Are Satisfied ..................................... 13

    B.   The Policies Underlying the Act of State Doctrine Favor Dismissal .......................... 14

III.    The Cooperative Marketing Act Bars Plaintiffs' Claims against UPGC ..................... 15

# TABLE OF AUTHORITIES

**Cases**

*Agritronics Corp. v. Nat'l Dairy Herd Ass'n*,
  914 F. Supp. 814 (N.D.N.Y. 1996) ........................................................... 16

*Agritronics Corp. v. Nat'l Dairy Herd Ass'n*,
  1994 U.S. Dist. LEXIS 14168 (N.D.N.Y. Sept. 22, 1994) ...................... 16

*Alexander v. Nat'l Farmers Org.*,
  687 F.2d 1173 (8th Cir. 1982) ................................................................. 16

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
  425 U.S. 682 (1976) ................................................................................. 13

*Arriba Ltd. v. Petroleos Mexicanos*,
  962 F.2d 528 (5th Cir. 1992) ................................................................... 11

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964) ................................................................................. 13

*Butler v. Sukhoi Co.*,
  579 F.3d 1307 (11th Cir. 2009) ............................................................... 12

*Cal. Dep't of Water Res. v. Powerex Corp.*,
  533 F.3d 1087 (9th Cir. 2008) (citation omitted) ............................ passim

*Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*,
  89 F.3d 650 (9th Cir. 1996) ....................................................................... 7

*Credit Suisse v. U.S. Dist. Court for Cent. Dist. of Cal.*,
  130 F.3d 1342 (9th Cir. 1997) ........................................................... 13, 15

*Dole Food Co. v. Patrickson*,
  538 U.S. 468 (2003) ................................................................................... 8

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*,
  322 F.3d 635 (9th Cir. 2003) .............................................................. 8, 10

*Fairdale Farms, Inc. v. Yankee Milk, Inc.*,
  635 F.2d 1037 (2d Cir. 1980) .................................................................. 16

*First Nat'l City Bank v. Banco Nacional de Cuba*,
  406 U.S. 759 (1972) ................................................................................. 14

*Gates v. Victor Fine Foods*,
  54 F.3d 1457 (9th Cir. 1995) ..................................................................... 4

*Honduras Aircraft Registry, Ltd. v. Honduras*,
  129 F.3d 543 (11th Cir. 1997) ................................................................. 14

*IAM v. OPEC*,
  477 F. Supp. 553 (C.D. Cal. 1979), *aff'd*, 649 F.2d 1354 (9th Cir. 1981) .............. 10, 13, 14, 15

*In re FCX, Inc.*,
  853 F.2d 1149 (4th Cir. 1988) ................................................................. 17

*In re Papandreou*,
  139 F.3d 247 (D.C. Cir. 1998) ................................................................ 11

*Kato v. Ishihara*,
  360 F.3d 106 (2nd Cir. 2004) .................................................................. 10

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
  213 F.3d 841 (5th Cir. 2000) ................................................................... 11

*Liberty Warehouse Co. v. Burley Tobacco Growers' Coop. Mktg. Ass'n,*
   276 U.S. 71 (1928) ............................................................................................... 16
*Liu v. Republic of China,*
   892 F.2d 1419 (9th Cir. 1989) .......................................................................... 15
*Md. & Va. Milk Prods. Ass'n v. United States,*
   362 U.S. 458 (1960) ............................................................................................ 17
*Midwest Milk Monopolization Litig.,*
   510 F. Supp. 381 (W.D. Mo. 1981) .................................................................. 16
*Oetjen v. Central Leather Co.,*
   246 U.S. 297 (1918) ............................................................................................ 15
*Republic of Philippines v. Marcos,*
   862 F.2d 1355 (9th Cir. 1988) .......................................................................... 14
*Spectrum Stores, Inc. v. Citgo Petroleum Co.,*
   632 F.3d 938 (5th Cir. 2011) ............................................................................ 13
*Underhill v. Hernandez,*
   168 U.S. 250 (1897) ............................................................................................ 14
*USX Corp. v. Adriatic Ins. Co.,*
   345 F.3d 190 (3rd Cir. 2003) ............................................................................... 9
*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l,*
   493 U.S. 400 (1990) .................................................................................... 13, 15

## Statutes

28 U.S.C. §§ 1603 (b)(3) ....................................................................................... 4
28 U.S.C. §§ 1603(b)(1) ......................................................................................... 4
7 U.S.C. § 455 ........................................................................................................ 17

## Other Authorities

MATTHEW BENDER, 3-55 ANTITRUST LAWS & TRADE REGULATION, § 55.01 (2d ed.) ................ 17
RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE U.S., § 443 cmt. a (1987) ............ 15

iii

The United Potato Growers of Canada ("UPGC") submits this reply brief in further support of its motion to dismiss all claims asserted against it in the Indirect Purchaser Plaintiffs' First Amended Class Action Complaint ("Compl.").

