James S. Lowrie
    jlowrie@joneswaldo.com
Andrew G. Deiss
    adeiss@joneswaldo.com
Billie J. Siddoway (ISB # 6628)
    bsiddoway@ joneswaldo.com
JONES WALDO HOLBROOK & MCDONOUGH PC
170 South Main St., Suite 1500
Salt Lake City, UT 84101
Telephone: (801) 521-3200
Facsimile: (801) 328-0537

Donald M. Barnes
    dbarnes@porterwright.com
Salvatore A. Romano
    sromano@porterwright.com
PORTER WRIGHT
1919 Pennsylvania Ave, N.W., Suite 500
Washington, D.C. 20006
Telephone: (202) 778-3056
Facsimile: (202) 778-3063

Steven B. Andersen (ISB #2618)
    sandersen@hollandhart.com
HOLLAND & HART LLP
101 S Capital Boulevard, Suite 1400
Boise, ID  83701-2527
Telephone: (208) 342-5000
Facsimile: (208) 343-8869

James E. Hartley
    jhartley@hollandhart.com
HOLLAND & HART LLP
555 Seventeenth St., Suite 3200
Denver, CO  80201-8749
Telephone: (303) 295-8000
Facsimile: (303-295-8261

Stephen V. Bomse
    sbomse@orrick.com
Robert A. Rosenfeld
    rrosenfeld@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard St.
San Francisco, CA  94105-2669
Telephone: (415) 773-4190
Facsimile: (415) 773-5759

Monte N. Stewart (ISB #8129)
    stewart@belnaplaw.com
Daniel W. Bower (ISB #7204)
    dbower@belnaplaw.com
BELNAP, STEWART, TAYLOR & MORRIS
12550 W Explorer Dr., Suite 100
Boise, ID  83713
Telephone: (208) 345-3333
Facsimile: (208) 345-4461

Represented parties are identified on the
signature page. ID.Civ.R. 5.2.

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IN RE: FRESH AND PROCESS POTATOES ANTITRUST LITIGATION | Case No. 4:10-md-02186-BLW |
| THIS DOCUMENT RELATES TO: | **REPLY TO [111] BRIGIOTTA'S MEMORANDUM IN OPPOSITION TO [85] MOTION TO DISMISS BASED ON THE CAPPER-VOLSTEAD ACT AND RELATED STATUTES** |
| *Brigiotta's v. United Potato Growers of Idaho, Inc., et al.*, Case No. 4:10-cv-307 | Case No. 4:10-cv-307-BLW |

977217v5

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................... 1

II. ARGUMENT ....................................................................................................... 2

    A.    The Capper-Volstead Protection of Supply Management Is a Legal Question to Be Decided on This Motion to Dismiss. ................................................................. 2

    B.    As a Matter of Law, Supply Management Is Protected by Capper-Volstead.................... 3

        1.    Nothing in the Broad Language of the Statutes Granting an Antitrust Exemption to Agricultural Cooperatives Supports a Distinction Between Pre- and Post-Production Activities. ........................................................... 4

        2.    There Is No Basis in Law or Economics to Distinguish Between Price and Output Agreements. ................................................................................ 8

        3.    The Legislative History Demonstrates that the Capper-Volstead Act Was Intended to Cover Supply Management. .................................................. 10

        4.    The Case Law Demonstrates That Supply Management Is Covered by the Capper-Volstead Exemption. ................................................................. 12

        5.    Inconsistent Agency Statements Are Entitled to Little Weight. ............................ 13

    C.    Defendants Are Protected by the Immunities of the Clayton Act and the Capper-Volstead Act.................................................................................................... 15

        1.    The UPGA/UPGI Cooperative Model Is Protected.................................................. 16

        2.    Growers That Have Vertically Integrated Are Not Barred from Cooperative Membership. ...................................................................... 16

        3.    The Allegations Relied upon by Plaintiffs Do Not Amount to Predatory Conduct.................................................................................................. 19

        4.    The Capper-Volstead Protection Applies to Collaborations with Foreign Cooperatives. ....................................................................................... 20

        5.    Agreements Among Cooperatives Are Protected. .................................................. 22

        6.    The Complaints Do Not Sufficiently Allege That the Cooperatives Have Unlawfully Colluded with Other Third Parties. ....................................... 23

III.    CONCLUSION................................................................................................... 25

977217v5

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Agritronics Corp. v. Nat'l Dairy Herd Ass'n*, 914 F. Supp. 814 (N.D.N.Y. 1996) ................................ 8

*Alexander v. Nat'l Farmers Organization*, 687 F.2d 1173 (8th Cir. 1982) .................................... 13, 24

*Ashcroft v. Iqbal*, 556 U.S. __, 129 S. Ct. 1937 (2009) ...................................................... 2, 23

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................... 2, 3, 23

*Case-Swayne Co. v. Sunkist Growers, Inc.*, 355 F. Supp. 408 (C.D. Cal. 1971) ................................ 17

*Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384 (1967) ............................................. 16

*Chicago Board of Trade v. United States*, 246 U.S. 231 (1918) ............................................. 10

*Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137
(9th Cir. 1974) ......................................................................................... 23

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ......................................... 18

*Ewald Bros., Inc. v. Mid-America Dairymen, Inc.*, 877 F.2d 1384 (8th Cir. 1989) ....................... 19, 20

*Fairdale Farms Inc. v. Yankee Milk, Inc.*, 715 F.2d 30 (2d Cir. 1983) ...................................... 19

*FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990) ............................................. 8

*GVF Cannery, Inc. v. Calif. Tomato Growers Ass'n, Inc.*, 511 F. Supp. 711
(N.D. Cal. 1981) ......................................................................................... 7

*In re Brand Name Prescription Drugs Litig.*, 288 F.3d 1028 (7th Cir. 2002) .................................. 24

*In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683
(E.D. Pa. 2007) .......................................................................................... 18

*In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d
274 (E.D. Pa. 2009) ...................................................................................... 18

*In the Matter of Central California Lettuce Producers Cooperative*, 90 F.T.C. 18,
1977 WL 188550 (1977) ................................................................................... 14

*In the Matter of Washington Crab Ass'n*, 66 F.T.C. 45, 1974 WL 73029 (1964) .......................... 12, 14

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) .............................................................. 15

*Jack Russell Terrier Network of Northern Calif. v. American Kennel Club*, 407 F.3d
1027 (9th Cir. 2005) ...................................................................................... 3

*Jones v. Bock*, 549 U.S. 199 (2007) ........................................................................ 3

*Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F. Supp. 608 (D.C. Ga., 1981) ................................ 9

Maryland & Virginia Milk Producers Ass'n, Inc. v. United States, 362 U.S. 458
(1960) ........................................................................................ 4, 6, 7, 11, 12, 13

*Nat'l Boiler Marketing Ass'n v. United States*, 436 U.S. 816 (1978) ........................................ 17

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) ........................................ 10

*No. California Supermarkets, Inc. v. Central California Lettuce Producers Coop.*,
413 F. Supp. 984 (N.D. Cal. 1976) ...................................................................... 6, 13

*Northland Cranberries Inc. v. Ocean Spray, Inc.*, 382 F. Supp. 2d 221
(D. Mass. 2004) .......................................................................................... 21

*Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173 (3d Cir. 1988) .............................. 3

*Ripplemeyer v. Nat'l Grape Coop Ass'n*, 807 F. Supp. 1439 (W.D. Ark 1992) ............................17, 18

*Rowland v. Calif. Men's Colony*, 506 U.S. 194 (1993) ........................................................................10

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19 (1962)..................18, 22

*Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203
   (9th Cir. 1974) ........................................................................................................ 5, 6, 7, 12, 22

*Truck-Rail Handling, Inc. v. Burlington Northern and Santa Fe RR*, 244 Fed.
   Appx. 130 (9th Cir. 2007) ......................................................................................................23

*United States v. Butler*, 297 U.S. 1 (1936).........................................................................................7

*United States v. Dairy Farmers of America*, Case No. 00-1663, 2000 WL 33200552
   (E.D. Pa., Nov. 3, 2000) ........................................................................................................21

*United States v. Hinote*, 823 F. Supp. 1350 (S.D. Miss. 1993) ..................................................17, 18

*United States v. Nat'l Board of Fur Farm Organizations, Inc.,* 395 F. Supp. 56 (E.D.
   Wisc. 1975).............................................................................................................................21

