Philip Gordon, Esq. (ISBN 1996)
Bruce S. Bistline, Esq. (ISBN 1988)
GORDON LAW OFFICES
623 W. Hays Street
Boise, Idaho 83702
Phone: (208) 345-7100
Fax: (208) 345-0050
pgordon@gordonlawoffices.com
bbistline@gordonlawoffices.com

[Additional Counsel listed on signature page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## EASTERN DIVISION

| | |
|---|---|
| IN RE FRESH AND PROCESS POTATOES ANTITRUST LITIGATION<br><br>*Brigiotta's Farmland Produce and Garden Center, Inc., v. United Potato Growers of Idaho, Inc.; et al.*, Case No. 4:10-cv-00307 BLW | Civil Case No. 4:10-md-02186 BLW<br><br>MDL No. 2186<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. Plaintiffs and Class Representatives Brigiotta's Farmland Produce and Garden Center, Inc. and J.R. Mazzola, Inc. ("Plaintiffs") bring this action individually and on behalf of a Class consisting of all United States direct purchasers of fresh and process potatoes from Defendants and their co-conspirators from June 18, 2006 to the present (the "Class Period"). The Defendants include individual growers, owners, and packing sheds; marketing and shipping agencies working as agents of and under the control of individual growers; and two Idaho potato cooperatives, one of which, together with other regional cooperatives, makes up the United Potato Growers of America, Inc. – a national cooperative through which Defendants have coordinated and facilitated their price-fixing conspiracy on a national and international scale. The present Amended Complaint ("Complaint") is filed as of right pursuant to the Court's Order of December 2, 2011 (Dkt. 215).

2. Plaintiffs allege a conspiracy among Defendants and certain unnamed co-conspirators wherein these entities agreed to fix, raise, maintain and/or stabilize the prices at which fresh and process potatoes (collectively "potatoes") were sold in the United States by controlling and reducing the aggregate supply of potatoes.  Each Defendant knew that it could not fix prices by itself, and that supply could only be restrained by collective action.  Thus, Defendants entered into an admitted and overarching agreement to manage the supply of potatoes in the United States for the purpose of elevating the sales prices of fresh and process potatoes.  During the Class Period, Defendants implemented this price-fixing and supply-management conspiracy by agreeing to take several coordinated actions including, among other methods, 1) agreeing to limit potato planting acreages; 2) agreeing to pay farmers to destroy existing stocks or not to grow additional potatoes; 3) and agreeing to reduce the overall number of potatoes available for sale to direct-purchaser entities.  Furthermore, Defendants implemented secondary market strategies designed to limit the flow of potatoes to the market when prices were low so that those prices could be supracompetitively raised.

3. In order to facilitate the massive price-fixing and supply-restriction conspiracy alleged herein, the Defendants, including the largest potato growers and shippers in the United States, first came together in 2004 to form regional and nationwide "cooperatives" – not for the purpose of marketing and selling their potato products collectively (as is the function of a traditional, small-scale cooperative) – but rather for the sole purpose of creating a national vehicle for potato growers and their co-conspirators to conspire together to reduce potato output and fix prices.

4. Defendants erroneously claimed immunity for their price-fixing activities under the 1922 Capper-Volstead Act (7 U.S.C. §§ 291-92), which provides a limited exemption from the

application of the antitrust laws to associations and cooperatives comprised of certain agricultural producers.  As discussed herein, Defendants have taken numerous overt actions that destroy the applicability of any potential immunity that may have been provided under this Act and, as such, the limited protections of the Capper-Volstead Act do not apply.

5. Plaintiffs' Complaint details the classic cartel behavior that Defendants and their co-conspirators exhibited.  The Complaint describes Defendants' admitted collusion; their admitted monitoring and policing of the cartel; their admitted impact on market price from the cartel's activities; and their admitted pressure on fellow co-conspirators, including "punitive" measures imposed on any cartel members who failed to follow the price-fixing agreement.

6. Defendants analogized their potato cartel to the Organization of Petroleum Exporting Countries ("OPEC") – the notorious petroleum supply-reduction and price-fixing cartel composed of various foreign nations.  Defendants suggested that they should "study" the OPEC model and were referred to as the "OPEC of Potatoes."

7. Defendants' supply-reduction and price-increase conspiracy has been a resounding success.  Defendants are not entitled to any immunity for their unlawful actions, and Plaintiffs request herein that Defendants be found liable to the Plaintiffs and the Class for the extensive damages caused by their per se illegal supply-reduction and price-fixing conspiracy.

## JURISDICTION AND VENUE

8. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).  The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of

$5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from the Defendants.

9. Venue is proper because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

10. This Court has personal jurisdiction over Defendants because, *inter alia*, they:  (a) transacted business throughout the United States, including in this District; (b) had substantial contacts with the United States, including in this District; and/or (c) were engaged in an illegal anticompetitive scheme that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## **PLAINTIFFS**

11. Plaintiff Brigiotta's Farmland Produce and Garden Center, Inc. ("Brigiotta's") is a corporation organized, existing, and doing business under the laws of New York with its principal place of business located in the state of New York.  During the Class Period, Brigiotta's purchased potatoes directly from one or more of the Defendants.  As a result of the federal antitrust law violations described herein, Brigiotta's was injured in its business or property.

12. Plaintiff J.R. Mazzola, Inc. ("Mazzola") is a corporation organized, existing, and doing business under the laws of Michigan with its principal places of business in Detroit, Michigan.  During the Class Period, Mazzola purchased potatoes directly from one or more of the Defendants.  As a result of the federal antitrust law violations described herein, Mazzola was injured in its business or property.

## DEFENDANTS

## I.  Potato Cooperatives

## A.  United Potato Growers of America, Inc.

13. Defendant United Potato Growers of America, Inc. ("UPGA") is a non-profit corporation organized, existing, and doing business under the laws of Utah with its offices and principal place of business located in Salt Lake City, Utah.  During the Class Period, UPGA participated in and facilitated the supply-restriction and price-fixing scheme alleged herein.

14. UPGA's members, located throughout the United States, produce approximately 70 to 80 % of the nation's fresh-market potatoes.

15. UPGA's stated mission is to "manage national potato supply so as to positively affect grower profitability."  It achieves this goal primarily by limiting potato-planting acreage among its members, including its ten member cooperatives: United At-Large Co-op; United Fresh Potato Growers of Colorado; United Potato Growers of Idaho; Kern Produce Shippers; United Fresh Potato Growers of the Klamath Basin; United Potato Growers of Montana; Red River Valley Fresh Potato Growers Cooperative; United Southwest Potato Growers; United Fresh Potato Growers of Washington/Oregon; and United Potato Growers of Wisconsin.  UPGA also coordinates market calls among competitors so that the co-conspirators can limit the flow of potatoes to the market when prices are low in order to further increase prices.

16. UPGA was formed in March of 2005.  Since its formation, UPGA has assisted regional potato cooperatives and their individual grower members in their collective efforts to restrict supply and fix prices by designing, proposing, and implementing various price-fixing initiatives, including acreage buy-down programs; crop-reduction programs; and flow-control programs designed to prevent market glut.

17.  UPGA has also provided professional leadership, data-gathering and analysis capabilities, guidance to growers, and served as a forum for regional cooperatives to share information about their supply-restriction efforts.

18. Since 2008, according to its website, UPGA has operated a United Potato Partners sponsorship program, which is described as "support[ing] the underwriting of United's databases, administration and educational seminars. The seminars provide a means for direct, two-way communication with potato growers."

19. UPGA's price-fixing and capacity reduction efforts are not limited to the United States.  From its inception, UPGA directors have periodically met and conspired with Canadian and other international growers to encourage similar supply-restriction efforts throughout North America and the world.  UPGA played an instrumental role in the creation of its Canadian counterpart, the United Potato Growers of Canada ("UPGC").  The two have worked together closely ever since to manage potato supply for the entire North American market.

**B.  United Potato Growers of Idaho, Inc.**

20. Defendant United Potato Growers of Idaho, Inc. (formerly known as "United Fresh Potato Growers of Idaho") ("UPGI") is a corporation organized, existing, and doing business under the laws of Idaho with its offices and principal place of business located in Idaho Falls, Idaho.  During the Class Period, UPGI participated in the supply-restriction and price-fixing scheme as alleged herein.

21. UPGI is a founding cooperative member of UPGA.

22. The North American potato cartel originated with UPGI and its founders.  In 2004, 23 Idaho potato growers – who collectively accounted for 60% of the fresh potatoes produced in Idaho and 25% of the fresh potatoes produced in the United States – met and agreed to

collectively reduce potato supplies and fix prices under the banner of the newly formed UPGI. Within one year, UPGI had received commitments to reduce potato supply from farmers responsible for approximately 91% of the fresh potato acreage in Idaho, including all of the founding members of UPGI.

23. UPGI employed numerous forms of supply management strategies to fix the prices of potatoes. Among other things, UPGI donated potatoes to charitable organizations and imposed "shipping holidays" during which potato-packing operations would shut down for at least a single shift. UPGI also began the acreage limitations outlined herein that UPGA eventually adopted and promoted on a nationwide basis.

24. As part of this collusive activity, UPGI engaged, *inter alia*, in the following practices: (a) disseminating to its members annual "planting guidelines," which members were required to follow, aimed at reducing capacity and thereby keeping prices for potatoes high; and (b) developing and disseminating a Grower Return Index ("GRI") aimed at measuring the profitability obtained by following its policies.

25. UPGI's charter included as one of its purposes the goal of working with similar cooperatives in other potato-growing states to manage supply. That effort was extraordinarily successful. By 2005, UPGI's founders had colluded with all of the potato trade groups in Idaho and met with growers in numerous states to help form regional cooperatives all over the country.

26. Defendant Albert Wada—an Idaho grower who helped create UPGI—gathered these other regional representatives in 2005 and with them formed Defendant UPGA, the nationwide cooperative.

27. In 2009, after some members left the group, UPGI announced it would disband if it was unable to reach its membership goal of controlling 80% of Idaho's fresh potato acreage. In

late 2009, UPGI announced that membership had reached 80% and the organization would continue its operations.

### C.  United II Potato Growers of Idaho, Inc.

28. Defendant United II Potato Growers of Idaho, Inc. ("United II") is a corporation organized, existing, and doing business under the laws of Idaho with its principal place of business located in Idaho Falls, Idaho.  During the Class Period, United II participated in the supply-restriction and price-fixing scheme as alleged herein.

29. In or around March 2007, UPGI acquired the assets of Idaho Fresh-Pak Corporation, a potato processor that operated plants in Eastern and Southern Idaho.

30. Also in or around March 2007, UPGI also formed United II, a second cooperative made up of UPGI members.  The stated purpose of United II, as articulated in its Articles of Incorporation, was to "stabilize potato prices and supplies in the State of Idaho [.]"  UPGI sought to use United II as a means to further the overall conspiracy of reducing potato supply.

31. The first United II board of directors included the following persons, each of whom is affiliated with one or more of the Defendants named herein:  Albert Wada; Dave Beesley; Jeff Raybould; Carl Taylor; and Gary Hansen. All United II members were required to be members of UPGI.

32. United II created a joint venture with Defendant R.D. Offutt Co. (the largest potato grower in the country) to form a new entity, defendant Idahoan Foods, LLC.  Idahoan Foods, LLC is one of the largest potato dehydrators in the country.

33. Under the terms of the joint venture, United II would own and contribute the processing plants acquired in UPGI's acquisition of Idaho Fresh-Pak.  R.D. Offutt Co. would own and contribute its processing plants in the states of Nevada, Idaho and North Dakota.  The

United II grower-owners would supply all of the potatoes for the joint venture's plants in Idaho and Nevada.

34. Consistent with its mission to "stabilize potato prices and supplies," the primary purpose for United II to enter into the joint venture with R.D. Offutt Co. was for UPGI to create an additional vehicle to divert "excess" fresh potatoes from the fresh potato market and thereby the overall scheme to reduce potato supply.

35. A 2007 Northwest Farm Credit Services analysis of the Wada Farms Defendants (discussed below), observed that the United II joint venture "will allow the overcapacity in the industry to be dealt with by closing some facilities . . . [and] **will help the co-op better manage the flow of potatoes into the fresh market**." (emphasis added)

36. As further detailed herein, United II achieved its objective of creating a mechanism for manipulating potato supply by, *inter alia*, implementing a membership agreement that permitted United II to call in up to 3% of each member's best quality fresh potatoes for dehydration.

37. Furthermore, as detailed herein, United II and co-conspirators Ronad D. Offutt, Jr. and R.D. Offutt Co. dominated and controlled the joint venture company Idahoan Foods, LLC.

## II. Defendant Potato Growers, Packers, Marketing Agencies, and Licensors

### A. Wada Farms Defendants

### Wada Farms, Inc; Cedar Farms, Inc.; Wada Family, LLC; Wada Farms Potatoes, Inc.; Wada Farms Marketing Group, LLC; Pro Fresh, LLC; and Albert Wada

38. Defendant Wada Farms, Inc. is a corporation organized, existing, and doing business under the laws of Idaho with its principal place of business located at 1487 Parkway

Drive in Blackfoot, Idaho.  During the Class Period, Wada Farms, Inc. participated in the supply-restriction and price-fixing scheme alleged herein.

39. Defendant Cedar Farms, Inc. is a corporation organized, existing, and doing business under the laws of Idaho with its principal place of business located at 1487 Parkway Drive in Blackfoot, Idaho.  During the Class Period, Cedar Farms, Inc. participated in the supply-restriction and price-fixing scheme alleged herein.

40. Defendant Wada Family, LLC is a limited liability company organized, existing, and doing business under the laws of Idaho with its principal place of business located at 326 S 1400 W in Pingree, Idaho. During the Class Period, Wada Family, LLC participated in the supply-restriction and price-fixing scheme alleged herein.

41. In sworn testimony in a different case in this Court, Dallas Ward, Chief Financial Officer for the "Wada Group of Companies," stated that defendants Wada Farms, Inc., Cedar Farms, Inc. and Wada Family, LLC are the Wada business entities that grow potatoes.  As such, Wada Farms, Inc., Cedar Farms, Inc. and Wada Family, LLC are referred to collectively herein as the "Wada Grower Entities."

42. Defendant Wada Farms Potatoes, Inc. is a corporation organized, existing, and doing business under the laws of the state of Idaho with its principal place of business located at 1487 Parkway Drive in Blackfoot, Idaho.  During the Class Period, Wada Farms Potatoes, Inc. participated in the supply-restriction and price-fixing scheme alleged herein.

43. Wada-Van Orden Potato, Inc. was, during the conspiracy alleged herein, a corporation organized, existing, and doing business under the laws of Idaho with its principal place of business located at 1487 Parkway Drive in Blackfoot, Idaho.  In or about 2007, Wada

Van-Orden Potato, Inc. merged with defendant Wada Farms Potatoes, Inc., at which point Wada Van-Orden Potato, Inc. ceased independent operations.

44. Defendant Wada Farms Potatoes, Inc. (and previously Wada-Van Orden Potatoes, Inc.) is the Wada corporate entity responsible for washing, grading, packing and shipping potatoes grown by the Wada Grower Entities and others.  Defendant Wada Farms Potatoes, Inc. is thus referred to herein as the "Wada Packing Entity."

45. In sworn testimony, Dallas Ward, the Chief Financial Officer for the Wada Group of Companies, explained how Defendant Wada Farms Potatoes, Inc. fits into the vertical integration of the "Wada Group of Companies:"

> Q: You testified a moment ago that Mr. Wada's earnings from Wada Farms Potatoes was – and I may be putting words in your mouth, so I'm hoping you can help me here. His earnings from Wada Farms Potatoes were needed on the farm side?
>
> A: The way the companies work is the earnings in the warehouse, the net income in the warehouse has always – at the end of the year, the earnings are paid out to the farm. And they do that because there are a lot of debt-based debts on the farm that need to be serviced by these revenues. We're a vertically integrated company.
>
> And so the bottom line is revenues, the net income from this company, if there is a net income, will be paid out to the farms. And the farms, because of the heavy debt load which they carry, use that money to pay down debt and enhance, bolster working capital.
>
> And so if we are affected adversely in the warehouse, that adversely affects the farm and their ability to pay down debt, which includes operating debt, equipment debt, all of that debt. And so structurally, Mr. Wada has built – has vertically integrated to do just that. The farm provides the potatoes so that these companies – this company can make its money, so the marketing company can make its money. And those funds find their way back to the farm to service debt. And had we had – in these Oust years, had we not lost revenue in the warehouse, that revenue would have flowed back down to the farm and serviced debt.

That's what I meant by that comment.

46. In sworn testimony, Albert Albert Wada further explained what vertical integration means to his operation:

> Q: What do you mean by, "Vertical integration at Wada Farms starts with our own potato seed growing operation?"
>
> A: Well, I guess, vertical integration to me means how many aspects of the total process from the first processes of growing potatoes through the selling of the potatoes to the ultimate consumer, how many of those processes do we actually control or manage. At that time, we did grow our own seed potatoes. I don't recall what years we did or did not grow our own potato seed. But in answer to your question, how far are we vertically integrated. At that time, we were integrated from the seed growing through the process of selling and shipping the fresh potatoes.

47. Defendant Wada Farms Marketing Group, LLC ("Wada Farms Marketing") is a limited liability company organized, existing, and doing business under the laws of Idaho with its principal place of business located at 326 S. 1400 W in Pingree, Idaho.  During the Class Period, Wada Farms Marketing participated in the supply-restriction and price-fixing scheme alleged herein.

48. Defendant Pro Fresh, LLC is a limited liability company organized, existing, and doing business under the laws of Idaho with its offices and principal place of business located at 326 S. 1400 W in Pingree, Idaho.  During the Class Period, Pro Fresh, LLC participated in the supply-restriction and price-fixing scheme alleged herein.

49. Defendants Wada Farms Marketing and Pro Fresh, LLC are the Wada corporate entities responsible for the marketing and sale of potatoes grown by the Wada Grower Entities as well as potatoes grown by other growers and washed and process by the Wada Packing Entity. Wada Farms Marketing and Pro Fresh, LLC are referred to collectively herein as the "Wada

Marketing Entities."  The Wada Marketing Entities have offices in Idaho, Oregon and Texas and market and distribute potatoes throughout the United States.

50. Defendant Albert Wada ("Wada") is the Chairman and former CEO of each of the Wada defendants listed above.  Wada is domiciled and resides at 1385 W Highway 39, Pingree, ID 83262.