## I.   The Foreign Sovereign Immunities Act Bars Plaintiffs' Claims against UPGC

Plaintiffs voluntarily dismissed PEIPB (one of the Canadian government entities that created UPGC and sits on the UPGC Board) rather than contest its foreign sovereign status, and for good reason. It is undisputed that the Canadian provincial governments explicitly granted PEIPB and the other Member Agencies the power to fix prices, manage supply, export or refuse to export potatoes, and to cooperate and act jointly with each other. And it is undisputed that these immune Agencies created UPGC, fund UPGC, comprise 100% of UPGC's membership and board of directors, and dictate every action of UPGC. Under *Powerex* and other cases that interpret the FSIA broadly, UPGC is immune from suit because it is an organ of a foreign government, was created by government agencies for a public purpose, is controlled and funded by government agencies, and has not engaged in commercial activities.

### A.   UPGC Is an Organ of the Canadian Provincial Governments

UPGC easily meets the requirements of 28 U.S.C. §§ 1603(b)(1) and (b)(3). The only dispute is whether UPGC is immune as "an organ of a foreign state or political subdivision thereof" under 1603(b)(2).[1] An organ of a foreign state "engages in a public activity on behalf of the foreign government." *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir. 2008) (citation omitted). The Ninth Circuit considers six factors in determining

---

[1] A party may meet (b)(2) through either the organ prong or the majority ownership prong. *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1460 (9th Cir. 1995). Because UPGC invokes the organ prong and has never argued that it is immune because a majority of its shares are owned by an agency or instrumentality of a foreign state, the two-tier ownership issue raised on page 10 of Plaintiffs' Opposition Brief is irrelevant.

whether a party is an organ of a foreign state: 1) the circumstances surrounding the entity's creation, 2) the purpose of its activities, 3) its independence from the government, 4) the level of government financial support, 5) its employment policies, and 6) its obligations and privileges under state law.  *Id*. at 1098.  At least five of these factors support a finding that UPGC is an organ of the Canadian provincial governments.

*The creation of UPGC supports organ status*.  The potato board in each Canadian province arose from a statute, and each potato board has the power to set prices, dictate supply and export levels, and cooperate and act jointly with the others.  UPGC Brief at 6-11.  In order to carry-out their statutory powers to cooperate and act jointly, these potato boards (the Member Agencies) created UPGC.  Drouin Dec. ¶ 9.  UPGC is nothing more than a forum through which the Member Agencies implement the powers granted by Canada's provinces.  *Id*. ¶¶ 15-16.

Plaintiffs allege that certain US potato growers encouraged the Member Agencies to work together through what the Agencies eventually created as UPGC, Opp. at 6-7, but there is no evidence that any US grower actually incorporated UPGC, founded it, funded it, or served on its board.  All of the evidence shows the opposite – that immune Canadian government agencies created UPGC to help facilitate the cooperation allowed by Canadian law.  Drouin Dec. ¶¶ 9, 15-16; *see also* Compl. ¶ 323 (stating that PEIPB "was a big player in the formation of the United Potato Growers of Canada").  That some US growers may have encouraged immune Canadian government agencies to create UPGC does not change the fact that the immune agencies created UPGC, nor does it destroy UPGC's status as an organ of the Canadian government.

Plaintiffs also argue that UPGC is not an organ of the Canadian government because UPGC was created under the Corporations Act.  Opp. at 5, 8.  The Ninth Circuit has already rejected this argument.  *Powerex*, 533 F.3d at 1100 ("Creation by formal legislation, however, is

not a precondition for recognition as an organ of a foreign state under FSIA."). In *Powerex*, the provincial government created BC Hydro, and BC Hydro created Powerex to "assist it with its sovereign functions." *Id*. at 1099. Similarly, the provincial governments created the Member Agencies, and those Agencies created UPGC to assist them with their sovereign functions. Like the creation of Powerex, the creation of UPGC supports a finding of organ status.