*United States v. Turkette*, 452 U.S. 576 (1981) ...........................................................................1, 10

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ................................................................20

*Zadvyas v. Davis*, 533 U.S. 678 (2001) ............................................................................................20

## STATE CASES

*United Dairymen of Arizona v. Schugg*, 128 P.3d 756 (Ct. App. Ariz. 2006) .......................................9

## FEDERAL STATUTES

Agricultural Adjustment Act of 1933 (P.L. 74-320) .............................................................................7

Agricultural Marketing Act of 1929 (12 U.S.C. § 1141) ......................................................................7

Agricultural Marketing Agreement Act of 1937 (P.L. 75-137) ............................................................7

Capper-Volstead Act (7 U.S.C. § 291) ....................................................................................... passim

Clayton Act § 1 (15 U.S.C. § 12) .....................................................................................................21

Clayton Act § 6 (15 U.S.C. § 17) .........................................................2, 3, 6, 7, 11, 15, 16, 21

Cooperative Marketing Act of 1926 (7 U.S.C. § 455)..............................................................6, 7, 25

Fishermen's Collective Marketing Act (15 U.S.C. § 521) .................................................................14

Sherman Act § 1 (15 U.S.C. § 1)...............................................................................................10, 21

Sherman Act § 2 (15 U.S.C. § 2)......................................................................................................21

Sherman Act § 8 (15 U.S.C. § 7)......................................................................................................21

## LEGISLATIVE HISTORY

59 Cong. Rec. 7851 (1920) ..............................................................................................................11

59 Cong. Rec. 8022 (1920) ..............................................................................................................11

59 Cong. Rec. 8033 (1920) ..............................................................................................................11

60 Cong. Rec. 366 (1920) ................................................................................................................11

60 Cong. Rec. 369 (1920) ................................................................................................................19

60 Cong. Rec. 376 (1920) ................................................................................................................11

61 Cong. Rec. 1033 (1921)..............................................................................................................11

977217v5

61 Cong. Rec. 1043 (1921) ........................................................................................11

62 Cong. Rec. 2052-53 (1922) ...................................................................................19

62 Cong. Rec. 2057-59 (1922) ..............................................................................11, 12

62 Cong. Rec. 2156 (1922) ........................................................................................19

62 Cong. Rec. 2262 (1922) ........................................................................................11

62 Cong. Rec. 2281 (1922) ........................................................................................12

H.R. Rep. No. 67-24 (1921).................................................................................11, 22

S. Rep. No. 67-236 (1922) .........................................................................................22

## OTHER AUTHORITIES

Charles Wright & Arthur Miller, Fed. Prac. & Proc. Civ. § 1277 (3d ed. 2004) ....................................3

Donald A. Frederick, The Antitrust Status of Farmer Cooperatives:  The Story of the Capper-Volstead Act, USDA Cooperative Information Report 59 (September 2002) .................................................................................................................................15

Kenneth O'Rourke and Andrew Frackman, *The Capper-Volstead Act Exemption and Supply Restraints in Agricultural Antitrust Actions*, 19 Journal of the Antitrust and Unfair Competition Section of the State Bar of California 69 (2010)..............8, 9

P. AREEDA, H. HOVENKAMP AND R. BLAIR, ANTITRUST LAW ¶ 395a (3d ed. 2007) ............8

977217v5

The defendants identified on the signature page respectfully submit this reply to [111] *Plaintiffs' Memorandum in Opposition to Joint Motion to Dismiss* ("Pls.' Br.").

## I.  INTRODUCTION

The central principle underlying the statutes granting farmers an exemption from the antitrust laws was to permit them to function efficiently as a single economic unit, much like traditional corporations.  The plaintiffs do not dispute this critical fact.  To the contrary, they concede that farmers can join together in co-ops and jointly set the price at which they sell their products, but argue that farmers cannot achieve the same result through certain agreements to manage supply.  To reach that conclusion, plaintiffs propose two distinctions: (1) that the applicable statutes create a bright-line division between conduct that occurs post-production (after harvest), and pre-production (before harvest); and (2) that there is a dispositive difference between agreements that relate to price as opposed to those which address output.  Pls.' Br. at 12.

Thus, while plaintiffs apparently concede that Capper-Volstead protects the destruction of harvested crops as a tool for managing supply, they contend that the Act does not allow an agreement by members of a co-op to regulate production before the crops are planted and pre-harvest resources are spent.  In other words, despite abundant economic and legal authority recognizing that price and output are but two sides of a single coin, plaintiffs assert that the former is wholly exempt, but the latter is not.

The distinctions plaintiffs attempt to draw have no basis in the language of the statues, their legislative history, case precedent or fundamental principles of antitrust law and economics.  Equally important, plaintiffs' arguments would result in a statute that is illogical in concept and unworkable in practice, thus violating a cardinal doctrine of statutory interpretation – invoked, ironically enough, by the plaintiffs – that statutes, first and foremost, "must always be interpreted with a view toward avoiding absurd results."  *United States v. Turkette*, 452 U.S. 576, 580 (1981); Pls.' Br. at 40 n.20.

- 1 -

977217v5

The abiding principle that should guide the Court in the resolution of defendants' motion is that when farmers join together in cooperatives, they are entitled to be treated as a single corporate entity with the ability to set prices *and manage supply*.  Farmers can get together and function like any efficient corporate entity with the right to determine how much to produce and how much to charge for their products.

The application of Capper-Volstead to supply management is a question of law that should be addressed by the Court in ruling on the present motion.  This litigation threatens the economic health of the potato industry in Idaho and elsewhere.  It has the capacity to be exceedingly expensive and burdensome for defendants, many of which are relatively small businesses that lack the resources to deal with the high cost of litigation, no matter what the ultimate outcome.  Yet, the outcome turns in large measure on this single, legal issue.  Defendants therefore respectfully request that the Court rule on the present motion that supply management agreements, including "pre-production" agreements, fall within the exemption of the Capper-Volstead and Clayton Acts.

## II.  ARGUMENT

In this memorandum, defendants first address the legal standard governing the present motion to dismiss.  We then demonstrate that, as a matter of law, Capper-Volstead permits supply management.  We next show that, as a matter of law, the exemption has not been lost due to vertical integration among the producer-members of the co-ops, agreements with other co-ops or agreements with foreign cooperatives.  Finally, we address the insufficiency of plaintiffs' remaining conspiracy and predatory conduct allegations under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. __, 129 S. Ct. 1937 (2009).

### A.    THE CAPPER-VOLSTEAD PROTECTION OF SUPPLY MANAGEMENT IS A LEGAL QUESTION TO BE DECIDED ON THIS MOTION TO DISMISS.

Plaintiffs initially argue that the potential application of the Capper-Volstead exemption is an

affirmative defense that should not be considered on this motion to dismiss.  Pls.' Br. at 9-11.  The predicate of that argument is that the Capper-Volstead inquiry is fact-intensive.  *Id.*

When the facts giving rise to the defense are apparent on the face of the pleadings, however, an affirmative defense may be addressed by a motion to dismiss under Rule 12(b).  *Jones v. Bock*, 549 U.S. 199, 215 (2007) ("A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief").[1]  These authorities are consistent with *Twombly*, which recognizes that the "costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint."  *Twombly*, 550 U.S. at 558 (internal citation and quotations omitted).

Accordingly, it makes no sense for the Court to delay addressing this central issue regarding the scope of Capper-Volstead protection.  Whether Capper-Volstead protects supply management activities can be decided on the current record, and the analysis will not benefit from discovery or the passage of time.

## B.   AS A MATTER OF LAW, SUPPLY MANAGEMENT IS PROTECTED BY CAPPER-VOLSTEAD.

The Capper-Volstead Act and Section 6 of the Clayton Act unquestionably allow farmers to form cooperatives and jointly fix the price of their products.  Defs.' Br. at 14-15.  Plaintiffs grudgingly agree.  Pls.' Br. at 23 n.14.  This right flows from both the express language of the

---

[1]  *Jack Russell Terrier Network of Northern Calif. v. American Kennel Club*, 407 F.3d 1027 (9th Cir. 2005) (granting a motion to dismiss antitrust claims based on the intra-corporate immunity defense); *Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 181-83 (3d Cir. 1988) (granting a 12(b)(6) motion to dismiss based on statutory exemption for conduct alleged).  *See also* CHARLES WRIGHT & ARTHUR MILLER, FED. PRAC. & PROC. CIV. § 1277 (3d ed. 2004) ("Many courts permit affirmative defenses to be asserted by motion even when the defenses are not available on the face of the complaint.  This is especially true as to those affirmative defenses that seem likely to dispose of the entire case or a significant portion of the case and defenses that require no factual inquiry for their adjudication.")