51. Wada controlled each of the Wada defendant entities identified above from the inception of such entity until at least 2010.  According to a Financial Analysis prepared by Northwest Farm Credit Services in 2008, Wada owns 90% of Wada Family LLC, 77% of Wada Farms Potatoes, Inc., and 62% of Wada Farms Marketing Group, LLC.   The independent report notes that Wada "owns the vast majority of and has complete control over these entities, and they are operated in concert with one another . . . ."

52. Albert Wada and the Wada defendant companies identified herein have operated as and continue to operate as a single, vertically integrated business, referred to as "Wada Farms."  The attorney representing Albert Wada, Wada Farms, Inc., Wada Family, LLC and Wada Farms Potatoes, Inc. wrote in an August 2011 brief in another case in this Court that, "Wada Farms [is a] large, vertically integrated organizations that utilized smaller entities within [its] corporate structure to handle every aspect of growing potatoes—some entities grew the potatoes for them and others, like . . . Wada Potatoes, washed, graded, and packaged them. . . . Wada Farms sought to vertically integrate so that [it] could handle all aspects of potato growing, marketing, and selling so that [it] did not have to rely on third parties during any part of the process.  The packing sheds served as one arm of the corporation that allowed [it] to achieve this goal." (Emphasis added).  The packing shed referred to is Defendant Wada Farms Potatoes, Inc.

53. Wada has operated this single "Wada Farms" business in disregard of the separate corporate form of each of the Wada defendant entities throughout the period of time relevant to the allegations made herein.  Profits are used from the marketing and packing entities to support the farm operations

54. The Wada defendant entities share a common website, www.wadafarms.com.  The wadafarms.com website explains, under a page entitled, "Our Farm":

> Based in Southeastern Idaho, **this family-owned and operated business** is dedicated toward the delivery of fresh and innovative products sustainably. Growing over a billion potatoes annually, we are among the largest growers and shippers in the industry.
>
> **Wada Farms** operates in 6 diversified farming locations across three counties, totaling around 30,000 irrigated acres. The original farming operation has expanded to include a fresh potato, onion and sweet potato sales & marketing group, 140,000 sq. ft. fresh potato packing warehouse and trucking company.
>
> (Emphasis added).

55. The Wada defendant companies share a CFO, Dallas Ward; a tax accountant, Layne Van Orden; and an IT expert, Jay Stowell.  Bryan Wada, Wada's son, explained in sworn testimony in February 2011 that Jay Stowell "is currently an employee of the Wada Marketing Group, **and we use him as needed with the other entities**." (Emphasis added).  The email addresses of employees of all Wada defendant entities end in the suffix: @wadafarms.com.

56. The business and financial operations of the Wada defendant entities are intertwined.  As Dallas Ward, CFO for the Wada Group of Companies, explained in sworn testimony: "The farm provides the potatoes so that these companies – [Wada Farms Potatoes, Inc.] can make money, so the marketing company can make its money.  And those funds find their way back to the farm to service debt."

57. A 2008 Northwest Farm Credit Services analysis of the Wada businesses similarly explained that "all income or loss" attributable to Wada Farms Potatoes Inc. and Wada Farms Marketing Group, LLC "is passed through to the farm entities."

58. Wada Family, LLC, in seeking a 2008 intermediate term loan, submitted to the lender a consolidated balance sheet that includes the following Wada defendant entities: Albert Wada; Wada Family, LLC; Wada Farms, Inc.; and Wada Farms Potatoes/Wada Farms Marketing Group (included as a single column). The bank considering the loan evaluated the "Wada et al." group of companies collectively as a single entity, and issued a risk rating for the "Wada et al." group reflected on the consolidated balance sheet.

59. A Northwest Farm Credit Services 2007 memorandum concerning an operating line renewal application for defendants Wada Farms, Inc. and Cedar Farms, Inc. ("2007 NWFCS Memo") similarly evaluated the Wada businesses as a single entity, explaining that: "**The Company's** vertical integration allows Wada to capture additional margin by marketing its own potatoes." (Emphasis added).

60. The 2007 NWFCS Memo states that collateral for the loan sought by Wada Farms, Inc. and Cedar Farms, Inc. included assets of various Wada defendant entities, including: "a first lien on crops, accounts receivable and inventory, as well as a first or best blanket lien on machinery and equipment, . . . Additionally, an assignment will be made to the bank of any proceeds that may result from the outcome of the litigation against Oust [to which Wada Farms, Inc.; Cedar Farms, Inc.; Wada Farms Potatoes, Inc.; and Wada Family, LLC were party]. . . . The best lien position has been obtained for all long-term assets of Wada Family, LLC . . . ."

61. The 2007 NWFCS Memo further states that, to remain in compliance, "Wada Farms" is required to submit "[m]onthly financial statements on Wada Farms Potatoes, Wada Van Orden Potatoes, Wada Farms Marketing Group and Profresh."

62. Wada Farms Marketing Group, LLC identifies itself in legal documents as Wada Farms Marketing Group d/b/a Wada Farms Potatoes, Inc.

63. Wada Farms Marketing Group, LLC and Wada Farms Potatoes, Inc. are treated as a single entity for accounting and balance sheet purposes.

64. Wada Farms, Inc. and Cedar Farms, Inc. are treated as a single entity for accounting and balance sheet purposes.

65. Wada's participation in the supply reduction and price fixing conspiracy was on behalf of, and implicated, each of the Wada defendant companies identified herein as a result of his and the companies' disregard for the companies' corporate structures.

66. The participation in the supply reduction and price fixing conspiracy by each of the Wada defendant companies was on behalf of, and implicated, each of the other Wada defendant companies as a result of Albert Wada's and the companies' disregard for their corporate structures.

67. The Wada Grower Entities were direct participants in the UPGI/UPGA acreage reductions schemes as alleged herein.  The Wada Packing Entity participated in the flow control scheme alleged herein.  The Wada Marketing Entities were direct participants by acting as the marketing arm of the Grower and Packing entities and selling the price fixed potatoes on their behalf with direct knowledge of and acquiescence to these schemes.   These corporate structures have little meaning beyond the overall integrated Wada Farm company and they all participated

in and profited from the schemes as alleged herein with ultimate profits flowing to the Wada Grower Entities and and Wada himself.

68. Wada was one of the masterminds of the price-fixing scheme alleged herein.

69. In 2004, Wada began publicizing his desire to unite potato growers, decrease competition, and "rationalize" the industry through curtailed production.

70. In September of 2004, Wada and Keith Cornelison (of Defendant Cornelison Farms) called a meeting of 23 Idaho potato farmers to discuss how to "curb protection" and "boost prices." Shortly after the meeting the group of Idaho potato farmers agreed to create UPGI as the forum by which to enact and enforce their potato acreage reduction scheme.

71. Wada served as chairman of the UPGI board from 2004 through 2007. While serving as chairman of the UPGI Board, Wada also met with other regional growers and cooperatives and set about creating the national cooperative, UPGA.  Wada served as chairman of the UPGA board from 2005 through 2007.  As one of the nation's largest potato growers, Albert Wada has been a leading member of UPGI and UPGA since their respective inceptions and he has served in numerous executive positions in those cooperatives.

72. As UPGA chairman, Wada encouraged growers and grower cooperatives all over the United States to join the supply-reduction effort; met with Canadian growers to discuss the creation of a Canadian equivalent of the UPGA; espoused the benefits of "supply management and grower solidarity"; and helped craft UPGA initiatives to achieve supply reduction.

73. When asked in an interview about the initiation of the price fixing cooperatives, Wada stated: "(I) and a few other grower competitors and colleagues established the United Potato Growers of Idaho [UPGI] in November of 2004 and then the United Potato Growers of America in March of 2005 . . . We started the cooperative here in Idaho in the fall of 2004 out of

economic necessity.  Because of the dire financial straights [sic], potato growers found strength in numbers.  We formed this cooperative and expanded it so it had national scope in order to gain the cooperation of nationwide growers to work with Idaho, the largest potato producing state in the United States.  **It's essentially been a huge benefit to Wada Farms and our financial health as potato growers in that we've been able to work with other producers across North America to stabilize the fresh potato growing business.**  So far, it's been quite an advantage for us to have been involved in.  Yes, the cooperative has costs of membership, but these costs are a small price to pay to be able to remove some of the big risk in potato production."  (emphasis added).

      74. In that same interview, Wada stated, "**United Potato Growers Cooperatives and its market intelligence information-gathering systems and supply management programs helped potato growers to sustain an unprecedented four years of relatively stable and profitable potato pricing.**" (emphasis added).

      75. In 2005, pursuant to the supply reduction conspiracy, all UPGI members were required to and did reduce their potato acreage by at least ten percent.  UPGI board members, including Wada, agreed to reduce their potato acreage by an amount greater than ten percent in support of the supply reduction conspiracy.

      76. As a result, the Wada Grower Entities reduced their potato acreage from 13,647 acres in 2004 to 12,083 acres in 2005.  In 2006, pursuant to the supply reduction conspiracy and under the direction of Wada, the Wada Grower Entities farmed approximately ten percent fewer potato acres than they farmed in 2004. In 2007, pursuant to the supply reduction conspiracy and under the direction of Wada, the Wada Grower Entities farmed approximately 12,500 acres of

potatoes. In both 2008 and 2009, pursuant to the supply reduction conspiracy and under the direction of Wada, the Wada Grower Entities farmed approximately 10,850 acres of potatoes.

77. Wada, as a board member of UPGI and UPGA, advocated for and implemented coordinated actions among shippers and marketers to reduce the amount of fresh potatoes to reach the market. Those actions, as detailed herein, included: shipping holidays; donations of fresh potatoes to charity; flow controls, and diversion of fresh quality potatoes to dehydrators. These efforts were intended to, and did, artificially and illegally support the price of potatoes.

78. The Wada Packer Entity and Wada Marketing Entities, under the direction and control of Wada, participated in coordinated actions to illegally reduce the supply of fresh potatoes to reach the market, including: shipping holidays; donations of fresh potatoes to charity; flow controls, and diversion of fresh quality potatoes to dehydrators.

79. Wada, as a board member of UPGI and UPGA, also advocated for and implemented a program for the sharing of data among potato shippers and marketers, as well as a weekly marketing call among numerous competing shippers and marketers during which a weekly potato pricing strategy was established. These entities also agreed to hold back potatoes from the market (a practice known as "flow control") during times of excess supply and/or low prices.

80. The Wada Packer Entity and Wada Marketing Entities, under the direction and control of Albert Wada, participated in illegal potato data sharing as well as marketing calls during which a potato pricing strategy was established illegally among competing potato shippers and marketers. These entities also agreed to hold back potatoes from the market ("flow control") during times of excess supply and/or low prices.

## B.  Larsen Farms/Potandon Defendants

### Blaine Larsen Farms, Inc.

81. Defendant Blaine Larsen Farms, Inc. ("Larsen Farms") is a corporation organized, existing, and doing business under the laws of the state of Idaho with its principal place of business located in Hamer, Idaho.  During the Class Period, Larsen Farms participated in the supply-restriction and price-fixing scheme as alleged herein and agreed to reduce potato acreage, among other things.

82. Larsen Farms grows, packs, and distributes potatoes under the Larsen Farms brand and private labels.  Larsen Farms operates farmland and facilities in Idaho, Nebraska, and Colorado and services retail and food-service customers worldwide.  The company also makes processed potato products (crushed, diced, flaked, and sliced), which it supplies to food processors.

83. Larsen Farms grows, stores, processes, and transports its own potatoes and refers to itself as a "vertically integrated potato grower."

84. Blaine Larsen of Larsen Farms was one of the founders of UPGI, a UPGI Board Member, and an originator of the price-fixing scheme alleged herein.

### Potandon Produce LLC

85. Defendant Potandon Produce LLC ("Potandon") is a limited liability company organized, existing, and doing business under the laws of Idaho with its offices and principal place of business located in Idaho Falls, Idaho.  During the Class Period, Potandon participated in the supply-restriction and price-fixing scheme as alleged herein by participating in flow control, among other things.

86. Once a division of Pillsbury, Potandon is now an independent company owned by five prior Pillsbury managers and six grower/shippers who control the company's operations. With over 45,000 acres and six packing facilities in Idaho, Potandon sells potatoes and onions to major retailers, club stores, wholesalers, produce distributors, and restaurant chains across the United States at the direction, on behalf of and/or as the agent of its grower/shippers.

87. In June 2002, Potandon merged the sales and marketing activities of an entity known as Idaho Fresh Cooperative ("IFC") into its operations.  IFC is a 70 grower cooperative with over 25,000 acres of potatoes and six packing sheds located throughout the Snake River Valley.

88. In June 2002, Potandon also merged the sales and marketing activities for High Country Potato, located in Rexburg, Idaho.

89. Two Washington grower/shippers (Harvest Fresh Produce in Othello and Balcom & Moe of Pasco) merged with Potandon in June of 2005.  In January of 2006, Potandon merged with Murakami Produce, the largest supplier of onions in the Idaho/Oregon region.  In October 2006, Potandon merged the sales activities for Defendant Larsen Farms into Potandon.

90. There is significant overlap between Potandon, UPGI and UPGA.  More specifically, the member owners of Potandon include:  Cornelison and Ron Olsen, both of whom attended the initial UPGI meeting and signed on to the supply reduction and price-fixing scheme alleged herein; Harvest Fresh Produce, whose president Allen Floyd was on the original UPGA Board of Directors; Defendant Larsen Farms, whose president Blaine Larsen attended the initial UPGI meeting and signed on to the supply reduction and price-fixing scheme alleged herein; and Howard Taylor & Sons, Inc., whose president Carl Taylor attended the initial UPGI meeting and signed on to the supply reduction and price-fixing scheme alleged herein.

91. Outside of Idaho, Potandon has established an extensive network of over 60 potato and onion co-packers in 24 states with another nine co-packers in Canada.  In addition, Potandon is involved in multiple joint venture growing areas and has several exclusive sales agreements.

92. By combining these sales and marketing functions of its growers, Potandon has positioned itself as the largest marketer of potatoes in North America.  Potandon controls a 25% share of the Idaho potato market and a 12% share of the total national potato market.

93. Potandon owns the exclusive licensing rights to the Green Giant® brand for fresh potatoes and onions (pursuant to an agreement with non-defendant co-conspirator General Mills, Inc.).  Potandon also markets SunSpiced potatoes.

94. Potandon sells potatoes throughout the United States.  It solicits internet sales of potatoes on its website at http://www.potandon.com/contact.htm.

95. Potandon is owned and/or controlled by its suppliers and has conspired with its potato growers to assist in efforts to reduce potato supplies and fix prices and has directly profited from the price-fixing scheme detailed herein.

96. Potandon also participated directly in "flow control" efforts (coordinated by growers, as we well as UPGI and UPGA) that were a key component of the supply reduction and price-fixing scheme alleged herein.

97. Flow control at Potandon was achieved through regular weekly meetings at which representatives of those growers who marketed potatoes through Potandon (members of the UPGA and UPGI) – including Defendants Larsen Farms and Driscoll Potatoes – met in Potandon's offices with Potandon executives.

98. Potandon was represented at these weekly grower meetings by top executives, including the Senior Vice President of Operations and Vice President of Operations.

99. During the course of these grower meetings, these executive obtained current potato harvesting and shed storage information from the participating grower representatives. Potandon and its constituent growers employed the information discussed in the weekly growers meeting to manipulate the flow of fresh potatoes to the market in order to supracompetitively raise prices both in its own sheds and through its growers' sheds.

100. Potandon is not an entity protected by the Capper Volstead Act and its participation in supply control efforts was illegal.

101. One of the methods used by Potandon to control the flow of potatoes to the market in concert with its growers was "grading" – the process of modifying quality criteria in order to increase or reduce the flow of potatoes into the market.  Following their meeting with Potandon's constituent growers, Potandon executives would direct Potandon's Director of Idaho Operations with regard to the appropriate grading standard.   Potandon would gather its Quality Assurance (QA) personnel and the Director of Operations would instruct the QA personnel regarding the grading standard to be employed and whether to adjust the flow of potatoes on the market, based on the information acquired during the weekly growers meeting.

102. If there were excessive quantities of potatoes in the growers' sheds, Potandon would direct its QA personnel to use stricter quality guidelines in order to reduce the volume of potatoes available for sale.  Conversely, if the quantities of stored potatoes were comparatively low, Potandon would instruct its QA personnel to use less rigid quality guidelines and thus permit larger numbers of potatoes to enter the market.  By judicious use of this "grading" strategy, Potandon and its constituent growers were able to ensure that the price of potatoes was maintained at supracompetitive levels.

103. Potandon coordinated these flow control efforts with its grower owners, who are members of UPGI and UPGA.

### C.  Other Grower Defendants

### Michael Cranney (Cranney Farms)

104. Defendant Michael Cranney ("Cranney") is an individual doing business as Cranney Farms, an assumed business name under the laws of the State of Idaho and located in Oakley, Idaho.  Michael Cranney is domiciled and resides at 503 W. 1300 S., Oakley, Idaho 83346.  During the Class Period, Michael Cranney participated in the supply-restriction and price-fixing scheme as alleged herein and agreed to reduce potato acreage, among other things.

105. Cranney Farms grows process and fresh potatoes, sugar beets, corn, wheat and barley.

106. Cranney of Cranney Farms is a founding member of UPGI and one of the original incorporators of UPGA.  At a January 2008 UPGA meeting, Cranney, UPGA Supply Management Committee Chairman, reminded grower attendees of UPGA's instruction to reduce potato acreage in the coming year by 5%—and told the audience that UPGA would advise even non-members to do the same.

### Cornelison Farms, Inc.

107. Defendant Cornelison Farms, Inc. ("Cornelison Farms") is a corporation organized, existing, and doing business under the laws of Idaho, with its principal place of business located in Rexburg, Idaho.  During the Class Period, Cornelison Farms participated in the supply-restriction and price-fixing scheme alleged herein and agreed to reduce potato acreage, among other things.

108. Cornelison Farms grows, packages, and ships fresh potatoes.

109. With Wada, Cornelison of Cornelison Farms organized the first meeting of growers in September 2004 of what would eventually become the UPGI.  Cornelison Farms is a founding member of UPGI and has long advocated collective action to reduce potato supplies.