*UPGC's national purpose supports organ status*. It is undisputed that the immune Member Agencies created UPGC for a national purpose – to facilitate the Member Agencies' efforts to implement the statutory powers granted to them. Drouin Dec. ¶ 9. UPGC is not a sprawling, for-profit corporation with assets, production facilities, distribution centers, and thousands of employees. It is a non-profit forum (a conference call and meeting organizer that disseminates data and publishes a newsletter) that the immune Member Agencies use to cooperate in managing the natural resource of potatoes. Plaintiffs argue that sharing information about production and marketing of potatoes is not a "uniquely governmental function." Opp. at 5. But that is not the test. Powerex's purpose was marketing surplus power, which a private entity could do, but the Ninth Circuit still found Powerex to be immune: "Although there is nothing inherently public about this type of activity, in this case Powerex is fulfilling the precise mission originally dictated by the Province's Ministry of Energy, Mines, and Petroleum Resources." *Powerex*, 533 F.3d at 1100.[2] Like Powerex, UPGC helps immune entities fulfill the mission and goals dictated by Canada's provinces and statutes. *Id*. (finding organ status

---

[2] *See also USX Corp. v. Adriatic Ins. Co*., 345 F.3d 190, 211 (3rd Cir. 2003) (holding that the national purpose prong of the organ test was met even though the entity engaged in the insurance business "as would a private insolvent insurance company"); *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd*., 322 F.3d 635, 640 (9th Cir. 2003) (holding that the national purpose prong of the organ test was met by an entity engaged in banking services).

because Powerex fulfilled the "precise mission" dictated by a Canadian province and "the goals" of a Canadian statute). Thus, this factor supports a finding of organ status.

*UPGC is controlled and funded by immune government entities*. It is undisputed that every member of UPGC is an immune Member Agency. Drouin Dec. ¶¶ 3, 7-8; *see also* Compl. ¶¶ 56, 58 (alleging that UPGC's members are the government potato boards). In addition, every member of UPGC's board of directors is a representative of an immune Member Agency, the board controls every action that UPGC takes, and those board members, like government employees generally, are immune from suit as long as they act in good faith when serving with UPGC. Drouin Dec. ¶ 17; UPGC Brief at 11. The 100% overlap between UPGC's members and directors and the immune Member Agencies supports a finding of immunity. Under *Powerex*, UPGC is immune even though the Member Agencies, rather than a province directly, supervise UPGC. *Powerex*, 533 F.3d at 1101 ("There is no reason to think Congress cared for the *manner* in which foreign states interacted with their organs – i.e., whether the foreign state supervises the organ directly, or through an incorporated agent.") (emphasis in original); *see also Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 654-55 (9th Cir. 1996) (finding organ status even though the entity was a subsidiary of an agency of the government and thus a second-tier subsidiary of the government).

The immune Member Agencies also fund UPGC. Drouin Dec. ¶ 18. UPGC owes its very existence to the provincial statutes that created the immune Member Agencies and to those immune Agencies' funds. Without its immune Members' funds, UPGC would not survive. *Id*. Thus, this factor also supports a finding of immunity under *Powerex*.

Plaintiffs try to divert attention away from UPGC's actual, immune members and argue that UPGC's future members might someday be private parties and that those hypothetical,

future members somehow destroy UPGC's organ status today.  Opp. at 11-13.  Again, Plaintiffs are wrong.  The Supreme Court has held that a party's status under the FSIA is determined as of the date the complaint is filed, not based on some hypothetical future scenario.  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 480 (2003) (stating that "instrumentality status is determined at the time of the filing of the complaint").  Because UPGC consists of immune Member Agencies, is controlled by those Agencies, and depends upon those Agencies for funds, the third and fourth factors support a finding of organ status.[3]

*UPGC's employment policies do not destroy its organ status*.  UPGC does not lose its organ status simply because its one part-time employee is not a civil servant.  The Ninth Circuit found that Powerex was an organ even though it employed dozens of employees who were not civil servants.  *Powerex*, 533 F.3d at 1102 ("[T]his court has repeatedly held that '[a] company may be an organ of a foreign state for purposes of the FSIA even if its employees are not civil servants.'") (citing cases); *EIE Guam*, 322 F.3d at 640-41 (finding organ status even though none of the entity's employees was a civil servant).  Moreover, the one part-time employee simply ensures that UPGC accomplishes its goal, which again is to ensure that immune representatives from immune Member Agencies use UPGC to facilitate their immunized sovereign acts.  Drouin Dec. ¶¶ 5, 16-17.  Thus, the fifth factor supports a finding of organ status or is, at worst, neutral.