- 3 -

pertinent statutes and the "general philosophy" that cooperatives are to have all of the rights of individual corporations.  As stated by the Supreme Court:

> We believe it is reasonably clear from the very language of the Capper-Volstead Act, as it was in § 6 of the Clayton Act, that the general philosophy of both was simply that individual farmers should be given, through agricultural cooperatives acting as entities, ***the same unified competitive advantage – and responsibility – available to businessmen acting through corporations as entities***.

Maryland & Virginia Milk Producers Ass'n, Inc. v. United States, 362 U.S. 458, 466 (1960) (emphasis added).

The Capper-Volstead Act, in particular, was designed to "make it possible for farmer-producers to organize together, set association policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation without thereby violating the antitrust laws."  *Id.* at 466.  And, of course, individual corporations have the ability to control their production and manage supply.

### 1. Nothing in the Broad Language of the Statutes Granting an Antitrust Exemption to Agricultural Cooperatives Supports a Distinction Between Pre- and Post-Production Activities.

Plaintiffs initially argue that supply management activities are not exempt based upon the supposed "plain language" of the Capper-Volstead exemption.  To that end, plaintiffs baldly assert that the "key phrase – processing, preparing for market, handling, and marketing" – applies to acts done to an agricultural product only *after* it has been planted and harvested."  Pls.' Br. at 12 (emphasis in original).  In support of their claim that the exemption only protects post-production activities, plaintiffs observe that "[n]otably, 'planting' is not included in the list of protected activities."  *Id.*  That is true, of course.  It is also true that neither "ranchmen" nor "dairymen" "plant" the product of their labors (beef and dairy cattle), and some "nut" and "fruit" growers reap the benefit of trees often planted many years before.  In other words, "planting" was not an appropriate word to use to describe the disparate activities of the farmers covered by the statute.

- 4 -

More important, the broad language of the Capper-Volstead Act readily encompasses supply management. Nothing in the operative language – that farmers may act together "in collectively processing, preparing for market, handling, and marketing" farm products – speaks only to post-production activities. 7 U.S.C. § 291. Nor does it follow as a matter of logic that a farmer "prepar[es]" his produce "for market" *only* after it comes out of the ground. There is no reason why the terms "processing, preparing for market, handling, and marketing" would not include decisions about what to plant, when to plant, and how much to plant.

Finally, "marketing" can include specifying a price – even where the price is set before the seeds for those products go in the ground. The Ninth Circuit has recognized the expansive nature of the term as it relates to pre-planting agreements:

> We think the term marketing is far broader than the word sell. A common definition of "marketing" is this: "The aggregate of functions involved in transferring title and in moving goods from producer to consumer, including among others buying, selling, storing, transporting, standardizing, financing, risk bearing, and supplying market information."

*Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 215 (9th Cir. 1974) (quoting WEBSTER'S NEW COLLEGIATE DICTIONARY (1953)).

The court also listed activities that routinely take place before planting:

- Much of the "buying" – including the purchasing of seed or seed potatoes – occurs prior to planting.

- Almost without exception "financing" must be in place prior to planting and is dependent upon a plan as to how many acres are to be planted and with which crop.

- "Risk bearing" is an analysis and activity that must be made pre-planting.

- And while "supplying market information" might be done post-planting, there is nothing inherent in the practice that would prevent it from occurring prior to planting, and, indeed, one would expect reasonable farmers to evaluate market information before they invest energy, funds and resources into growing crops.

*Treasure Valley*, 497 F.2d at 215.[2]

Plaintiffs' narrow interpretation of the Capper-Volstead Act is also inconsistent with Section 6 of the Clayton Act. Section 6 exempts agricultural organizations and labor unions from the antitrust laws. *Maryland & Virginia*, 362 U.S. at 465. The Capper-Volstead Act "extended § 6 of the Clayton Act exemption to capital stock agricultural cooperatives which had not previously been covered by that section." *Id.* at 466. Both Section 6 and the Capper-Volstead Act were intended to extend to farmers forming co-ops, the benefits "available to businessmen acting through corporations." *Id.* Given this acknowledged relationship, the meaning of the language in Capper-Volstead plainly is informed by the broad scope of Section 6 of the Clayton Act. *Treasure Valley,* 497 F.2d at 213; *No. California Supermarkets, Inc. v. Central California Lettuce Producers Coop.*, 413 F. Supp. 984, 991 (N.D. Cal. 1976).

Specifically, Section 6 of the Clayton Act provides:

> Nothing contained in the antitrust laws shall be construed to forbid the existence and ***operation of labor, agricultural or horticultural organizations*** instituted for the purposes of mutual help . . . or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; ***nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws***.

15 U.S.C. § 17 (1914) (emphasis added). In *Maryland & Virginia Milk Producers*, the Supreme Court observed:

> Thus, the full effect of § 6 is that a group of farmers acting together as a single entity in an association cannot be restrained "from lawfully carrying out ***the legitimate objects*** thereof," but the section cannot support the contention that it gives such an entity full freedom to engage in predatory trade practices at will.

362 U.S. at 465-66 (emphasis in original). In short, Section 6 embodies, in broad terms, the right of

---

[2] Before reaching this broad interpretation, the Ninth Circuit cited the Cooperative Marketing Act of 1926 which confirmed the right of producers and cooperatives to exchange and disseminate prospective, past and present crop, market and statistical data to facilitate supply management in order to avoid overproduction. *Treasure Valley* at 214.

farmers to carry out their legitimate activities as if the co-op were a single corporation.  *Id.* at 466; *see also Treasure Valley*, 497 F.2d at 216.

Of course, both setting prices and managing supply are legitimate, core responsibilities of any corporate entity.  Accordingly, the Supreme Court has ruled that Section 6 permits a co-op to fix the price at which the members will sell their produce.  *Maryland & Virginia*, 362 U.S. at 466.  The same logic and broad interpretation of the statutory language compels the conclusion that they also can jointly manage and control supply.

Plaintiffs' reliance on the supposedly "clear" language of the Capper-Volstead Act is unavailing.  Taken together, the broad terms of the two statutes demonstrate an intention to allow farmers to engage cooperatively in the full range of activities involved in the production of agricultural products and to do so as if they were a single organization.[3]  The statutes, appropriately, use relatively open-ended terms that are consistent with this broad purpose.  Nonetheless, both statutes have been construed broadly to permit co-ops to fix price (although those words, too, do not appear in either statute), and both have been construed to cover all manner of pre- and post production activities.  *See GVF Cannery, Inc. v. Calif. Tomato Growers Ass'n, Inc.*, 511 F. Supp. 711, 713 (N.D. Cal. 1981) ("The courts have broadly interpreted this statute to afford farmers'

---

[3]  The Cooperative Marketing Act of 1926 and the Agricultural Marketing Act of 1929 confirm that Congress wanted to empower farmers to take collective action to combat overproduction – just as they were permitted to do under the Clayton and Capper-Volstead Acts.  Defs.' Br. at 13-14.

Plaintiffs incorrectly argue that the Agricultural Adjustment Act of 1933 (P.L. 74-320) and the Agricultural Marketing Agreement Act of 1937 (P.L. 75-137) implicitly vested the federal government with exclusive authority over production restrictions.  Pls.' Br. at 16-18.  Neither statute limits a cooperative's ability to manage its production.  Moreover, in 1936, the Supreme Court declared that the Agricultural Adjustment Act of 1933 was unconstitutional.  *United States v. Butler*, 297 U.S. 1, 74, 78 (1936) (holding that "Congress has no power to enforce its commands on the farmer to the ends sought by the Agricultural Adjustment Act").  While these and other federal programs may authorize federal agencies to compel or promote limitations on production, the Capper-Volstead Act addresses the ability of farmers' cooperatives to voluntarily agree on supply management without government assistance.

associations significant exemptions from the antitrust laws."). *See also Agritronics Corp. v. Nat'l Dairy Herd Ass'n*, 914 F. Supp. 814, 824-25 (N.D.N.Y. 1996). This Court should reject plaintiffs' call for a sterile and constricted construction of language that plainly has a broader intent, in order to support a narrow interpretation that make no sense, in law, economics or logic.