### Snake River Plains Potatoes, Inc.

110. Defendant Snake River Plains Potatoes, Inc. ("Snake River Plains Potatoes") is a corporation organized, existing, and doing business under the laws of the state of Idaho, with  its principal place of business located in Rexburg, Idaho.  During the Class Period, Snake River Plains Potatoes participated in the supply-restriction and price-fixing scheme alleged herein and agreed to reduce potato acreage, among other things.

111. Snake River Plains Potatoes is an integrated potato producer that grows, packs, stores, and ships its own potatoes.

112. Snake River Plains Potatoes is a founding member of UPGI and a UPGA member.  David Beesley, chief executive officer of Snake River Plains Potatoes, is a member of the UPGA executive committee.

### Driscoll Potatoes, Inc.

113. Defendant Driscoll Potatoes, Inc. ("Driscoll Potatoes") is a corporation organized, existing, and doing business under the laws of the state of Idaho, with its principal place of business located in American Falls, Idaho.  During the Class Period, Driscoll Potatoes participated in the supply-restriction and price-fixing scheme alleged herein and agreed to reduce potato acreage, among other things.

114. Driscoll Potatoes is an integrated potato producer that grows, packs, stores, and ships its own potatoes.

115. Driscoll Potatoes is a founding member of UPGI, and Loraine Driscoll ("Driscoll") of Driscoll Potatoes is an original incorporator of UPGA.  Driscoll has served on the UPGA Board of Directors.

## Lance Funk (Lance Funk Farms)

116. Defendant Lance Funk is an individual doing business as Lance Funk Farms, an assumed business name under the laws of the state of Idaho, located in American Falls, Idaho. Lance Funk is domiciled and resides at 3853 Rast Rd., American Falls, Idaho 83211.  During the Class Period, Lank Funk participated in the supply-restriction and price-fixing scheme alleged herein and agreed to reduce potato acreage, among other things.

117. Lance Funk Farms is a potato grower.

118. Lance Funk Farms is a founding member of UPGI.

## Rigby Produce, Inc.

119. Defendant Rigby Produce, Inc. ("Rigby Produce") is a corporation organized, existing, and doing business under the laws of the state of Idaho and is located in Rigby, Idaho. During the Class Period, Rigby Produce participated in the supply-restriction and price-fixing scheme alleged herein and agreed to reduce potato acreage, among other things.

120. Rigby Produce is an integrated potato producer that grows, packs, stores, and ships its own potatoes.

121. Rigby Produce is a founding member of UPGI.

## Pleasant Valley Potato, Inc., KCW Farms, Inc., and Kim Wahlen d/b/a Kim Wahlen Farms

122. Aberdeen potato grower Kim Wahlen ("Wahlen"), who operates 6,000 acres of Idaho farmland, participated in the supply-restriction and price-fixing scheme alleged herein on

behalf of three entities:  Defendant Pleasant Valley Potato, Inc. ("Pleasant Valley Potato");

Defendant KCW Farms, Inc. ("KCW Farms"); and Defendant Wahlen d/b/a Kim Wahlen Farms.

123. Pleasant Valley Potato is a corporation organized, existing, and doing business

under the laws of Idaho and is located in Aberdeen, Idaho.  During the Class Period, Pleasant

Valley Potato participated in the supply-restriction and price-fixing scheme alleged herein by

agreeing to flow control measures, among other things.

124. Pleasant Valley Potato is an integrated potato producer that grows, packs, stores,

and ships its own potatoes.  Pleasant Valley Potato was formed in 1988 for the purpose of

"processing, packing and marketing of potatoes."  Its website states that "we grow our own

potatoes;" "we've brought the old-fashioned virtues of farming to the new technology of packing

and shipping" potatoes; "We always have an abundant, constant supply of potatoes for our

customers because we dedicate thousands of acres of land each year for potatoes only;" "Since

1988, Pleasant Valley Potato has been known as one of Idaho's leading potato growing,

packaging and shipping companies."

125. Wahlen is one of the original incorporators of Pleasant Valley Potato and has

been a director of Pleasant Valley Potato since its formation in 1988.  As of October 2004,

Wahlen served as director and registered agent for Pleasant Valley Potato.

126. KCW Farms, Inc., formerly known as Kim Wahlen Transport, Inc. ("KCW

Farms"), is a corporation organized, existing, and doing business under the laws of Idaho and is

located in Aberdeen, Idaho.  During the Class Period, KCW Farms participated in the supply-

restriction and price-fixing scheme as alleged herein and agreed to reduce potato acreage, among

other things.

127. KCW Farms is a potato grower.  KCW Farms has received subsidies from the U.S. Department of Agriculture as a potato grower.  Pleasant Valley Potato markets the potatoes grown by KCW Farms.

128. Wahlen is one of the original incorporators of KCW Farms and has been a director of KCW Farms since its formation in 1998.  As of October 2004, Wahlen served as president and registered agent for KCW Farms.

129. During the Class Period, Wahlen used the assumed business name Kim Wahlen Farms and conducted business under that name as a potato grower in Aberdeen, Idaho.  Kim Wahlen Farms is identified on the Pleasant Valley Potato website as one of Pleasant Valley's growers.  Pleasant Valley markets the potatoes grown by Wahlen, d/b/a Kim Wahlen Farms. During the Class Period, Wahlen, d/b/a Kim Wahlen Farms, participated in the supply-restriction and price-fixing scheme as alleged herein and agreed to reduce potato acreage, among other things.

130. Wahlen, acting on behalf of and as agent for Pleasant Valley Potato, KCW Farms, and Kim Wahlen Farms, is a founding member of UPGI. Wahlen participated in the October 2004 meeting (alleged in more detail below) during which UPGI was formed.  Wahlen's name appears in the November 2004 Articles of Incorporation of UPGI as one of "the incorporators of the Cooperative," and he is one of the signatories of that document.

131. In an article published by *Spudman Magazine* in January 2006, Wahlen admitted that he actively participated in the acreage reduction conspiracy alleged herein.  Pursuant to the conspiracy, by 2006, he had reduced his potato acreage by 13% to 1,710 acres, down from a high of 1,951 acres in 2004, when the conspiracy was formed.  Wahlen was quoted by *Spudman Magazine* as saying, "We've been successful in trimming the acreage being grown and in large

part are responsible for the good market we are enjoying now."  According to Wahlen, as a result of UPGI's efforts as of January 2006, "We in Idaho have 100,000 less acres in potatoes then we did in the year 2000."  The *Spudman* article describes Wahlen as "active" in the activities of UPGI.  The January 2007 UPGI newsletter indicates that Wahlen served as the District 5 Representative for the association.

132. Wahlen's conduct in joining the conspiracy was admittedly intended to benefit each of the potato operations in which he was involved, namely, Pleasant Valley Potato, KCW Farms, and Kim Wahlen Farms.  All three operations are potato growers who would directly benefit from the acreage reduction scheme and the resulting inflated prices alleged herein.  Pleasant Valley's packing, shipping, and marketing functions were also implicated.  Wahlen acknowledged in the *Spudman* article that he joined UPGI and the conspiracy alleged herein because of "the instability of the potato market" and because he was "very troubled, in the past, about how we market our crop.  Everyone was doing major expansion and the market was too mature to handle it."  As a potato packer, shipper, and marketer, Wahlen's company Pleasant Valley Potato was critical to the conspiracy's success.

133. As an original incorporator of UPGI, Whalen was required to ensure that the companies (packing sheds and growers) he operated were participating in the conspiracy to reduce potato supplies.  Thus, as part of the scheme alleged herein, Pleasant Valley implemented "shipping holidays," during which each its potato packing operation would shut down for at least one eight-hour shift in order to control the flow of potatoes into the market, further reducing supplies and increasing prices.  Pursuant to the conspiracy, Pleasant Valley also coordinated its shipments and held back product from the market as a "flow control" measure.  Pleasant Valley also used marketing as a tool to further its conspiracy and provided information to UPGI, which

was used during the conspiracy to set price floors. It was also the job of the marketing arm to identify new market opportunities such as donating potatoes to charities and food banks—which Pleasant Valley would then implement. By acting together, these conspirators (including Pleasant Valley) were able to control the rate at which the potato crop actually reached the market, and facilitate growers' price manipulation by sharing information about packing, shipping and order volumes.

134. When Wahlen became an incorporator of UPGI, and consciously joined the original October 2004 meeting during which the conspiracy was first formed, he acted on behalf of each potato growing, packing, shipping and marketing entity with which he was affiliated, including Pleasant Valley, KCW Farms, and Kim Wahlen Farms.

### Raybould Brothers Farms LLC

135. Defendant Raybould Brothers Farms LLC ("Raybould Brothers Farms") is a limited liability company under the laws of Idaho and is located in Rexburg, Idaho. During the Class Period, Raybould Brothers Farms participated in the supply-restriction and price-fixing scheme as alleged herein and agreed to reduce potato acreage, among other things.

136. Raybould Brothers Farms grows and sells fresh potatoes.

137. Raybould Brothers Farms is a founding member of UPGI, and Jeff Raybould of Raybould Brothers Farms is an original incorporator of UPGA.

### D. Offutt Defendants

### R.D. Offutt Co.; Ronald D. Offutt, Jr.

138. Defendant R.D. Offutt Co. ("R.D. Offutt") is a subsidiary of RDO Holdings Co., a corporation organized, existing, and doing business under the laws of North Dakota with its principal place of business located in Fargo, North Dakota. During the Class Period, R.D. Offutt

participated in the supply-restriction and price-fixing scheme as alleged herein and agreed to reduce potato acreage and participate in a scheme to divert fresh potatoes to the dehydration market, among other things.

139. Defendant Ronald D. Offutt, Jr. ("Ron Offutt") is the Chairman and Founder of R.D. Offutt.  Ron Offutt controls R.D. Offutt.

140. R.D. Offutt has approximately 160,000 acres of farming operations across eight states and is one of the nation's largest producers of potatoes with approximately 60,000 acres devoted to potatoes.  According to R.D. Offutt's listing in the 2010 National Potato Council Statistical Yearbook, R.D. Offutt's "[p]roduction is utilized in all segments of the potato market —fry, chip, fresh and flake."

141. In July 2010, R.D. Offutt acquired the assets of Ryan Potato Company, a major fresh potato packing facility that is "a nationally recognized name in the fresh table potato industry."

142. Ron Offutt and R.D. Offutt are affiliated with the Potato Marketing Association of North America ("PMANA"), an organization that generates potato marketing data.  PMANA provides potato marketing data to Defendant UPGA which is used to facilitate the potato supply reduction and price fixing scheme alleged herein.

143. R.D. Offutt, one of the world's largest potato growers, sent representatives to at least one of the initial UPGI meetings.  R.D. Offutt had representatives at a November 2004 meeting where UPGI founders recruited members for its organization and outlined UPGI's commitment to raising fresh potato prices by reducing fresh potato supply.  Ron Offutt and R.D. Offutt were therefore aware of UPGI's anticompetitive objectives and eventually agreed to join these efforts.

144. R.D. Offutt explicitly agreed to join UPGI in or about March 2007 – thereby affirming his commitment to UPGI's potato supply manipulation agenda – and agreed to reduce supply as a result.  Offutt's agreement to join UPGI (and thus the UPGI/UPGA acreage reduction scheme) was celebrated and lauded to the UPGI membership in UPGI's March 2007 newsletter.

145. R.D. Offutt agreed to join UPGI at the same time that R.D. Offutt, under Ron Offutt's control, entered into a joint venture with United II to participate in another aspect of the supply control scheme as alleged herein.

146. In or about March 2007, R.D. Offutt partnered with Defendant United II to create a joint venture.  The joint venture is entitled Idahoan Foods, LLC, and was originally known as North American Foods LLC.  The contribution of R.D. Offutt to the joint venture consisted of potato processing plants in several states.  The R.D. Offutt – United II joint venture enabled potato growers to offload surplus potatoes into the dehydration market and further reduce supplies, thus facilitating and contributing to the price-fixing scheme alleged herein.

147. Pursuant to the joint venture, R.D. Offutt's Nevada and Idaho dehydration plants were to be supplied exclusively by United II members.

148. Ron Offutt and R.D. Offutt were aware that UPGI and United II desired to create the dehydration joint venture in order to further manipulate the fresh potato supply.  R.D. Offutt, under Ron Offutt's control, consciously facilitated that potato market manipulation by entering into the joint venture with United II.

149. Ron Offutt addressed United II members on November 12, 2007 at the first United II shareholder meeting.  Offutt told United II members that, with regard to dynamic changes facing the potato industry, such as oversupply, "you can sleep better tonight because you're a part of a bigger organization that will help solve those challenges and problems."  Offutt

32

understood and touted that, due to R.D. Offutt's participation in the joint venture, membership in United II would enable the growers to offload fresh potatoes to the dehydration market and thereby address "challenges" facing the fresh potato market.

150. R.D. Offutt benefited from the conspiracy alleged herein in its capacity as a grower and packer of fresh potatoes, and in its capacity as a grower and dehydrator of process potatoes.

151. R.D. Offutt owns approximately 54% of Idahoan Foods through two of its subsidiary companies, *i.e.*, U.S. Foods, Inc. ("U.S. Foods") and RDO Frozen Co. of Delaware, Inc. ("RDO Frozen"). US Foods Inc. owns 38% of Idahoan Foods, and RDO Frozen owns 16% of Idahoan Foods.

152. R.D. Offutt, along with United II, dominated and controlled Idahoan Foods, LLC.

### III.  Non Grower Defendant

### Idahoan Foods, LLC (f/k/a North American Foods, LLC)

153. Defendant Idahoan Foods, LLC (formerly known as North American Foods, LLC, referred to herein as "Idahoan Foods") is a limited liability company organized, existing, and doing business under the laws of Delaware with its principal place of business located in Grand Forks, North Dakota.  During the Class Period, North American Foods participated in the supply-restriction and price-fixing scheme alleged herein.

154. Idahoan Foods is a joint venture between Defendants R.D. Offutt, a potato grower and processor, and United II, a co-operative of potato growers.  Idahoan Foods manufactures mashed-potato products and dehydrated potato products.

155. United II owns approximately 46% of Idahoan Foods.  R.D. Offutt, through two subsidiary entities, owns approximately 54% of Idahoan Foods.

156. Idahoan Foods was dominated and controlled by two entities, United II and R.D. Offutt, in disregard of Idahoan Foods' separate corporate identity.

157. United II and R.D. Offutt dominated Idahoan through control of the Idahoan Foods board of directors. The Idahoan Foods board of directors is comprised of United II members and R.D. Offutt executives, including the following:  Albert Wada; Ron Offutt; Keith McGovern, CEO of R.D. Offutt; and Tyler Falk, another R.D. Offutt executive.

158. United II and R.D. Offutt have controlled Idahoan Foods by placing their members and employees in key positions with Idahoan Foods.  For example:

    a. Kerry Buck, Idahoan CFO, was previously an employee of Defendant Blaine Larsen.

    b. Sam Huffman, Idahoan VP of operations, is a former owner of Winnemucca Farms, a Nevada dehydration plant acquired by R.D. Offutt in 1999.  Huffman continued to work for Offutt following the acquisition.

    c. Drew Facer, Idahoan VP of Marketing, was a marketing employee of Idaho Fresh-Pak, which UPGI acquired prior to the joint venture.

159. R.D. Offutt is the registered agent for Idahoan Foods in Minnesota and North Dakota.

160. Wada is one of the grower/owners involved in this joint venture that supplies potatoes to Idahoan.

161. Through its United II/R.D. Offutt joint venture, UPGI has devised an admitted means of furthering its supply-reduction and price-fixing efforts through Idahoan.

162. Idahoan is operated as an instrumentality of the conspiracy.  Ownership and control of Idahoan provided fresh potato growers with an outlet for disposal of fresh potatoes that otherwise would have been sent to the fresh potato market.  Growers transferred their potatoes without regard to dehydration market conditions in order to buttress fresh potato prices.

163. As one of the largest potato dehydrators in the country, Idahoan Foods enables its United II grower-owners to divert potatoes that would otherwise be sold on the fresh market to dehydration plants in order to reduce fresh potatoes and supracompetitively raise prices.

164. All Defendants are collectively referred to herein as "Defendants."  Whenever in this Complaint reference is made to any act, deed, or transaction of the Defendants, the allegation means that the Defendants engaged in the act, deed or transaction by or through their officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of Defendants' business or affairs.

## NON-DEFENDANT CO-CONSPIRATORS

165. Bayer CropScience LLC ("Bayer CropScience") is a non-defendant co-conspirator.  Bayer CropScience is a corporation organized, existing, and doing business under the laws of North Carolina with offices and its principal place of business located in North Carolina.

166. In 2008, Bayer CropScience became a "sponsor" of UPGA's United Potato Partners program.  That sponsorship continued in 2009 and 2010.   In 2010, Lee Frankel, the CEO of UPGA, described the partnership with Bayer CropScience as follows:

> This continued effort with Bayer CropScience represents the best in a working relationship between potato growers and an agriculture corporation," said Lee Frankel, UPGA president and chief executive officer. "For Bayer, the partnership fosters unique insights into the production needs of potato growers. For growers, the partnership offers invaluable insights into the global factors that influence their markets. Above all, Bayer CropScience's involvement in United helps our organization innovate and obtain the most up-to-date and accurate supply and demand data possible which then allows growers to grow and market their crops more successfully.

167. Bayer CropScience is the primary sponsor of UPGA's United Potato Partners program, which is described on UPGA's website as supporting "the underwriting of United's

databases, administration and educational seminars. The seminars provide a means for direct, two-way communication with potato growers."

168.  Bayer CropScience's participation in and funding of the United Potato Partner Program, enables UPGA to "offset" the cost to growers of UPGA's data-gathering and price-fixing efforts.  UPGA literature explains that this funding partnership arises out of the "common objective" among UPGA, its growers, and its corporate vendors: "The objective that a potato grower has in common with each vendor is that each party wishes to survive and thrive in the potato business."

169. Bayer CropScience, as the UPGA's primary United Potato Partner and attendee at many meetings, was aware of, endorsed, participated in, and profited from the supply-reduction price-fixing scheme alleged herein by providing funds to UPGA to assist its supply restriction efforts in order to gain exclusive access to potato growers to sell Bayer CropScience products.

170. General Mills, Inc. ("General Mills") is a non-defendant co-conspirator.  General Mills is a corporation organized, existing, and doing business under the laws of Delaware with its offices and principal place of business located in Minneapolis, Minnesota.