*UPGC's obligations and privileges under Canadian law*.  As a non-profit, UPGC does not pay income tax, and any surplus at the end of a fiscal year cannot be distributed to members as dividends.  Also, the Member Agency representatives who serve on UPGC's board of directors are immune from suit so long as they act in good faith.  UPGC Brief at 11.  The fact

---

[3] The fact that the Canadian Horticultural Council ("CHC") has private members is completely irrelevant.  Opp. at 12-13.  The CHC is not a party to this case, and its membership is entirely separate from UPGC's immune Member Agencies and board members.

that UPGC does not enjoy other special privileges as a result of its organ status does not destroy its immunity under the FSIA.  *USX*, 345 F.3d at 213-14 (finding organ status even though the organ did not have "special obligations or privileges under Irish law" because five other factors favored immunity).  Thus, this factor does not defeat UPGC's claim to organ status.

###### B.      UPGC Did not Engage in Commercial Activity

To invoke the commercial activities exception to the FSIA, Plaintiffs must show that their claims are "based upon" commercial activity by UPGC.  Plaintiffs fail this test because their claims are based upon sovereign conduct by Member Agencies that UPGC allegedly facilitated.

Plaintiffs claim that UPGC participated in a conspiracy to suppress the supply of potatoes and thereby raise prices.  Compl. ¶¶ 1-5, 55, 193-199, 310-323.  Plaintiffs also allege that UPGC worked to reduce potato exports between the US and Canada.  *Id*. ¶¶ 311-12.  In their response to a different motion to dismiss, Plaintiffs twice emphasized the critical importance of exports and argued that UPGC reduced potato exports from Canada into the US (referring to them as "lower-priced imports" into the US).  (Docket No. 112, at 10-11.)

If UPGC had the power to control supply and exports, then the commercial activities exception would not apply because managing natural resources and exports is sovereign conduct. UPGC Brief at 18; PEIPB Brief at 11-15.  But Plaintiffs do not refute that it was actually the immune Member Agencies that had the power to reduce supply and exports, not UPGC.  *See* UPGC Brief at 6-11.  That the immune Member Agencies allegedly worked together (as their enabling statutes allowed) through UPGC, rather than cooperating in another way, does not change the nature of their activity from sovereign to commercial.  "It is ridiculous to suggest that the essential nature of an activity changes merely by the act of two or more countries coming

together to agree upon how they will carry on that activity." *IAM v. OPEC,* 477 F. Supp. 553, 568-69 (C.D. Cal. 1979), *aff'd*, 649 F.2d 1354 (9th Cir. 1981).

Moreover, because UPGC itself did not have the power to control supply, its alleged facilitation of the immune Member Agencies' sovereign actions does not trigger the commercial activities exception. A government organ that merely promotes products, assists with business development, participates in trade shows, and leases office space in order to assist a nation's general economy has not engaged in commercial activity. *Kato v. Ishihara*, 360 F.3d 106, 112 (2nd Cir. 2004). Like the organ in *Kato*, UPGC's alleged activities were aimed at promoting or facilitating the activities of the Member Agencies in general and were not designed to promote the financial interests of itself or any one company. Drouin Dec. ¶ 9; *see also Kato*, 360 F.3d at 112 (noting that a private business engaged in commercial activities would promote itself but would not, as did the organ in that case, promote other businesses or "Japanese business interests in general"). Therefore, at most, UPGC was engaged in the promotion of Canadian interests in general, which "is a basic – even quintessential – governmental function," *Kato*, 360 F.3d at 112, and was not engaged in commercial activities.