**2.     There Is No Basis in Law or Economics to Distinguish Between Price and Output Agreements.**

As presented in their opening brief, defendants' argument is based on three straightforward propositions: (1) Capper-Volstead is intended to allow growers to organize and carry on like a business corporation; (2) the antitrust exemption allows price-setting by cooperatives; and (3) as both a legal and an economic matter, price-setting and output limitations are, in purpose and effect, the same thing. Defs.' Br. at 14-16. To construe Capper-Volstead to permit one (price setting), but to preclude the other (supply management), makes no sense as a matter of statutory interpretation, antitrust policy or basic economics.

Plaintiffs never respond to this argument, and that silence speaks volumes. As defendants explained in their opening brief, output restrictions and price-setting are two sides of the same coin. *Id.* at 15-16. The Supreme Court observed succinctly in *FTC v. Superior Court Trial Lawyers Ass'n*, that "constriction of supply is the essence of 'price-fixing,' whether it be accomplished by agreeing upon a price, which will decrease the quantity demanded, or by agreeing upon an output, which will increase the price offered." 493 U.S. 411, 423 (1990) (internal citation omitted). *See also* Kenneth O'Rourke and Andrew Frackman, *The Capper-Volstead Act Exemption and Supply Restraints in Agricultural Antitrust Actions*, 19 J. OF THE ANTITRUST & UNFAIR COMP. SEC. OF THE STATE BAR OF CAL.69, 83 (2010) ("To an economist, competitors fixing prices or reducing supply are two sides of the same coin") (citing P. AREEDA, H. HOVENKAMP & R. BLAIR, ANTITRUST LAW ¶ 395a, p. 377 (3d ed. 2007)).

977217v5

To put the matter most directly, Capper-Volstead permits price regulation accomplished through output limitations just as it permits direct agreements on price among co-op members. Any other conclusion would champion semantic games over real-world outcomes. As O'Rourke aptly concludes "Congress' current exemption of an agricultural cooperative's conduct logically – and legislatively – immunizes coordinated supply restraints among the members of an otherwise lawful agricultural cooperative to the same extent Congress immunized the members' lawful price restraints." O'Rourke at 85.

Plaintiffs effectively concede the equivalence of price and output restrictions in their opposition brief. On one hand, plaintiffs draw a distinction between agreements to set prices – which they necessarily acknowledge are permitted by Capper-Volstead – and agreements to achieve the same result through output restrictions. On the other, they repeatedly equate the two practices and describe the challenged supply limitation agreements as "price fixing." *See, e.g.,* Pls.' Br. at 24 ("the cooperatives colluded with non-members . . . in enacting their price fixing scheme"). *See also* Pls.' Br. at 34, 38.

Moreover, plaintiffs' interpretation of the exemption to limit agreements to post-production activities is senseless and would yield socially undesirable results. Plaintiffs would allow farmers to agree to plow under their crops or let them rot, but only after expending the seed, water, electricity, fuel, equipment and labor to produce the crop. This proposed interpretation is both illogical and impractical. If farmers are permitted to agree to withhold milk, as recognized in *Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F. Supp. 608 (D.C. Ga., 1981) and *United Dairymen of Arizona v. Schugg*, 128 P.3d 756 (Ct. App. Ariz. 2006), then they are surely permitted to refrain from milking their cows or expanding their herds. Under either scenario, the effect on competition is no different – and that is the relevant inquiry.

Though plaintiffs champion a so-called "plain meaning" rule, the antitrust laws have never been interpreted in such a rote and hidebound manner.  From the very beginning, the Supreme Court has recognized that the language of the antitrust laws must be interpreted in light of their purposes and the need to avoid otherwise absurd and unworkable results.  For example, Section 1 of the Sherman Act prohibits all contracts "in restraint of trade."  15 U.S.C. § 1.  Yet, as the Supreme Court has said on numerous occasions, Section 1 of the Sherman Act cannot mean what it says.  *See, e.g., Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 687 (1978).  As Justice Brandeis pointed out, if the language of the Sherman Act were interpreted literally, all commercial contracts would be unlawful:

> But the legality of an agreement or regulation cannot be determined by so simple a test as whether it restrains competition.  ***Every agreement concerning trade, every regulation of trade, restrains.***  To bind, to restrain, is of their very essence.  The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.

*Chicago Board of Trade v. United States*, 246 U.S. 231, 238 (1918) (emphasis added).[4]

In sum, plaintiffs' bright-line distinction between price and output, or pre- versus post-production activity, makes no sense.  It would lead to a statutory scheme that would be fairly described as absurd.

### 3.   The Legislative History Demonstrates that the Capper-Volstead Act Was Intended to Cover Supply Management.

Plaintiffs' discussion of the legislative history of the Capper-Volstead Act ignores the overriding objective of Congress to permit associations of farmers to function efficiently as a single corporate entity.  Pls.' Br. at 13-16.  Yet, there can be no doubt that the object of Capper-Volstead

---

[4] The Supreme Court has repeatedly said that a federal law may not be interpreted in such a way as to lead to an "absurd result."  *See, e.g., Rowland v. Calif. Men's Colony*, 506 U.S. 194, 200-01 (1993); *United States v. Turkette*, 452 U.S. at 580.

was "to modify the laws under which business organizations are now formed, so that farmers may take advantage of the form of organization that is used by business concerns." 61 Cong. Rec. 1033 (1921) (Rep. Volstead).[5] Senator Capper described the necessity for the legislation: "More and more it has become evident that growers must have the same opportunity to merchandise their products in an orderly way, instead of being compelled to dump them on a glutted market at prices below cost of production." 62 Cong. Rec. 2057-2059; *see also* Defs.' Br. at 16-17. Consistent with these views, the Supreme Court endorsed the basic principle of both Capper-Volstead and Section 6 of the Clayton Act that farmers should be given the same competitive advantages as corporate entities. *Maryland & Virginia*, 362 U.S. at 466.

The desire to treat agricultural cooperatives the same as corporate entities led to the judicial recognition that farmers could form co-ops and jointly set the price of their produce. *See* Defs.' Br. at 16-18. In a similar fashion, Congress recognized that a single corporate entity faced with an excess of supply over demand, could "reduce the production[,] . . . discharge their men, cut down their forces, and run their factories upon what is called 25 or 30 percent capacity, and merely feed out to the market what it will consume at their prices." 62 Cong. Rec. 2262 (1922) (Sen. Hitchcock). To that end, Representative Hershey stated that the ability to form co-ops would enable farmers "to act together for their mutual interests in the ***planting***, care, and marketing of agricultural products." 61 Cong. Rec. 1043 (1921) (emphasis added).[6]

In sum, the aim of the Capper-Volstead Act was to allow farmers to act like a single

---

[5] To the same effect are statements appearing at 59 Cong. Rec. 7851, 8022, 8033 (1920); 60 Cong. Rec. 366 (1920) ); H.R. Rep. No. 67-24 at 2-3 (1921).

[6] As Senator Smith stated: "Without the right to determine the best market, without the right to cooperate in production and disposition of products, the farm will continue to be a very unprofitable, unsuccessful place where men and women can work." 60 Cong. Rec. 376 (1920).

- 11 -

corporation, not only to control prices, but also to manage supply.  Defs.' Br. at 16-18.[7]

### 4.   The Case Law Demonstrates That Supply Management Is Covered by the Capper-Volstead Exemption.

Plaintiffs acknowledge judicial authority for supply control, but cite no cases limiting Capper-Volstead to post-production activities.  Pls.' Br. at 22-23 (citing *Alexander*, *Holly*, *No. California Supermarkets*, *Ewald Bros*, and *Kinnett Dairies*).  In contrast, the cases identified by defendants address pre-harvest, harvest, and post-harvest activities.  Defs.' Br. at 19-23.

In *Treasure Valley*, for example, the Ninth Circuit permitted farmers to bargain collectively for preseason potato contracts as part of their marketing activities.  The court made no effort to limit marketing activities to post-harvest production.  497 F.2d at 215.