171. General Mills is an authorized out-of-state processor with the Idaho Potato Commission.

172. As the licensor of potatoes sold by the Potandon Defendants under the trademark "Green Giant Fresh®", General Mills had, through its exclusive licensing agreement, control over many aspects of marketing, selling, packaging, quality, and branding of these potatoes. General Mills' involvement with Potandon's operations includes specifying and designing packaging, designing and managing cross promotions, headquarters sales calls, quality and safety standards, and inspecting potato growing and packaging operations.

173. Promotional materials distributed by Potandon stated that the "Green Giant Fresh®" potatoes were grown under a "stringent quality control program" and discussed "regular visits to all approved packing facilities."

174. Potandon describes itself on its website as the "[e]xclusive sales agent for Green Giant Fresh potatoes and onions."

175. General Mills was aware of, endorsed, and profited from the price-fixing scheme alleged herein.

176. Potandon and its growers acted as General Mills's agents in participating in the price-fixing scheme alleged herein.  In their capacity as agents of General Mills, Potandon and its growers reduced potato supply and encouraged other growers to do the same.

177. As the exclusive licensor of the "Green Giant Fresh®" trademark, Potandon enjoys frequent contact with and supervision from General Mills representatives.

178. Throughout the Class Period, General Mills exercised actual or apparent authority over Potandon and its growers as those entities publicly and repeatedly announced their intentions to reduce potato supplies nationwide and encouraged competitors to do the same. General Mills invested authority in the Potandon and its growers to act on General Mills's behalf, including by reducing the supply of Green Giant-branded potatoes, despite knowing of Potandon's and its growers' efforts to restrict potato supplies and fix prices nationwide with their co-conspirators.

179. General Mills and Potandon made representations to various third parties and the public concerning their relationship, and these representations gave rise to a reasonable belief that Potandon and its growers possessed authority to act on General Mills's behalf.  In particular, Potandon issued releases to the press and on the Potandon website detailing the Green

Giant/Potandon relationship and confirming that Potandon was acting on General Mills's behalf and as the agent of General Mills in the production, marketing and sales of Green Giant potatoes.

180. Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations alleged herein.

181. At all relevant times, each co-conspirator was an agent of Defendants and each of the remaining co-conspirators, in performing the acts alleged herein, were acting within the course and scope of such agency.  Defendants and each co-conspirator ratified and/or authorized the wrongful acts of Defendants and each of the other co-conspirators.  Defendants and the co-conspirators, and each of them, are participants as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE TRADE AND COMMERCE

182. The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

183. During the Class Period, Defendants transacted business in multiple states in a continuous and uninterrupted flow of interstate commerce throughout the United States.

## CLASS ACTION ALLEGATIONS

184. Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on their own behalf and on behalf of the following class (the "Class"):

> All persons residing in the United States who, at any time from **June 18, 2006** through the present, directly purchased fresh or process potatoes from Defendants or their Co-Conspirators.  The Class excludes the Defendants, co-conspirators (members of any UPGA-affiliated cooperative), and any of their subsidiaries or affiliates.  The Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

185. Plaintiffs do not know the exact number of Class members because that information is in the exclusive control of Defendants.  However, due to the nature of the trade and commerce involved, Plaintiffs believe that the Class members number in at least the thousands and are so geographically diverse that joinder of all Class members is impracticable.

186. There are questions of law and fact common to the Class, including but not limited to the following:

a.    whether Defendants and their co-conspirators engaged in or entered into a contract, combination or conspiracy among themselves to fix, maintain, raise and/or stabilize the prices of potatoes sold in the United States;

b.    whether Defendants' unlawful conduct has enabled them to increase, raise, maintain, or stabilize above competitive levels the prices for potatoes sold in the United States;

c.    the duration of the contract, combination, or conspiracy alleged herein;

d.    whether Defendants violated Section 1 of the Sherman Act;

e.    whether Defendants' actions are exempt from application of the antitrust laws under the Capper-Volstead Act;

f.    whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and Class members;

g.    the appropriate measure of damages sustained by Plaintiffs and Class members;

h.    whether injunctive relief is appropriate; and

i.    if injunctive relief is appropriate, what types of such relief are suitable in this matter.

187. These common questions and others predominate over questions, if any, that affect only individual Class members.

188. Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other Class members.  By advancing their claims, Plaintiffs will also advance the claims of all Class

members, because Defendants participated in activities that caused all Class members to suffer similar injuries.

189. Plaintiffs and their counsel will fairly and adequately protect the interests of absent Class members.  There are no material conflicts between Plaintiffs' claims and those of absent Class members that would make class certification inappropriate.  Counsel for Plaintiffs are highly experienced in complex class action litigation, including antitrust litigation, and will vigorously assert Plaintiffs' claims and those of absent Class members.

190. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

191. A class action is superior to other methods for the fair and efficient resolution of this controversy.  The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court.  The damages suffered by Plaintiffs and each Class member are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus, absent class certification, it would not be feasible for Plaintiffs and Class members to redress the wrongs done to them.  It also would be grossly inefficient for the judicial system to preside over large numbers of individual cases.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system.

## FACTUAL ALLEGATIONS

### The Potatoes Market

192. Potatoes are the most important vegetable in the diet of United States consumers. During the last twenty years, potatoes were ranked as the second most important product in United States food consumption following wheat flour.

193. Potato consumption can be divided into four general categories:

    a.  Table stock (also known as fresh potatoes) includes numerous varieties such as round white, round red, russet and Irish potatoes;

    b.  Potatoes for processing includes chips and shoestring, dehydrated, frozen (french fries and other forms such as patties), canned, starches and flours;

    c.  Other sales including seed and feed for livestock; and

    d.  Non-sale uses such as shrink, loss and on-farm uses such as feed and seed.

194. Sweet potatoes and yams are separate products and are not included in the definition of fresh or process potatoes herein.

195. The United States potato industry is a multi-billion dollar annual market. For example, in 2007, the United States potato market had a total production of 449 million cwt (hundredweight or 100 pounds) of potatoes and the value of such production was $3.2 billion dollars.

196. In 2008, total domestic potato production was 415 million cwt, approximately 7 percent below the 2007 crop levels (due to the supply reduction price-fixing scheme alleged herein). Despite the reduced production, however, overall market value of production was $3.49 billion—an increase of 13 percent over 2007 production values.

197. Potatoes are grown primarily in the Western and Northern regions of the United States. Potato crops are generally planted in the spring and harvested in the fall (these are known

as "fall potatoes"), although potatoes are also harvested in the other seasons depending on where they are grown.

198. Because of good storage technology and practices, the marketing season for fall potatoes extends from July (early harvest areas) through June of the following year.

199. Idaho and Washington are the two largest potato-producing states (growing mostly "fall potatoes"), accounting for over half of United States production.  North Dakota, Colorado, Wisconsin, Oregon, Maine and Minnesota accounted for another 30 percent of U.S. production, with 23 other states accounting for the remaining 19 percent.

200. California, Florida and Texas lead production of winter, spring, and summer potatoes.  These potatoes have a smaller share in the total potato market, but satisfy specific needs for the fresh and process markets.

201. Fresh potatoes are usually sold in the open market and processing potatoes are typically sold through contracts.  Processing potato contracts are usually signed prior to the planting season and specify a potato variety, quantity, and base price with incentives based on quality requirements.

202. The fresh and process potato markets are interconnected.  According to Defendants, one of the problems contributing to excess potato supply was process growers planting acres of potatoes not under contract to sell on the open market.  Thus, it was crucial to fresh potato growers to get process potato growers to agree to the price fixing conspiracy, as well.  Defendants' price fixing scheme, as alleged herein, was designed to and did fix, raise, maintain, and/or stabilize prices for both fresh potatoes and potatoes sold for processing.

203. Potatoes can be readily stored and transported, making it possible to market them to both the fresh and processed market.  The fresh market generally commands the highest price.

Nearly two-thirds of potatoes were used for processing in 2008, with frozen french fries and other frozen potato forms being the largest segment. Table stock accounted for 28% of use and the remainder went to feed, seed and other uses.

204. Many fresh potato growers (such as several of the Defendants herein) are vertically integrated and handle growing, packing, shipping, and even further processing on the farm. Many of the large potato growers also act as packing and shipping operations for other growers.

205. Packing sheds generally work in conjunction with (or are owned by) growers to wash, grade, and pack potatoes to be shipped to direct purchasers such as retailers and distributors.

206. While potatoes were the single most-consumed vegetable in the United States in 2007, consumption in total pounds and as a percentage of total vegetables consumed have been declining since 2001. Average yearly potato consumption per person was 138.8 pounds in 2001, had declined to 126.0 pounds in 2007 and was forecasted to further decline to 125.3 pounds in 2008. Potatoes were 31.4 % of all vegetables consumed in 2001 and were only 28.4 % in 2007. The decline was true for both fresh potatoes and potatoes for processing, although the decline was greater for fresh potatoes. Fresh potato consumption declined almost 16% from 2001 to 2007, while potatoes for processing declined nearly 6% over the same time period.

207. Despite declining demand, potato demand is highly price inelastic. A 1% decrease in fresh potato supply can cause up to a 7% increase in price due to a lack of suitable alternatives.

**I.**        **The History and Operation of the Potato Cartel**

208. In response to declining prices, Idaho potato growers (who produce approximately one-third of the potatoes in the United States) grew concerned about their profits in the early 2000s.  In 2003, several Idaho growers agreed to implement acreage reductions in order to reduce supplies.  Given the limited success of these schemes, however, one of the largest potato growers in the country, Defendant Wada, decided to form an Idaho "cooperative" with other Idaho growers in order to formalize a joint agreement among his competitors to reduce potato supply and fix, raise, maintain and/or stabilize prices.

209. Wada began realizing his expressed intent of "managing North American potato supply" by first seeking to organize Idaho potato growers.  In late 2004, along with other Idaho potato growers, Wada co-founded United Fresh Potato Growers of Idaho ("UFPGI"), later renamed UPGI.  Wada hoped UPGI would serve as a nucleus for an even larger, nationwide "cooperative" with member co-ops in each potato-producing state.

210. Wada called his potato price-fixing plan, "United We Stand" and openly discussed how he wanted to "unite" potato growers, "decrease competition," and "rationalize the industry" by collectively curtailing production.  UPGA's website makes a similar point: "[i]n 2004, after evaluating the economic realities of the current business climate, a group of potato growers decided that long-term production and supply management are critically needed to provide stability and a reasonable return for growers."

211. In published articles about this plan, Wada acknowledged that his activities might be subject to antitrust laws.  The attorney for UPGI and UPGA, Randon Wilson, also discussed the fact that the Idaho cooperative (and later the nationwide cooperative) would have to conform to the Capper-Volstead Act and that packers and other ineligible businesses could not participate

in the cooperative or their supply reduction schemes.  Mr. Wilson is quoted in non-privileged, public articles as saying that in order to receive protection under the Capper-Volstead Act, "[w]e've got to be a pure farmer's cooperative" and packers and other ineligible businesses could not be involved in the cooperative.

212. This advice was not followed.  Numerous non-grower entities and growers that also were packers were involved with Defendants' price fixing scheme.  For example, Wada Farms' own website notes: "Wada Farms is among the largest growers **and packers** in the industry." (Emphasis added.)  Many packers, including the packing Defendants herein, participated in UPGA/UPGI flow control measures.  Thus, UPGI and UPGA have no protection under the Capper-Volstead Act.

213. The potato cartel was first formalized when Wada organized a meeting of Idaho potato farmers in September of 2004 to discuss how to "curb production" and "boost prices" for potatoes.  At this meeting, Wada and Cornelison (of Defendant Cornelison Farms) summoned 23 Idaho potato growers to an office in Blackfoot, Idaho to discuss how their collective efforts at reducing potato supplies would help fix, raise, maintain, and stabilize prices.

214.  After more meetings, phone calls, and emails among these growers, the group agreed to form UPGI - with the explicit goal of reducing potato supplies through various means.

215. The 23 growers in attendance at this meeting became the founders of UPGI, which filed for incorporation on November 2, 2004.  The founders' operations encompassed approximately 60 percent of the fresh potatoes produced in Idaho and 25 percent of the fresh potato market in the United States.

216. The individuals at the initial UPGI meeting who explicitly signed on to the supply reduction and price-fixing scheme alleged herein included: Blaine Larsen (of Defendant

Larsen Farms), Albert Wada (of the Wada Defendants Entities), and Defendant Michael Cranney (of Cranney Farms) – the three largest potato growers in Idaho and among the biggest growers in the U.S.  Other Idaho-based growers at this meeting who became founders of UPGI and signed on to the price-fixing and capacity reduction scheme, some of whom are named as Defendants herein, include Keith Cornelison (of Defendant Cornelison Farms), David Beesley (of Defendant Snake River Plains Potatoes), George Crapo (of Crapo Farms, Inc.), Mark Cummins (of Cummins Farms/Cummins Family Produce), Loraine Driscoll (of Defendant Driscoll Potatoes), Jeff Duffin (of Duffin Potato Company), Paul Duncan and Defendant Lance Funk (of Lance Funk Farms), Gary Hansen (of Hansen Farms), Dale Mickelson (of Defendant Rigby Produce), Ron Olsen (of Murdock Farms), Jeff Raybould (of Defendant Raybould Brothers Farms), Carl Taylor (of Howard Taylor & Sons), Kim Wahlen (of Defendant Pleasant Valley Potato, Defendant KCW Farms, and Kim Wahlen, d/b/a Kim Wahlen Farms), Blair Walker, Dick Watt (of Sunspiced Grower Cooperative) , Lynn Wilcox (of Floyd Wilcox & Sons), Clint Young, and Roy Young.

217. In the Articles of Incorporation of UPGI, the stated purpose of the organization is "to stabilize potato prices and supplies in the State of Idaho and to work with similar cooperatives in other states having similar purposes."

218. In October of 2004, the UPGI founders issued a press release discussing their goals of "supply management" principles and asked other potato growers from around the country to attend another meeting to discuss the formation of additional regional and national groups to assist in their price-fixing efforts.  The next cartel price-fixing meeting occurred on November 3, 2004, at 10:00 a.m. at the Shiloh Inn Convention Center in Idaho Falls, Idaho—the day after UPGI's articles of incorporation were filed.

219. Growers from Colorado, Oregon, Washington, Wisconsin, and California joined the Idaho potato farmers at the meeting.  The meeting was closed to the media.  At the meeting, Wada announced the group's price-fixing plans to several hundred potato farmers, which prompted a standing ovation.  Many farmers signed on to the supply reduction agreement on the spot agreeing to pay annual dues ranging from about $10,000 to $500,000 depending on how much acreage each farmer utilized for growing potatoes.  Defendant R.D. Offutt, one of the world's largest potato growers, sent a representative to this meeting.  R.D. Offutt subsequently agreed to the price-fixing scheme alleged herein and participated in a joint venture to further aid the potato supply reduction efforts.

220. On December 2, 2004, the 23 founding members of UPGI, all of whom had signed on to the supply management scheme, voted to move the commitment date to join the co-op to January 17, 2005—two weeks ahead of the original membership deadline.  At this point, the group already had 80 percent of all acres dedicated to fresh potatoes in Idaho committed to supply reductions under its membership agreements.  By February of 2005, UPGI was colluding with owners of 91 percent of the fresh potato grower acreage in Idaho through various means.

221. The fresh potato market is strongly affected by, and interrelated with, the processing potato and seed potato markets.  Cooperation with the process and seed potato growers was crucial for UPGI's success.  Thus, UPGI sought out groups of process and seed growers to sign on to its anticompetitive scheme.

222. As of December of 2004, UPGI had negotiated "Memorandums of Understanding" ("MOU") with the directors of every potato grower group in Idaho, including Potato Growers of Idaho ("PGI"), Potato Management Company ("PMC"), Seed Potato Growers

of Idaho ("SPGI"), and the Southern Idaho Potato Cooperative ("SIPCO"). SPGI and SIPCO later joined UPGI as independent districts.

223. PGI was formed in 1968 to serve as a bargaining unit for growers in contract negotiations with potato processing companies. In the more than 30 years since its founding, PGI's mission has evolved to include representation of growers with governmental, legislative and industry organizations. In 2000, PGI membership opted to end its role as a contract negotiator, and to focus its efforts more fully on its information and representation missions.

224. PMC was formed in 2000 by a group of Idaho potato growers and shippers to help reduce potato supplies. The group was successful in organizing various programs, including charitable donations and cattle feeding, that removed several million hundredweight of potatoes from the market. In addition, the group donated over 15 million pounds of potatoes to help reduce domestic supply.

225. SIPCO was founded in 1997 and acts as the bargaining unit for Idaho frozen process growers. SIPCO also negotiates annual contracts with Idaho and Oregon processors with the goal of providing a stable and reasonable rate of return for the Idaho frozen process grower.

226. SPGI was a group of seed potato growers. Seed potatoes are produced to be used for planting new crops of potatoes. Once cut into sets and planted, seed potatoes grow into tablestock potato varieties. Seed potatoes themselves are not intended for human consumption.

227. These groups were not "Capper-Volstead cooperatives," yet UPGI collaborated and conspired with them to reduce potato supplies. Through the cooperation insured by these MOUs, the growers, shippers, and other entities working collectively with UPGI to reduce potato supplies accounted for more than 60 percent of *all* Idaho potato acres (and not just the vast majority of those devoted solely to fresh potato production).

228. In December of 2004, as part of these coordinated agreements, PGI (a non-cooperative) issued a statement in its newsletter stating that "supply is manageable but the key to making it so lies in a united and concerted effort to manage supply." PGI re-emphasized that it is in the best interests of all growers to unite in working out a plan to manage supply and spread the responsibility. PGI and UPGI also issued joint newsletters espousing the need to collectively reduce supply.

229. To achieve its supply reduction objectives, UPGI developed and started enforcing a set of programs and policies that targeted both production and marketing of fresh potatoes. The level of potato production was controlled through the implementation of two policies. First, before the beginning of a planting season, the potato production was controlled by enforcing an acreage management program, which was implemented through a bid buy down program. Secondly, during the potato growing season, before harvest, the production was monitored over time and accurate yield predictions were made; this was implemented through a series of field digs.

230. UPGI's marketing programs also included coordination of potato shipments throughout a marketing year, providing marketing information to potato growers and implementation of secondary market strategies. UPGI also sought to remove excess potatoes by identifying new market opportunities such as donating potatoes to charities.