Plaintiffs argue that UPGC's actions are presumptively commercial because any private entity "can collect, analyze, and disseminate information about the potato market." Opp. at 16-17. But that is not the test. A private party can engage in marketing, attend trade shows, and engage in banking services on nonperforming loans, but courts have still found that organs engaged in those activities were immune under the FSIA. *Kato*, 360 F.3d at 111-12; *EIE*, 322 F.3d at 640-41. Moreover, Plaintiff freely admit that their claims are not "based upon" the collection, analysis, and sharing of information about the potato market. In responding to a different motion to dismiss, Plaintiffs plainly admitted that "the dissemination of data does not

'form the basis of the antitrust claim.'" (Docket No. 113, at 26.).  Likewise, the claims against UPGC are not based on its collection of data and circulation of newsletters.  Plaintiffs allege that those actions by UPGC caused harm only because they were taken as part of an effort by the Member Agencies to reduce the supply of the natural resource of potatoes.  Because the UPGC conduct at issue merely facilitated the Member Agencies' alleged exercise of their sovereign power over supply and exports, UPGC's actions were sovereign and not commercial activity.[4]

### C.  Plaintiffs Should Not Be Allowed to Burden UPGC with Discovery

The FSIA protects foreign governments from precisely the burdens that jurisdictional discovery would impose.  "Immunity should reduce the expenses, in time and inconvenience, imposed on foreign sovereigns by litigation in U.S. courts. . . .  It would be bizarre if an assertion of immunity worked to increase litigation costs via jurisdictional discovery, to the neglect of swifter routes to dismissal."  *In re Papandreou*, 139 F.3d 247, 254 (D.C. Cir. 1998); *see also Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 849 (5th Cir. 2000) ("when FSIA immunity has been claimed, unlimited jurisdictional discovery is *not* permitted as a matter of course") (emphasis in original).

Plaintiffs have not presented sufficient facts to question UPGC's sovereign immunity claim, which is the "necessary prerequisite to an order for limited discovery . . . against a sovereign entity."  *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 534 (5th Cir. 1992) (reversing discovery order and dismissing case when "pleadings allege much less than they imply in the way of 'commercial activity'").  Plaintiffs also have not suggested any facts that discovery might reveal that would defeat FSIA immunity.  *See, e.g., Butler v. Sukhoi Co.*, 579

---

[4] UPGC's employment of a non-civil servant is irrelevant to the commercial activities question because Plaintiffs' claims are not "based upon" UPGC's employment practices.

11

F.3d 1307, 1314 (11th Cir. 2009) (refusing to grant jurisdictional discovery when court was "unable to see what specific facts additional discovery might reveal that would be crucial to the court's immunity determination").  For example, Plaintiffs have given no hint as to how an immensely expensive discovery process would ever disprove: that the Member Agencies incorporated UPGC, that UPGC is a non-profit created for a national purpose, that the Member Agencies comprise 100% of UPGC's members and board of directors, that the Member-dominated board directs all of UPGC's actions, that the Member Agencies fund UPGC, or that UPGC is simply a forum for the Member Agencies to carry-out their sovereign duties. Therefore, the Court should deny Plaintiffs' request for jurisdictional discovery.

## II.     The Act of State Doctrine Bars Plaintiffs' Claims against UPGC

UPGC and PEIPB showed that only the Member Agencies have the power to dictate price, supply, quality, quantity, and exports of Canadian potatoes.  PEIPB Brief at 3-5, 21; UPGC Brief at 6-11.  Plaintiffs offer no evidence to the contrary.  Thus, to the extent that any decision was made to reduce the supply or export of Canadian potatoes, that decision was made by the immune Member Agencies in their sovereign capacity.  And through this lawsuit, Plaintiffs attack the Member Agencies' alleged decision to reduce supply and exports as a violation of numerous federal and state statutes.  The act of state doctrine bars this exact type of attack on a foreign government's decisions.  It does not matter that the immune Member Agencies are not defendants.  Even without the Member Agencies in the case, the act of state doctrine prevents Plaintiffs from attacking those Agencies' sovereign supply-control decisions through the back door by suing UPGC, a non-profit with no assets that the Member Agencies created simply to facilitate their cooperation and to help them carry-out their sovereign duties.

A.      The Requirements of the Act of State Doctrine Are Satisfied

The act of state doctrine is "not some vague doctrine of abstention but a 'principle of decision binding on federal and state courts alike.'" *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990) (*quoting Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 (1964)).  It requires that "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *Id.* at 409.  Thus, the act of state doctrine will bar judicial review of a claim if "(1) there is an official act of a foreign sovereign performed within its own territory; and (2) the relief sought or the defense interposed in the action would require a court in the United States to declare invalid the foreign sovereign's official act." *Credit Suisse v. U.S. Dist. Court for Cent. Dist. of Cal.*, 130 F.3d 1342, 1346 (9th Cir. 1997).