Similarly, the FTC endorsed the actions of the members of a fishing cooperative who agreed to "sit on the beach" and not fish for the express purpose of obtaining more favorable price terms.  *In the Matter of Washington Crab Ass'n, et al.*, 66 F.T.C. 45, 1974 WL 73029 at *30 (1964).  Equally important, in holding that managing supply (sitting on the beach) was a protected activity, the FTC expressly relied on the Supreme Court's interpretation of the Capper-Volstead Act: "the general philosophy of Capper-Volstead was simply that individual farmers should be given, through agricultural cooperatives acting as entities, the same unified competitive advantage – and responsibility – available to businessmen acting through corporations as entities."  *Id.* at *59 (quoting *Maryland & Virginia*, 362 U.S. at 466 (1960)).  The Commission continued:  "There is no obligation

---

[7] Senator Capper's statement, cited at page 14 of plaintiffs' brief, is not indicative of any intent on the part of Congress to proscribe supply management.  The statement that a farmers' monopoly would be impossible was made in opposition to a proposed amendment that would have made an agricultural monopoly expressly unlawful.  62 Cong. Rec. 2057-59 (1922).  Senator Capper noted that the Secretary of Agriculture was authorized to deal with undue price enhancement under Section 2 of the Act, and for these reasons, Congress rejected the amendment.  62 Cong. Rec. 2281 (1922).  None of the other excerpts from the legislative history cited by plaintiffs indicate that Congress intended to **limit** supply management to post-production activities.  Pls.' Br. at 14-16.

on the single corporation to produce at capacity; it may produce in any volume that it likes . . . ."  *Id.*

The management of supply through all production phases also was discussed in *Northern California Supermarkets*, which concerned a cooperative engaged in setting floor prices or price ranges for lettuce.  413 F. Supp. at 987.  The cooperative also was involved in gathering and disseminating information concerning the planting, harvesting and shipment of lettuce.  *Id.*  Relying on both the Clayton and Capper-Volstead Acts, the trial court held that the cooperative's "activities are consistent with the purpose of the statutes 'to make it possible for farmer-producers to organize together, set association policy, [and] fix prices at which their cooperative will sell their produce.'" *Id.* at 991 (quoting *Maryland & Virginia*, 362 U.S. at 466).

And, in *Alexander v. Nat'l Farmers Organization*, 687 F.2d 1173 (8th Cir. 1982), the Eighth Circuit considered antitrust claims involving a cooperative's efforts to limit the supply of milk.  The court approved the restriction on supply, holding that the decision to withhold milk from the market "as a general matter, is within the scope of the Capper-Volstead exemption."[8]  *Id.* at 1188.

These cases demonstrate that collective activity at all phases of production is protected by the Capper-Volstead Act.  No court has struck down supply control measures within a qualified Capper-Volstead framework.  Presumably, plaintiffs would have the Court grapple with questions such as whether farmers may agree jointly to buy seed potatoes but not plant them, or whether they may plant but not fertilize or irrigate the crops.  Defendants submit that the statute neither compels, nor permits, such impractical and facially absurd queries.

### 5.   Inconsistent Agency Statements Are Entitled to Little Weight.

Plaintiffs next claim that their interpretation of the relevant statutes is supported by the

---

[8]  While plaintiffs dismiss this ruling as dealing with post-production issues, the court's holding was not so limited:  cooperatives cannot "conspire or combine with nonexempt entities to fix prices ***or control supply, even though such activities are lawful when engaged in by coops alone***."  *Id.* at 1182 (emphasis added).

federal antitrust enforcement agencies.  Pls.' Br. at 19-21.  Again, plaintiffs overstate their case.

Plaintiffs begin by purporting to distinguish the FTC's opinion in *In re Washington Crab Ass'n*, 66 F.T.C. 45, 1964 WL 73029 (1964) on the ground that it involved a different statute (the Fishermen's Collective Marketing Act).  Pls.' Br. at 21-22.  They then chide defendants for not having called to the Court's attention the agency's subsequent opinion in *In the Matter of Central California Lettuce Producers Cooperative*, 90 F.T.C. 18, 1977 WL 188550 (1977).  While plaintiffs are correct that the FTC in the *Washington Crab* case dealt with a different statute, as explained above, the Commission's opinion and holding were directly concerned with, and addressed at length, the issue of output limitations as exempt activity.  1974 WL 73029 at *59.  In doing so, the FTC relied upon Capper-Volstead as support for its holding.  *Id.*  In other words, whatever distinctions plaintiffs may seek to draw between Capper-Volstead and the Fishermen's Collective Marketing Act, they were not important to the FTC.

Meanwhile, the *California Lettuce* decision was not concerned with supply limitations.  Rather, that case addressed and upheld direct price agreements.  1977 WL 188550 at *17-18.  The only mention of supply limitations was *dicta* in a footnote which suggested that there might be a reason for distinguishing between price and production limitations.  *Id.* at n.20.  Not only was that purely a passing comment, but the FTC emphasized at the end of its brief discussion that "[t]he issue of cooperative production control was not litigated here."  *Id.*

It is equally misleading for plaintiffs to suggest that their interpretation of the statutory exemption is supported by the Department of Justice.  As defendants noted in their prior brief, the head of the Antitrust Division, Assistant Attorney General Christine Varney, has most recently written to observe that, in her opinion, the issue of supply limitations under Capper-Volstead is open and for the courts to decide.  Defs.' Br. at 22 n.18.

- 14 -

Plaintiffs also say that the USDA supports their position that supply control is not permitted under Capper-Volstead.  Pls.' Br. at 20-21.  Yet, the latest published view of the USDA appears to be to the contrary:

> It is uncontested . . . that a value-added cooperative can, just like its non-cooperative competitors, limit the amount of product it offers for sale.  These precedents suggest that members of a cooperative may voluntarily agree among themselves to limit their production as well.

Donald A. Frederick, The Antitrust Status of Farmer Cooperatives:  The Story of the Capper-Volstead Act, USDA Cooperative Information Report 59 at 291 (September 2002).

In any event, comments from federal regulators and negotiated settlements with administrative agencies should not be accorded weight.  In this matter, particularly, the comments of federal agency employees have changed over time and deviated from Congressional intent as evidenced by the legislative history discussed above.[9]  There is, therefore, no justification for plaintiffs' assertion that the "Federal Agencies Recognize That Production Limitations Are Not Permitted under Capper-Volstead."  Pls.' Br. at 19.

### C.   DEFENDANTS ARE PROTECTED BY THE IMMUNITIES OF THE CLAYTON ACT AND THE CAPPER-VOLSTEAD ACT.

The complaints allege a series of reasons why the defendant cooperatives are not entitled to the protection of the Clayton and Capper-Volstead Acts.  In defendants' opening memorandum, we explained that the first four of these should be rejected as a matter of law, and that the conspiracy claims should be dismissed for failure to plead facts sufficient to establish the "plausibility" of plaintiffs' claims.  Defs.' Br. at 23-39.  Nothing in plaintiffs' response undercuts those arguments.

---

[9] *See, e.g., INS v. Cardoza-Fonseca*, 480 U.S. 421, 446-447 n.30 (1987) (rejecting agency interpretation of statute on ground that interpretation was not consistent with Congressional intent, and agency's interpretation was not entitled to heightened deference because it had been inconsistent over time).

1.      **The UPGA/UPGI Cooperative Model Is Protected.**

Defendants initially demonstrated that cooperatives do not have to wash, grade, package, store, transport and distribute their members' potatoes to fall within the protection of the Clayton Act and the Capper-Volstead Act.  Defs.' Br. at 24-26.  Plaintiffs present no argument in response, thus conceding the point that limited purpose cooperatives, like UPGA and UPGI, are eligible for Capper-Volstead protection.

2.      **Growers That Have Vertically Integrated Are Not Barred from Cooperative Membership.**

Plaintiffs argue that vertically integrated *farmers* do not qualify for Capper-Volstead protection.  Pls.' Br. at 24-31.  That is not the law.  The legislative history of Capper-Volstead and the case law confirm that *growers who otherwise qualify for Capper-Volstead protection*, but who additionally integrate vertically into other activities, do not lose the exemption.  Defs.' Br. at 26-28.