231. UPGI initially studied and implemented many different methods to reduce potato supply. UPGI's first supply control efforts involved using a price floor by analyzing market information and setting floors for the main fresh pack products. The price floors were eventually abandoned. UPGI also coordinated, and where necessary, made grading standards more

stringent because diverting smaller potatoes into processing would also reduce fresh potato supplies and boost market prices. This was one part of flow control measures.

232. A short time later, UPGI also employed another supply management tool – "shipping holidays."  The UPGI marketing committee would review market information, including data from each member's packing operation. Each week they would decide if a "shipping holiday" would be imposed. If a "shipping holiday" was put in place, each potato packing operation affiliated with UPGI through various growers would shut down for at least one eight-hour shift in order to further reduce supplies and increase prices.

233. UPGI realized that its most effective method of controlling supply would be to manage the production of the next year's potato crop through acreage reductions.

234. UPGI's first year acreage management program was implemented in spring 2005. The number of planted fresh potato acres for the fall 2005 crop was reduced by approximately 15% (26,000 acres) relative to the 2004 year acreage base against which the reduction was measured. The program proceeded in two phases. First, a group of the largest potato growers reduced their planted area by 11,000 acres (15% on average). Second, the first ever bid buy-down program was implemented. Potato growers submitted bids on how much they needed to be compensated in order not to plant, and UPGI accepted the best (*i.e.*, lowest) bids, thus resulting in further acreage reductions.

235. UPGI also executed a secondary market strategy at the beginning of 2005 that removed approximately 8% of potato stock from the market. The surplus from the 2004 fall crop was diverted to charities and food banks. For example, in January 2005, UPGI donated 40,000 pounds of potatoes to food banks for the expressly stated purpose of reducing potato supplies.

236. Furthermore, the first ever Idaho marketing conference calls were implemented. The calls took place twice a week at the state level (and were later established as once a week at the national level with the formation of UPGA).  Prior to a conference call, participating warehouses would log on to the UPGI web-page and provide information on capacity, stocks and pack-outs.  This data, along with other information (prices, trends, weather, etc.), were discussed during the conference call, and were summarized as a marketing summary posted on the internet to assist with "flow control" and prevent potatoes from being shipped when prices were too low.

237. With the understanding that these supply management techniques would need to be undertaken on more than just a regional level, UPGI used UPGA and the other co-conspirators, including Potandon, to institute its supply-restriction techniques on a much broader, nationwide scale.  Wada and his co-conspirators nationalized (and internationalized) their potato supply-restriction efforts and assisted in forming other regional and national potato cooperatives with this goal in mind.

238. According to one industry observer, market data reporting and product flow controls are key components of UPGA's efforts to control potato supplies and "enhance" producer returns.  Just as acreage-reduction efforts depend on the participation and cooperation of growers, market data reporting and flow control efforts depend on the participation and cooperation of those involved in the marketing, sale and shipment of potatoes (such as Potandon).

239. In its monthly newsletter, UPGI emphasized the importance of flow control as a means of managing supply, noting that "[f]or flow control to work, growers and [packing] sheds need to communicate and work together.  Supply management falls apart if the sheds and growers undermine each others [sic] efforts to raise prices by flooding the market."

240. In a March 2006 newsletter, UPGI discussed one set of flow controls standards it implemented and the spike in potato prices it caused:

United of Idaho instituted flow controls on Jan 23, 2006, after 20 consecutive weeks of falling prices and weak shipments. The rationale was as clear then as it is now:

1) Lowering prices wasn't going to sell any more product!

2) In spite of clear information that '05 Idaho supplies for packing sheds would be short by 9 million in-weight cwt, packing shed overcapacity statewide consistently was over supplying the Idaho distribution pipeline, creating the perception among category buyers that there was no real shortage of potatoes in Idaho.

3) Without some form of flow control, the "daily" oversupply as presented to the market place would hold prices down until late June or July when a large number of Idaho packing sheds who are actually short of supplies would run out.

4) The undisciplined manner in which the crop was being shipped would not only prevent higher pricing BUT would also run Idaho out of inventory far too early in the shipping season creating a loss of market share, key customers, and revenue for Idaho.
With over 75 percent of the state's packing capacity participating in United's flow control program, the results have been phenomenal. GRIs increased from $4.87 to $6.24, adding over $6 million into growers' returns in the last six weeks alone!

241. UPGI further described these efforts as follows:

Flow controls are based upon sound economic principals…if daily offerings (supplies) DO NOT exceed buyers' needs (demand), buyers begin calling salesmen searching for product. When salespeople DO NOT have the product available, they raise the price. Conversely, when a salesperson has excess floor inventory (supply) that is "unsold," he feels pressure to "clear the floors" and move the supply out. That is usually done with some sort of "sale" or deal to get the buyer to buy more than he really needs (demand). That lowers the price. It is basic supply and demand. Simply stated, flow controls interrupt the cycle by balancing weekly and monthly production (supplies), preventing the usual production surges and spikes that create the "full floors" and "fire sale" cycles. Thus, flow controls allow real demand to set prices rather than the artificial "oversupplies" created by overproduction.

. . .

Idaho's decision

We have a choice! We can either choose to ship this crop as fast as we can (which is faster than the market can absorb it) and in so doing, over supply the fragile pipeline with 50 thousand to 100 thousand cwt excess spuds weekly OR we can choose to discipline the shipments, NOT oversupply the pipeline, maximize pricing and grower returns for the rest of the season, and preserve supplies so we run out August 4th as planned.

It is true that some sheds have more stocks than they can ship at their current shipping rate. But, it is also true that many more sheds are short of supplies for the season. As those "short" sheds close for the season, the pipeline will open, allowing larger production quotas and a market for all the spuds we have in Idaho this season. We won't get backed up and we won't be giving any away. How can we be so sure? First, because we know what other states have to ship nationwide and they do not have the spuds to over supply the market. Flow controls have also reduced the production of washed process grade to the dehy plants. Those companies are already in the market, buying lower grade field-run potatoes to make up for the loss of washed process grade supply. If there were ANY excess, dehydrators and fryers should buy it before seasons end. We strongly encourage growers and shippers to include more small #1 potatoes in the washed process stream and to sell marginal lots to dehydrators. This will help to balance supplies especially of consumer sizes, meet the needs of the dehy companies, and support the struggling price of Idaho consumer packs.

Knowledge is Power

Don't believe the rumors and "old school logic" used by some to panic growers into poor business decisions. "We are not backing this crop up." You have the facts. And you have seen the results so far. Flow controls work and they are making ALL GROWERS money.

242. As recently as July 2011, the President of UPGA emphasized the importance of frequent and accurate sharing of information between growers and marketers as a means of securing higher return, noting as follows: "Fire sales resulting from heavy floor inventories can also be minimized by closer communication between the grower and the marketer. The market

will be changing constantly during the transition period. The prices for a particular pack type the day a vine is killed will be different than three weeks later when potatoes from that vine arrive on the market. Communicating information about vine kill dates, size and yield from sample digs at vine kill, and the expected market are key elements for growers to share with their marketer."

243. Potandon and its growers have heeded this message and hold weekly meetings that include Potandon's top executives and Potandon's potato growers (who also participate in these discussions with other growers through UPGI/UPGA).

244. In December of 2004, UPGI met with growers in Colorado and Wisconsin to aid in the formation of United Fresh Potato Grower groups in those states as well.  Oregon growers in Klamath basin formed another group in that state too.  In February 2005, Washington growers also met to coordinate supply restrictions.  Regional potato grower cooperatives were later formed in Central California, and other areas of the Southwest, Midwest, and West. As UPGA's website states, "Idaho leaders reach[ed] out to growers in other regions and invite[d] them to form their own supply-management cooperatives as part of the united effort.  Soon, regional co-ops [were] formed in Colorado, Klamath basin (on the border of California and Oregon), Washington-Oregon, and Wisconsin. (Later, growers in central California, the Southwest, Midwest and West form[ed] co-ops.)"

245. These regional cooperatives then met to form a national group, under the leadership of Wada, that could coordinate the supply restrictions discussed herein across the country and North America.

246. The original incorporators of UPGA include: Albert Wada (of Defendant Wada Farms); Loraine Driscoll (of Defendant Driscoll Potatoes); and Jeff Raybould (of Defendant Raybould Brothers Farms).  The initial Board of Directors were Tony Amstad (of Amstad

Produce Inc. in Oregon); Warren Boegel (of Boegel Farms in Kansas); Defendant Michael

Cranney (of Cranney Farms in Idaho); Dennis Day (of Montana); Allen Floyd (of Harvest Fresh

Produce in Washington); Tom Franconi (of Kern Produce Shippers in California); Dick Okray

(of Okray Farms in Wisconsin); Ed Staunton (of Staunton Farms in California); Dave Warsh (of

Warsh Farm in Colorado).

247. According to the UPGA website,"[r]ealizing the need for national coordination,

communication, data gathering and analysis, professional leadership and staff to handle the many

facets and programs of the organization, United Potato Growers of America [was] formed" in

March 2005.  The national cooperative facilitated the nationwide supply-restriction campaign

through its regional cooperative members (which were in turn made up of individual growers

who implemented the actual supply reductions).

248. UPGA nationalized the regional supply-restriction scheme initially developed by

UPGI.  The UPGA's mission statement read:  "[w]e bring order and stability to the North

American potato growing industry and increase our member potato growers' economic potential

by the effective use of cooperative principles."

249. The management structure of UPGA is depicted in this graphic from its website,

which includes a distinct "Supply/Demand Committee":



250. UPGA's supply control efforts are further confirmed by the mission statements on its own website: "Vision:  We will manage national potato supply so as to positively affect grower profitability."

251. The UPGA's key initiatives are listed as:

> United Potato Growers of America implements strategic supply management programs. Key priorities include providing planting guidelines based on sound data and historical facts; acreage verification programs; information sharing; developing strategic alliances; managing supplies; and improving grower return on investment.

252. In a Frequently Asked Questions ("FAQ") section that used to appear on its website (but which UPGA has now removed), UPGA detailed its goals regarding supply reduction, its mechanisms for implementing supply reduction, the effectiveness of its supply reduction scheme, and other details of its operations as follows:

> By joining United Potato Growers of America, you can help bring stability to the industry.  A stable industry is good for your operation and for the entire industry.

> UPGA provides the infrastructure so that growers across the
> country can share information, evaluate and analyze the market,
> and better communicate and cooperate for the good of all.  By
> working together, we can manage supply to meet demand, and
> influence the market to foster a reasonable return for the grower.
>
> UPGA has many programs that help growers work collaboratively
> to match supply to demand.
>
> **UPGA has many initiatives and programs in place to manage
> supply.  Acre buy-down is one of our programs.  In most
> cases, acreage buy down is funded by payments from growers
> who do not achieve their acreage reduction targets.  Each
> member co-op decides its level of involvement.**
> . . .
> **Our efforts are targeted at supply management in order to
> help growers receive a reasonable price for their crop.**
> (Emphasis added.)

253. In April of 2005, UPGA announced to its members the first nationwide acreage

buy-down program in the history of United States potato production.  As with UPGI's acreage

reduction efforts, grower members were allowed to "bid" acres into the buy-down program if

they agreed to plant less acreage than they did in 2004.  UPGA member funds would then be

used to compensate those growers who agreed to plant less.  Similar programs and acreage

reductions have continued to present.

254. Regarding this acreage buy-down program, Wada is quoted as saying: "[t]his is a

great opportunity to bring stability and rationale to our Potato Industry… Through cooperation

and unity we can and will help ourselves and each other achieve our goals.  We strongly

encourage all growers to take advantage of this offer while it is available and join their state or

regional cooperative and the United of America Board to reduce 2005 acres."

255. In April of 2005, Wada also traveled to Prince Edward Island in Canada to

facilitate the formation and operation of a North American-wide potato cartel that would reduce

potato supplies and fix potato prices across the continent.  The entire UPGA Board of Directors

met with Canadian growers in Charlottetown, Prince Edward Island, in June 2005.  More than

250 growers attended this meeting, preliminarily approved starting a Canadian counterpart to the

UPGA, and voted to cap island potato acreage for each grower.  As a result of this meeting and

as discussed further *infra*, Canadian growers formed the UPGC, which, as reflected in the

organization chart set forth previously, became a part of the UPGA.

256. In June of 2005, UPGA announced that its first acreage buy-down program had

been a success.  Members (including those member Defendants named herein) collectively

agreed to cut their crop by tens of thousands of acres to their lowest levels since 1959.

Preliminary estimates showed United States potato acreage down 35,000 acres as a direct result

of the UPGA's buy-down program.

257. The impact of the UPGA program was also noted at the national level.  The

average potato price was approximately 23 percent higher in 2005 relative to 2004.  The United

States Department of Agriculture ("USDA") noted that this was due to the bid-buy program

instituted by UPGA, which removed from the market almost 11% of fresh potato production in

2005.

258. UPGA's officers confirmed the success of their efforts.  Jerry Wright, the former

CEO of UPGA, was quoted as saying that "due primarily to [UPGA's] three-phase supply

management program implemented nationwide, growers have the highest returns ever for this

time of the year.... The success of the whole program is the result of the growers' determination

to solve their own problems and manage their supply."

259. On November 16-17, 2005, Idaho growers met to discuss 2006 crop reduction

guidelines at the Red Lion Inn in Pocatello, Idaho.  Joint meetings were also held with the

SIPCO, U.S. Potato Board, and the Potato Marketing Company.  At these meetings, UPGI

members (including Defendant growers herein) and other Idaho growers agreed to plant 10% less than their 2004 base acres.

260. UPGA's January 2006 newsletter announced the group's national 2006 crop reduction efforts following the Idaho growers' agreement to reduce plantings by 10% from 2004 acres.  Members not agreeing to reduce plantings by 10% were required to pay a $50 per acre assessment.  Those growers that agreed to reduce acreage more than 10% were allowed to put their acres into the bid buy-down program for extra compensation.

261. UPGI and UPGA also coordinated potato flow control throughout the marketing year in order to control the quantity of potatoes supplied to the market throughout a marketing year when prices were low.

262. In Idaho, warehouses participating in the "flow control" entered information concerning capacity, stocks and pack-outs on the UPGI webpage on a regular basis.  After weekly telephone conversations, price advisory information was then posted on the internet for members and non-members, which was then used as the pricing strategy for the coming week.

263. Warehouses participating in the flow control program represented more than 75% of Idaho's fresh potato packing capacity.  Thus, warehouses operated by Potandon, which accounted for at least 25% of Idaho's fresh potato market, also participated in this effort to control potato flow through data sharing.

264. In a 2006 PowerPoint presentation prepared by Wada for UPGA members titled "The North American Potato Cooperative Movement," Wada detailed strong encouragement for members to stay committed to the supply-restriction efforts.  Slides included the following:

> • UNITED = GROWER PROFITABILITY - The UNITED
> cooperative is gaining the grower critical mass to be able to
> EFFECTIVELY manage supply in order to attain fair pricing

• UNITED's System Will Work! - UNITED's programs have helped to increase open market fresh table grower returns for the '05 crop by multiple times '04 crop pricing - Process grower markets are stronger - Econ. 101: The only effective method for influencing price is to manage the supply!

• The law of ECONOMICS will always win and growers will lose if production and supplies are not managed

• UNITED'S STRATEGY? THE WHOLE PILE OF POTATOES HAS TO BE MANAGED!

• Cooperative growers must create orderly markets and grow the category……instead of fighting for a piece of it by zero-sum competition!

265. In published articles, Wada confirmed that the purpose of UPGA was to reduce supply and raise prices:

[Wada] said the major benefit of the association is communication. Sharing supply management data across a broad growing region has allowed the organization to raise prices by better matching potato supplies with demand.

"We're talking to one another," Wada said. He described the industry's oversupply and poor profitability as "an albatross hanging around our necks for years."

. . . .

**"Without supply management and grower solidarity, we don't have adequate profit margins," Wada added. "Growers tend to think it is a sin to produce a profit.  Potato growers are very independent and the one thing that they can do is independently go broke."** (Emphasis added.)

266. In another interview, Wada asserted that UPGA had "worked with members to eliminate the potato glut by things like reducing the amount of potatoes planted and pledging not to send potatoes to market in the event of oversupply."

267. In addition to acreage buy-downs, UPGA also touted its "flow control" efforts to keep potatoes from entering the market.  Buzz Shahan, former COO of UPGA, stated that "[y]ou

can't enter all of those potatoes into the market in one day.  So we monitor the flow of product

into the market on a weekly basis and adjust the flow so that we don't create a periodic glut."

     268. An August 2007 article in *High Country News* entitled "The Sultans of Spuds -

Battered by their own success, farmers form the 'OPEC of Potatoes'" described the meetings of

UPGA and this "potato cartel" as follows:

> Once a month, usually on a Wednesday morning, about a dozen
> men arrive at the Salt Lake City airport on separate flights from
> around the country.  They are whisked into waiting cars for the
> five-minute trip to a glass fronted office building nearby.  There,
> in an unpretentious conference room, they meet several more of
> their associates.
>
> **These men are the leaders of a little-known international
> cartel, and at meetings such as these, they fine-tune an
> elaborate system of production targets and quota transfers to
> control the price of the commodity around which their world
> revolves.**  It is a serious business, backed up with reconnaissance
> from satellites orbiting high above the Earth, and **the
> organization's strict code of conduct allows for the use of what
> its members artfully refer to as "punitive measures" against
> anyone who violates the rules.**  And, at lunchtime, the men
> always pause to sample their merchandise.  "We always serve
> potatoes.  We always serve potatoes, whether it's chips or fried or
> mashed or whipped or salad," says Barb Shelley, one of a small
> cadre of people who carry out the organization's legwork.  Not
> even lunch, it turns out, is safe from the group's intense scrutiny:
> "When we order from the caterer, we say, 'These are potato
> growers.  We want your highest quality potatoes.  Do not'" -
> Shelley pauses ominously - "'give us bad quality.'"
>
> This may sound like a plot lifted straight out of a Mel Brooks
> movie, **but the potato cartel is real**. And its existence speaks
> volumes about the often-perverse dynamics of American
> agriculture. (Emphasis added.)

     269. Mr. Shahan was also quoted in this article as stating that the UPGA's members

"are very strong guys that have been kicking people's butts since junior high" and that "to get

them in a room and have them discuss market share and things like that, it gets a little Western."