This case satisfies both requirements under *Credit Suisse*.  First, the Member Agencies are foreign sovereigns that have performed official acts within their respective provinces.  *See generally* PEIPB Brief.  Plaintiffs offer no evidence to the contrary.  Instead, Plaintiffs focus entirely on UPGC's status and actions, thereby confusing the FSIA with the act of state doctrine.  Unlike the FSIA, "a private litigant may raise the act of state doctrine, even when no sovereign state is a party to the action."  *IAM*, 649 F.2d at 1359; *Spectrum Stores, Inc. v. Citgo Petroleum Co.*, 632 F.3d 938, 954 (5th Cir. 2011) ("For act of state (as opposed to sovereign immunity) purposes, the relevant acts are not merely those of the named defendants, but any governmental acts whose validity would be called into question by adjudication of the suit."), *petition for cert. filed* (No. 10-1371) (U.S. May 5, 2011).

Similarly, Plaintiffs claim that the commercial acts of a foreign sovereign are not subject to the act of state doctrine, citing *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682 (1976).  Opp. at 21.  But *Alfred* was a plurality opinion and is not binding on this Court.

13

Moreover, the Ninth Circuit has rejected this view: "The act of state doctrine is not diluted by the commercial activity exception which limits the doctrine of sovereign immunity." *IAM*, 649 F.2d at 1360; *see also Honduras Aircraft Registry, Ltd. v. Honduras*, 129 F.3d 543, 550 (11th Cir. 1997) ("[T]here is no commercial exception to the act of state doctrine as there is under the FSIA."). Thus, there is no "commercial acts" exception to the act of state doctrine.

Second, Plaintiffs' claims would require this Court to declare the Member Agencies' sovereign acts invalid. In order to prevail on their claims, this Court would need to determine whether the Member Agencies' purported agreement, through UPGC, to reduce the supply and export of potatoes in their respective provinces was illegal or otherwise improper. But Canadian law expressly empowers the Member Agencies to cooperate and work with each other to regulate the marketing of potatoes within their respective provinces. UPGC Brief at 6-11. Thus, in order to grant Plaintiffs' requested relief, this Court would be forced to declare the Member Agencies' sovereign acts invalid. *See IAM*, 649 F.2d at 1361 ("While the case is formulated as an anti-trust action, the granting of any relief would in effect amount to an order from a domestic court instructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources."). Consequently, the act of state doctrine bars this suit.

**B.     The Policies Underlying the Act of State Doctrine Favor Dismissal**

The act of state doctrine "has its roots . . . in the notion of comity between independent sovereigns." *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 765 (1972); *see also Underhill v. Hernandez*, 168 U.S. 250, 252 (1897) ("Every sovereign state is bound to respect the independence of every other sovereign state . . . ."). Similarly, the doctrine is "meant to facilitate the foreign relations of the United States . . . ." *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988); *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS

14

LAW OF THE U.S., § 443 cmt. a (1987) ("The doctrine was developed . . . essentially to avoid disrespect for foreign states.").

Plaintiffs claim that the act of state doctrine is not applicable here because there is no "politically sensitive" issue that will lead to an "international dispute." Opp. at 23, 24. But the act of state doctrine has no such requirement. The Supreme Court most recently concluded that the act of state doctrine "merely requires that . . . the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *Kirkpatrick*, 493 U.S. at 409; *see also Credit Suisse*, 130 F.3d at 1346. Moreover, the Supreme Court has stated that this requirement is closely tied to the doctrine's underlying policy rationale. *See Oetjen v. Central Leather Co.*, 246 U.S. 297, 303-04 (1918) ("To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly 'imperil the amicable relations between governments and vex the peace of nations.'").

Thus, in applying the act of state doctrine this Court will further the doctrine's policies by avoiding any impairment to U.S.-Canada relations or any affront to Canada's sovereignty that may otherwise result should the Court second-guess the Member Agencies' sovereign decisions to regulate potatoes in their respective provinces. *See Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989) ("[I]nstructing a foreign sovereign to alter its chosen means of allocating and profiting from its own valuable natural resources would affront the sovereignty of a state."); *IAM*, 649 F.2d at 1361.

## III. The Cooperative Marketing Act Bars Plaintiffs' Claims against UPGC

In addition to immunity under Capper-Volstead, UPGC independently qualifies for immunity from antitrust liability under Section 5 of the Cooperative Marketing Act of 1926 (the "CMA"), as described in detail in UPGC's Opening Brief.