In support of their argument, plaintiffs first rely on *Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384 (1967).  Contrary to plaintiffs' suggestion, however, that case supports *defendants'* argument that vertically integrated growers are protected by Capper-Volstead.  Specifically in *Case-Swayne*, the Court ruled that the presence in the Sunkist cooperative of members who were "not actually growers" destroyed the exemption.  389 U.S. at 386.  The Court observed that 80-82% of the co-op members were fruit growers, 5% were growers that had integrated vertically to install their own packing houses; and 13-15% were "agency associations" that did not grow fruit, but operated packing houses.  *Id.* at 387.  The Court then stated that "[i]t is the membership of these *agency associations* that gives rise to the issue presented here."  *Id.* (emphasis added).  In other words, it was the presence of the non-grower "agency associations" – not the vertically integrated growers – that destroyed the exemption.  In fact, to put a finer point on it, on remand the district court ruled that once the membership of Sunkist was reorganized to include only

- 16 -

integrated grower/processors, the Capper-Volstead Act exemption applied.  *Case-Swayne Co. v. Sunkist Growers, Inc.*, 355 F. Supp. 408, 414-15 (C.D. Cal. 1971).

In *Nat'l Boiler Marketing Ass'n v. United States*, 436 U.S. 816 (1978) ("*NBMA*"), is to the same effect.  There the Court observed that "all of the members of NBMA are '***integrated***,' that is they are involved in more than one of the stages of production" in the broiler chicken industry.  *Id.* at 821 (emphasis added).  However, six NBMA members were not "growers" in that they did not own or control any breeder flock or hatchery.  *Id.*  Accordingly, the Court held that, despite the vertical integration of the NBMA members, the ***non-grower*** members who did not own a breeder flock or hatchery destroyed the exemption.[10]  *Id.* at 827.  The Court did not reach the question of whether the exemption applied to integrated growers.  *Id.* at 828 n.21; *see also id.* at 823.  The concurring opinion of Justice Brennan "suggests some considerations" which he believed were pertinent to "this broader question," but his views were not adopted by the majority.  *Id* at 829.

Plaintiffs finally rely on two district court cases, *United States v. Hinote*, 823 F. Supp. 1350 (S.D. Miss. 1993), and *Ripplemeyer v. Nat'l Grape Coop Ass'n*, 807 F. Supp. 1439 (W.D. Ark 1992).  Pls.' Br. at 27-29.  Yet, neither case makes plaintiffs' point.  In *Hinote*, two of the largest food processing companies in the country attempted to take advantage of the Capper-Volstead exemption by virtue of their reverse integration into catfish farming.  Through this arrangement, they were able to fix the price of processed catfish, and also limit the amounts paid to other catfish producers.  The

---

[10]  Contrary to plaintiffs' representation, the majority opinion did not state that "several attempted amendments extending protection to processors who 'integrated' with producers had been considered and rejected by Congress."  Pls.' Br. at 25.  Instead, the legislative history cited by the Court indicated only that ***non-growers*** could not be members of the co-op.  Thus, the Court noted that "several attempts were made to amend the Act to include certain processors who, according to pre-planting contracts, paid growers amounts based on the market price of processed goods; these attempts were roundly rejected.  Clearly, Congress did not intend to extend the benefits of the Act to the processors and packers to whom the farmers sold their goods, even when the relationship was such that the processor and packer bore a part of the risk."  *Id.* at 826.

court recognized this subterfuge for what it was – a mechanism that allowed processor middlemen to take advantage of a statutory exemption that was intended to limit their market power, not augment it.  Significantly, the court recognized that, if a separate cooperative of catfish farmers – who built their own processing facility to process and sell their catfish – had been the only entity involved, its activities **would be protected** under the exemption.  *Id.* at 1354, n.8.  As a result, *Hinote* confirms that a cooperative with vertically integrated ***growers*** is entitled to protection under Capper-Volstead.

*Ripplemeyer* is equally inapplicable.  *Sua sponte* and without briefing, the court erroneously treated a cooperative and its wholly owned processing subsidiary as separate entities.[11]  On that basis the court held that the inclusion of the non-grower processing subsidiary precluded application of the Capper-Volstead exemption.  807 F. Supp. at 1457.  Whatever may be said about the court's analysis, the case does not hold that a vertically integrated ***grower/processor*** is ineligible for protection under Capper-Volstead.[12]

In fact, it is hard to see how there can be any serious issue regarding this point because the language of the Act makes it clear that integrated ***growers*** are subject to Capper-Volstead protection. Defs.' Br. at 27.  Thus, the Act directly specifies that farmers may act together in "collectively ***processing, preparing for market, handling and marketing*** . . . such products of persons so engaged." 7 U.S.C. § 291 (emphasis added).  Those are all discrete steps in the process of growing potatoes and getting them from the field to the grocery store or table.  Under Capper-Volstead, these

---

[11]  In reaching its decision, the district court overlooked *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19, 29 (1962), in which the Supreme Court had held that a cooperative and its subsidiary are one organization for purposes of the Capper-Volstead exemption.  The court avoided an erroneous result by holding that there was no unlawful conspiracy between a parent and its subsidiary based on the doctrine established in *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

[12]  Likewise, the *Mushroom* cases do not apply because they turned on the fact or allegation that the membership of the co-op included persons who were ***not engaged*** in agricultural production.  *In re Mushroom Direct Purchaser Antitrust Litig.*, 514 F. Supp. 2d 683, 694 (E.D. Pa. 2007); 621 F. Supp. 2d 274, 285 (E.D. Pa. 2009).

- 18 -

steps can be undertaken by the co-op, through a contract with a third party, or by vertically integrated growers who engage in these various phases of the process on their own behalf.  In other words, the various activities that are specifically referred to in Capper-Volstead are, themselves, types of "integrated activities." [13]

In this case, each of the cooperative members identified in the complaint is alleged to be a grower, and plaintiffs contend that some members engage in activities in addition to growing potatoes, such as selling, transporting, shipping, packing, processing, packaging, supplying or distributing potatoes. DP Compl. ¶¶ 25, 34, 68, 69, 92, 95, 98, 101, 107, 110, 113; IP Compl. ¶¶ 68, 69, 70, 82, 83, 95, 106, 117, 121.  Because plaintiffs have not identified a single non-grower cooperative member, the activities of the co-ops are protected by Capper-Volstead.

### 3.    The Allegations Relied upon by Plaintiffs Do Not Amount to Predatory Conduct.

In their opening brief, defendants explained that "predatory" conduct generally refers to actions taken for the purpose of harming competitors or to coerce businesses to engage in conduct against their will.  Def' Br. at 29.  Within the meaning of Capper-Volstead, predatory conduct is aimed at eliminating competition from current or potential rivals.  *Fairdale Farms Inc. v. Yankee Milk, Inc.*, 715 F.2d 30, 31-32 (2d Cir. 1983).  Examples of predatory conduct include "coerced membership, boycotts, picketing, bad faith harassment or discriminatory pricing."  *See Ewald Bros.,*

---

[13]  The legislative history of the act similarly reflects the intent of Congress that growers should be able to integrate into the processing, marketing and distribution of their products. Defs.' Br. at 27.  In addition to the legislative history cited in defendants' brief, Senator Wash noted "that under the provisions of both bills the organization authorized must be an organization of the producers themselves of the product of the farm. ***They may engage in marketing that product or they may engage in processing it for the purpose of putting it upon the market, but the proposed legislation would exclude a combination of producers of condensed milk who do not themselves produce it***." 62 Cong. Rec. 2156 (1922) (emphasis added).  *See also* 60 Cong. Rec. 369 (1920), 62 Cong. Rec. 2052-53 (1922).  The legislative history cited by plaintiffs suggests only that Congress intended to exclude from Capper-Volstead protection processors who were not also growers. Pls.' Br. at 29 n.16.

*Inc. v. Mid-America Dairymen, Inc.*, 877 F.2d 1384, 1392 (8th Cir. 1989). *See also* Defs.' Br. at 30.

Plaintiffs pay lip service to the concept of "predatory conduct" by claiming that defendants "coerced" non-members to join the co-ops by calling them "free riders." They also complain that existing members were subjected to "surprise audits and inspections" and required to provide access to federal farm subsidy forms. Finally, they claim that compliance with supply management programs were enforced by fines and satellite imagery. Pls.' Br. at 49.