270. An article in the *Wall Street Journal* entitled "This spud's not for you: Co-op of farmers seeks to become OPEC of potatoes" also compared the Defendants' potato supply control conspiracy to that of OPEC: "[i]t took farmer Merrill Hanny three days to bury $100,000 worth of his perfectly good potatoes.  He remembers how they crunched beneath his tractor as he plowed over his muddy field in the spring of last year.  Mr. Hanny destroyed part of his crop at the behest of the United Potato Growers of America, a fledgling group of regional farming cooperatives.  The group aspires to be to potatoes what OPEC is to oil by carefully managing supply to keep demand high and constant, resulting in a more stable return for farmers."

271. In order to ensure strict compliance with the supply reduction and price-fixing agreement, UPGI and UPGA conducted audits and utilized GPS, aerial photography, and satellite imaging to verify that co-conspirators had complied with the quotas and not exceeded the potato acreage upon which they agreed to grow.

272. At the beginning of the planting season, growers filled out the Planting Intention Form.  On this form, the grower recorded their 2004 year base acreage and their current year planting intentions by potato variety.  The Planting Intention Form was then the grower's commitment against which the grower's actual performance was evaluated.

273. UPGA also checked farmers' acreage against the paperwork they submitted to the federal Farm Service Agency for government-support programs.  The documents used to assess the actual acreage grown were the copies of the Farm Service Agency ("FSA") Form 578 (*i.e.* a report of acreage).  Growers had to agree to allow UPGA access to these otherwise confidential submissions.

274. The UPGI's and UPGA's field representatives would review the grower's planting intention commitment, filed maps and FSA Form 578.  Then, the representative would

conduct inspections of each parcel of land to verify actual plantings and reductions. The results of the audit were then reported to the Future Crop Committee and the UPGI and UPGA Boards.

275. In 2006, the fields of 25% of the general membership and of 100% of the UPGI Board members were audited, which represented 65% of the UPGI's fresh potato acres. At that audit, all the audited fields were in compliance with supply reduction scheme and bid buy-down programs. The audit confirmed that the audited members of the UPGI reduced the potato acreage by more than 10% relative to the 2004 year base.

276. Any growers that did "cheat" were subject to punitive measures and fines. For example, the cooperatives' bylaws allowed them to levy fines of $100 per acre against growers who violated the supply reductions.

277. UPGA argued in its newsletter that its acreage buy-out and reduction program would lead to significant financial returns for growers: "[w]ithout the Acreage Buy-Out program, growers very likely will be looking at GRI's next year that will be $3 to $4 per cwt. lower versus 2005. Please do not forget the lessons of the last few bad years caused by overproduction. With your $50 per acre 'Payment-in-Kind' investment in the acreage reduction plan, we anticipate 2006 GRI's greater than 2005. Per acre, that is more than a 3000% ROI. It is not a gamble; IT IS SMART BUSINESS AND RISK-MANAGEMENT!!"

278. UPGA was correct; the potato cartel's efforts began to see significant progress in raising prices starting in 2005 (and continuing to present) as the cartel was able to reduce potato supply. Between September of 2005 and June of 2006, potato growers received an average of $6.67 for every 100 pounds of potatoes – a nearly $4 increase from the previous year.  By 2007, farmers were averaging $7.75 for every 100 pounds of potatoes.

279. According to a *Spudman* reader survey in May of 2006 – cited in then-UPGA CEO Julia Cissel's 2006 PowerPoint presentation titled "Managing Supply and Influencing Acreage" – "85% of all respondents said they have seen an increase in their profits since UPGA was formed."

280. UPGA's and UPGI's potato acreage reductions and subsequent price increases carried on in to 2007, 2008, and to the present.

281. UPGA and UPGI's 2007-08 United Acreage Reduction Program established the following rules similar to those of the earlier years:  Each base potato acre was assessed at $50. A base year relative to which the acreage reduction was calculated was 2004.  Members and *non-members* willing to participate in the program had two options.   The first option was to reduce potato planting area by exactly 15% relative to the 2004 year base.  This option was considered to be a payment in kind and the grower would owe no cash.  The second option was to reduce potato acreage by less than 15% relative to the 2004 year base.  In this case, the grower was assessed a pro-rated percentage of $50 per acre on all base acres.

282. There were four levels of the pro-rated percentage.  For example, if a grower's acreage reduction was between 10% and 14.99%, then the grower paid $20 per base acre; if the acreage reduction was between 5% and 9.99%, then the grower paid $30 per base acre.  The collected money was used to "buy out" acres elsewhere.  Growers who decided to expand beyond their base were assessed $100 per acre on all acres (expansion plus base acres).  This fee was a punitive measure to prevent the "mindless expansion" that UPGI and UPGA considered to be illegitimate and against the mission of supply reduction.

283. Those SIPCO members of UPGI who grew only processing potatoes were allowed to plant only contracted processing potato acres.  The UPGI/SIPCO members who grew

both fresh and processing potatoes were required to follow the potato planting guidelines for their fresh potato acres and were allowed to plant only contracted processing potato acres.

284. All UPGA and UPGI members (and some conspiring non-members) agreed to these programs and reduced supply as a result, or paid assessments to allow others to reduce supply.

285. In 2008, growers following UPGA's plans planted on 80,000 fewer acres than in 2007.  In Idaho alone, growers reduced acreage from 350,000 to 300,000.  In an interview about why farmers were cutting acres, UPGI's CEO, Jerry Wright stated: "[y]ou have the combination of growers having alternative cash crops and they know they have to reduce potato planting to get supply in balance with demand.  This is the year they've been able to do it."

286. As a result of these efforts, by the summer of 2008, according to the Idaho Potato Commission, a ten pound bag of potatoes cost consumers $15—up $6 over 2007.

287. A 2008 study by an Agricultural Economics Professor at the University of Idaho confirmed that UPGI's and UPGA's efforts had led to increased prices.  The study found that the Idaho monthly fresh potato prices increased from $3.89 per cwt in the pre-coop period to $6.63 per cwt in the coop period, while the US monthly fresh potato prices increased from $7 per cwt. to $10.19 per cwt.  The study found that approximately 60% of the price increases were due to reasons other than increased production costs and that the cooperatives' price-fixing efforts were "likely to be the most significant factor explaining the identified price increases."

288. The study found that "[a]s indicated by the US monthly fresh potato prices, all potato growers received higher prices since 2005, after the acreage management programs started being implemented in several potato growing regions in the country."  Furthermore, the authors concluded, "we believe that the [UPGI] and potato growers cooperatives with similar

objectives were successful in accomplishing their goals and impacted the fresh potato price level and volatility during the period of 2005-2008, which ultimately benefited all potato growers."

289. In an article in the December 15, 2008 issue of *Packer Online*, Paul Dolan, General Manager of Associated Potato Growers, Inc., noted that demand was down from 2007 because potato prices were 50% higher than the previous year, a situation he attributed in part to "market unity."

290. By 2009, potato prices had remained constant or grown for four consecutive growing seasons - something that had never happened in more than a century that USDA has been keeping such records.

291. On its previous website FAQs, UPGA stated that there was "no doubt" that its numerous efforts to reduce supply had impacted and improved potato prices: "Q. How can you prove that UPGA's efforts to manage supply influenced last year's price?  A. While many factors influence supply, there is no doubt that UPGA's acreage reduction, acre buy-down, flow-control, and information sharing programs impacted the market."

292.   In its 2009 annual report, UPGA presented the following graph that showed how its anticompetitive scheme had inflated the prices for fresh potatoes:



293. With respect to this graph, UPGA said: "[t]he first graph shows total U.S. fresh shipments in bars and the U.S. Grower Return Index as a line. GRI is what a grower received on average after accounting for packing charges. GRI continued to decline from 2002-03 to 2004-05. **Once [UPGA] formed it implemented supply management programs, and the effect can be seen in the drop in total U.S. Fresh Shipments (the bars in the graph) and a corresponding increase in the GRI**." (Emphasis added.)

294. UPGA's annual report also discussed how its anticompetitive scheme affected prices for process potatoes: "[b]efore United [UPGA] was formed nearly all of the process contracts were tonnage-based. As a result, process growers overplanted to avoid penalties associated with not delivering enough potatoes to meet their contract. The Potato Marketing Association of North America and processors began to switch the contracts from tonnage-based to acreage-based contracts. Acreage-based contracts minimized the uncertainty for the process grower and frozen processor while also reducing excessive flow of potatoes from the process sector to the fresh sector. Graph #3 reveals the frozen processing usage volumes versus out of

field contract prices in Washington.  [UPGA] has a data sharing agreement with PMANA [the Potato Marketing Association of North America] to improve the profitability of process growers."

295. The "Graph #3" referenced by UPGA is as follows:



296. Thus, Defendants' and their co-conspirators' acreage restrictions, acreage buy-downs, and flow control measures caused potato prices to be fixed, raised, maintained, and/or stabilized.

297. Defendants' anticompetitive scheme has continued to the present.  For example, a May 2010 UPGA newsletter describes how 400 fresh and process potato growers in the United States attended 16 United Potato Partners seminars this year at which they "consider[ed] the latest about cost of production specific to their area, ponder[ed] current demand data and review[ed] United's published acreage guidelines before beginning spring planting."  The seminars were designed to facilitate "informal discussions."  As Mr. Shahan was quoted as saying, "[t]hese seminars are one of the most important methods we have for communicating

United's published acreage planting guidelines to member and non-member growers in a face-to-face setting."  At each of these seminars, a representative of co-conspirator Bayer CropScience was also present.

298.  Similarly, on its website, UPGI has a page devoted to its 2010 Planting Guidelines, which were issued in September of 2009.  UPGI has the following to say about planting:

> Harvest is in full swing, and many are establishing plans for next year's potato crop.  By now, all of you already know the top line on this year's crop.  Across the state, it appears we are experiencing higher yields. If this continues, we could have as much as 5% more potatoes statewide than expected.  The same thing is happening in Wisconsin and Colorado.  They, too, are experiencing higher yields. Your markets are already telling you what to expect.  The GRI on Norkotahs today is $4.66 and on Burbanks it is $5.52.  Realistically, given the likely size of this year's crop, we could easily see a larger than normal carry over into next year.
>
> **With this potential in mind, United of Idaho's Supply Committee is in agreement with ALL of the United of America Directors in recommending the follow planting guidelines for next year.  All growers are asked to plant 70-75% of their 2004 base in 2010 to BALANCE next year's crop with this year's anticipated large carry over.**  This recommendation to cut 25–30% off your 2004 base acres will be finalized in November when we have the final tally on this year's yields and production nationwide. This same 70-75% planting guideline is extended to all fry contract growers. (Emphasis added.)

299. Shortly after this Court ruled that Defendants' Motion to Dismiss, Jerry Wright of UPGA announced on January of 2012 that UPGA, in a departure from its prior practice, "chose[] not to promote specific planting guidelines for its members" for the 2012 potato crop.  Wright predicted that this omission would cause potato supply to increase significantly in 2012 and would also cause potato prices to fall.  Wright did not say, however, that the UPGA and its members were discontinuing all future use of potato planting guidelines or other supply control efforts.

300. All Defendants involved in potato growing, packing, and selling operations herein (including the Wada Grower Entities, Wada Packer Entity and Wada Marketing Entities; Potandon; Blaine Larsen Farms; Michael Cranney doing business as Cranney Farms; Cornelison Farms; Snake River Plains Potatoes; Driscoll Potatoes; Lance Funk doing business as Lance Funk Farms; Rigby Produce; Pleasant Valley Potato; KCW Farms, Inc.; Kim Wahlen d/b/a Kim Wahlen Farms; Raybould Brothers Farms; and R.D. Offutt), as well as the individuals who controlled these operations, were direct participants in the supply reduction scheme outlined herein and followed acreage reductions, participated in the bid-buy-down program, participated in and utilized information obtained from marketing calls and packing reports, participated in "flow control," and/or reduced the domestic supply of potatoes for the express purposes of fixing, raising, maintaining and/or stabilizing prices.

301. While certain aspects of UPGA's schemes have been publicly discussed, all attendees to UPGA Board of Directors and Committee meeting attendees must have signed a "United Confidentiality Agreement" each year and promised not to disclose information shared at these meetings.

302. Any violation of that agreement allows UPGA to exclude such person from future meetings or to sue such a person in a court of law to halt disclosure and for damages experienced by UPGA as a result of any such disclosure.

## II.  Defendants are not Entitled to the Limited Protections of the Capper-Volstead Act

303. The Capper-Volstead Act provides an exemption from antitrust law for certain associations and cooperatives comprised of agricultural producers that meet specific criteria. The Act protects an association and its members from antitrust scrutiny, provided that: (1) the association is operated for the mutual benefit of its members; (2) no member of the association is

allowed more than one vote because of the amount of stock or membership capital he may own therein, or that the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum; and (3) the association does not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members.  The antitrust immunity provided by Capper-Volstead is "limited" and does not exempt all cooperative conduct from review under the Sherman Act.

304. The Capper-Volstead Act only protects "persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers."  This phrase does not extend to a processor of agricultural products or any person or entity not engaged in farming, planting, ranching, and growing.  Capper-Volstead Act immunity will not protect an association or any of its members if even one member fails to qualify as a "person[] engaged in the production of agricultural products."

305. In a 1985 publication titled "Understanding Capper-Volstead," reprinted in 1995, the USDA stated that "if an association of producers . . . restricts members' agricultural output . . . [or] colludes with third parties to fix prices . . . [or] conspires with third parties to fix prices . . . [or] combines with other firms to substantially lessen competition . . . " then "it may find itself just as subject to prosecution for being in violation of the antitrust laws as would any other firm that engages in such practices."

306. UPGI, UPGA and their co-conspirators have touted their purported immunity from suit under the Capper-Volstead Act and have prominently featured the advice of their antitrust lawyer (Randon Wilson of the Jones Waldo law firm) in publicly available, non-privileged documents as cover for their admitted supply-restriction efforts and conspiracy to fix, raise, maintain and/or stabilize prices.

307. For example, in an article in the publicly-available UPGA newsletter entitled "The power of cooperative collaboration," Mr. Wilson wrote:

> A grower who markets his crops or products alone has very little bargaining power.  He is at the mercy of the market, where a processor could turn away his crop or delay receiving it.  A grower is especially vulnerable if there is a market surplus.  Yet, an individual grower can do very little to bring supply in line with demand.  On the other hand, when growers join together in cooperatives they can achieve market power even when there is a surplus.
>
> . . . .
>
> The potato industry is to be commended.  It might have sought federal orders which would mandate participation by all growers under a mandatory program.  Much to their credit they have pursued a voluntary program through cooperation under the Capper-Volstead Act. . . .  I urge all to join in the current industry efforts to achieve supply/demand balance and to make potato farming profitable.

308. In another interview, Mr. Wilson stated: "I have high hopes the farmers will deal with this problem as an industry, that they will work together to bring the supply of potatoes into line with the demand.  That's the name of the game."

309. As discussed below, however, none of the defendants herein is entitled to the limited protections found in the Capper-Volstead Act for their efforts to restrict potato supply and fix prices.  As an initial matter, Capper-Volstead does not protect pre-planting acreage reductions – one of the central agreements at issue in this case.

310. UPGA and its co-conspirators' efforts at reducing potato supply fall outside and are not protected by the Capper-Volstead Act.  UPGA, UPGI and their co-conspirators have engaged in all of the activities discussed above, as well as others, which have negated their ability to claim immunity from antitrust laws under the Capper-Volstead Act.

311. UPGA, UPGI and their co-conspirators are not entitled to the limited protections found in the Capper-Volstead Act for at least the following reasons:

    (a)    UPGA and its members (including UPGI and the other member cooperatives) are not legitimate cooperatives and they do not market, process or sell potatoes—they are instead trade groups designed to serve as forums for a nationwide (and continent-wide) agricultural supply-restriction agreement among competitors.  Their efforts have improperly and unduly enhanced prices;

    (b)    UPGA and its members are made up of vertically integrated producers that are also packers and shippers in violation of the Capper-Volstead Act;

    (c)    UPGA and its members implement predatory conduct and impose coercive, punitive and retaliatory measures against members that do not comport with the supply reduction conspiracy;

    (d)    UPGA, its members, and co-conspirators have conspired and colluded with third parties to reduce supply and fix prices;

    (e)    UPGA, its members, and co-conspirators have conspired and colluded with non-member potato farmers to reduce supply and fix prices;

    (f)    UPGA, its members, and co-conspirators have conspired and colluded with foreign entities, including the United Potato Growers of Canada and Potato Marketing Association of North America, in an attempt to reduce supply and fix prices for the North American continent;

    (g)    UPGA, its members, and co-conspirators have conspired and colluded with non-member "partners" who are not engaged in agricultural

production and who have funded potato supply control efforts; and

(h)     UPGI, its members, and co-conspirators have conspired and colluded with

"United II"—a non-grower, vertically integrated potato purchaser, to assist

with supply-restriction efforts.

**a.   <u>UPGA and its members operate as a price-fixing trade group, not a
legitimate cooperative.</u>**

312. UPGA and its individual cooperative members (collectively referred to herein as

"UPGA") do not engage in any of the functions enumerated under the Capper-Volstead Act.

UPGA does not grow, harvest, ship, sell, bargain or compete for the sale of potatoes or any

agricultural products.  UPGA merely serves as a potato trade group and a forum for a supply

management scheme and a price-fixing agreement.  These activities fall outside the legitimate

objectives of an agricultural marketing co-op.

313. UPGA member cooperatives are made up of direct competitors rather than small

farmers banding together to cut out the corporate middlemen who would otherwise market their

potatoes.  These cooperative members do not associate to collectively process, handle, and

market their products, and UPGA does not provide those services.

314. UPGA does not wash, grade, package, store, transport, or distribute its members'

potatoes.  UPGA does not negotiate contracts of sale for its members.  UPGA does not "market"

its members' products.  Rather, as set forth in its promotional materials, publications, website,

and numerous public statements, UPGA was founded for the express purpose of implementing a

scheme to manage and restrict the supply of potatoes.

315. In an *Agweek* article entitled "Valley Potato Association Thinking National: RRV

Fresh Potato Growers Votes to Initiate Membership Drive for [UPGA],'," a quotation from Buzz

Shahan crystallized UPGA's purpose:

"The UPGA is a federated coop [*sic*], meaning our members are not growers," says UPGA's [COO], Buzz Shahan. "Our members are co-ops, to which growers belong. We facilitate the interaction, nationally, between co-ops and provide the legal umbrella under which they can discuss issues like supply and demand."