Plaintiffs argue that the CMA does not provide an exemption from antitrust liability, but that assertion, for which the Plaintiffs provide no support in case law, is contrary to both the purpose of the statute and its interpretation by the courts.  Section 5 of the CMA was enacted precisely "for the purpose of making it clear that agricultural cooperatives [are] free to exchange and disseminate marketing, economic, and agricultural production data among themselves without incurring antitrust liability."  *Agritronics Corp. v. Nat'l Dairy Herd Ass'n*, 914 F. Supp. 814, 823 (N.D.N.Y. 1996).

Congress passed the CMA as part of a "'save the farmer'" movement, which included the passage of Capper-Volstead, to "enable an agricultural producer to obtain a fair price for his products" in the agricultural depression after World War I and to allow farmers to cooperate without fear of antitrust implications.  *In re Midwest Milk Monopolization Litig.*, 510 F. Supp. 381, 433 n.25 (W.D. Mo. 1981), *aff'd in part, rev'd in part*, *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173 (8th Cir. 1982).  As the Supreme Court has acknowledged, the passage of the CMA, Capper-Volstead, and the Clayton Act exemption "reveal widespread legislative approval of the plan for [protecting] scattered producers"—protection needed only because of the otherwise applicable antitrust laws.  *Liberty Warehouse Co. v. Burley Tobacco Growers' Coop. Mktg. Ass'n*, 276 U.S. 71, 92-93 (1928); *see also Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1041 (2d Cir. 1980) (describing the Sherman Act as "a strong deterrent to the development of large agricultural cooperatives" when it was enacted in 1890).  Through these "[antitrust] exemption statutes," *Agritronics Corp. v. Nat'l Dairy Herd Ass'n*, 1994 U.S. Dist. LEXIS 14168, at *2 (N.D.N.Y. Sept. 22, 1994), Congress sought to allow a farming cooperative the same "'unified competitive advantage' available to businessmen acting through corporations."  *Fairdale*, 635 F.2d at 1043 (quoting *Md. & Va. Milk Prods. Ass'n v. United*

16

*States*, 362 U.S. 458, 466 (1960)).  In giving cooperatives the same advantages as corporations, "[the CMA] permits the exchange, without interference from the antitrust laws, of . . . information among producers of agricultural products," thereby immunizing the exchange of price and supply information alleged in the Amended Complaint.  MATTHEW BENDER, 3-55 ANTITRUST LAWS & TRADE REGULATION, § 55.01 (2d ed.).

Plaintiffs also assert that UPGC is not covered by the CMA because it is a collection of potato boards instead of potato farmers.  But Section 5 covers "a common agent" selected by "associations or federations" of "original producers of agricultural products . . . acting together in associations." 7 U.S.C. § 455.  Nearly all of the individuals from the Member Agencies who serve on UPGC's board of directors are potato farmers.  Whether the UPGC is an association of those farmers directly, or an association of farmers' associations (the potato boards), is immaterial under the CMA.  The law allows associations of farmers to create a common agent to exchange information without antitrust liability.  The antitrust exemption would prove futile if it applied to the cooperative actions of the "original producers" but not an association acting on their behalf.  *See In re FCX, Inc*., 853 F.2d 1149, 1151 (4th Cir. 1988) (noting members of agricultural cooperative, organized under a similar state Cooperative Marketing Act, are themselves cooperatives).

----------------

UPGC respectfully requests dismissal with prejudice because amendment would be futile.  Plaintiffs' claims against UPGC are inherently barred by the FSIA, the act of state doctrine, and the CMA.  There is no conceivable way that Plaintiffs could plead around those defects.