None of this conduct rises to the level of coercion or exclusionary conduct recognized by courts as "predatory." Defs.' Br. at 29-31. Moreover, activities taken to confirm compliance with a program to which members voluntarily agreed is hardly coercive. *Ewald*, 877 F.2d at 1392, 1394; Defs.' Br. at 29-30. Plaintiffs have not alleged any predatory practices sufficient to survive a motion to dismiss.

### 4.  The Capper-Volstead Protection Applies to Collaborations with Foreign Cooperatives.

The parties agree that, at minimum, the Capper-Volstead Act was intended to protect farmers in this country. Pls.' Br. at 42-43; Defs.' Br. at 36. Plaintiffs argue, however, that the farmers of this country lose the protection of the Act when they cooperate with farmers in Canada or elsewhere outside the United States. Pls.' Br. at 38-43. For several reasons, plaintiffs' analysis is incorrect.

First, plaintiffs argue that the term "persons" as used in the Capper-Volstead Act does not apply to foreign agricultural producers, relying on *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) and *Zadvydas v. Davis*, 533 U.S. 678 (2001). Pls.' Br. at 42. But these cases stand for the unremarkable proposition that rights protected in the Constitution do not extend to aliens residing outside the United States. *See Verdugo-Urquidez*, 494 U.S. at 269. These cases have nothing to do with the Capper-Volstead Act.

More importantly, the Capper-Volstead Act uses the term "persons" without limitation and

does not exclude foreign producers.  The reference in the Act to "foreign commerce" demonstrates that Congress intended Capper-Volstead to apply to foreign entities.  7 U.S.C. §§ 291-292. Moreover, Section 6 of the Clayton Act serves to exempt agricultural producers from liability under the antitrust laws, particularly Sections 1 and 2 of the Sherman Act.  The Sherman Act and the Clayton Act both define "person" to include "corporations and associations existing under or authorized by the laws of the United States, the laws of any of the Territories, the laws of any State, or the laws of *any foreign country*."  15 U.S.C. §§ 7, 12(a) (emphasis added).  Foreign persons and entities, including cooperatives, accordingly come within the term "persons" in these interrelated statutory schemes.  *Northland Cranberries Inc. v. Ocean Spray, Inc.*, 382 F. Supp. 2d 221, 225-26 (D. Mass. 2004).

Second, the two cases relied upon by plaintiffs do not support their argument.  Contrary to the claim at page 39 of plaintiffs' brief, the court in *United States v. Nat'l Board of Fur Farm Organizations, Inc.*, 395 F. Supp. 56, 57 (E.D. Wisc. 1975), never reached the question of whether the foreign organizations were exempt under Capper-Volstead.  Instead, the court simply denied the motion to dismiss because the government was not obligated to negate the defense in the criminal indictment.  *Id.* at 57.

The issue of foreign ownership was irrelevant to the DOJ's position in *United States v. Dairy Farmers of America*, Case No. 00-1663, 2000 WL 33200552 (E.D. Pa., Nov. 3, 2000).  In its Competitive Impact Statement, the DOJ opposed the proposed merger because it would eliminate the only remaining privately-held butter processor in the area.  Pls.' Br. at Ex. S. p. 4 (describing the transaction as one that would "eliminate the sole remaining, significant, privately held (*i.e.*, non-cooperative) branded butter producer").  Plaintiffs' claim that the foreign-owned cooperative's lack of antitrust immunity was "[c]entral to [DOJ's] decision to block the merger," simply is not true.

- 21 -

Pls.' Br. at 41.

The few legislative comments referenced by plaintiffs are inapplicable because they simply do not evince any intent to limit the definition of "persons" to United States citizens or entities.  Pls.' Br. at 43.  There is no suggestion that Congress intended to alter or amend the definition of "persons" in the antitrust laws, and the Congressional reports relating to the exemption likewise do not reflect any such incongruous result.  *See* H.R. Rep. No. 67-24 (1921); S. Rep. No. 67-236 (1922).

Finally, plaintiffs' argument relating to the "extraterritorial application" of Capper-Volstead makes no sense.  Pls.' Br. at 44-46.  At issue on this motion is whether the Capper-Volstead exemption protects co-ops and their members that are residents of the United States, from claims of alleged antitrust violations ***in this country***, or whether by collaborating in some fashion with Canadian farmers, they have lost the exemption.  With the possible exception of the Canadian defendants, who address the application of Capper-Volstead to them in their separate reply, this motion does not involve the potential extraterritorial effect of the antitrust laws.  Accordingly, the Court should rule as a matter of law that the alleged collaboration with foreign growers did not destroy the Capper-Volstead exemption.

### 5.    Agreements Among Cooperatives Are Protected.

Plaintiffs argue that defendants lost the Capper-Volstead exemption because they "entered into supply reduction agreements with four other Idaho potato groups that were *not* Capper-Volstead cooperatives and *not* members of UPGA/UPGI."  Pls.' Br. at 33 (emphasis in original).  Yet, the complaints allege that these non-defendant entities all are groups of potato growers.  DP Compl. ¶ 176; IP Compl. ¶ 214.  Collaboration between grower organizations is protected by the Capper-Volstead Act.  *Sunkist Growers*, 370 U.S. 27-29; *Treasure Valley*, 497 F.2d at 217 (recognizing collaboration between bargaining associations did not destroy the exemption).

Case 4:10-md-02186-BLW   Document 138   Filed 06/03/11   Page 28 of 33

**6.    The Complaints Do Not Sufficiently Allege That the Cooperatives Have Unlawfully Colluded with Other Third Parties.**

Plaintiffs also contend that defendants have lost Capper-Volstead protection because they conspired with a variety of third parties, including nonmember growers, the UPGA "Partners," the Idahoan joint venture, and other third parties.  Pls.' Br. at 31-38.  Defendants now show that these allegations are insufficient under *Twombly* and *Iqbal*.  Defs.' Br. at 34-36, 37-39.

### a.    Plaintiffs Have Not Alleged Agreements with Nonmember Growers.

The Ninth Circuit recognizes that the "crux of any price-fixing agreement is the relinquishment by a trader . . . of the freedom to set prices in accordance with his own judgment." *Truck-Rail Handling, Inc. v. Burlington Northern and Santa Fe RR*, 244 Fed. Appx. 130 (9th Cir. 2007) (quoting *Chisholm Bros. Farm Equip. Co. v. Int'l Harvester Co.*, 498 F.2d 1137, 1142 (9th Cir. 1974).)  In this case, plaintiffs have not alleged any agreement requiring that a non-member grower relinquish his freedom to set the price or control the supply of his own crop.  Rather, the plaintiffs alleged that certain defendants solicited members, shared information with non-member growers, or hoped that non-member growers would use the information to address overproduction. DP Compl. ¶¶ 282-94; IP Compl. ¶¶ 299-308.  While non-member growers may have voluntarily adopted acreage reduction guidelines, the plaintiffs have not alleged the existence of any agreement or facts sufficient to infer any unlawful agreement with a non-member grower.  Defs.' Br. at 34-36.

### b.    The Partner Program Does Not Involve Any Agreement to Fix Prices or Limit Supply.

The "United Potato Partners Program" was an advertising opportunity through which manufacturers of potato production products could have access to cooperative members for advertising purposes in exchange for funding cooperative activities.  Defs.' Br. at 37.

Nowhere in the complaints or their response do plaintiffs explain exactly what it is that causes the mere funding of cooperative activities to be transformed into participation in a price-fixing

- 23 -

conspiracy.  The act of soliciting and accepting donations does not defeat Capper-Volstead immunity.  In *Alexander*, a cooperative solicited and received financial support from a handful of non-farmers, including a "car dealer, a truck driver, a fertilizer salesman, a school teacher, a retired farmer, a TV salesman and a telephone company employee."  687 F.2d 1186.  The Eighth Circuit ruled that the cooperative could claim Capper-Volstead immunity notwithstanding the donations.  *Id.* at 1187.  The "Partners Program" allowed non-farmers to make contributions much in the same way that non-farmers supported the cooperative in *Alexander*.