316. In another *Agweek* article, entitled "Spud Growers Eye National Group: Red River Valley-Area Growers to Meet on Joining [UPGA]," author Mikkel Pates highlighted UPGA's role: "[Duane] Maatz, President of the Northern Plains Potato Growers of East Grand Forks, Minnesota, says the United Potato Growers doesn't negotiate contracts, but it can have a big effect because it links the region's farmers' information with a group that represents more than half of the U.S. fresh potato produces [*sic*] . . . ."

317. As discussed herein, UPGA's and UPGI's price fixing and supply reduction efforts have unduly enhanced potato prices.

**b.** **UPGA and its member cooperatives have as members producers that are also packers and shippers in violation of the Capper-Volstead Act**

318. Mr. Wilson, UPGA's attorney, publicly discussed that shippers and packers could not be affiliated with any Capper-Volstead Act potato cooperatives.

319. The Capper-Volstead Act does not protect fully integrated producers that also grow, pack, process, store, and ship potatoes.

320. Many of the founders of UPGI and UPGA, as well as numerous other co-conspirators, are integrated operators (called grower-shippers) that grow, pack, process, store, and ship their own and other growers' potatoes.

321. For example, the vertically integrated Wada defendant entities operate a 140,000 square foot packing facility in Pingree, Idaho.

322. In addition to growing and shipping, Defendant Larsen Farms, one of founders of UPGI, refers to itself as a "fully vertically integrated operation."  Larsen Farms has an on-site processing facility that cooks, dehydrates, mashes and further processes its potatoes.

323. Other Idaho grower-shippers involved in the conspiracy alleged herein (some of whom are named as Defendants) include, among others: Cummins Family Produce, Inc.; Driscoll Potatoes; Floyd Wilcox & Sons, Inc.; Howard Taylor & Sons, Inc.; Pleasant Valley Potato; Rigby Produce; and Snake River Plains Potatoes.

**c.   UPGA and its member cooperatives impose predatory, coercive, punitive and retaliatory measures against members that do not comport with the supply reduction conspiracy.**

324. Predatory conduct and coercive tactics are beyond the scope of any legitimate business activity that may be protected by the Capper-Volstead Act.

325. As discussed herein, UPGA utilized predatory conduct and coercive conduct in ensuring compliance with the price-fixing scheme alleged herein.  For example, UPGA used satellite imagery, fly-overs, GPS systems, and other methods to enforce its agreement to reduce potato supply.

326. UPGA also instituted surprise audits and inspections of members' farms to monitor compliance with its scheme.

327. UPGA forced members to sign documents allowing UPGA board members access to growers' confidential federal farm subsidy forms in order to ensure that members were following its scheme.

328. Members who did not comply with UPGA's supply restrictions were subject to fines (of $100 per acre) and other punitive measures, such as removal from the cooperative.

329. UPGA also coerced non-members to join the price-fixing scheme and referred to them as "free-riders" who were profiting from the conspiracy, but not reducing acreage.

**d.   UPGA and its members have conspired and colluded with third parties to reduce supply and fix prices.**

330. Under the Capper-Volstead Act, members of a co-operative may not collude or conspire with third parties.

331. Yet UPGI, the Idaho grower cooperative whose founders also started the UPGA, colluded with numerous third parties in seeking to control Idaho and national potato acreage. For example, as discussed supra, UPGI entered into MOUs with PGI, SIPCO, and SPGI to control potato supply in Idaho.  These groups were not entitled to any Capper-Volstead protections.

332. UPGI and UPGA conspired with non-exempt packers and warehouses in implementing flow control measures.

333. As discussed in more detail *infra*, UPGA also colluded with non-member growers in seeking to control supplies.

334. As discussed in more detail *infra*, UPGI also colluded with non-growers in forming a joint venture with a potato dehydration plant that was designed to help its efforts to reduce supply and fix prices.

335. As discussed in more detail *infra*, UPGA also colluded with financial "partners" that helped fund UPGA's supply-restriction efforts.

**e.   UPGA, its members, and co-conspirators have conspired and colluded with non- member potato farmers to reduce supply and fix prices.**

336. UPGA and its regional co-operative members routinely coerced and conspired with non-members in seeking to reduce potato supply and explicitly recognized the importance of having non-members follow their planting reductions and other supply-restriction efforts.

337. In a publicly disclosed interview on UPGA's website, not subject to attorney client privilege, UPGA's attorney, Randon Wilson stated, "cooperatives wishing to benefit from the limited antitrust protection afforded by the Capper-Volstead Act must make sure that they do not enter into agreements with non-members to fix prices or limit supplies. They cannot be predatory or unduly enhance prices." This advice was not followed.

338. UPGA and UPGI specifically sought out and allowed non-members to participate in their acreage reduction programs.

339. On the same page as Mr. Wilson's advice above, UPGA discussed its recommendations for 2010 based on the "assumption" that non-members would also join its efforts to reduce supplies: "[UPGA's] recommendation for 2010 of planting 75 percent of 2004 base acreage takes into account the significant carryover that will accompany the industry into the fall harvest of 2010. As a result of carryover, growers producing for the out of field market in 2010 will likely need to cut beyond [UPGA's] recommendations. **It should be noted that the [UPGA] recommendations are still based on the assumption of non-members following the same guidelines as [UPGA] members for their operations as well.** Please consult with your United chapter for the latest information before you plant in 2010."

340. UPGA's January 2006 newsletter stated that the co-operative "**invites all non-members to attend their meetings, ask questions, and be a part of the solution and not the problem.** We need every area in North America, big or small, to participate. By working

together, sharing information, and making smart business decisions, we have the unprecedented

opportunity to make this industry profitable." (Emphasis added.)

341. Mr. Shahan noted that these efforts to collude with non-members had paid off in

a Spud Smart article, titled "U.S. Production Stays Steady:"

> Shahan says potato growers have really taken to UPGA's efforts.
> "Growers have seen the wisdom of matching supply to demand so
> they're much more educated in a side of the industry they have
> not understood before," says Shahan. **"Curiously, the non-
> members are even receptive to the program, because it brings
> science to what has been sorcery."** (Emphasis added.)

342. Thus, non-members were not only invited to participate in the price fixing

scheme discussed herein, but they did actively participate at UPGA's direction and request.

343. Shermain D. Hardesty, an agricultural economist that does work for UPGA, also

noted that UPGA's leaders colluded with nonmembers to achieve compliance with supply

reduction efforts:

> Because it is a voluntary organization, UPGA is facing the free rider problem.
> Nonmember producers benefit from the higher and more stable prices achieved,
> without having to reduce their acreage and control their sales flows.  **UPGA's
> leadership is striving to impress upon nonmembers the need for compliance and
> the significant additional benefits that could be derived by all producers from
> such cooperation.** (Emphasis added.)

344. In January of 2008, Defendant United Fresh Potato Growers of Colorado reported

on the UPGA Board of Directors Meeting in its newsletter:

> Mike Cranney, Supply Management Committee Chairman,
> reminded the attendees that in 2008 United's direction is that all
> United members will reduce acreage by five percent off of 2007
> plantings.  **Non members will be urged to do the same.**
> (Emphasis added.)

345. In December of 2008, in a special edition of its newsletter, the UPGA made a direct appeal to its members to reach out and conspire with nonmembers to limit supply in "United to growers:  limit '09 acreage for survival":

> Following an in-depth review of 2008 planting, production and storage data contrasted with ongoing falling demand for fresh potatoes and with an eye on a rocky, world-wide economy, the United Potato Growers of America board of directors decided at a December board meeting to strongly urge all fresh potato growers to plant no more acreage in 2009 than they planted in 2008.
>
> **Members asked to reach out to their neighbors**
>
> **All members and co-op leaders are asked to immediately make a strong effort to reach out to members and non-members** in their growing region to impress upon them the urgent necessity to freeze or even reduce fresh acreage in 2009.  **Everyone, including non United members, is asked to join United in an effort to manage supplies by limiting acreage in 2009.**  (Emphasis added.)

346. UPGA's then-CEO Julia Cissel prepared a PowerPoint presentation dated December 7, 2006, which explicitly encouraged non-member participation several times.  One slide read as follows:

> Conclusion:  Supply Management depends on YOU!
> 1) Manage your acres
> 2) Insist on reasonable returns
> 3) Engage and collaborate
> 4) **Convince non-members to follow . . . they win too!**
> 5) DO THE RIGHT THING! (Emphasis added.)

347. In another UPGA PowerPoint, entitled "Report for 2008 Plan for 2009," UPGA again encouraged engagement with non-members.  One slide read:

> United's Plans for 2009
>
> - What is the market's fundamental and guiding principle?
> - Supply and demand is a real economic principle, and one that potato growers can manage
> - **Become a missionary: befriend all growers and encourage them to heed marketplace dynamics** (Emphasis added.)

348. UPGI's April 2009 newsletter clearly identified the group's willingness to incorporate non-member participation:

> Inventory Management
> If acreage management isn't enough, United will be prepared with the option of implementing an Inventory Management Program. However, in order to implement such a program, the following guidelines must be met:
> - 75% member and base acre agreement to initiate the action
> - 75% member and base acre ratification to implement
> - **A set percentage non-member participation for members to ratify** (Emphasis added.)

**f.** **UPGA, its members, and co-conspirators have conspired and colluded with foreign entities in an attempt to reduce supply and fix prices for the North American continent**

349. The Capper-Volstead Act does not protect non-United States farmers or cooperatives, nor does the Act protect domestic cooperatives that conspire with non-protected entities, such as foreign producers, to reduce global agricultural supply.

350. In implementing the output restriction scheme discussed herein, UPGA has conspired with a Canadian potato association and a North American growers association made up of many Canadian growers.

351. UPGA and UGPC are admittedly jointly managing North American potato supply.

352. The UPGA and UPGC have an interest in preventing lower-priced imports from each other's members. By jointly agreeing on supply restrictions, each can limit or minimize the deleterious effects of low-priced imports flooding their market.

353. A substantial amount of Canadian potatoes are imported into the United States each year. For example, Agriculture and Agri-Food Canada reported the following:

> In 2006-07, 118,926 tonnes of seed potatoes valued at $39 million

and 471,491 tonnes of table potatoes valued at $145 million were exported. That same period, 970,000 tonnes of frozen French fries were also exported, making Canada the second largest french fry exporter after the Netherlands.  The United States is Canada's main market for potatoes and potato products; 74% (by value) of Canadian potato exports were destined for the United States in 2007.

354. Just as the United States is a very important export market for Canadian potato producers, Canada is an extremely important export market for United States potato producers. The Office of the United States Trade Representative noted in November of 2007:

Canada is the United States largest export market for agriculture, including potatoes.  In 2006, the United States exported $92.8 million in potatoes to Canada, representing 68.73 percent of all U.S. potato exports.  Since 2004, U.S. potato exports to Canada have increased by 38.13 percent.

355. As noted above, prior to UPGC's formation in August of 2005, representatives of seven potato producing provinces in Canada comprising more than 96% of the potato acreage in Canada met with the board of directors of the UPGA in Toronto.  The expressed purpose of this meeting was to "jointly consider 'cross border' programs and cooperation that will greatly improve profitability for all growers in both countries."  At the Toronto meeting, Canadian growers agreed to form a steering committee with representation from each province to define more concretely methods for collaborating between provinces and establishing a formal link with the UPGA.

356. UPGC was formed in February 2006 with the assistance of UPGA.  In its Fall 2007 newsletter (which is publicly available and thus not privileged), the UPGC discussed its formation and the "legal advice" it received regarding collaborating with a U.S. cooperative:

To my recollection the initial rational[e] for establishing this Corporation was that the U.S. had just formed a National Co-Operative (United Potato Growers of America), the Anti-Trust laws in the U.S. are such that an organization of this nature could

> possibly face legal issues, but there is a remedy for properly
> constituted agricultural co-operatives in the U.S. in the form of the
> Capper-Volstead Act.  **Legal opinion advised us, that as**
> **Canadians we would need to join this U.S. cooperative in order**
> **to communicate/cooperate with our U.S. friends and associates**
> **in their new cooperative.**
>
> Thus the need to have a National group that could join our U.S.
> counterparts.
> (Emphasis added.)

357. In April of 2006, *Spudman* magazine reported that Gary Sloik, co-chairman of UPGC's steering committee, stated that his group and the UPGA would work closely together, and that Mr. Sloik stated that "[o]ur market is their market, and their market is our market.  It's all one big puzzle."

358. The UPGA states on its website that it assisted in the formation of UPGC in 2006 and also states that "[d]iscussions are ongoing with growers in other countries."  The UPGA further states that it "has a data sharing arrangement with the UPGC."  UPGA, on its website's FAQ section regarding its United Potato Partners Program, states "United reaches 80 percent of U.S. and Canadian potato growers by providing them with market intelligence that can improve profitability."  The UPGA organization chart depicted *supra* the presence of UPGC as part of UPGA's structure.

359. In February of 2007, UPGA and UPGC held a joint meeting in Las Vegas, along with the PMANA.  Sixty growers were in attendance.  According to a press release the groups issued, at this meeting the growers agreed to "collaborate" and work together to reduce supplies across North America.  Specifically, the groups agreed to work together to eliminate speculative potato planting and manage 2007 plantings.   The groups also agreed to a uniform data gathering and analysis program.

360.  Wada, UPGA's chairman at the time, discussed this joint meeting, stating: "[w]e are continuing our efforts and working together for a sustainable payday for all potato growers. We have made significant progress over the last year, and agreed that the level of collaboration among our three grower cooperatives will be heightened in 2007."

361. In its Winter 2007 newsletter, UPGC noted that one of the benefits of joining it was that "UPGC offers a unique opportunity to partner with two strong U.S. Potato organizations [sic] United Potato Growers of America and Potato Marketing Association of North America (the potato industry is global)."  UPGC also noted that the "US is our largest trading partner, it is critically important to be connected."  The newsletter also featured an "open letter" from Mr. Shahan to the members of the UPGC, that, among other things, stated that "[w]e can now put all of our varying situations together into a master plan . . . ."

362. In its PowerPoint presentation entitled "Report for 2008 Plan for 2009," UPGA also discussed its work with foreign entities:

- "Worked to further trade between U.S. and Mexico for fresh potatoes"

- "Worked to achieve more current reporting for Canadian fresh-potato imports"

- "Improved United of Canada structure and effectiveness"

- "There is now a United of Europe"

- "The UK will have a similar structure soon"

363.  In July of 2008, The *Journal Pioneer* reported on the collective impact that UPGA, UPGC, and PMANA were having on reducing potato supplies:

Teamwork can bring impressive benefits, says Buzz Shahan, chief operating officer of the United Potato Growers of America.

U.S. potato producers were able to slash planted acreage for 2008 by eight percent, or about 81,000 acres, firming up prices in the process. Idaho, the largest potato producer in North America, led the way with a 14 percent cut. Meanwhile, the (Prince Edward) Island's cut [in Canada] was cut by 3,000 acres over 2007, to 93,000 acres.

"PEI growers have certainly pioneered the effort, they have already developed their systems (for managing potato production) in a very sophisticated way, but everybody else across the country needs to collaborate with PEI," said Shahan, a keynote speaker at province-wide meeting for growers, held Wednesday (Aug. 6) night at the Loyalist Lakeview Resort.

. . . .

Shahan says the U.S. potato industry is seeking three cents more a pound for its producers.  That works out to $10 a hundredweight instead of $7 and that's an enormous boost for them.

. . . .

PEI . . . was a big player in the formation of the United Potato Growers of Canada in 2006, which restrained production and boosted prices.

Shahan said American producers have been able to share a massive database of information about everything from shipping and marketing to planting—in fact nearly everything involved in raising and selling potatoes.  That has played a major role in increasing prices and demand.

**g.  UPGA, its members, and co-conspirators have conspired and colluded with non-member "partners" who are not engaged in agricultural production and who funded potato supply control efforts**

364. UPGA has "partnered" with non-agricultural producing companies that explicitly conspire with UPGA and assist in its efforts to reduce potato supply so that the companies can have access to UPGA members to sell their products.

365. UPGA's website discusses this "United Partners Program" as a "strategic alliance" by which partner companies help offset UPGA's costs in implementing its supply-restriction scheme:

> Q: What is the United Potato Partners Program?
> A: The United Potato Partners Program has three objectives: 1. Maximize the price the potato producer receives for his annual crop. 2. Minimize the cost of gathering the market data that allows the producer to maximize price. 3. Provide manufacturers of crop-input products a direct link to their grower-users.
>
> The market intelligence supplied by United's database matches supply to demand such that grower returns remain positive and stable. Financially healthy growers can afford healthy budgets. **There is a cost to acquiring, analyzing, and implementing the data relating to potato markets. Until now, these costs have been borne by United's growers. Corporations that supply potato growers with everything from potato handling equipment, to tractors, to field chemicals and fertilizers, irrigation equipment, and packing and packaging equipment can now, through a carefully structured program, offset the cost of the database nationally and regionally.**
> (Emphasis added.)

366. UPGA's March 2009 newsletter further discussed this "partnership" program: "[a]mong other benefits, the partner program reduces the costs to member growers of developing and maintaining United databases that are critical to grower sustainability." The 2009 partners were: Bayer CropScience, AMVAC Chemical Corporation and WinField Solutions. Further specific activities of non-defendant co-conspirator Bayer CropScience in connection with the UGPA have been discussed above.

367. Lee Frankel, UPGA's CEO, stated, "[w]e are pleased that our partners are realizing the strategic benefits of teaming up with United as a means of reaching the potato grower directly and have chosen to extend their partnership with us. We definitely value the contributions of ideas and financial support of these agricultural corporations as United Potato

Partners and look forward to another successful year for the potato industry overall.  Growers should remember to thank our partners for their support by supporting them through purchases and use of their products when appropriate."

368. These partners were aware of and supported the supply reduction price-fixing conspiracy alleged herein.  For example, UPGI's April 2009 newsletter noted that at "the recent United Potato Partners meeting in March, [UPGI] announced its planting guidelines and inventory management for 2009-10."

### h.   UPGI, its members, and co-conspirators have conspired and colluded with a vertically integrated potato purchaser, a non-grower, to assist with supply-restriction efforts

369. In 2007, UPGI facilitated the formation of a joint venture (Defendant Idahoan Foods) to create the second largest potato dehydrator in the country, as well as a second co-op to supply potatoes to this venture.  The explicit and publicly stated purpose of this joint venture was to assist UPGI and its co-conspirators in their overall scheme to reduce potato supply.