June 3, 2011                               Respectfully submitted,


                                          _____/s/_____
                                          David R. Lombardi
                                            Idaho State Bar ID# 1965
                                          Patrick J. Miller
                                            Idaho State Bar ID# 3221
                                          GIVENS PURSLEY LLP
                                          601 W. Bannock
                                          P.O. Box 2720
                                          Boise, Idaho 83701
                                          Telephone Number: (208) 388-1200
                                          Facsimile: (208) 388-1300
                                          drl@givenspursley.com
                                          patmiller@givenspursley.com


                                          Brian E. Robison (*pro hac vice*)
                                            Texas Bar No. 00794547
                                          GIBSON DUNN & CRUTCHER LLP
                                          2100 McKinney Avenue
                                          Suite 1100
                                          Dallas, Texas 75201-6912
                                          Telephone Number: (214) 698-3100
                                          Facsimile: (214) 571-2928
                                          (brobison@gibsondunn.com)


                                          *ATTORNEYS FOR DEFENDANT*
                                          *UNITED POTATO GROWERS OF*
                                          *CANADA*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 3rd day of June 2011, a true and correct copy of the foregoing was caused to be filed with CM/ECF with service by electronic mail to the following:

Albert P. Barker
abp@idahowaters.com

Allen Steyer
asteyer@steyerlaw.com

Arthur N. Bailey, Jr.
abailey@hausfeldllp.com

Bart M. Davis
bmdavis@bmdlaw.net

Benjamin Andrew Schwartzman
bschwartzman@bwslawgroup.com

Bonny E. Sweeney
bonnys@rgrdlaw.com

Brad P. Miller
bmiller@hawleytroxell.com

Bruce S. Bistline
bbistline@gordonlawoffices.com

Carmen A. Medici
cmedici@rgrdlaw.com

Chad V. Bonanni
chad@essex.bpflegal.com

Daniel G. Swanson
dswanson@gibsondunn.com

Daniel M. Cohen
danielc@cuneolaw.com

David T. Biderman
dbiderman@perkinscoie.com
David J. Syrios
dsyrios@ademilaw.com

Donald Amamgbo
Donald@amamgbolaw.com

Douglas A. Millen
dmillen@fklmlaw.com

Elizabeth McKenna
emckenna@milberg.com

Eric P. Enson
epenson@jonesday.com

Eugene A. Spector
espector@srkw-law.com

Gregort L. Crockett
gregcrockett@hopkinsroden.com

Guri Ademi
gademi@ademilaw.com

Hollis Salzman
hsalzman@labaton.com

James A. Wilson
jawilson@vorys.com

James Pizzirusso
jpizzirusso@hausfeldllp.com

Jay L. Himes
jhimes@labaton.com

Jay S. Cohen
jcohen@srkw-law.com

Jeffrey Alan LeVee
jlevee@jonesday.com

Jeffrey L. Spector
jspector@srkw-law.com

Jon T. King
jking@hausfeldllp.com

Joseph Michael Barton
jbarton@glancylaw.com

Julio Joaquin Ramos
ramosfortrustee@yahoo.com

Kimberly A. Kralowec
kkralowec@kraloweclaw.com

Lionel Z. Glancy
lglancy@glancylaw.com

Loren Block
lblock@milberg.com

Mark A Griffin
mgriffin@kellerrohrback.com

Matthew S. Wild
mwild@wildlawgroup.com

Michael M. Goldberg
mmgoldberg@glancylaw.com

Michael Hausfeld
mhausfeld@hausfeldllp.com

Michael D. Gaffney
gaffney@beardstclair.com

Michael P. Lehmann
mlahmann@hausfeldllp.com

Mindee J. Reuben
reuben@wka-law.com

Monte N. Stewart
stewart@belnaplaw.com

Neil D. McFeeley
nmcfeeley@eberle.com

Paul Novak
pnovak@milberg.com

Peter Safirstein
psafirstein@milberg.com

Philip Howard Gordon
pgordon@gordonlawoffices.com

Reginald Von Terrell
Reggie2@aol.com

Richard C. UPGCman
rUPGCman@perkinscoie.com

Robert Rosenfeld
rrosenfeld@orrick.com

Ronald J. Aranoff
aranoff@bernlieb.com

Samuel G. Liversidge
sliversidge@gibsondunn.com

Shpetim Ademi
sademi@ademilaw.com

Stephen R. Thomas
srt@moffatt.com

Steven A. Asher
asher@wka-law.com

Steven A. Kanner
skanner@fklmlaw.com

Steven Bomse
sbomse@orrick.com

Susan G. Kupfer
skupfer@glancylaw.com

Wade L. Woodard
wwoodard@bwslawgroup.com

William Greene
William.greene@leonard.com

William V. Reiss
wreiss@labaton.com

Winston Beard
winston@beardstclair.com

 In addition, a true and correct copy of the foregoing was caused to be sent by electronic mail to the following attorneys not registered to receive electronic notice via CM/ECF:

[None].

/s/

Patrick J. Miller