In their response, plaintiffs make the circular argument that the Partners "aided and abetted" the alleged conspiracy.  Pls.' Br. at 34.  "Yet, the very case relied upon by plaintiffs shows that liability for aiding and abetting" an unlawful conspiracy means "materially assisting a known-to-be-illegal activity in the hope that it will flourish to the benefit, pecuniary or otherwise, of the aider."  *In re Brand Name Prescription Drugs Litig.*, 288 F.3d 1028, 1035 (7th Cir. 2002) (cited at page 35 of plaintiffs' brief).  The complaints nowhere allege that the Partners knew that the alleged supply management conspiracy was (as plaintiffs claim) illegal, or that they provided "material assistance" to its success.  Accordingly, the Partner Program does not limit Capper-Volstead immunity.

### c.   *Plaintiffs' Allegations of a Conspiracy Involving the Idahoan Joint Venture Are Insufficient.*

As discussed in defendants' opening memorandum, the complaints allege that the formation of the Idahoan joint venture was part of the supply management and price fixing conspiracy.  Defs.' Br. at 38-39.  Rather than burden the record with duplicative argument, these defendants respectfully incorporate by reference the argument in Section D of *Reply to [110] Brigiotta's Memorandum in Opposition to Motion to Dismiss . . . [79] Certain Defendants and Defendant Associations*.

### d.   *Plaintiffs' Allegations That Defendants Conspired With Other Ineligible Entities Are Insufficient.*

In their response, plaintiffs claim summarily that the "cooperatives colluded with non-exempt

packing warehouses, that had no growing operations, in order to implement 'flow control' measures in restricting supply." Pls.' Br. at 38.  In their complaints, however, plaintiffs allege only that UPGI and later UPGA implemented "marketing conference calls" which took place once or twice each week:  "***Prior to a conference call***, participating warehouses would log on the UPGI web-page and provide information on capacity, stocks and pack-outs."  DP Compl. ¶ 190 (emphasis added); IP Compl. ¶ 224.  In other words, plaintiffs allege that UPGI and UGPA gathered information from warehouses.  This conduct is permitted by the Cooperative Marketing Act, which authorizes the collection of crop information.  7 U.S.C. § 455.  There are no allegations of agreement with a warehouse or any other ineligible entity which would limit the cooperatives' statutory immunity.

### III.    CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court grant the *Motion to Dismiss Based on the Capper-Volstead Act and Related Statutes*.

Respectfully submitted on June 3, 2011.

By: /s/  James S. Lowrie
      JONES WALDO HOLBROOK & McDONOUGH PC
      James S. Lowrie
      Andrew G. Deiss
      Billie J. Siddoway

      HOLLAND & HART LLP
      James E. Hartley
      Steven B. Andersen

      PORTER WRIGHT
      Donald M. Barnes
      Salvatore A. Romano

      *Counsel for United Potato Growers of Idaho, Inc.; United Potato Growers of America, Inc.; United II Potato Growers of Idaho, Inc.; Albert Wada; Wada Farms, Inc.; Wada Farms Potatoes, Inc.; Wada-Van Orden Potatoes, Inc.; Wada Farms Marketing Group, LLC; Michael Cranney; Keith Cornelison; Cornelison Farms, Inc.; Snake River Plains Potatoes, Inc.; and Raybould Brothers Farms LLC*

- 25 -

977217v5

ORRICK, HERRINGTON & STUCLIFFE, LLP
Stephen V. Bomse
Robert A. Rosenfeld

BELNAP, STEWART, TAYLOR & MORRIS
Monte N. Stewart
Daniel W. Bower

*Counsel for Blaine Larsen; Blaine Larsen Farms, Inc.;*
*Driscoll Potatoes, Inc.; and Rigby Produce, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 3rd day of June, 2011, I caused the foregoing to be electronically filed through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | | |
|---|---|---|
| Albert P. Barker<br>abp@idahowaters.com | David J. Syrios<br>dsyrios@ademilaw.com | Jay S. Cohen<br>jcohen@srkw-law.com |
| Allen Steyer<br>asteyer@steyerlaw.com | David R. Lombardi<br>drl@givenspursley.com | Jeffrey L. Spector<br>jspector@srkw-law.com |
| Andrew G. Deiss<br>adeiss@joneswaldo.com | Donald Michael Barnes<br>dbarnes@porterwright.com | John Michael Avondet<br>javondet@beardstclair.com |
| Arthur N. Bailey, Jr.<br>abailey@hausfeldllp.com | Donald Amamgbo<br>Donald@amamgbolaw.com | Jon T. King<br>jking@hausfeldllp.com |
| Bart M. Davis<br>bmdavis@bmdlaw.net | Douglas A. Millen<br>dmillen@fklmlaw.com | Joseph Michael Barton<br>jbarton@glancylaw.com |
| Benjamin Andrew Schwartzman<br>bschwartzman@bwslawgroup.com | Elizabeth McKenna<br>emckenna@milberg.com | Julio Joaquin Ramos<br>ramosfortrustee@yahoo.com |
| Billie Jean Siddoway<br>bsiddoway@joneswaldo.com | Eugene A. Spector<br>espector@srkw-law.com | Kimberly A. Kralowec<br>kkralowec@kraloweclaw.com |
| Bonny E. Sweeney<br>bonnys@rgrdlaw.com | Gregory L. Crockett<br>gregcrockett@hopkinsroden.ocm | Lionel Z.  Glancy<br>lglancy@glancylaw.com |
| Brad P. Miller<br>bmiller@hawleytroxell.com | Guri Ademi<br>gademi@ademilaw.com | Lauren Block<br>lblock@milberg.com |
| Bruce S. Bistline<br>bbistline@gordonlawoffices.com | Hollis Salzman<br>hsalzman@labaton.com | Mark A Griffin<br>mgriffin@kellerrohrback.com |
| Carmen A. Medici<br>cmedici@rgrdlaw.com | James A. Wilson<br>jawilson@vorys.com | Matthew McBurney<br>mmcburney@crowell.com |
| Christopher Emrich Ondeck<br>condeck@crowell.com | James E. Hartley<br>jhartley@hollandhart.com | Matthew S. Wild<br>mwild@wildlawgroup.com |
| Chad V. Bonanni<br>chad@essex.bpflegal.com | James S. Lowrie<br>jlowrie@joneswaldo.com | Michael D. Gaffney<br>gaffney@beardstclair.com |
| Daniel G. Swanson<br>dswanson@gibsondunn.com | James Pizzirusso<br>jpizzirusso@hausfeldllp.com | Michael P. Lehmann<br>mlahmann@hausfeldllp.com |
| Daniel M. Cohen<br>danielc@cuneolaw.com | Jay L. Himes<br>jhimes@labaton.com | Michael M. Goldberg<br>mmgoldberg@glancylaw.com |

| | | |
|---|---|---|
| Michael Kowsari<br>mkowsari@girardikeese.com | Robert Rosenfeld<br>rrosenfeld@orrick.com | Steven A. Asher<br>asher@wka-law.com |
| Mindee J. Reuben<br>reuben@wka-law.com | Ronald J. Aranoff<br>aranoff@bernlieb.com | Steven A. Kanner<br>skanner@fklmlaw.com |
| Monte N. Stewart<br>stewart@belnaplaw.com | Salvatore Anthony Romano<br>sromano@porterwright.com | Steven B. Andersen<br>sandersen@hollandhart.com |
| Neil D. McFeeley<br>nmcfeeley@eberle.com | Samuel G. Liversidge<br>sliversidge@gibsondunn.com | Steven Bomse<br>sbomse@orrick.com |
| Paul Novak<br>pnovak@milberg.com | Sharron Williams Gelobter<br>sgelobter@yurumeinlaw.com | Wade L. Woodard<br>wwoodard@bwslawgroup.com |
| Peter Safirstein<br>psafirstein@milberg.com | Shpetim Ademi<br>sademi@ademilaw.com | William L. Greene<br>William.greene@leonard.com |
| Michael D. Gaffney<br>gaffney@beardstclair.com | Stephen R. Thomas<br>srt@moffatt.com | William V. Reiss<br>wreiss@labaton.com |
| Michael P. Lehmann<br>mlahmann@hausfeldllp.com | Susan G. Kupfer<br>skupfer@glancylaw.com | Winston V. Beard<br>winston@beardstclair.com |

In addition, a true and correct copy of the foregoing was caused to be sent by United States mail, postage prepaid to the following attorneys not registered to receive electronic notice via CM/ECF:

Charles Slidders
One Pennsylvania Plaza, 48th Fl
New York, NY 10119


/s/  Billie J. Siddoway