370. As part of this transaction, UPGI acquired Idaho Fresh-Pak, Inc. —the country's third largest potato dehydration company.  The purchase included Idaho Fresh Pak's four Idaho plants and the "Idahoan" brand names.  UPGI then formed United II, a second co-op based in Idaho Falls, Idaho.  All UPGI members were able to join the new co-op (and had to join to be able to sell potatoes to the venture).  United II and R.D. Offutt next formed a joint venture entitled North American Foods, LLC.  United II contributed the dehydration plants acquired from Idaho Fresh-Pak.  R.D. Offutt contributed its three dehydration plants located in North Dakota, Nevada, and Idaho.  Under a formula-based pricing arrangement, United II growers supplied all of the potatoes for the Idaho and Nevada plants.

371. United II potato growers have ownership of the new company, receive dividends, and have a guaranteed market for their dehydrator-grade potatoes, which changes based on whether growers seek to further reduce supply.

372. United II members are contractually bound to abide by all UPGI acreage management, data collection and dues assessment procedures. Failure by United II members to abide by UPGI policies, including acreage management, is punishable by fine or penalty.

373. United II requires that all members "commit[] to allow participating sheds **to divert up to 3% of the growers #1's and #2's into premium washed process grade to alleviate size specific excess as needed to balance the fresh pipeline.  Decisions to divert will be made by the U-II board of directors**." (Emphasis added).  These high quality potatoes otherwise would be sold on the fresh potato market.  The Board makes decisions based on whether it seeks to prop up fresh supply prices by reducing supply.

374. Thus, the United II board of directors, in its discretion, may "siphon off" a percentage of each member's best quality fresh potatoes, as United II explains in a document entitled "How to Join United-II."  This "siphoning" is not done at normal market conditions or rates.  It is done to lower fresh potato supplies in order to increase prices for the fresh potato grower owners of the cooperative and Idahoan.

375. In addition, each United II member is encouraged to "commit between 5% - 10% of his total production as low quality field run. . . . **This is NOT field run contracted for dehy processing.**  This is field run production grown for fresh consumption."

376. The partnership between United II and Offutt has therefore facilitated the removal of up to 13% of growers' fresh potatoes from the fresh potato market.

377. United II and its directors controlled the quality of potatoes to be dehydrated by Idahoan Foods. Idahoan Foods has no economic interest in dehydrating high quality potatoes. Idahoan Foods is owned and controlled by potato growers whose greater economic interest is to ensure a higher price for their fresh potatoes by siphoning off excess supply into the dehydration marke

378. United II requires its members to commit to deliver 100% of processor quality potatoes produced on members' fresh base acres registered with United II. Failure to deliver 100% of such potatoes is punishable by significant financial penalty.

379. UPGI also discussed the venture in its March 2007 newsletter and stated "**United of Idaho [UPGI] feels that the current dehy strategy being implemented is critical to United's overall mission of supply management**." (Emphasis added.).

380. In a March 30, 2007 press release touting the joint venture, UPGI stated:

> "Since forming two and half years ago, United has proven its ability to manage fresh potato supplies, meet and match demand, and improve grower returns," said Jerry Wright, United president and chief executive officer. "**This new venture will not only lead to a more stable dehy industry but also serve as an important tool for growers to balance their fresh crop and fresh industry marketing pipelines, all with the objective of improving grower returns**. As a result, potato growers, our communities, and the entire industry will benefit."
>
> Under the terms of the agreement, United has formed United II, a new grower cooperative that will be involved in the new company with Idahoan and Offutt. Idaho potato growers who are members of United or who join United, can opt to join United II. By investing in United II, potato growers will have ownership of the new company, will receive dividends, and have a guaranteed market for their dehy grade potatoes.
>
> "This new venture is another in a series of strategic initiatives by United to improve potato grower returns," said Wright. "**The fresh and dehy industries work hand-in-hand. By maintaining a fair dehy price, fresh grower returns also improve. This new dehy**

**company also provides United with an outlet for surplus potatoes.**"

Wright said, "Through United, growers have access to market data and facts that are crucial to their marketing. Through United II, growers who invest will have the opportunity to earn dividends while having a reliable market for their dehy grade potatoes."

Members of United II will be the sole potato suppliers for the new company. "**Potato growers will now be integrated vertically into the overall industry system**," said Wright. "Through United II, we will create efficiencies from the development of seed to production to marketing. We anticipate greater long-term stability and no more boom or bust cycles." (Emphases added).

381. Furthermore, the April 2007 UPGI newsletter included a guest letter from UPGA board member Louis Wysocki congratulating UPGI members and R.D. Offutt for "displaying great vision in this new venture."  Wysocki praised the grower members for having "gained the ability to divert fresh market over-supply of specific packs[.]"  Wysocki reminded growers that, "[w]hile profitability in this new venture is a must and is important, **the ball growers need to keep their eye on is the profitability [that] this effort provides to the larger portion of the grower's crop, which is sold as fresh**." (Emphasis added).

382. In December of 2007, UPGI announced the new "Idahoan Fresh Potato Plan" as part of this venture and as a means to further control supplies and fix prices where UPGI proposed that growers sell 100% of their potatoes to Idahoan Fresh.

383. Jerry Wright, UPGI's president, outlined the plan as follows:

1. The first step happened when United II entered into partnership with R.D. Offutt Company and purchased Idahoan Foods. Growers now own the largest dehydrator in North America.

2. Starting in December, United will meet with groups of growers in each district to review the program and ask for your commitment.  To meet the demands of the lender, a majority of growers will need to sign their contract between January and

March of next year.  The program will start selling potatoes in September 2008.

3. Along with grower meetings, United will schedule shed meetings with the goal of consolidating sheds.  Sign up will start in April 2008.  As part of the plan, sheds can join a "merged ownership" pool with full equity ownership in NewCo or join a "lease group" where the shed owners maintains ownership and leases the facilities to NewCo.  The presentation will also cover a fair exit strategy for owners based on a common valuation format offering cash with terms.  NewCo can acquire inefficient sheds and close them, making up the purchase cost through increased efficiencies at the remaining sheds.

4. The final step involves creating a coordinated sales and marketing system for the Idahoan potatoes.  Growers and shed owners will see, at minimum, a system overview during the group meetings at the beginning of the year.  Growers who commit their potatoes will receive cash payment on a staggered schedule.  For all quality potatoes (based on independent harvest, cellar, and shed inspections), growers will receive $2.00/cwt as a down payment in October.  After a successful holding period, growers will receive an additional $2.00/cwt in December.  Then, based on market returns, growers will receive up to $1.25 in February. Growers will receive the balance of their returns, based on the market for the year, in September. Minus administrative expenses, growers will receive 100% of the up, a change from the current grower/shed relationship.

The final settlement will reflect each grower's individual pack out and crop quality.

To join, a grower must be a United member in good standing and adhere to the 2008–09 Acreage Planting Guidelines (reduce 20% off of 2004 acres).  This acreage based contract requires 100% commitment of the fresh crop, with Idahoan Fresh honoring prior process grade and shed commitments.

384. In the PowerPoint entitled, "Pacific Coast National Bargaining Conference & Sherman Hardesty, UPGA COO Buzz Shahan cited this vertical expansion as part of UPGA's philosophy.  The relevant slides read:

Philosophy of UPGA
- What is Sustainable Agriculture?

- Sustainable agriculture produces rational on-farm profitability year after year
  - What is rational on-farm profitability?
    - Rational on-farm profitability facilitates equity growth
      - **Equity growth does not have to be linear, but can include vertical and horizontal expansion**

An Example of Vertical Expansion!
- **North American Foods**
  - **World's largest supplier of dehydrated potato products**
  - **Rollup included UPGI, called UPGI II, or U II, and included three other entities**
  - **Stock offered to UPGI members** (Emphasis added.)

## EFFECTS OF THE DEFENDANTS' ILLEGAL COURSE OF CONDUCT

385. Defendants' conspiracy had the following effects, among others:

(a) Price competition among the Defendants and their co-conspirators in the sale of potatoes was restrained and suppressed;

(b) Prices of potatoes manufactured and sold in the United States by the Defendants and their co-conspirators were fixed, raised, maintained and/or stabilized at supracompetitively higher, non-competitive levels; and

(c) Direct purchasers of potatoes, including Plaintiffs and Class members, were deprived of the benefits of free and open competition in the purchase of potatoes.

386. Defendants' contract, combination and conspiracy described herein consists of a continuing agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to artificially fix, raise, maintain, and/or stabilize prices paid by Plaintiffs and Class members for the direct purchase of potatoes in the United States, its territories and possessions.

387. In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things: agreeing to artificially fix, raise, maintain and/or stabilize prices for potatoes in the United States; and implementing and monitoring the conspiracy among cartel members.

## INJURY TO PLAINTIFFS AND CLASS MEMBERS

388. The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreement to fix, raise, maintain and/or stabilize the prices for potatoes sold in the United States.

389. As a direct and proximate result of the contract, combination and conspiracy alleged herein, Plaintiffs and other members of the classes were, and continue to be, damaged in their business or property in that they paid supracompetitive prices for potatoes products during the Class Period, higher than that which they would have paid in the absence of the contract, combination, and conspiracy.

## CAUSE OF ACTION

### Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1

### (Against All Defendants)

390. Plaintiffs incorporate and re-allege each allegation set forth in the preceding paragraphs of this Complaint.

391. Beginning at least as early as 2003, and continuing to the present day, Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents, or other representatives, entered into a continuing contract, combination and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize the prices paid by Class Members for their purchases of potatoes in the United States and its territories and

possessions (through, *inter alia*, agreed upon reductions in potato capacity), in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

392. Defendants' unlawful conduct resulted in artificially fixed prices charged by Defendants and their co-conspirators to Plaintiffs and the members of the Class for their purchases of potatoes.

393. Plaintiffs and the members of the Class paid more than they otherwise would have for their purchases of potatoes in a competitive marketplace, were thus damaged, and seek to recover for those damages.

394. As a direct and proximate result of Defendants' scheme, Plaintiffs and the members of the Class have been injured and financially damaged in amounts which are presently undetermined.  Plaintiffs' and Class members' injuries consist of paying more for their purchases of potatoes than they would have paid absent Defendants' conduct.  Plaintiffs' and Class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray as follows:

A.   That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been in violation of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.   That judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and the Class as permitted by law, together with the costs and expenses of this action, including reasonable

attorneys' fees;

        D.   That Defendants, their  affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

        E.   That Plaintiffs and Class members be awarded any available prejudgment and post-judgment interest;

        F.   That Plaintiffs and Class members have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

        Plaintiffs demand a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all triable issues.

Dated: January 31, 2012                Respectfully submitted,


                                /S/_____
                                Philip Gordon, Esq. (ISBN 1996)
                                Bruce S. Bistline, Esq. (ISBN 1988)
                                GORDON LAW OFFICES
                                623 W. Hays Street
                                Boise, Idaho 83702
                                Phone: (208) 345-7100
                                Fax: (208) 345-0050
                                pgordon@gordonlawoffices.com
                                bbistline@gordonlawoffices.com

                                Michael D. Hausfeld, Esq
                                James J. Pizzirusso, Esq.
                                HAUSFELD LLP
                                1700 K Street, N.W.

Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeldllp.com
jpizzirusso@hausfeldllp.com

Michael Lehmann, Esq.
Jon King, Esq.
Art Bailey, Jr., Esq.
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Phone: (415) 633-1908
Fax: (415) 358-4980
mlehmann@hausfeldllp.com
jking@hausfeldllp.com
abailey@hausfeldllp.com

**Counsel for Plaintiffs and the Proposed Class**

| | |
|---|---|
| Stanley D. Bernstein, Esq.<br>Ronald J. Aranoff, Esq.<br>Christian Siebott, Esq.<br>Gabriel G. Galletti, Esq.<br>BERNSTEIN LIEBHARD LLP<br>10 East 40th Street, 22nd Floor<br>New York, NY 10016<br>Phone: (212) 779-1414<br>Fax: (212) 779-3218<br>bernstein@bernlieb.com<br>aranoff@bernlieb.com<br>siebott@bernlieb.com<br>galletti@bernlieb.com | Eugene A. Spector, Esq.<br>Jay S. Cohen, Esq.<br>Jeffrey L. Spector, Esq.<br>SPECTOR ROSEMAN KODROFF AND<br>WILLIS, P.C.<br>1818 Market Street, Suite 2500<br>Philadelphia, Pennsylvania 19103<br>Phone: (215) 496-0300<br>Fax: (215) 496-6611<br>espector@srkw-law.com<br>jcohen@srkw-law.com<br>jspector@srkw-law.com |
| Bruce L. Simon, Esq.<br>Aaron M. Sheanin, Esq<br>PEARSON SIMON WARSHAW PENNY,<br>LLP<br>44 Montgomery Street<br>Suite 1200<br>San Francisco, CA 94104<br>Phone: (415) 433-9000<br>Fax: (415) 433-9008<br>bsimon@pswplaw.com<br>asheanin@pswplaw.com | Daniel L. Warshaw, Esq.<br>PEARSON SIMON WARSHAW PENNY.<br>LLP<br>15165 Ventura Boulevard<br>Suite 400<br>Sherman Oaks, CA 91403<br>Phone: (818) 788-8300<br>Fax: (818) 788-8104<br>dwarshaw@pswplaw.com |

| | |
|---|---|
| Steven A. Asher, Esq.<br>Mindee J. Reuben, Esq.<br>WEINSTEIN KITCHENOFF & ASHER LLC<br>1845 Walnut Street<br>Suite 1100<br>Philadelphia, PA 19103<br>Phone: (215) 545-7200<br>Fax: (215) 545-6535<br>asher@wka-law.com<br>reuben@wka-law.com | Robert W. Finnerty, Esq.<br>GIRARDI KEESE<br>1126 Wilshire Boulevard<br>Los Angeles, CA 90017<br>Phone: (213) 977-0211<br>Fax: (213) 481-1554<br>rfinnerty@girardikeese.com |
| Bonny E. Sweeney, Esq.<br>Carmen A. Medici, Esq.<br>ROBBINS GELLER RUDMAN & DOWD LLP<br>655 West Broadway, Suite 1900<br>San Diego, CA 92101<br>Phone: (619) 231-1058<br>Fax: (619) 231-7423<br>bonnys@rgrdlaw.com<br>cmedici@rgrdlaw.com | Hollis Salzman, Esq.<br>Jay Himes, Esq.<br>William Reiss, Esq.<br>LABATON SUCHAROW LLP<br>140 Broadway<br>New York, NY 10005<br>Phone: (212) 907-0717<br>Fax: 212-818-0477<br>HSalzman@labaton.com<br>JHimes@labaton.com<br>WReiss@labaton.com |
| Allan Steyer, Esq.<br>STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH LLP<br>One California Street, Third Floor<br>San Francisco, CA 94111<br>Phone: (415) 421-3400<br>Fax: (415) 421-2234<br>asteyer@steyerlaw.com | Steven A. Kanner, Esq.<br>Douglas A. Millen, Esq.<br>FREED KANNER LONDON & MILLEN LLC<br>2201 Waukegan Road, Suite 130<br>Bannockburn, IL 60015 USA<br>Phone: (224) 632-4500<br>Fax: (224) 632-4521<br>skanner@fklmlaw.com<br>dmillen@fklmlaw.com |
| G. Scott Emblidge, Esq.<br>Sylvia Sokol, Esq.<br>MOSCONE EMBLIDGE & SATER LLP<br>220 Montgomery Street<br>Suite 2100<br>San Francisco, CA 94104<br>Phone:  (415) 362-3599<br>Fax:  (415) 362-2006<br>emblidge@mesllp.com<br>sokol@mesllp.com | Kimberly A. Kralowec, Esq.<br>THE KRALOWEC LAW GROUP<br>188 The Embarcadero, Suite 800<br>San Francisco, CA 94105<br>Phone: (415) 546-6800<br>Fax: (415) 546-6801<br>kkralowec@kraloweclaw.com |

| | |
|---|---|
| Arthur N. Bailey, Sr., Esq.<br>ARTHUR N. BAILEY & ASSOCIATES<br>111 West Second St., Suite 4500<br>Jamestown, NY 14701<br>Phone: (716) 483-3732<br>Fax: (716) 664-2983<br>artlaw@windstream.net | Daniel Cohen, Esq.<br>Joel Davidow, Esq.<br>CUNEO GILBERT & LADUCA LLP<br>106-A South Columbus Street<br>Alexandria, VA 22314<br>Phone: (202) 789-3960<br>Fax: (202) 789-1813<br>danielc@cuneolaw.com |
| Mark Griffin, Esq.<br>Raymond Farrow, Esq.<br>KELLER ROHRBACK LLP<br>1201 Third Street, Suite 3200<br>Seattle, WA 98101<br>Phone: (206) 623-1900<br>Fax: (206) 623-3384<br>mgriffin@kellerrohrback.com<br>rfarrow@ kellerrohrback.com | Brian Murray, Esq.<br>Lee Albert, Esq.<br>Benjamin D. Bianco, Esq.<br>MURRAY FRANK & SAILER LLP<br>275 Madison Avenue, Suite 801<br>New York, NY 10016<br>Phone: (212) 682-1818<br>Fax: (212) 682-1892<br>lalbert@murrayfrank.com |
| Gregory P. Hansel, Esq.<br>Randall B. Weill, Esq.<br>Joshua R. Carver, Esq.<br>PRETI, FLAHERTY, BELIVEAU<br>& PACHIOS LLP<br>One City Center<br>P.O. Box 9546<br>Portland, ME 04112<br>Phone: (207) 791-3000<br>Fax: (207) 791-3111<br>ghansel@preti.com<br>rweill@preti.com<br>jcarver@preti.com | Bruce E. Gerstein, Esq.<br>Jonathan M. Gerstein, Esq.<br>Dan Litvin, Esq.<br>GARWIN GERSTEIN & FISHER LLP<br>1501 Broadway, Suite 1416<br>New York, NY 10036<br>Phone: (212) 398-0055<br>Fax: (212) 764-6620<br>bgerstein@garwingerstein.com<br>jgerstein@garwingerstein.com<br>dlitvin@garwingerstein.com |

**Additional Counsel for Plaintiffs and the Proposed Class**