# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO, EASTERN DIVISION

|  |  |  |
|---|---|---|
| | : | |
| IN RE FRESH AND PROCESS POTATOES ANTITRUST LITIGATION | : | Case No. 4:10-md-02186-BLW |
| | : | |
| | : | |
| | : | |
| | : | |
| THIS DOCUMENT RELATES TO: ALL INDIRECT PURCHASER ACTIONS. | : | THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT |
| | : | DEMAND FOR JURY TRIAL |
| | : | |

**Table of Contents**

**Page**

INTRODUCTION ............................................................................................................ 1

NATURE OF THE ACTION ......................................................................................... 1

JURISDICTION AND VENUE ..................................................................................... 3

INTERSTATE AND INTRASTATE TRADE AND COMMERCE ............................ 4

PARTIES ........................................................................................................................ 5

PLAINTIFFS .................................................................................................................. 5

DEFENDANTS .............................................................................................................. 9

    A.  United Potato Growers of America, Inc. ........................................................ 9

    B.  United Potato Growers of Idaho, Inc. ......................................................... 11

    C.  Wada Farms Defendants ............................................................................... 12

    D.  Blaine Larsen Farms, Inc. and Blaine Larsen ........................................... 16

    E.  Potandon Produce LLC ................................................................................ 17

    F.  Cornelison Farms, Inc. and Keith Cornelison ........................................... 19

    G.  Michael Cranney d/b/a Cranney Farms ...................................................... 19

    H.  Snake River Plains Potatoes, Inc. ................................................................ 20

    I.  Driscoll Potatoes, Inc. ................................................................................... 20

    J.  Lance Funk d/b/a Lance Funk Farms .......................................................... 21

    K.  Rigby Produce, Inc. ....................................................................................... 21

    L.  Pleasant Valley Potato, Inc. and Kim Wahlen ........................................... 22

M. Raybould Brothers Farms LLC .......................................................................... 24

N. Idahoan Foods LLC ........................................................................................... 24

O. United II Potato Growers of Idaho, Inc. ........................................................... 26

P. RD Offutt Co. and Ronald D. Offutt .................................................................. 27

CO-CONSPIRATORS ................................................................................................... 28

AGENTS ....................................................................................................................... 30

CLASS ACTION ALLEGATIONS ............................................................................... 31

THE POTATO INDUSTRY ........................................................................................... 33

CARTEL HISTORY AND OPERATION ...................................................................... 37

A. Overview ........................................................................................................... 37

B. Agreements and Overt Acts .............................................................................. 38

DEFENDANTS ARE NOT ENTITLED TO PROTECTION OF THE CAPPER-VOLSTEAD
ACT .............................................................................................................................. 61

A. UPGA and its Members Operate as a Price-Fixing Trade Group,  Not a Legitimate
Cooperative ........................................................................................................ 62

B. UPGA and its Member Cooperatives Have as Members Producers that are Also Packers
and Shippers in Violation of the Capper-Volstead Act ...................................... 64

C. UPGA and its Member Cooperatives Impose Predatory, Coercive, Punitive and Retaliatory
Measures against Members that do not Comport with the Capper-Volstead Act ............. 65

D. UPGA and its Members have Conspired and Colluded with Third Parties to Reduce
Supply and Fix Prices ........................................................................................ 65

E. UPGA, its Members, and Co-Conspirators have Conspired and Colluded with Non-
Member Potato Farmers to Reduce Supply and Fix Prices ................................ 66

F.  UPGA, its Members, and Co-Conspirators have Conspired and Colluded with Foreign Entities in an Attempt to Reduce Supply and Fix Prices for the North American Continent ......................................................................................................... 69

G.  UPGA, its Members, and Co-Conspirators have Conspired and Colluded with Non-Member "Partners" Who are not Engaged in Agricultural Production and Who Funded Potato Supply Control Efforts ......................................................................................... 73

H.  UPGI, its Members, and Co-Conspirators have Conspired and Colluded with a Non-Grower, Vertically Integrated Potato Purchaser, to Assist with Supply-Restriction Efforts .......................................................................................................................... 75

ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT ......................................... 78

INJURY TO PLAINTIFF AND CLASS MEMBERS ................................................. 80

COUNT One (Section 1 of the Sherman Act) (For Injunctive Relief Only) ................... 80

COUNT Two (Violations of State Antitrust Statutes) ....................................................... 81

COUNT Three (Violations of State Consumer Protection and Unfair Competition Statutes) .......................................................................................................................... 82

COUNT Four (Unjust Enrichment) ................................................................................. 87

PRAYER FOR RELIEF ......................................................................................................... 97

JURY DEMAND ................................................................................................................... 98

## INTRODUCTION

Plaintiffs, on behalf of themselves and all others similarly situated, bring this action for damages, disgorgement, injunctive relief and costs of suit, including reasonable attorneys' fees, for injuries to themselves and members of the proposed Class consisting of all individuals and entities who indirectly purchased fresh potatoes in Arizona, California, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Nevada, New York, North Carolina, South Dakota, Tennessee, Vermont, and Wisconsin ("Identified States"), not for resale as fresh potatoes, between October 14, 2004 and continuing until such time as Defendants' cartel activities and their effects cease (the "Class Period"). The allegations set forth in this Third Consolidated Amended Class Action Complaint ("Third Amended Complaint") are based upon information and belief pursuant to the investigation of counsel, except as to those allegations regarding Plaintiffs themselves.

## NATURE OF THE ACTION

1.      Plaintiffs allege that, during the Class Period, Defendants and their co-conspirators conspired to fix, raise, maintain, and stabilize the price of fresh potatoes in the United States starting as early as 2004. Their actions have reduced competition in the market for fresh potatoes sold in North America. The Defendants and their co-conspirators, who have been publicly called the "potato cartel," control 80% of the United States potato supply.

2.      As used in the Third Amended Complaint, "fresh potatoes" include potatoes that have not been processed and are sold as fresh produce. "Process potatoes" are potatoes that have been  processed into potato products such as potato chips, shoestring potatoes, instant mashed potatoes, dehydrated potatoes and frozen potatoes.

3.      Through the use of illegitimate cooperatives and by other means, Defendants and their co-conspirators:  (i) agreed among themselves and with other potato growers (both members and non-members of the cooperatives) to reduce the amount of potatoes that they each grew and when they were sold; (ii) agreed to divert potatoes from the fresh potato markets to the process potatoes market; (iii)  bribed, threatened and coerced potato growers to comply with the cartel's directives; (iv) monitored compliance through the use of satellite imagery, fly-overs and inspection of potato growers' confidential reports to the Farm Service Agency; and (v) punished violators of the cartel's directives.  The purpose and effect of the cartel is and was to fix, raise, maintain and stabilize the prices paid for fresh potatoes.

4.      Defendants rallied support for their cartel by advising anyone concerned with the anticompetitive nature of their conduct that it was immune from antitrust scrutiny under the Capper-Volstead Act, 7 U.S.C. §§ 291-92 (1922), which provides a limited antitrust exemption to associations and cooperatives comprised of certain agricultural producers.  Defendant cooperatives, however, are not genuine cooperatives engaged in the sale, marketing, processing, handling, storing, transporting or distribution of their members' potatoes.

5.      As detailed further in this Third Amended Complaint, the following acts by Defendants violate the express language as well as the intent and purpose of the Capper-Volstead Act, thereby stripping them of any possible claim of antitrust immunity:  (i) Defendant United Potato Growers Association ("UPGA") and its co-conspirator member cooperatives operate as a price-fixing trade group, not legitimate cooperatives; (ii) UPGA and its co-conspirator member cooperatives have as members producers that are also packers and shippers in violation of the Capper-Volstead Act; (iii) UPGA and its co-conspirator member cooperatives impose predatory, coercive, punitive and retaliatory measures against members that do not comport with the supply

2

reduction conspiracy; (iv)  UPGA and its co-conspirator member cooperatives have conspired and colluded with third parties to reduce supply and fix prices; and  (v) United Potato Growers of Idaho, Inc. ("UPGI") and its co-conspirators have conspired and colluded with a non-grower, vertically integrated potato processor, to assist with supply-restriction efforts.

## JURISDICTION AND VENUE

6.      This action arises under § 1 of the Sherman Act (15 U.S.C. § 1) and the antitrust and consumer protection statutes and common law of the Identified States in this Third Amended Complaint.

7.      This Court has original jurisdiction over the federal claim pursuant to § 16 of the Clayton Act (15 U.S.C. § 26) and 28 U.S.C. §§ 1331 and 1337.  This Court also has jurisdiction over this entire action pursuant to 28 U.S.C. § 1332(d) because one Plaintiff and one Defendant are citizens of different states and the amount-in-controversy sought on behalf of the Class exceeds $5 million exclusive of interest and costs.  Additionally, each Plaintiff seeks the statutory or equitable remedy of disgorgement of all profits attributable to Defendants' wrongful conduct.

8.      This Court has supplemental jurisdiction over the pendent state claims pursuant to 28 U.S.C. § 1367 because they arise out of a common nucleus of operative facts as those asserted in the federal claim in this action.

9.      Venue is proper in this District because Defendants reside, are found, have agents, and transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

10.     This Court has personal jurisdiction over Defendants because, *inter alia*, Defendants transacted business throughout the United States, including in this District, had substantial contacts in the United States, including in this District; were engaged in an illegal anticompetitive conspiracy that was directed at, and had the intended effect of causing injury to persons in the United States, including in this District; and received substantial compensation and profits from sales of fresh potatoes in this District.

11.     Plaintiffs bring this Third Amended Complaint in the District of Idaho, where personal jurisdiction and venue are proper against all named Defendants.

## INTERSTATE AND INTRASTATE TRADE AND COMMERCE

12.     Throughout the Class Period, Defendants conducted business throughout the United States and purposefully availed themselves of the laws of the United States.  Defendants' products are sold in the flow of interstate commerce and Defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

13.     Defendants' conspiracy further substantially affected commerce in each of the states identified in the Third Amended Complaint.  Defendants have purposefully availed themselves of the laws of each of the states identified in connection with their activities relating to the pricing of fresh potatoes.  Defendants produced, distributed, promoted, sold or marketed fresh potatoes in each of the states identified or impacted the price of those potatoes through their joint output reduction schemes.

14.     Defendants' conspiracy affected adversely every person in each of the Identified States in this Third Amended Complaint who indirectly bought fresh potatoes.  Defendants' conspiracy caused the price of fresh potatoes to increase to supra-competitive levels in each and

4

every state in the United States and in the District of Columbia.  Defendants knew that commerce in each of the states identified in this Third Amended Complaint would be adversely affected by their conspiracy.

## PARTIES

## PLAINTIFFS

15.     Plaintiff Jonathan Rizzo is a resident of Arizona.  Mr. Rizzo regularly purchased fresh potatoes, not for resale, in the State of Arizona during the relevant Class Period.  Mr. Rizzo was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

16.     Plaintiff Trang Nguyen is a resident of California.  Ms. Nguyen regularly purchased fresh potatoes, not for resale, in the State of California during the relevant Class Period.  Ms. Nguyen was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

17.     Plaintiff Kelly Tschantz is a resident of California. Ms. Tschantz regularly purchased fresh potatoes, not for resale, in the State of California during the relevant Class Period.  Ms. Tschantz was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

18.     Plaintiff John Brashears is a resident of Florida.  Mr. Brashears regularly purchased fresh potatoes, not for resale, in the State of Florida during the relevant Class Period.  Mr. Brashears was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

19.     Plaintiff Jeffrey Keel is a resident of Florida.  Mr. Keel regularly purchased fresh potatoes, not for resale, in the State of Florida during the relevant Class Period.  Mr. Keel was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

20.     Plaintiff Crystal Tschantz is a resident of Iowa.  Ms. Tschantz regularly purchased fresh potatoes, not for resale, in the State of Iowa during the relevant Class Period.  Ms. Tschantz was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

21.     Plaintiff Gary Tschantz is a resident of Iowa.  Mr. Tschantz regularly purchased fresh potatoes, not for resale, in the State of Iowa during the relevant Class Period.  Mr. Tschantz was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

22.     Plaintiff BreAnne Krabbenhoft is a resident of Kansas.  Ms. Krabbenhoft regularly purchased fresh potatoes, not for resale, in the State of Kansas during the relevant Class Period.  Ms. Krabbenhoft was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

23.     Plaintiff Paul Langner is a resident of Massachusetts.  Mr. Langner regularly purchased fresh potatoes, not for resale, in the State of Massachusetts during the relevant Class Period.  Mr. Langner was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

24.     Plaintiff Kory Pentland is a resident of Michigan.  Mr. Pentland regularly purchased fresh potatoes, not for resale, in the State of Michigan during the relevant Class Period.  Mr. Pentland  was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

25.     Plaintiff Abigail Rizzo is a resident of Minnesota.  Ms. Rizzo regularly purchased fresh potatoes, not for resale, in the State of Minnesota during the relevant Class Period.  Ms. Rizzo was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

26.     Plaintiff Julie Ewald is a resident of Nevada.  Ms. Ewald regularly purchased fresh potatoes, not for resale, in the State of Nevada during the relevant Class Period.  Ms. Ewald was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

27.     Plaintiff Brendan Farrell is a resident of New York.  Mr. Farrell regularly purchased fresh potatoes, not for resale, in the State of New York during the relevant Class Period.  Mr. Farrell was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

28.     Plaintiff Robert Finch is a resident of North Carolina.  Mr. Finch regularly purchased fresh potatoes, not for resale, in the State of North Carolina during the relevant Class Period.  Mr. Finch was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

29.     Plaintiff Benedetto DiLorenzo is a resident of New York.  Mr. DiLorenzo regularly purchased fresh potatoes, not for resale, in the State of New York during the relevant Class Period.  Mr. DiLorenzo was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

30.     Plaintiff Suzy Ivey McCrory is a resident of Tennessee.  Ms. McCrory regularly purchased fresh potatoes, not for resale, in the State of Tennessee during the relevant Class Period.  Ms. McCrory was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

31.     Plaintiff Jeff Potvin is a resident of Vermont.  Mr. Potvin regularly purchased fresh potatoes, not for resale, in the State of Vermont during the relevant Class Period.  Mr. Potvin was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

32.     Plaintiff Navtej Bhandari is a resident of Wisconsin.  Mr. Bhandari regularly purchased fresh potatoes, not for resale, in the State of Wisconsin during the relevant Class Period.  Mr. Bhandari was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

33.     Plaintiff Joyce Rizzo is a resident of Wisconsin.  Ms. Rizzo regularly purchased fresh potatoes, not for resale, in the State of Wisconsin during the relevant Class Period.  Ms. Rizzo was injured as a result of Defendants' illegal conduct by purchasing fresh potatoes at artificially inflated prices.

34.     Defendants' unlawful and anticompetitive agreements with each other and their co-conspirators concerning fresh potatoes restricted fresh potato output and enabled them to fix, raise, maintain and/or stabilize the price they charge their customers for fresh potatoes in excess of what they otherwise would have been able to charge absent their agreements.  These price increases were passed on to indirect purchasers of fresh potatoes at subsequent steps of the distribution chain.  The inflated prices Plaintiffs paid for potatoes are traceable to, and the foreseeable result of, the Defendants' output reduction scheme and the inflated prices Defendants and co-conspirators charged.

## DEFENDANTS

**A.     United Potato Growers of America, Inc.**

35.     Defendant United Potato Growers of America, Inc. ("UPGA"), formed in March 2005, is a non-profit corporation, organized, existing, and doing business pursuant to the laws of Utah, with its principal place of business in Salt Lake City, Utah.

36.     During the Class Period, UPGA participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

37.     UPGA members include fresh potato growers, vertically integrated fresh potato growers (that grow, pack, process, clean, transport and sell potatoes), potato seed growers, dehydration processors and potato processors.

38.     UPGA's members located throughout the United States produce approximately 70 to 80% of the nation's fresh potatoes.

9

39. UPGA includes potato growers throughout the United States and ten cooperatives: United At-Large Co-op; United Fresh Potato Growers of Colorado, Inc.; United Potato Growers of Idaho, Inc.; Kern Produce Shippers; United Fresh Potato Growers of the Klamath Basin, Inc.; United Potato Growers of Montana, Inc.; Red River Valley Fresh Potato Growers Cooperative; United Southwest Potato Growers, Inc.; United Fresh Potato Growers of Washington/Oregon; and United Potato Growers of Wisconsin.

40. UPGA's website states that since 2008, UPGA has operated a United Potato Partners sponsorship program which "supports the underwriting of [its] databases, administration and educational seminars.  The seminars provide a means for direct, two-way communication with potato growers."

41. UPGA price-fixing and capacity reduction efforts expand beyond the United States.  UPGA, who was involved in the creation of its Canadian counterpart, the United Potato Growers of Canada ("UPGC"), and works closely with the UPGC to manage potato supply for the entire North American market.  UPGA has periodically met and conspired with Canadian and other international growers to encourage supply-restriction schemes throughout North America and the world.

42. UPGA's stated mission is to "manage national potato supply so as to positively affect grower profitability."  It achieves this goal primarily by limiting potato-planting acreage among its members, including its ten member cooperatives.  UPGA also coordinates market calls among competitors so that the co-conspirators can limit the flow of potatoes to the market when prices are low in order to further increase prices.

43.     UPGA does not market, distribute, wash, grade, package, store, transport or sell its members' potatoes.

**B.     United Potato Growers of Idaho, Inc.**

44.     Defendant United Potato Growers of Idaho, Inc. ("UPGI") f/k/a United Fresh Potato Growers of Idaho, is a corporation organized, existing and doing business pursuant to the laws of Idaho with its offices and principal place of business in Idaho Falls, Idaho.

45.     During the Class Period, UPGI participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

46.     The North American potato cartel originated with UPGI and its founders.  In 2004, 23 Idaho potato growers -- who collectively accounted for 60% of the fresh potatoes produced in Idaho and 25% of the fresh-potato market in the United States -- met and agreed to collectively reduce potato supplies and fix prices under the banner of the newly-formed UPGI. Within one year, UPGI had received commitments to reduce potato supply from farmers responsible for approximately 91% of the fresh potato acreage in Idaho.

47.     UPGI utilized numerous forms of supply management to fix the prices of fresh potatoes, including its initial efforts of donating potatoes to charitable organizations and imposing "shipping holidays" during which each potato-packing operation would shut down for at least a single shift.  UPGI also began the acreage limitations outlined in this Third Amended Complaint that UPGA eventually adopted and promoted on a nationwide basis.

48.     In 2009, after some members had left the group, UPGI announced it would disband if it were unable to reach its membership goal of controlling 80% of Idaho's fresh potato

acreage.  In late 2009, UPGI announced that its members had reached the 80% goal and the organization would continue.

49.     UPGI does not market, distribute, wash, grade, package, store, transport or sell its members' potatoes.

**C.     Wada Farms Defendants**

50.     The Wada family potato business "is a vertically integrated grower, packer, and supplier of potatoes" consisting of a number of entities primarily owned by Defendant Albert Wada and includes Defendants Wada Farms ("Wada Farms"), Wada Farms Potatoes, Inc. ("Wada Farms Potatoes"), Wada Farms Marketing Group, LLC ("Wada Farms Marketing"), and Wada-Van Orden Potatoes, Inc ("Wada-Van Orden") (collectively, the "Wada Farms Group").

51.     In an article on the Wada companies' website, Defendant Albert Wada ("Albert Wada") refers to "the Wada companies [as] includ[ing]" the following entities:  "Wada Farms Inc; Wada Farms Potatoes Inc.; Wada-Van Orden Potatoes Inc. … Wada Farms Trucking and Wada Farms Marketing Group."

52.     The website for the Wada companies generally refers to "Wada Farms" and does not differentiate between Wada Farms Inc., Wada Farms Potatoes and Wada-Van Orden Potatoes, Inc.  *See* www.wadafarms.com.  Similarly, in news articles written about Albert Wada or discussing Wada companies there is no differentiation between the three entities.  The email addresses of employees of all Wada defendant entities end in the suffix: @wadafarms.com.

53.     The business and operations of the Wada companies are interrelated.  In various loan application documents submitted to Northwest Farm Credit Services during the Class

12

Period, the consolidated balance sheet included the income of the Wada Farms Group, and the finance provider considered the Wada companies as a single entity for the purpose of the finance application.

54.    Defendant Wada Farms is a corporation, organized, existing and doing business pursuant to the laws of Idaho with its principal place of business in Pingree, Idaho.  Wada Farms is the main farming and potato growing enterprise in the Wada Farms Group.

55.    Wada  Farms operates an irrigated farming enterprise in southeastern Idaho growing fresh and process potatoes, seed and commercial wheat, corn, alfalfa, sugar beets and hybrid canola seed.  Established in 1943, Wada Farms operates in six diversified farming locations in three counties, totaling around 30,000 irrigated acres.  Growing over a billion potatoes annually, Wada Farms is among the largest growers in the industry.

56.    Wada Farms Potatoes is a corporation, organized, existing and doing business pursuant to the laws of Idaho with its principal place of business in Pingree, Idaho.  Wada Farms Potatoes is the potato packer of the Wada Farms Group and packs the potatoes grown by Wada Farms.

57.    Wada Farms Potatoes also packs its own potatoes and potatoes produced by others.  It owns a 140,000 square foot potato packing facility.  Wada Farms Potatoes has potato co-packing agreements with entities in Alabama, California, Colorado, Florida, Georgia, Idaho, Illinois, Kentucky, Maine, Massachusetts, Michigan, Missouri, Nebraska, New Jersey, New York, North Carolina, North Dakota, Ohio, Pennsylvania, Washington, and Wisconsin.

13

58.     Wada-Van Orden is a corporation, organized, existing and doing business pursuant to the laws of Idaho with its principal place of business in Blackfoot, Idaho.  It operates a potato packing facility in Blackfoot, Idaho, and is a subsidiary of Wada Farms Potatoes.

59.     Wada Farms Marketing is a limited liability company, organized, existing and doing business pursuant to the laws of Idaho with its principal place of business in Idaho Falls, Idaho.  Wada Farms Marketing is the marketing arm of the Wada Farms Group and markets the potatoes grown by Wada Farms and packed by Wada Potatoes.

60.     As per Wada Farms' website, Wada Farms Marketing acts as the agent of, and handles the marketing and sales for, Wada Farms and Dole-label potatoes, onion and sweet potatoes.  Wada Farms Marketing has offices in Idaho, Oregon and Texas and distributes potatoes throughout the United States.

61.     Wada Farms Marketing holds the exclusive marketing agreement for all potatoes, onions and sweet potatoes sold under the national Dole label.

62.     The Wada Farms website states as follows:

Our relationship with Dole started approximately 15 years ago based on a mutual commitment to provide the highest quality products and service to every customer …. Through Wada Farms Marketing Group, Dole will continue to meet customers' expectations by consistently providing potatoes and onions that meet the highest standard.  With the combined program and experience of Wada Farms, there are unlimited opportunities with the National Dole label for potatoes, onions, and sweet potatoes ….

63.     Albert Wada is a citizen of Idaho, and is domiciled and residing at 1385 W. Highway 39, Pingree, Idaho 83262-1126.

64.     Albert Wada is the principal of the Wada Farms Group and is the majority shareholder, chairman and Chief Operating Officer of Wada Farms, Wada Farms Potatoes, Wada Farms Marketing and Wada-Van Orden.  Albert Wada is, and at all relevant times has also been, an officer or director of Wada Farms, Wada Farms Potatoes, Wada Farms Marketing, and Wada-Van Orden.

65.     At all relevant times, Albert Wada has been the chairperson, officer or director of UPGA, UPGI and United II.  Albert Wada is a founding member of UPGA, UPGI and United II.

66.     During the Class Period, Wada Farms Group and Albert Wada participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.  Albert Wada played a critical role in the price-fixing scheme and the implementation of the supply reduction conspiracy.

67.     In 2004, Albert Wada began announcing his intent to unite potato growers, decrease competition, and "rationalize" the industry through decreased production.

68.     As UPGA Chairman, Albert Wada encouraged growers and grower cooperatives all over the United States to join the supply-reduction effort; met with Canadian growers to discuss the creation of a Canadian equivalent of the UPGA; espoused the benefits of "supply management and grower solidarity"; and helped craft UPGA initiatives to achieve supply reduction.

69.     Albert Wada organized and attended UPGI and UPGA conspiracy meetings on behalf of the Wada Farms Group and spoke openly in favor of supply restriction.

70.     In 2009, Albert Wada stated that, "Wada [Farms Group] has consolidated some other area potato packer/shippers' production into Wada Farms Marketing to reduce the number of sellers selling into the fresh potato market.  The strategic plan is to continue to consolidate more shipper sales into Wada Marketing to improve the value and price proposition for these growers/shippers and increase the marketability of these fresh potatoes under the Wada Marketing program."

71.     The Wada Farms Group's and Albert Wada's participation in the price-fixing scheme involved each of the other Wada defendants as a result of the Wada Farm Group's disregard for their corporate structure.

**D.      Blaine Larsen Farms, Inc. and Blaine Larsen**

72.     Defendant Blaine Larsen Farms, Inc. ("Larsen Farms") is a corporation organized, existing and doing business pursuant to the laws of Idaho with its principal place of business in Hamer, Idaho.

73.     During the Class Period, Larsen Farms participated in the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

74.     Larsen Farms grows, packs and distributes potatoes under the Larsen Farms brand and private labels.  Larsen Farms operates farmland and facilities in Idaho, Nebraska and Colorado and services retail and food-service customers worldwide.  It also makes processed potato products (e.g., crushed, diced, dehydrated, flaked and sliced potatoes), which it sells and supplies to food processors.

75.     Larsen Farms grows, stores, processes and transports its own potatoes and refers to itself as a "vertically integrated potato grower."

76.     Defendant Blaine Larsen ("Larsen") of Larsen Farms is a citizen of Idaho and was one of the founders of UPGI, a UPGI Board Member, and an originator of the price-fixing scheme alleged in this Third Amended Complaint.

77.     During the Class Period, Larsen participated in the supply-restriction and price-fixing scheme alleged.

**E.     Potandon Produce LLC**

78.     Defendant Potandon Produce LLC ("Potandon") is a limited liability company, organized, existing and doing business pursuant to the laws of Idaho with its offices and principal place of business in Idaho Falls, Idaho.

79.     During the Class Period, Potandon participated in the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

80.     Once a division of Pillsbury, Potandon is now an independent company owned by five prior Pillsbury managers and six grower/shippers who control the company's operations. With over 45,000 acres and six packing facilities in Idaho, Potandon sells potatoes and onions to major retailers, club stores, wholesalers, produce distributors and restaurant chains across the United States at the direction, and on behalf of and as the agent of its grower/shippers.

81.     Between 2002 and 2006, Potandon took over the sales and marketing activities of several Idaho potato growers, including Idaho Fresh Cooperative f/k/a Sunspiced of Idaho

(which has 25,000 acres of potato farmland and six packing facilities in Idaho), High Country Potato and Larsen Farms.

82.     Outside of Idaho, Potandon has established an extensive network of over 60 potato and onion co-packers in twenty-four states with another nine co-packers in Canada.  In addition, Potandon is involved in multiple joint-venture growing areas and has several exclusive sales agreements.

83.     By combining these sales and marketing functions of its growers, Potandon has positioned itself as the largest marketer of potatoes in North America.  Potandon controls a 25% share of the Idaho potato market and a 12% share of the total national potato market.

84.     Potandon owns the exclusive licensing rights to the Green Giant® brand for fresh potatoes and onions (pursuant to an agreement with General Mills, Inc.).  Potandon also markets SunSpiced potatoes.

85.     Potandon participated in the flow control and output restriction efforts by imposing pretextual and unreasonable grading controls on the potatoes it sold.  Immediately following weekly meetings to discuss flow control issues, Potandon management instructed the Potandon operations team to impose more stringent and arbitrary grading standards on fresh potatoes it sold.     Potatoes that did not meet Potandon's artificially-imposed requirements were rejected and not sold on the fresh potato market.

86.     Potandon sells potatoes throughout the United States.  It solicits internet sales of potatoes on its website at http://www.potandon.com/contact.htm.

**F.      Cornelison Farms, Inc. and Keith Cornelison**

87.      Defendant Cornelison Farms, Inc. ("Cornelison Farms") is a corporation, organized, existing and doing business pursuant to the laws of Idaho with its principal place of business in Rexburg, Idaho.

88.      Cornelison Farms grows, packages and ships fresh potatoes.

89.      Defendant Keith Cornelison ("Cornelison") is a citizen of Idaho.  At all relevant times, Cornelison was an officer or director of Cornelison Farms.  He is a founding member of UPGI.

90.      During the Class Period, Cornelison Farms and Cornelison participated in the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

91.      Cornelison Farms is a founding member of UPGI and has long advocated for collective action to reduce potato supplies.

**G.      Michael Cranney d/b/a Cranney Farms**

92.      Defendant Michael Cranney d/b/a Cranney Farms ("Cranney Farms"), an assumed business name under the laws of Idaho, located in Oakley, Idaho.

93.      Michael Cranney is domiciled and residing at 503 W. 1300 S., Oakley, Idaho 83346.

94.      Cranney Farms grows potatoes, sugar beets, corn, barley and wheat.

95.      During the Class Period, Cranney Farms participated in the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

96.     Michael Cranney is a founding member of UPGI and one of the original incorporators of UPGA.  At a January 2008 UPGA meeting, Michael Cranney, UPGA Supply Management Committee Chairman, reminded grower attendees of UPGA's instruction to reduce potato acreage in the coming year by 5% -- and told the audience that UPGA would advise even non-members to do the same.

**H.      Snake River Plains Potatoes, Inc.**

97.     Defendant Snake River Plains Potatoes, Inc. ("Snake River") is a corporation organized, existing and doing business pursuant to the laws of Idaho with its principal place of business in Ucon, Idaho.

98.     During the Class Period, Snake River participated in the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

99.     Snake River is a potato producer that grows, packs, stores and ships its own potatoes.

100.    Snake River is a founding member of UPGI and a member of UPGA.  David Beesley, its Chief Executive Officer, was a member of the UPGA executive committee during the relevant time period.

**I.      Driscoll Potatoes, Inc.**

101.    Defendant Driscoll Potatoes Inc. ("Driscoll Potatoes") is a corporation organized and existing pursuant to the laws of Idaho with its principal place of business in American Falls, Idaho.

102.     During the Class Period, Driscoll Potatoes participated in the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

103.     Driscoll Potatoes is an integrated potato producer that grows, packs, stores and ships its own potatoes.

104.     Driscoll Potatoes is a founding member of UPGA, and Loraine Driscoll, an officer of Driscoll Potatoes during the relevant time period, was an original incorporator of UPGA and served on the board of directors of UPGA, also during the relevant time period.

**J.     Lance Funk d/b/a Lance Funk Farms**

105.     Defendant Lance Funk is a citizen of Idaho d/b/a Lance Funk Farms, as assumed business name under the laws of Idaho, located in American Falls where Lance Funk also resides.  Lance Funk is domiciled and residing at 3853 Rast Rd., American Falls, Idaho 83211.

106.     During the Class Period, Lance Funk Farms and Lance Funk participated in the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

107.     Lance Funk is a potato grower and founding member of UPGI.

**K.     Rigby Produce, Inc.**

108.     Defendant Rigby Produce, Inc. ("Rigby Produce") is a corporation organized, existing and doing business pursuant to the laws of Idaho with its principal place of business in Rigby, Idaho.

109.     During the Class Period, Rigby Produce participated in the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

110.    Rigby Produce is an integrated potato producer that grows, packs, stores and ships its own potatoes.

111.    Rigby Produce is a founding member of UPGI.

**L.    Pleasant Valley Potato, Inc. and Kim Wahlen**

112.    Defendant Pleasant Valley Potato, Inc. ("Pleasant Valley") is a corporation organized, existing and doing business pursuant to laws of Idaho with its principal place of business in Aberdeen, Idaho.

113.    Defendant Kim Wahlen, a resident of Aberdeen, Idaho, has been a director of Pleasant Valley since its formation in 1988.  Wahlen has also been identified as an "owner," "operator," and/or "president" of Pleasant Valley in numerous publications.  As of October 2004, Kim Wahlen served as director and registered agent for Pleasant Valley.

114.    The same article also states that, "Pleasant Valley is and has long been owned by four family farms:  Kim Wahlen Farms, Val Wahlen Farms, Ray Duffin Farms and Barry Christensen & Sons."

115.    Pleasant Valley's website page entitled, "Growers," identifies Kim Wahlen, of Kim Wahlen Farms, and Val Wahlen, of Val Wahlen & Sons Farms, as Pleasant Valley's original founders.

116.    In the January 2006 issue of Spudman magazine, in an article entitled, "Kim Wahlen Works Hard In Industry He Grew Up In," Kim Wahlen is identified as "one of the original owners of Pleasant Valley Potato, which markets his potatoes."  Wahlen stated, that "My

other partners in that venture are Val Wahlen, Ray Duffin, Barry Christensen, Dwight Horsch and Eric Wahlen."

117.   During the Class Period, Kim Wahlen and Pleasant Valley participated in the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

118.   Pleasant Valley is an integrated potato producer that grows, packs, stores and ships its own potatoes.

119.   On its website, Pleasant Valley states that "[s]ince 1988, Pleasant Valley Potato has been known as one of Idaho's leading potato growing, packaging and shipping companies."

120.   Its website also states that "we grow our own potatoes;" "we've brought the old-fashioned virtues of farming to the new technology of packing and shipping" potatoes; "We always have an abundant, constant supply of potatoes for our customers because we dedicate thousands of acres of land each year for potatoes only[.]"

121.   In a September 1, 2011 article entitled, "Pleasant Valley Potato runs Norkotahs into spring, Burbanks through summer," Sales Manager Ryan Wahlen stated that Pleasant Valley Potato is "a grower-shipper in the true sense of the term."

122.   As early as 1988, Kim Wahlen advocated withholding potato crops from the market to increase prices.

123.   In The Idaho Falls Post Register's article "Spud Growers Ponder Holding Back Crops," Kim Wahlen, identified as a part-owner of Pleasant Valley Produce, stated that "Growers hold the key because they own the potatoes, not the shippers or the processors[.]  How

can anybody be angry because somebody wants to be profitable?" The article discussed, growers "tak[ing] a holiday" on which "they won't move any potatoes" and "shut[ting] your cellar down and tell[ing] your shipper to do the same."

124. Pleasant Valley is a founding member of UPGI.

125. In a January 2006 article in Spudman, in reference to UPGI, in 2006 Kim Wahlen stated that, "[w]e've been successful in trimming the acreage being grown and in large part are responsible for the good market we are enjoying now."

**M.    Raybould Brothers Farms LLC**

126. Defendant Raybould Brothers Farms LLC ("Raybould Brothers Farms") is a limited liability company organized and existing pursuant to the laws of Idaho with its principal place of business in Rexburg, Idaho.

127. During the Class Period, Raybould Brothers Farms participated in the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

128. Raybould Brothers grows and sells fresh potatoes.

129. Raybould Brothers is a founding member of UPGI. Jeff Raybould, a member of Raybould Brothers, is an original incorporator of UPGA.

**N.    Idahoan Foods LLC**

130. Defendant Idahoan Foods, LLC (formerly known as North American Foods, LLC, referred to as "Idahoan Foods") is a limited liability company organized, existing and doing business under the laws of Delaware with offices and its principal place of business located in Grand Forks, North Dakota.

24

131.     Idahoan Foods is a joint venture between Defendants R.D. Offutt Co. ("RD Offutt"), a potato grower and processor, and United II Potato Growers of Idaho, Inc. ("United II"), a co-operative of potato growers.  Idahoan Foods manufactures mashed-potato products and dehydrated products.

132.     In a press release dated March 30, 2007, UPGI announced the formation of a joint venture with Idahoan and R.D. Offutt Company to create the "nation's second largest dehydrator."  In the announcement, Jerry Wright, president and CEO of UPGI, praised UPGI's ability to "match fresh potato supplies, meet and match demand, and improve grower returns." He went on to say, "[t] his new venture will not only lead to a more stable dehy industry but also serve as an important tool for growers to balance their fresh crop and fresh industry marketing pipelines, all with the objective of improving grower returns."  The statement shows the intent of the joint venture to aid in the supply restriction agreement; the ability to divert the supply of fresh potatoes into the market for dehydrated potatoes significantly increased the profitability of supply restriction and price elevation in the market for fresh potatoes.

133.     UPGI discussed the joint venture in its March 2007 newsletter and stated, "United of Idaho [UPGI] feels that the current dehy strategy being implemented is critical to United's overall mission of supply management."  In December of 2007, UPGI announced the new "Idahoan Fresh Potato Plan" as part of this venture and as a means to further control supplies and fix prices where UPGI proposed that growers sell 100% of their potatoes to Idahoan Fresh.

134.     The explicit and publicly stated purpose of Idahoan Foods joint venture was to assist UPGI in reducing potato supply.  The Idahoan joint venture stabilized cartel prices by providing the grower-owners with an outlet to divert surplus fresh potatoes, which furthered

UPGI's supply-restriction efforts.  As one of the largest potato dehydrators in the country, Idahoan Foods enables its United II grower-owners to divert surplus potatoes to a dehydration operation.

## O.      United II Potato Growers of Idaho, Inc.

135.      United II is a corporation, organized, existing and doing business pursuant to the laws of Idaho with its principal place of business in Idaho Falls, Idaho.

136.      United II owns processing plants and processes UPGI members' potatoes.

137.      In 2007, UPGI formed United II, a second cooperative consisting of UPGI members.  At the instigation of UPGI, United II created a joint venture with Defendant RD Offutt Co. (the largest potato grower in the country) and Defendant Idahoan.  Idahoan Foods is one of the largest potato dehydrators in the country, and the United II grower-owners supply all the potatoes for its Idaho and Nevada plants.

138.      United II's incorporating documents provide that its purpose is to "stabilize potato prices and supplies in the State of Idaho."

139.      The inaugural board of United II included Albert Wada, Dave Beesley, Jeff Raybould, Carl Taylor, and Gary Hansen, each of whom is, or is associated with a defendant(s).

140.      During the Class Period, United II participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

26

**P.      RD Offutt Co. and Ronald D. Offutt**

141.     Defendant RD Offutt Co. ("RD Offutt") is a corporation organized, existing and doing business pursuant to the laws of North Dakota with its principal place of business in Fargo, North Dakota.

142.     Defendant Ronald D. Offutt, Jr. ("Ronald Offutt") is the chairman and founder of RD Offutt.  Ronald Offutt controls RD Offutt.

143.     Ronald Offutt is a citizen of North Dakota and is the owner and principal of Defendant R.D. Offutt Co.  Ronald Offutt is domiciled and residing at 401 Harwood Drive South, Fargo, North Dakota 58104.  Ronald Offutt is a founding member of UPGI.

144.     RD Offutt has approximately 160,000 acres of farming operations across eight states, and is one of the nation's largest producers of potatoes, with approximately 60,000 acres devoted to potatoes.

145.     RD Offutt joined UPGI in or about March 2007 and sent representatives to the initial meetings establishing the UPGI and participated in the group's price-fixing efforts.

146.     During the Class Period, Ronald Offutt and RD Offutt participated in the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

147.     To further the price-fixing scheme, in 2007 R.D. Offutt partnered with Defendant United II, at the instigation of UPGI, to create the joint venture North American Foods LLC (now known as Idahoan Foods, LLC).  The joint venture created the second largest potato dehydrator in the country.

27

148.    R.D. Offutt contributed a number of potato processing plants in several states to assist the joint venture and advance the price fixing scheme.  Jerry Wright, UPGI's president, acknowledged R.D. Offutt's contribution to the price fixing plan: "The first step happened when United II entered into partnership with R.D. Offutt Company and purchased Idahoan Foods."

149.    During the Class Period, R.D. Offutt participated in the supply-restriction and price-fixing scheme alleged.

## CO-CONSPIRATORS

150.    Co-Conspirator United Potato Growers At Large, Inc. is a corporation, organized, existing, and doing business pursuant to the laws of Utah, with its principal place of business in Salt Lake City, Utah.   As a member of UPGA during the Class Period, Co-Conspirator United Potato Growers At Large, Inc. participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

151.    Co-Conspirator United Fresh Potato Growers of Colorado is a corporation, organized, existing, and doing business pursuant to the laws of Colorado, with its principal place of business in Monte Vista, Colorado.  As a member of UPGA during the Class Period, Co-Conspirator United Fresh Potato Growers of Colorado participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

152.    Co-Conspirator Kern Produce Shippers Association is a corporation, organized, existing, and doing business pursuant to the laws of California, with its principal place of business in Edison, California.  As a member of UPGA during the Class Period, Co-Conspirator Kern Produce Shippers Association participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

28

153.     Co-Conspirator United Potato Growers of the Klamath Basin, Inc. is a corporation, organized, existing, and doing business pursuant to the laws of Oregon, with its principal place of business in Merrill, Oregon.  As a member of UPGA during the Class Period, Co-Conspirator United Potato Growers of the Klamath Basin, Inc. participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

154.     Co-Conspirator United Potato Growers of Montana, Inc. is a corporation, organized, existing, and doing business pursuant to the laws of Montana, with its principal place of business in Dillon, Montana.  As a member of UPGA during the Class Period, Co-Conspirator United Potato Growers of Montana, Inc. participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

155.     Co-Conspirator Red River Valley Fresh Potato Growers Cooperative is a corporation, organized, existing, and doing business pursuant to the laws of Minnesota, with its principal place of business in East Grand Forks, Minnesota.  As a member of UPGA during the Class Period, Co-Conspirator Red River Valley Fresh Potato Growers Cooperative participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

156.     Co-Conspirator United Southwest Potato Growers of America, Inc. is a corporation, organized, existing, and doing business pursuant to the laws of Texas, with its principal place of business in Muleshoe, Texas.  As a member of UPGA during the Class Period, Co-Conspirator United Southwest Potato Growers of America, Inc. participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

157.    Co-Conspirator United Fresh Potato Growers of Washington and Oregon, Inc. is a corporation, organized, existing, and doing business pursuant to the laws of Washington, with its principal place of business in Othello, Washington.  As a member of UPGA during the Class Period, Co-Conspirator United Fresh Potato Growers of Washington and Oregon, Inc. participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

158.    Co-Conspirator United Potato Growers Cooperative of Wisconsin, Inc. is a corporation, organized, existing, and doing business pursuant to the laws of Wisconsin, with its principal place of business in Stevens Point, Wisconsin.  As a member of UPGA during the Class Period, Co-Conspirator United Potato Growers Cooperative of Wisconsin, Inc. participated in and facilitated the supply-restriction and price-fixing scheme alleged in this Third Amended Complaint.

159.    Various individuals and entities that are presently unknown to Plaintiffs participated as co-conspirators with Defendants in the wrongful conduct alleged in this Third Amended Complaint and have engaged in conduct and made statements in furtherance of the conspiracy.

## AGENTS

160.    The acts alleged to have been done by the Defendants were performed by their respective officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of the Defendants' business affairs.

## CLASS ACTION ALLEGATIONS

161.    Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated.  The "Class" is defined as:

> All individuals and entities who indirectly purchased fresh potatoes in the Identified States, not for resale as fresh potatoes, between October 14, 2004 and continuing until such time as Defendants' cartel activities and their effects cease.  Excluded from the Class are Defendants, their co-conspirators, all present or former parents, predecessors, subsidiaries or affiliates of Defendants, all governmental entities and any judicial officer to whom this case is assigned.

162.    Defendants have acted, or refused to act, with respect to some or all issues presented in this Third Amended Complaint, on grounds generally applicable to the Class making final injunctive relief appropriate with respect to the Class under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

163.    Plaintiffs also bring this action seeking treble damages, restitution and disgorgement on behalf of themselves and the Class pursuant to the provisions of Rule 23(b)(3) of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following Indirect Purchaser State Classes or subclasses:  Arizona, California, Florida, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Nevada, New York, North Carolina, South Dakota, Tennessee, Vermont, and Wisconsin.

164.    Plaintiffs do not know the exact number of Class Members because such information is in Defendants' exclusive control.  Plaintiffs believe that, due to the nature of the trade and commerce involved, the Members of the Class are so numerous that joinder of all of them would be impracticable.  The exact number of Class Members is unknown by Plaintiffs at this time, but they believe them to number in the millions.

165.    Plaintiffs' claims are typical of the Class Members.  Plaintiffs and all Class Members were impacted and damaged in a similar manner by Defendants' wrongful conduct. Plaintiffs and the Class Members purchased fresh potatoes at artificially inflated prices because of Defendants' wrongful conduct, and the relief sought is common to the Class.

166.    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.  Plaintiffs also have retained counsel who have experience in the prosecution of complex antitrust class actions including of the type of claims alleged in this Third Amended Complaint.  Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members.  Defendants have acted on grounds generally applicable to the entire Class. Common questions of law and fact include, but are not limited to:

a.    Whether Defendants engaged in an agreement, a contract, combination or conspiracy to reduce the supply of potatoes in the United States, and to raise, fix, maintain or stabilize the price of fresh potatoes sold in the United States;

b.    The duration and extent of an agreement, the contract, combination or conspiracy alleged in this Third Amended Complaint;

c.    Whether the alleged agreement, contract, combination or conspiracy violated Section 1 of the Sherman Act as set forth in Count I;

d.    Whether any of the Defendants' activities are protected by the Capper-Volstead Act;

e.    Whether Defendants violated the state antitrust and consumer protection statutes set forth in Counts II and III;

f.    Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Class as set forth in Count IV;

g.    Whether Defendants' conduct caused the price of fresh potatoes sold in the United States to be artificially high and non-competitive;

      h.      Whether Plaintiffs and Class Members were injured by Defendants' conduct;

      i.      The appropriate measure of damages sustained by Plaintiffs and Class Members; and

      j.      Whether Plaintiffs and Class Members are entitled to equitable and injunctive relief and the nature of such relief.

167.    These common questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class Members.

168.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all Class Members is impractical.  The damages suffered by the individual Class Members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus, absent the availability of class action procedures, it would not be feasible for Class Members to redress the wrongs done to them.  Even if the Class Members could afford individual litigation, the court system could not.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and the court system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision in a single court.

## THE POTATO INDUSTRY

169.    Potatoes are one of the most important vegetables in the diet of United States consumers.  During the last twenty years, potatoes were ranked as the second most important product in United States food consumption following wheat flour.

170.     Potato consumption can be divided into four general categories: (i) table stock which includes numerous varieties such as round white, round red, russet and Irish potatoes; (ii) potatoes for processing, which includes chips, shoestring, dehydrated and frozen (french fries and other forms such as patties); (iii) other sales, including seed and feed for livestock; and (iv) non-sale uses such as shrink, loss and on-farm uses such as feed and seed.

171.     Potatoes do not have ready substitutes.  Consumers will not substitute other products for potatoes in response to a small price increase.  Sweet potatoes and yams are not substitutes for potatoes.

172.     The United States potato industry is a multi-billion dollar annual market.  For example, in 2007, the United States potato market had a total production of 449 million cwt (hundredweight or 100 pounds) of potatoes and the value of production was $3.2 billion dollars. In 2008, total domestic potato production was 415 million cwt, approximately 7% below the 2007 crop levels (due to the supply reduction price-fixing scheme alleged in this Third Amended Complaint).  Despite the reduced production, however, overall market value of production was $3.49 billion – an increase of 13% over 2007 production values.

173.     Idaho and Washington are the two largest potato-producing states (growing mostly "fall potatoes"), accounting for over half of United States production.  North Dakota, Colorado, Wisconsin, Oregon, Maine and Minnesota accounted for another 30% of U.S. production, with 23 other states accounting for the remaining 19%.

174.     California, Florida and Texas lead production of winter, spring, and summer potatoes.  These potatoes have a smaller share in the total potato market, but satisfy specific needs for the fresh and process markets.

175.     Because of good storage technology and practices, the marketing season for fall potatoes extends from July (early harvest areas) through June of the following year.

176.     The storage and transportation of fresh potatoes is not costly relative to their price.  The supply of fresh potatoes throughout the United States influences the price of fresh potatoes throughout the United States.

177.     Fresh potatoes are usually sold in the open market and process potatoes are typically sold through contracts.  Process potato contracts are usually signed prior to the planting season and specify a potato variety, quantity, and base price with incentives based on quality requirements.

178.     Markets for fresh and process potatoes are interconnected.  According to Defendants, one of the problems contributing to excess fresh potato supply was process growers planting acres of potatoes not under contract to sell on the open market.  Thus, it was crucial to fresh potato growers to get process potato growers to agree to the output restriction and price fixing conspiracy, as well.

179.     Because of the ease of storage and transportation, potatoes can be sold both as fresh and processed.  The fresh potato market generally commands the highest price.  Nearly two-thirds of potatoes were used for processing in 2007, with frozen french fries and other frozen potato forms being the largest segment.  Table stock accounted for 27% of use, and the remainder went to feed, seed and other uses.

180.     Potato growers can, and do, monitor the amount of potatoes that each of them grows through various visual surveillance methods.

35

181.    All types of potatoes impact the price of each of them.  As such, excess supply of potatoes sold in the process potatoes market influences the price of fresh potatoes.

182.    Many fresh potato growers (such as several of the Defendants in this Third Amended Complaint) are vertically integrated and handle growing, packing, shipping, and even further processing on the farm.  Many of the large potato growers also pack and ship for other growers.

183.    Packing sheds generally work in conjunction with growers to wash, grade, and pack potatoes to be shipped to direct purchasers such as retailers and distributors.

184.    Consumers of fresh potatoes are not sensitive to the price, as they will not significantly reduce the quantity of potatoes that they purchase in response to a small but significant non-transitory increase in price.  Thus, an increase in price will not produce a sufficient reduction in the quantity of potatoes sold so as to render a price increase unprofitable.

185.    Defendants have reduced the quantity of potatoes that they grew during the relevant period in the face of flat input costs.  In the face of declining demand and flat input costs, Defendants' supply reduction efforts have resulted in dramatic price increases during the relevant time period.

186.    Potatoes are fungible commodities.  There is minimal branding of potatoes. Consumers and customers do not have preferences for any particular grower's potatoes.

## CARTEL HISTORY AND OPERATION

**A.      Overview**

187.     In the early 2000's, in response to declining prices, Idaho potato growers realized that the way to increase prices and profits was to reduce the supply of potatoes.  Even in the face of declining demand, growers knew that they would be able to increase prices by limiting the supply of fresh potatoes to reach the market.

188.     Beginning in 2003 and continuing to date, the cartel controlled as much as 80% of potato production (by acreage).  Defendants, in combination with these other potato growers (non-members of the cooperatives), devised and implemented a plan to reduce the supply of fresh potatoes for sale on the market.

189.     Defendants have reduced the supply of every type of potato from every locale that might impact price.  They achieved this result through, *inter alia*, supply-reduction agreements among fresh potato producers in the United States.  Defendants also implemented various other measures to control the supply potatoes sold to the seed and process potato markets.

190.     To reduce the supply of fresh potatoes, Defendants convinced potato growers to change the method in which they contract with potato processors and large food manufacturers – their customers.  Instead of contracting to supply a specified quantity of potatoes, the growers and the processors or food manufacturers entered into agreements whereby contracts would specify a specific number of acres of potatoes to be grown.  This type of contract eliminated diversion between markets for potatoes by growers and reduced the likelihood that the market for fresh potatoes would be flooded and potato prices would be depressed.

191.    A critical element in the scheme to restrict the supply and raise the prices of fresh potatoes was this agreement between growers and processors or food manufacturers to specify potato supply contracts in terms of acreage rather than quantities of potatoes.  Prior to this change, growers under contract to sell process potatoes had an incentive to plan production so as to provide a safety margin over contract amounts, and then sell or dump the surplus in the fresh potato market, depressing and destabilizing prices for fresh potatoes.  Changing the contract to specifying acreage eliminated this source of supply into the fresh market.  Absent this change, attempts to raise the price of fresh potatoes by restricting fresh potato acreage would not have been effective because growers of process potatoes could be expected to respond to the higher, supra-competitive prices for fresh potatoes by increasing their planned margin of production over contract amounts and shifting excess production to fresh markets.  Acreage based contracts reduced the prospect that these types of shifts would occur.

192.    Defendants were also successful in obtaining the cooperation of seed potato growers to reduce the amount of potatoes they grew.

193.    The cartel has been successful, drastically reducing the supply of fresh potatoes, and causing fresh potato prices to increase significantly during the conspiracy, even in the face of declining demand and flat input costs.

**B.    Agreements and Overt Acts**

194.    In the early 2000's, in response to declining prices, Idaho potato growers (who produce approximately one-third of the potatoes in the United States) were concerned about their profits.  In 2003, several Idaho growers agreed to implement acreage reductions in order to reduce supplies.  Given the limited success of these schemes, however, one of the largest potato

growers in the country, Albert Wada, decided to form an Idaho "cooperative" with other Idaho growers in order to formalize a joint agreement between and among competitors to reduce potato supply and fix, raise, maintain and stabilize prices.

195.    Albert Wada began realizing an expressed intent of "managing [North American] potato supply" by first seeking to organize Idaho potato growers.  In late 2004, along with other Idaho potato growers, Albert Wada co-founded United Fresh Potato Growers of Idaho ("UFPGI"), later renamed UPGI.

196.    Albert Wada called the potato price-fixing plan, "United We Stand," and openly discussed a desire to "unite" potato growers, "decrease competition," and "rationalize the industry" by collectively curtailing production.  UPGA's website makes a similar point:  "[i]n 2004, after evaluating the economic realities of the current business climate, a group of potato growers decided that long-term production and supply management are critically needed to provide stability and a reasonable return for growers."

197.    In published articles about this plan, Albert Wada acknowledged that these activities might violate antitrust laws.  The attorney for UPGI and UPGA, Randon Wilson discussed the fact that the Idaho cooperative (and later the nationwide cooperative) would have to conform to the Capper-Volstead Act and that packers and other ineligible businesses could not participate in the cooperative or their supply reduction schemes.  Wilson is quoted in a publication as saying that in order to receive protection under the Capper-Volstead Act, "[w]e've got to be a pure farmer's cooperative" inasmuch as packers and other ineligible business could not be involved in the cooperative.

198.    This advice was not followed.  Numerous non-grower entities and growers that also were packers were involved with Defendants' price-fixing scheme.  For example, Wada Farms' own website notes:  "Wada Farms is among the largest growers and packers in the industry."  UPGI and UPGA have no protection under the Capper-Volstead Act.

199.    The potato cartel was first formally organized when Albert Wada organized a meeting of Idaho potato farmers in September of 2004 to discuss how to "curb production" and "boost prices" for potatoes.  At this meeting, Defendants Albert Wada and Keith Cornelison (of Defendant Cornelison Farms) summoned 23 Idaho potato growers to an office in Blackfoot, Idaho to discuss how their collective efforts at reducing potato supplies could help fix, raise, maintain, and stabilize prices.

200.    After more meetings, phone calls, and emails among these growers, the group agreed to form UPGI with the explicit goal of reducing potato supplies through various means.

201.    The 23 growers in attendance at this meeting became the founders of UPGI, which filed for incorporation on November 2, 2004.  At that time, the founders' operations encompassed approximately 60% of the fresh potatoes produced in Idaho and 25% of the fresh potatoes in the United States.

202.    The individuals at the initial UPGI meeting who explicitly signed on to the supply reduction and price-fixing scheme alleged in this Third Amended Complaint included: Defendant Blaine Larsen (of Defendant Larsen Farms), Defendant Albert Wada (of Defendant Wada Farms Group), and Defendant Michael Cranney (of Defendant Cranney Farms) — the three largest growers in Idaho and among the biggest in the U.S.  Other Idaho-based growers at this meeting who became founders of UPGI and signed on to the price-fixing and capacity

40

reduction scheme, some of whom are named as Defendants in this Third Amended Complaint, include Defendant Keith Cornelison (of Defendant Cornelison Farms), David Beesley (of Defendant Snake River Plains Potatoes), George Crapo (of Crapo Farms, Inc.), Mark Cummins (of Cummins Farms/Cummins Family Produce), Loraine Driscoll (of Defendant Driscoll Potatoes), Jeff Duffin (of Duffin Potato Company), Paul Duncan and Defendant Lance Funk (of Defendant Lance Funk Farms), Gary Hansen (of Hansen Farms), Dale Mickelson (of Defendant Rigby Produce), Ron Olsen (of Murdock Farms), Jeff Raybould (of Defendant Raybould Brothers Farms), Carl Taylor (of Howard Taylor & Sons), Kim Wahlen (of Defendant Pleasant Valley Potato), Blair Walker, Dick Watt (of Sunspiced Grower Cooperative), Lynn Wilcox (of Floyd Wilcox & Sons), Clint Young, and Roy Young.

203.    UPGI's stated purpose in its Articles of Incorporation is "to stabilize potato prices and supplies in the State of Idaho and to work with similar cooperatives in other states having similar purposes."

204.    In October of 2004, UPGI founders issued a press release discussing their goals of "supply management" and asked other potato growers from around the country to attend another meeting to discuss the formation of additional regional and national groups to assist in these efforts.  The next cartel meeting occurred on or about November 3, 2004, at the Shiloh Inn Convention Center in Idaho Falls, Idaho – the day after UPGI's articles of incorporation were filed.

205.    Growers from Colorado, Oregon, Washington, Wisconsin, and California joined the Idaho potato farmers at the meeting.  Albert Wada announced the group's supply reduction plans at the meeting to several hundred potato farmers, which prompted a standing ovation.

Many farmers signed on to the supply reduction agreement on the spot agreeing to pay annual dues ranging from about $10,000 to $500,000 depending on how much acreage each farmer utilized for growing potatoes.

206.     On December 2, 2004, the 23 founding members of UPGI, all of whom had agreed to the supply management scheme, voted to move the commitment date to join the co-op to January 17, 2005 – two weeks ahead of the original membership deadline.  At this point, the group already had 80% of all acres dedicated to fresh potatoes in Idaho committed to supply reductions under its membership agreements.  By February of 2005, UPGI was colluding with owners of 91% of the fresh potato grower acreage in Idaho through various means.

207.     UPGI sought groups of growers who sold their potatoes to processors to join the cartel.  Cooperation with these growers also reduced the supply of potatoes and helped to stabilize and increase prices.  The fresh potato market is strongly affected by the process potato markets as they are all interrelated.

208.     As of December of 2004, UPGI had negotiated "Memoranda of Understanding" ("MOUs") with the directors of every potato grower group in Idaho, including Potato Growers of Idaho ("PGI"), Potato Management Company ("PMC"), Seed Potato Growers of Idaho ("SPGI"), and the Southern Idaho Potato Cooperative ("SIPCO").  SPGI and SIPCO later joined UPGI as independent districts.

209.     PGI was formed in 1968 to serve as a bargaining unit for growers in contract negotiations with potato processing companies.  According to its website, "[i]n the more than 30 years since its organization, PGI's mission has evolved to include representation of growers with governmental, legislative and industry organizations.  In 2000, PGI membership opted to end its

role as a contract negotiator, and to focus its efforts more fully on its information and representation missions."

210.    PMC was formed in 2000 by a group of Idaho potato growers and shippers to help reduce potato supplies.  The group was successful in organizing various programs, including charitable donations and cattle feeding, that removed several million hundredweight of potatoes from the market.  In addition, the group donated over 15 million pounds of potatoes to help reduce domestic supply.

211.    SPGI is a group of seed potato growers.  Seed potatoes are grown for use in planting new crops of potatoes.  Once cut into sets and planted, seed potatoes grow into table stock potato varieties.  Seed potatoes themselves are not intended for human consumption.

212.    SIPCO was founded in 1997 and acts as the bargaining unit for Idaho frozen process growers.  SIPCO also negotiates annual contracts with Idaho and Oregon processors with the goal of providing a stable and reasonable rate of return for the Idaho frozen process grower.

213.    These groups were not "Capper-Volstead cooperatives," yet UPGI collaborated and conspired with them to reduce potato supplies.  Through the cooperation insured by these MOUs, the growers, shippers, and other entities working collectively with UPGI to reduce potato supplies, accounted for more than 60% of *all* Idaho potato acres (and not just the vast majority of those devoted solely to fresh potato production).

214.    In December of 2004, as part of these coordinated agreements, PGI (a non-cooperative) issued a statement in its newsletter stating that "supply is manageable but the key to making it so lies in a united and concerted effort to manage supply."  PGI re-emphasized that it

43

is in the best interests of all growers to unite in working out a plan to manage supply and spread the responsibility.  PGI and UPGI also issued joint newsletters espousing the need to collectively reduce supply.

215.    To achieve its supply reduction objectives, UPGI developed and started enforcing a set of programs and policies that targeted both production and marketing of fresh potatoes. UPGI employed two policies.  First, before the beginning of a planting season, the potato production was controlled by enforcing an acreage management program, which was implemented through a bid buy down program.  Secondly, during the potato growing season, before harvest, the production was monitored for coverage and to ensure accurate yield productions were made, which was implemented through a series of field digs.

216.    UPGI also executed a secondary market strategy at the beginning of 2005 that removed approximately 8% of potato stock from the market.  A surplus from the 2004 fall crop was diverted to charities and food banks.

217.    UPGI also employed another supply management tool — "shipping holidays." The UPGI marketing committee would review market information, including data from each member's packing operation.  Each week they would decide if a "shipping holiday" would be imposed.  If a "shipping holiday" was put in place, each potato packing operation would shut down for at least one eight-hour shift in order to further reduce supplies and increase prices.

218.    The "cooperatives" also participated in conference calls to share data about market conditions.  The calls took place twice a week at the state level (and were later established as once a week at the national level with the formation of UPGA).  Prior to a conference call, participating warehouses would log on the UPGI web-page and provide

information on capacity, stocks and pack-outs.  This data, along with other information (prices, trends, weather, etc.), were discussed during the conference call, and were summarized as a marketing summary posted on the internet to assist with "flow control" and prevent potatoes from being shipped when prices were too low.

219.    To assist in its flow control and output restriction efforts, UPGI also reduced the supply of fresh potatoes by diverting fresh potatoes to market for process potatoes.

220.    In published articles, Albert Wada confirmed that the purpose of UPGA was to reduce supply and raise prices:

> [Wada] said the major benefit of the association is communication. Sharing supply management data across a broad growing region has allowed the organization to raise prices by better matching potato supplies with demand.
>
> "We're talking to one another," Wada said.  He described the industry's oversupply and poor profitability as "an albatross hanging around our necks for years."
>
> **"Without supply management and grower solidarity, we don't have adequate profit margins," Wada added.**  (Emphasis added.)

221.    In another interview, Albert Wada asserted that UPGA had "worked with members to eliminate the potato glut by things like reducing the amount of potatoes planted and pledging not to send potatoes to market in the event of oversupply."

222.    In addition to acreage buy-downs, UPGA also touted its "flow control" efforts to keep potatoes from entering the market.  Buzz Shahan, former COO of UPGA, stated that, "[y]ou can't enter all of those potatoes into the market in one day.  So we monitor the flow of

product into the market on a weekly basis and adjust the flow so that we don't create a periodic glut."

223.    In its monthly newsletter, UPGI emphasized the importance of flow control as a means of managing supply, noting that "[f]or flow control to work, growers and [packing] sheds need to communicate and work together. Supply management falls apart if the sheds and growers undermine each others [sic] efforts to raise prices by flooding the market."

224.    In a March 2006 newsletter, UPGI discussed one set of flow controls standards it implemented and the spike in potato prices it caused:

> United of Idaho instituted flow controls on Jan 23, 2006, after 20 consecutive weeks of falling prices and weak shipments. The rationale was as clear then as it is now:
>
> 1) Lowering prices wasn't going to sell any more product!
>
> 2) In spite of clear information that '05 Idaho supplies for packing sheds would be short by 9 million in-weight cwt, packing shed overcapacity statewide consistently was over supplying the Idaho distribution pipeline, creating the perception among category buyers that there was no real shortage of potatoes in Idaho.
>
> 3) Without some form of flow control, the "daily" oversupply as presented to the market place would hold prices down until late June or July when a large number of Idaho packing sheds who are actually short of supplies would run out.
>
> 4) The undisciplined manner in which the crop was being shipped would not only prevent higher pricing BUT would also run Idaho out of inventory far too early in the shipping season creating a loss of market share, key customers, and revenue for Idaho.
> With over 75 percent of the state's packing capacity participating in United's flow control program, the results have been phenomenal. GRIs increased from $4.87 to $6.24, adding over $6 million into growers' returns in the last six weeks alone!

225.    UPGI further described these efforts as follows:

Flow controls are based upon sound economic principals…if daily offerings (supplies) DO NOT exceed buyers' needs (demand), buyers begin calling salesmen searching for product. When salespeople DO NOT have the product available, they raise the price. Conversely, when a salesperson has excess floor inventory (supply) that is "unsold," he feels pressure to "clear the floors" and move the supply out. That is usually done with some sort of "sale" or deal to get the buyer to buy more than he really needs (demand). That lowers the price. It is basic supply and demand. Simply stated, flow controls interrupt the cycle by balancing weekly and monthly production (supplies), preventing the usual production surges and spikes that create the "full floors" and "fire sale" cycles. Thus, flow controls allow real demand to set prices rather than the artificial "oversupplies" created by overproduction.

. . .

Idaho's decision

We have a choice! We can either choose to ship this crop as fast as we can (which is faster than the market can absorb it) and in so doing, over supply the fragile pipeline with 50 thousand to 100 thousand cwt excess spuds weekly OR we can choose to discipline the shipments, NOT oversupply the pipeline, maximize pricing and grower returns for the rest of the season, and preserve supplies so we run out August 4th as planned.

It is true that some sheds have more stocks than they can ship at their current shipping rate. But, it is also true that many more sheds are short of supplies for the season. As those "short" sheds close for the season, the pipeline will open, allowing larger production quotas and a market for all the spuds we have in Idaho this season. We won't get backed up and we won't be giving any away. How can we be so sure? First, because we know what other states have to ship nationwide and they do not have the spuds to over supply the market. Flow controls have also reduced the production of washed process grade to the dehy plants. Those companies are already in the market, buying lower grade field-run potatoes to make up for the loss of washed process grade supply. If there were ANY excess, dehydrators and fryers should buy it before seasons end. We strongly encourage growers and shippers to include more small #1 potatoes in the washed process stream and to sell marginal lots to dehydrators. This will help to balance supplies especially of consumer sizes, meet the needs of the dehy companies, and support the struggling price of Idaho consumer packs.

Knowledge is Power

Don't believe the rumors and "old school logic" used by some to panic growers into poor business decisions. "We are not backing this crop up." You have the facts. And you have seen the results so far. Flow controls work and they are making ALL GROWERS money.

226.    Potandon knowingly participated in the flow control and output restriction scheme through intentionally imposing pretextual and inconsistent grading controls on the fresh potatoes it sold.  Throughout the Class Period, Potandon's principals met on a weekly basis in Snake River Valley, Idaho, to discuss flow control issues, including the amount of potatoes to be sold on the fresh potato market.

227.    As a result of these weekly meetings, and in order to reduce the number of potatoes sold on the fresh potato market when fresh potatoes supplies were high, Potandon management instructed the Potandon operations team to grade potatoes more rigorously. Potandon's employee oversaw the more rigorous grading of the potatoes in Potandon's own packing sheds, as well as the packing sheds of other growers, including Larsen Farms and Driscoll Potatoes.  Potandon's application of the more rigorous grading standards while supplies were high facilitated the conspirators' objective of reducing the supply of potatoes to the fresh potato market.  Potandon thereby reduced the supply of fresh potatoes to the market by intentionally participating in the flow control and output restrictions.

228.    In July 2011, the President of UPGA, stated the following: "Fire sales resulting from heavy floor inventories can also be minimized by closer communication between the grower and the marketer. The market will be changing constantly during the transition period. The prices for a particular pack type the day a vine is killed will be different than three weeks later when potatoes from that vine arrive on the market. Communicating information about vine kill dates, size and yield from sample digs at vine kill, and the expected market are key elements for growers to share with their marketer."

229.    An August 2007 article in *High Country News* entitled, "The Sultans of Spuds -
Battered by their own success, farmers form the 'OPEC of Potatoes'" described the meetings of
UPGA and this "potato cartel" as follows:

> Once a month, usually on a Wednesday morning, about a dozen men
> arrive at the Salt Lake City airport on separate flights from around the
> country.  They are whisked into waiting cars for the five-minute trip to a
> glass fronted office building nearby.  There, in an unpretentious
> conference room, they meet several more of their associates.
>
> **These men are the leaders of a little-known international cartel, and
> at meetings such as these, they fine-tune an elaborate system of
> production targets and quota transfers to control the price of the
> commodity around which their world revolves.**  It is a serious business,
> backed up with reconnaissance from satellites orbiting high above the
> Earth, and **the organization's strict code of conduct allows for the use
> of what its members artfully refer to as "punitive measures" against
> anyone who violates the rules.**  And, at lunchtime, the men always pause
> to sample their merchandise.  "We always serve potatoes.  We always
> serve potatoes, whether it's chips or fried or mashed or whipped or salad,"
> says Barb Shelley, one of a small cadre of people who carry out the
> organization's legwork.  Not even lunch, it turns out, is safe from the
> group's intense scrutiny:  "When we order from the caterer, we say,
> 'These are potato growers.  We want your highest quality potatoes.  Do
> not'" - Shelley pauses ominously - "'give us bad quality.'"
>
> This may sound like a plot lifted straight out of a Mel Brooks movie, **but
> the potato cartel is real**.  And its existence speaks volumes about the
> often-perverse dynamics of American agriculture.  (Emphasis added.)

230.    An article in the *Wall Street Journal* entitled, "This spud's not for you: Co-op of
farmers seeks to become OPEC of potatoes" also compared the Defendants' potato supply
control conspiracy to that of OPEC:  "[i]t took farmer Merrill Hanny three days to bury $100,000
worth of his perfectly good potatoes.  He remembers how they crunched beneath his tractor as he
plowed over his muddy field in the spring of last year.  Mr. Hanny destroyed part of his crop at
the behest of the United Potato Growers of America, a fledgling group of regional farming

cooperatives. The group aspires to be to potatoes what OPEC is to oil by carefully managing supply to keep demand high and constant, resulting in a more stable return for farmers."

231. With the understanding that these supply management techniques were necessary on more than just a regional level, UPGI used UPGA and the other co-conspirators to institute its supply-restriction techniques on a nationwide scale. The Defendants nationalized (and internationalized) their potato supply-restriction efforts and assisted in forming other regional and national potato "cooperatives" with this goal in mind.

232. In December of 2004, UPGI met with growers in Colorado and Wisconsin to aid in the formation of UFPG groups in those states as well. Oregon growers in Klamath basin formed another group in that state too. In February 2005, Washington growers also met to coordinate supply restrictions. Regional potato grower cooperatives were later formed in Central California, and other areas of the Southwest, Midwest, and West. As UPGA's website states, "Idaho leaders reach[ed] out to growers in other regions and invite[d] them to form their own supply-management cooperatives as part of the united effort. Soon, regional co-ops [were] formed in Colorado, Klamath basin (on the border of California and Oregon), Washington-Oregon, and Wisconsin. (Later, growers in central California, the Southwest, Midwest and West form[ed] co-ops.)"

233. Under Albert Wada's leadership, these regional cooperatives, each of which is a named co-conspirator, then met to form a national group to reduce supply throughout North America. Albert Wada (of Defendant Wada Farms Group), Loraine Driscoll (of Defendant Driscoll Potatoes) and Jeff Raybould (of Defendant Raybould Brothers Farms) were UPGA's original incorporators. Tony Amstad (of Amstad Produce Inc. in Oregon), Warren Boegel (of

Boegel Farms LLC in Kansas), Defendant Michael Cranney (of Cranney Brothers Farms in Idaho), Dennis Day (of Montana), Allen Floyd (of Harvest Fresh Produce in Washington), Tom Franconi (of Kern Produce Shippers in California), Dick Okray (of Okray Farms in Wisconsin), Ed Staunton (of Staunton Farms in California) and Dave Warsh (of Warsh Farm in Colorado) were UPGA's initial directors.

234.    According to UPGA website, "[r]ealizing the need for national coordination, communication, data gathering and analysis, professional leadership and staff to handle the many facets and programs of the organization, United Potato Growers of America [was] formed" in March 2005.  UPGA facilitated the nationwide supply-restriction campaign through its regional cooperative members (which were in turn made up of individual growers who implemented the actual supply reductions).

235.    UPGA nationalized the regional supply-restriction scheme initially developed by UPGI.  UPGA's mission statement read:  "[w]e bring order and stability to the North American potato growing industry and increase our member potato growers' economic potential by the effective use of cooperative principles."  UPGA's supply control efforts are further confirmed by the mission statements on its own website:  "Vision:  We will manage United's national potato supply in order to positively affect grower profitability."

236.    The UPGA's key initiatives are listed as:  "United Potato Growers of America implements strategic supply management programs.  Key priorities include providing planting guidelines based on sound data and historical facts; acreage verification programs; information sharing; developing strategic alliances; managing supplies; and improving grower return on investment."

237.     In April of 2005, UPGA announced the first nationwide acreage buy-down program in the history.  Growers were allowed to "bid" acres into the buy-down program if they agreed to plant less acreage than they did in 2004.  UPGA member funds would then be used to compensate those growers who agreed to plant less.  Similar programs and acreage reductions have continued to the present day.

238.     Regarding this acreage buy-down program, Albert Wada stated, "[t]his is a great opportunity to bring stability and rationale to our Potato Industry ....  Through cooperation and unity we can and will help ourselves and each other achieve our goals.  We strongly encourage all growers to take advantage of this offer while it is available and join their state or regional cooperative and the United of America Board to reduce 2005 acres."

239.     In June of 2005, UPGA announced that its first acreage buy-down program had been a success.  Members collectively agreed to cut their crop by tens of thousands of acres to their lowest levels since 1959.  Preliminary estimates showed United States potato acreage down 35,000 acres as a direct result of the UPGA's buy-down program.

240.     The impact of the UPGA program was also noted at the national level.  The average potato price was approximately 23% higher in 2005 relative to 2004.  The United States Department of Agriculture ("USDA") concluded that this was due to the bid-buy program instituted by UPGA, which removed almost 11% of fresh potato production from the market in 2005.

241.     UPGA's officers confirmed the success of their efforts.  Jerry Wright, the former CEO of UPGA, stated, "due primarily to [UPGA's] three-phase supply management program implemented nationwide, growers have the highest returns ever for this time of the year ....  The

52

success of the whole program is the result of the growers' determination to solve their own problems and manage their supply."

242.   On or about November 15-16, 2005, Idaho growers met to discuss 2006 crop reduction guidelines at the Red Lion Inn in Pocatello, Idaho.  Joint meetings were also held with the SIPCO, U.S. Potato Board, and the Potato Marketing Company.  At these meetings, UPGI members (including Defendant growers in this Third Amended Complaint) and other Idaho growers agreed to plant 10% less than their 2004 base acres.

243.   UPGA's January 2006 newsletter announced the group's national 2006 crop reduction efforts following the Idaho growers' agreement to reduce plantings by 10% from 2004 acres.  Members not agreeing to reduce plantings by 10% were required to pay a $50 per acre assessment.  Those growers that agreed to reduce acreage more than 10% were allowed to put their acres into the bid buy-down program for extra compensation.

244.   UPGI and UPGA also coordinated potato "flow control" to control the quantity of potatoes supplied to the market throughout a marketing year when prices were low.  In Idaho, warehouses participating in the "flow control" program represented more than 75% of Idaho's potato packing capacity.  Personnel at warehouses entered information on the capacity, stocks and pack-outs on the UPGI webpage on a regular basis.  After weekly telephone conversations, price advisory information was then posted on the internet for members and non-members, which was then used as the pricing strategy for the coming week.

245.   In order to ensure strict compliance with the supply reduction and price-fixing agreement, UPGI and UPGA conducted audits and utilized GPS, aerial photography, and

satellite imaging to verify that co-conspirators had complied with the quotas and not exceeded the potato acreage upon which they agreed to grow.

246.    At the beginning of the planting season, growers filled out the Planting Intention Form.  On this form, the grower recorded their 2004-year base acreage and their current year planting intentions by potato variety.  The Planting Intention Form was then the grower's commitment against which the grower's actual performance was evaluated.  UPGA also checked farmers' acreage against the Farm Service Agency ("FSA") Form 578 (i.e., a report of acreage) submitted to the federal FSA for government-support programs.  Growers had to agree to allow UPGA access to these otherwise confidential submissions.

247.    The UPGI's and UPGA's field representatives would review the grower's planting intention commitment, filed maps and FSA Form 578.  The representative would conduct inspections of each parcel of land to verify actual plantings and reductions.  The results of the audit were then reported to the Future Crop Committee and the UPGI and UPGA Boards.

248.    In 2006, the fields of 25% of the general membership and of 100% of the UPGI Board members were audited, representing 65% of the UPGI's fresh potato acres.  At that audit, all the audited fields were in compliance with supply reduction scheme and bid buy-down programs.  The audit confirmed that the audited members of the UPGI reduced the potato acreage by more than 10% relative to the 2004-year base.

249.    Any growers that "cheated" were subject to punitive measures and fines.  For example, the cooperatives' bylaws allowed them to levy fines of $100 per acre against growers who violated the supply reductions.

250.    The potato cartel's efforts began to see significant progress in raising prices starting in 2005 (and continuing to present), as the cartel was able to reduce potato supply. Between September of 2005 and November of 2005, potato growers received an average of $6.67 for every 100 pounds of potatoes – a nearly $4 increase from the previous year.  By 2007, farmers were averaging $7.75 for every 100 pounds of potatoes.  UPGA's and UPGI's potato acreage reductions and subsequent price increases carried on in to 2007, 2008, and to the present.

251.    A December 2006 power point presentation by then UPGA-CEO Julia Cissel at the Potato Outlook Summit entitled, "Managing Supply and Influencing Acreage," stated that a May 2006 *Spudman* magazine reader survey found that "85% of all respondents said they have seen an increase in their profits since UPGA was formed."  The presentation also included the conclusions that, "Supply Management depends on YOU!  1) Manage your acres 2) Insist on reasonable returns 3) Engage and collaborate 4) Convince non-members to follow … they win too! 5)  **DO THE RIGHT THING!**"

252.    In 2007, as reported in UPGC's summer 2007 newsletter, potato growers who belonged to UPGC and Potato Marketing Association of North America agreed to participate with UPGA in the United Potato Partners Program.  UPGC reported this program has two objectives:  "1. Maximize the price the potato producer receives for his annual crop.  2. Minimize the cost of gathering the market data that allows the producer to maximize price." UPGC reported that prices received for potatoes in the past two marketing years were positively affected by the market intelligence supplied by UPGC's data.

253.    UPGA's and UPGI's 2007-08 United Acreage Reduction Program established the following rules similar to those of the earlier years:  each base potato acre was assessed at $50.

A base year relative to which the acreage reduction was calculated was 2004.  Members and *non-members* willing to participate in the program had two options.  The first option was to reduce potato-planting area by exactly 15% relative to the 2004 year base.  This option was considered to be a payment in kind and the grower would owe no cash.  The second option was to reduce potato acreage by less than 15% relative to the 2004-year base.  In this case, the grower was assessed a pro-rated percentage of $50 per acre on all base acres.

254.    There were four levels of the pro-rated percentage.  For example, if a grower's acreage reduction was between 10% and 14.99%, then the grower paid $20 per base acre; if the acreage reduction was between 5% and 9.99%, then the grower paid $30 per base acre.  The collected money was used to "buy out" acres elsewhere.  Growers who decided to expand beyond their base were assessed $100 per acre on all acres (expansion plus base acres).  This fee was a punitive measure to prevent the "mindless expansion" that UPGI and UPGA considered to be illegitimate and against the mission of supply reduction.

255.    Those SIPCO members of UPGI who grew only process potatoes were allowed to plant only contracted process potato acres.  The UPGI/SIPCO members who grew both fresh and process potatoes were required to follow the potato planting guidelines for their fresh potato acres and were allowed to plant only contracted process potato acres.

256.    In 2008, growers following UPGA's plans planted on 80,000 fewer acres than in 2007.  In Idaho alone, growers reduced acreage from 350,000 to 300,000.  UPGI's CEO, Jerry Wright stated, "[y]ou have the combination of growers having alternative cash crops and they know they have to reduce potato planting to get supply in balance with demand.  This is the year they've been able to do it."

56

257.    By the summer of 2008, according to the Idaho Potato Commission, a ten pound bag of potatoes cost consumers $15 -- an increase of $6 over the price in 2007.

258.    A 2008 study by a professor of Agricultural Economics and Rural Sociology at the University of Idaho, entitled, "Does the Potato Supply Management Program Work?  A case of the Idaho Potato Industry," concluded that UPGI's and UPGA's efforts had resulted in increased prices.  Idaho monthly fresh potato prices increased from $3.89 per cwt in the pre-co-op period to $6.63 per cwt in the co-op period, while the United States monthly fresh potato prices increased from $7.78 per cwt to $10.19 per cwt.  In fact, approximately 60% of the price increases were due to reasons other than increased production facts and the cooperatives' price-fixing activities were "likely to be the most significant factor explaining the identified price increases."

259.    The study reported that "[a]s indicated by the US monthly fresh potato prices, all potato growers received higher prices since 2005, after the acreage management programs started being implemented in several potato growing regions in the country."  The study concluded that, "we believe that the [UPGI] and potato growers cooperatives with similar objectives were successful in accomplishing their goals and impacted the fresh potato price level and volatility during the period 2005-2008, which ultimately benefitted all potato growers."

260.    An article in The Guardian, a Prince Edward Island publication, reported a 54,0000 acre drop in potato production across North America in 2005 with most states and provinces participating.

261.    That same article quoted Albert Wada who was a guest speaker at the Prince Edward Island Potato Board annual meeting in November 2005, that "[t]he only way to influence the price is to manage the supply and you guys are doing too good of a job these days[.]"

262.    In an article in the December 15, 2008 issue of *Packer Online*, Paul Dolan, General Manger of Associated Potato Growers, Inc., noted that demand was down from 2007 because potato prices were 50% higher than the previous year, a situation he attributed in part to "market unity."

263.    PotatoPro, a web portal run by Food Innovation Online Corp., providing potato news, services and products for the global potato processing industry, reported on the measures taken by PEIPB to improve returns of table stock growers and all potato growers in the province, including supporting acreage reductions through UPGA and UPGC.  In September 2008, PotatoPro reported that since 2004, potato acreage in Canada had decreased by 45,900 acres or 10.6% and fall potato acreage in the United States had decreased by 110,600 acres or 10.6%.

264.    PotatoPro continued that through the organizations in both countries, information is shared on supply and demand, current market conditions and pricing.  The PEIPB then disseminates that information out to Prince Edward Island potato farmers as well as to the potato dealers and exporters who market the crop in North America and around the world.  This is done through participation in weekly marketing conference calls with growers in the United States and Canada, information shared among United member organizations, PEIPB providing growers and dealers with a free weekly industry newsletter, as well as giving regular market updates to Prince Edward Island growers and dealers.  On these calls, information is provided from other areas of Canada and the United States.

265.    By 2009, potato prices had remained constant or increased for four consecutive growing seasons – something that had never happened in more than a century that the USDA has been keeping such records.

266.    UPGA's 2009 Annual Report included a graph reflecting U.S. Fresh Shipments vs. U.S. Grower Return Index: 2002-2009.  The Report concluded that "[o]nce UPGA formed it implemented supply management programs, and the effect can be seen in the drop in total U.S. Fresh Shipments (the bars in the graph) and a corresponding increase in the GRI."

267.    Defendants' anticompetitive scheme has continued to the present.  For example, a May 2010 UPGA newsletter describes how 400 fresh and process potato growers in the United States attended 16 United Potato Partners seminars this year at which they "consider[ed] the latest about cost of production specific to their area, ponder[ed] current demand data and review[ed] United's published acreage guidelines before beginning spring planting."  The seminars were designed to facilitate "informal discussions."  Buzz Shahan, UPGA's Chief Operating Officer, stated, "[t]hese seminars are one of the most important methods we have for communicating United's published acreage planting guidelines to member and non-member growers in a face-to-face setting."  A representative of Bayer CropScience attended each of the seminars.

268.    Similarly, on its website, UPGI has a page devoted to its 2010 Planting Guidelines, which were issued in September of 2009.  UPGI stated that the potato crop may be larger than usual in 2010.  UPGI then strategized that,

> **With this** potential **in mind, United of Idaho's Supply Committee is in agreement with ALL of the United of America Directors in recommending the follow [sic] planting guidelines for next year.  All**

59

**growers are asked to plant 70-75% of their 2004 base in 2010 to BALANCE next year's crop with this year's anticipated large carry over.**  This recommendation to cut 25–30% off your 2004 base acres will be finalized in November when we have the final tally on this year's yields and production nationwide.  This same 70-75% planting guideline is extended to all fry contract growers.  (Emphasis added.)

269.   Defendants involved in potato growing and selling operations described in this Third Amended Complaint including Wada Farms Group and Wada Farms Marketing; Potandon; Larsen Farms; Michael Cranney doing business as Cranney Farms; Cornelison Farms; Snake River Plains Potatoes; Driscoll Potatoes; Lance Funk doing business as Lance Funk Farms; Rigby Produce; Pleasant Valley Potato; Raybould Brothers Farms; and RD Offutt were direct participants in the supply reduction scheme outlined above and followed acreage reductions, participated in the bid-buy-down program, participated in and utilized information obtained from marketing calls and packing reports, and/or reduced the domestic supply of potatoes for the express purposes of fixing, raising, maintaining and stabilizing prices.

270.   While certain aspects of UPGA's schemes have been publicly discussed, all attendees to UPGA Board of Directors and Committee meeting attendees had to sign a "United Confidentiality Agreement" each year and promised not to disclose information shared at these meetings.  Any violation of that agreement allows UPGA to exclude the violator from future meetings or to sue such violator in a court of law to halt disclosure and for damages sustained by UPGA as a result of any such disclosure.

271.   As described above, Defendants followed acreage reduction requirements, participated in the bid-buy down program, participated in and utilized information obtained from marketing calls and packing reports and engaged in other efforts to reduce the supply of potatoes.

The acts were undertaken with the purpose and effect of fixing, raising, maintaining and stabilizing fresh potato prices.

272.    The price effect of Defendants' conspiracy upon indirect purchasers of fresh potatoes grew as the price increases attributable to Defendants' conduct were passed through the distribution chain.  In fact, the price increases for potatoes, as measured by the consumer price index, exceeded the price increases for potatoes, as measured by the producer price index.

## DEFENDANTS ARE NOT ENTITLED TO PROTECTION OF THE CAPPER-VOLSTEAD ACT

273.    The Capper-Volstead Act provides an exemption from antitrust law for certain associations and cooperatives comprising agricultural producers that meet specific criteria that Defendants do not meet here.  The Act protects an association and its members from antitrust scrutiny, provided that:  (i) the association is operated for the mutual benefit of its members; (ii) no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or that the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum; and (iii) the association does not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members.  The antitrust immunity provided by the Capper-Volstead Act is "limited" and does not exempt all cooperative conduct from review.

274.    The Capper-Volstead Act only protects "persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers."  This protection does not extend to a processor of agricultural products or any person or entity not engaged in farming, planting, ranching, and growing.  Capper-Volstead Act immunity will not

61

protect an association or any of its members if even one member fails to qualify as a "person[]" engaged in the production of agricultural products."

275.    In a 1985 publication titled "Understanding Capper-Volstead," reprinted in 1995, the USDA stated that "if an association of producers . . . restricts members' agricultural output . . . [or] colludes with third parties to fix prices . . . [or] conspires with third parties to fix prices . . . [or] combines with other firms to substantially lessen competition . . . " then "it may find itself just as subject to prosecution for being in violation of the antitrust laws as would any other firm that engages in such practices."

276.    UPGI, UPGA and their co-conspirators have touted their purported immunity from suit under the Capper-Volstead Act and have prominently featured the advice of their antitrust lawyer (Randon Wilson of the Jones Waldo law firm) in publicly available  documents as supposed cover for their admitted supply-restriction efforts and conspiracy to fix, raise, maintain and stabilize prices.

277.    None of the Defendants are entitled to the limited protections found in the Capper-Volstead Act for their efforts to restrict potato supply and fix prices.

**A.    UPGA and its Members Operate as a Price-Fixing Trade Group, Not a Legitimate Cooperative**

278.    UPGA and its individual cooperative members (collectively referred to as "UPGA") do not engage in any of the functions enumerated under the Capper-Volstead Act. UPGA does not grow, harvest, ship, sell, bargain or compete for the sale of potatoes or any agricultural products.  UPGA merely serves as a potato trade group and a forum for a supply

management scheme and a price-fixing agreement.  These activities fall outside the legitimate objectives of an agricultural marketing co-op.

279.    UPGA member cooperatives are made up of direct competitors rather than small farmers banding together to cut out the corporate middlemen who would otherwise market their potatoes.  These cooperative members do not associate to collectively process, handle, and market their products, and UPGA does not provide those services.

280.    UPGA does not wash, grade, package, store, transport, or distribute its members' potatoes.  UPGA does not negotiate contracts of sale for its members. UPGA does not "market" its members' products.  Rather, as set forth in its promotional materials, publications, website, and numerous public statements, UPGA was founded for the express purpose of implementing a scheme to manage and restrict the supply of potatoes.

281.    In an *Agweek* article entitled, "Valley Potato Association Thinking National: RRV Fresh Potato Growers Votes to Initiate Membership Drive for [UPGA]," a quotation from Buzz Shahan crystallized UPGA's purpose:

> "The UPGA is a federated coop [*sic*], meaning our members are not growers," says UPGA's [COO], Buzz Shahan.  "Our members are co-ops, to which growers belong.  We facilitate the interaction, nationally, between co-ops and provide the legal umbrella under which they can discuss issues like supply and demand."

282.    UPGA's and UPGI's price fixing and supply reduction efforts have improperly enhanced fresh potato prices.

**B.** **UPGA and its Member Cooperatives Have as Members Producers that are Also Packers and Shippers in Violation of the Capper-Volstead Act**

283.    Mr. Wilson, UPGA's attorney, publicly discussed that shippers and packers could not be affiliated with any Capper-Volstead Act potato cooperatives.

284.    The Capper-Volstead Act does not protect fully integrated producers that also grow, pack, process, store, and ship potatoes.

285.    Many of the founders of UPGI and UPGA, as well as numerous other co-conspirators, are integrated operators (called grower-shippers) that grow, pack, process, store, and ship their own and other growers' potatoes.

286.    For example, Defendant Wada Farms Group operates a 140,000 square foot packing facility in Pingree, Idaho.  Wada also operates a 35,000 square foot Blackfoot, Idaho facility with partner Van Orden Enterprise.

287.    In addition to growing and shipping, Defendant Larsen Farms, one of founders of UPGI, refers to itself as a "fully vertically integrated operation."  Larsen Farms has an on-site processing facility that cooks, dehydrates, mashes and further processes its potatoes.

288.    Other Idaho grower-shippers involved in the conspiracy (some of whom are named as Defendants) include, among others: Cummins Family Produce, Inc.; Driscoll Potatoes; Floyd Wilcox & Sons, Inc.; Howard Taylor & Sons, Inc.; Pleasant Valley Potato; Rigby Produce; and Snake River Plains Potatoes.

**C.     UPGA and its Member Cooperatives Impose Predatory, Coercive, Punitive and Retaliatory Measures against Members that do not Comport with the Capper-Volstead Act**

289.    Predatory conduct and coercive tactics are beyond the scope of any legitimate business activity that may be protected by the Capper-Volstead Act.

290.    UPGA utilized predatory conduct and coercive conduct in ensuring compliance with the price-fixing scheme.  For example, UPGA used satellite imagery, fly-overs, GPS systems, and other methods to enforce its agreement to reduce potato supply.

291.    UPGA also instituted surprise audits and inspections of members' farms to monitor compliance with its scheme.

292.    UPGA forced members to sign documents allowing UPGA board members access to growers' confidential federal farm subsidy forms in order to ensure that members were following its scheme.

293.    Members who did not comply with UPGA's supply restrictions were subject to fines (of $100 per acre) and other punitive measures, such as removal from the cooperative.

294.    UPGA also coerced non-members to join the price-fixing scheme and referred to them as "free-riders" who were profiting from the conspiracy, but not reducing acreage.

**D.     UPGA and its Members have Conspired and Colluded with Third Parties to Reduce Supply and Fix Prices**

295.    Under the Capper-Volstead Act, members of a cooperative may not collude or conspire with third parties.

65

296.     Yet UPGI, the Idaho grower cooperative whose founders also started the UPGA, colluded with numerous third parties in seeking to control Idaho and national potato acreage. For example, as discussed, *supra*, UPGI entered into MOUs with PGI, SIPCO, and SPGI to control potato supply in Idaho.  These groups were not entitled to any Capper-Volstead protections.

297.     UPGI and UPGA conspired with non-exempt, packer and warehouses in implementing flow control measures.

298.     As discussed in more detail, *infra*, UPGA also colluded with non-member growers in seeking control supplies.

299.     As discussed in more detail, *infra*, UPGI also colluded in forming a joint venture with a potato dehydration plant that was designed to help its efforts to reduce supply and fix prices.

**E.     UPGA, its Members, and Co-Conspirators have Conspired and Colluded with Non-Member Potato Farmers to Reduce Supply and Fix Prices**

300.     UPGA and its regional cooperative members routinely coerced and conspired with non-members in seeking to reduce potato supply and explicitly recognized the importance of having non-members follow their planting reductions and other supply-restriction efforts.

301.     UPGA and UPGI specifically sought out and allowed non-members to participate in their acreage reduction programs.

302.     On the same page as Mr. Wilson's advice above, UPGA discussed its recommendations for 2010 based on the "assumption" that non-members would also join its

66

efforts to reduce supplies: "[UPGA's] recommendation for 2010 of planting 75 percent of 2004 base acreage takes into account the significant carryover that will accompany the industry into the fall harvest of 2010.  As a result of carryover, growers producing for the out of field market in 2010 will likely need to cut beyond [UPGA's] recommendations.  **It should be noted that the [UPGA] recommendations are still based on the assumption of non-members following the same guidelines as [UPGA] members for their operations as well.**  Please consult with your United chapter for the latest information before you plant in 2010."

303.    UPGA's January 2006 newsletter stated that the cooperative "**invites all non-members to attend their meetings, ask questions, and be a part of the solution and not the problem.**  We need every area in North America, big or small, to participate.  By working together, sharing information, and making smart business decisions, we have the unprecedented opportunity to make this industry profitable."  (Emphasis added.)

304.    Mr. Shahan noted that these efforts to collude with non-members had paid off in a Spud Smart article entitled, "U.S. Production Stays Steady:"

> Shahan says potato growers have really taken to UPGA's efforts. "Growers have seen the wisdom of matching supply to demand so they're much more educated in a side of the industry they have not understood before," says Shahan.  **"Curiously, the non-members are even receptive to the program, because it brings science to what has been sorcery."**  (Emphasis added.)

305.    Non-members were not only invited to participate in the price-fixing scheme but they did actively participate at UPGA's direction and request.

67

306.    Shermain D. Hardesty, an agricultural economist that does work for UPGA, also noted that UPGA's leaders colluded with nonmembers to achieve compliance with supply reduction efforts:

> Because it is a voluntary organization, UPGA is facing the free rider problem.  Nonmember producers benefit from the higher and more stable prices achieved, without having to reduce their acreage and control their sales flows.  **UPGA's leadership is striving to impress upon nonmembers the need for compliance and the significant additional benefits that could be derived by all producers from such cooperation.**  (Emphasis added.)

307.    In January of 2008, Defendant United Fresh Potato Growers of Colorado reported on the UPGA Board of Directors Meeting in its newsletter:

> Mike Cranney, Supply Management Committee Chairman, reminded the attendees that in 2008 United's direction is that all United members will reduce acreage by five percent off of 2007 plantings.  **Non members will be urged to do the same.** (Emphasis added.)

308.    In December of 2008, in a special edition of its newsletter, the UPGA made a direct appeal to its members to reach out and conspire with nonmembers to limit supply in "United to growers:  limit '09 acreage for survival":

> Following an in-depth review of 2008 planting, production and storage data contrasted with ongoing falling demand for fresh potatoes and with an eye on a rocky, world-wide economy, the United Potato Growers of America board of directors decided at a December board meeting to strongly urge all fresh potato growers to plant no more acreage in 2009 than they planted in 2008.
>
> **Members asked to reach out to their neighbors**
>
> **All members and co-op leaders are asked to immediately make a strong effort to reach out to members and non-members** in their growing region to impress upon them the urgent necessity to freeze or even reduce fresh acreage in 2009.  **Everyone, including non United members, is asked to join United in an effort to**

68

**manage supplies by limiting acreage in 2009.** (Emphasis added.)

309.    UPGI's April 2009 newsletter clearly identified the group's willingness to

incorporate non-member participation:

> Inventory Management
>
> If acreage management isn't enough, United will be prepared with
> the option of implementing an Inventory Management Program.
> However, in order to implement such a program, the following
> guidelines must be met:
>
> • 75% member and base acre agreement to initiate the action
>
> • 75% member and base acre ratification to implement
>
> • **A set percentage non-member participation for members to ratify**
>   (Emphasis added.)

## F.    UPGA, its Members, and Co-Conspirators have Conspired and Colluded with Foreign Entities in an Attempt to Reduce Supply and Fix Prices for the North American Continent

310.    The Capper-Volstead Act does not protect non-United States farmers or

cooperatives, nor does the Act protect domestic cooperatives that conspire with non-protected

entities, such as foreign producers, to reduce global agricultural supply.

311.    In implementing the output restriction scheme, UPGA has conspired with a

Canadian potato association and a North American growers association made up of many

Canadian growers.

312.    UPGA and UGPC are admittedly jointly managing North American potato

supply.

313.    The UPGA and UPGC have an interest in preventing lower-priced imports from each other's members.  By jointly agreeing on supply restrictions, each can limit or minimize the deleterious effects of low-priced imports flooding their market.

314.    A substantial amount of Canadian potatoes are imported into the United States each year.  For example, Agriculture and Agri-Food Canada reported the following:

> In 2006-07, 118,926 tonnes of seed potatoes valued at $39 million and 471,491 tonnes of table potatoes valued at $145 million were exported.  That same period, 970,000 tonnes of frozen French fries were also exported, making Canada the second largest french fry exporter after the Netherlands.  The United States is Canada's main market for potatoes and potato products; 74% (by value) of Canadian potato exports were destined for the United States in 2007.

315.    Just as the United States is a very important export market for Canadian potato producers, Canada is an extremely important export market for United States potato producers.  The Office of the United States Trade Representative noted in November of 2007:

> Canada is the United States largest export market for agriculture, including potatoes.  In 2006, the United States exported $92.8 million in potatoes to Canada, representing 68.73 percent of all U.S. potato exports. Since 2004, U.S. potato exports to Canada have increased by 38.13 percent.

316.    As noted above, prior to UPGC's formation in August of 2005, representatives of seven potato producing provinces in Canada comprising more than 96% of the potato acreage in Canada met with the board of directors of the UPGA in Toronto.  The expressed purpose of this meeting was to "jointly consider 'cross border' programs and cooperation that will greatly improve profitability for all growers in both countries."  At the Toronto meeting, Canadian growers agreed to form a steering committee with representation from each province to define

70

more concretely methods for collaborating between provinces and establishing a formal link with the UPGA.

317.    UPGC was formed in February 2006 with the assistance of UPGA.  In its Fall 2007 newsletter (which is publicly available and thus not privileged), the UPGC discussed its formation and the "legal advice" it received regarding collaborating with a U.S. cooperative:

> To my recollection the initial rational[e] for establishing this Corporation was that the U.S. had just formed a National Co-Operative (United Potato Growers of America), the Anti-Trust laws in the U.S. are such that an organization of this nature could possibly face legal issues, but there is a remedy for properly constituted agricultural co-operatives in the U.S. in the form of the Capper-Volstead Act.  **Legal opinion advised us, that as Canadians we would need to join this U.S. cooperative in order to communicate/cooperate with our U.S. friends and associates in their new cooperative.**
>
> Thus the need to have a National group that could join our U.S. counterparts.  (Emphasis added.)

318.    In April of 2006, Spudman magazine reported that Gary Sloik, co-chairman of UPGC's steering committee, stated that his group and the UPGA would work closely together, and that Mr. Sloik stated that, "[o]ur market is their market, and their market is our market. It's all one big puzzle."

319.    The UPGA states on its website that it assisted in the formation of UPGC in 2006 and also states that "[d]iscussions are ongoing with growers in other countries."  The UPGA further states that it "has a data sharing arrangement with the UPGC."  UPGA, on its website's FAQ section regarding its United Potato Partners Program states, "United reaches 80 percent of U.S. and Canadian potato growers by providing them with market intelligence that can improve profitability."

320.     In February of 2007, UPGA and UPGC held a joint meeting in Las Vegas, along with the PMANA. Sixty growers were in attendance.  According to a press release the groups issued, at this meeting the growers agreed to "collaborate" and work together to reduce supplies across North America.  Specifically, the groups agreed to work together to eliminate speculative potato planting and manage 2007 plantings.  The groups also agreed to a uniform data gathering and analysis program.

321.     Albert Wada, UPGA's chairman at the time, discussed this joint meeting, stating: "[w]e are continuing our efforts and working together for a sustainable payday for all potato growers.  We have made significant progress over the last year, and agreed that the level of collaboration among our three grower cooperatives will be heightened in 2007."

322.     In its Winter 2007 newsletter, UPGC noted that one of the benefits of joining it was that "UPGC offers a unique opportunity to partner with two strong U.S. Potato organizations [sic] United Potato Growers of America and Potato Marketing Association of North America (the potato industry is global)."  UPGC also noted that the "US is our largest trading partner, it is critically important to be connected."  The newsletter also featured an "open letter" from Mr. Shahan to the members of the UPGC, that, among other things, stated that, "[w]e can now put all of our varying situations together into a master plan …."

323.     In its PowerPoint presentation entitled, "Report for 2008 Plan for 2009," UPGA also discussed its work with foreign entities:

        • "Worked to further trade between U.S. and Mexico for fresh potatoes"

        • "Worked to achieve more current reporting for Canadian fresh-potato
           imports"

        • "Improved United of Canada structure and effectiveness"

72

• "There is now a United of Europe"

• "The UK will have a similar structure soon"

324.    In July of 2008, The *Journal Pioneer* reported on the collective impact that

UPGA, UPGC, and PMANA were having on reducing potato supplies:

> Teamwork can bring impressive benefits, says Buzz Shahan, chief
> operating officer of the United Potato Growers of America.  U.S.
> potato producers were able to slash planted acreage for 2008 by
> eight percent, or about 81,000 acres, firming up prices in the
> process.  Idaho, the largest potato producer in North America, led
> the way with a 14 percent cut.  Meanwhile, the (Prince Edward)
> Island's cut [in Canada] was cut by 3,000 acres over 2007, to
> 93,000 acres.
>
> "PEI growers have certainly pioneered the effort, they have already
> developed their systems (for managing potato production) in a very
> sophisticated way, but everybody else across the country needs to
> collaborate with PEI," said Shahan, a keynote speaker at province-
> wide meeting for growers, held Wednesday (Aug. 6) night at the
> Loyalist Lakeview Resort.
>
> . . . .
>
> Shahan says the U.S. potato industry is seeking three cents more a
> pound for its producers.  That works out to $10 a hundredweight
> instead of $7 and that's an enormous boost for them …. PEI …
> was a big player in the formation of the United Potato Growers of
> Canada in 2006, which restrained production and boosted prices.
> Shahan said American producers have been able to share a massive
> database of information about everything from shipping and
> marketing to planting—in fact nearly everything involved in
> raising and selling potatoes.  That has played a major role in
> increasing prices and demand.

**G.    UPGA, its Members, and Co-Conspirators have Conspired and Colluded with Non-Member "Partners" Who are not Engaged in Agricultural Production and Who Funded Potato Supply Control Efforts**

325.    UPGA has "partnered" with non-agricultural producing companies that explicitly

conspire with UPGA and assist in its efforts to reduce potato supply so that the companies can

have access to UPGA members to sell their products.

73

326.   UPGA's website discusses this "United Partners Program" as a "strategic alliance" by which partner companies help offset UPGA's costs in implementing its supply-restriction scheme:

> Q: What is the United Potato Partners Program?
>
> A: The United Potato Partners Program has three objectives:  1. Maximize the price the potato producer receives for his annual crop.  2. Minimize the cost of gathering the market data that allows the producer to maximize price.  3. Provide manufacturers of crop-input products a direct link to their grower-users.
>
> The market intelligence supplied by United's database matches supply to demand such that grower returns remain positive and stable.  Financially healthy growers can afford healthy budgets.  **There is a cost to acquiring, analyzing, and implementing the data relating to potato markets.  Until now, these costs have been borne by United's growers.  Corporations that supply potato growers with everything from potato handling equipment, to tractors, to field chemicals and fertilizers, irrigation equipment, and packing and packaging equipment can now, through a carefully structured program, offset the cost of the database nationally and regionally.**  (Emphasis added.)

327.   UPGA's March 2009 newsletter further discussed this "partnership" program: "[a]mong other benefits, the partner program reduces the costs to member growers of developing and maintaining United databases that are critical to grower sustainability."  The 2009 partners were:  Bayer CropScience, AMVAC Chemical Corporation and WinField Solutions.  Further specific activities of Bayer CropScience in connection with the UGPA have been discussed above.

328.   These partners were aware of and supported the supply reduction price-fixing conspiracy.  For example, UPGI's April 2009 newsletter noted that at "the recent United Potato

Partners meeting in March, [UPGI] announced its planting guidelines and inventory management for 2009-10."

## H.     UPGI, its Members, and Co-Conspirators have Conspired and Colluded with a Non-Grower, Vertically Integrated Potato Purchaser, to Assist with Supply-Restriction Efforts

329.     In 2007, UPGI facilitated the formation of a joint venture (Defendant Idahoan Foods) to create the second largest potato dehydrator in the country, as well as a second co-op to supply potatoes to this venture.  The explicit and publicly stated purpose of this joint venture was to assist UPGI in reducing potato supply.

330.     As part of this transaction, UPGI formed United II, a second co-op based in Idaho Falls, Idaho.  All UPGI members were able to join the new co-op (and had to join to be able to sell potatoes to the venture).  With RD Offutt Co., United II next formed a joint venture, North American Foods, LLC.  This joint venture purchased Idaho Fresh-Pak, Inc. ("IFP") - - the country's third largest potato dehydration company.  The purchase included IFP's four Idaho plants and the "Idahoan" brand names.  RD Offutt contributed its three dehydration plants located in North Dakota, Nevada, and Idaho along with its production agreement with Idaho Supreme Potatoes, Inc.  Under a formula-based pricing arrangement, United II growers supply all the potatoes for the Idaho and Nevada plants.

331.     United II potato growers have ownership of the new company, receive dividends, and have a guaranteed market for their dehydrator-grade potatoes.

332.     In a 2007 article in the USDA's "Rural Business - Cooperative Service," Jerry Wright, president of UPGI, discussed the formation of this venture as being intended to help reduce supplies:

"Since forming two-and-half-years ago, United has proven its ability to manage fresh potato supplies, meet and match demand, and improve grower returns," said Jerry Wright, United president and CEO. "**This new venture will not only lead to a more stable dehydrator industry, but also serve as an important tool for growers to balance their fresh crop and fresh industry marketing pipelines, all with the objective of improving grower returns**. As a result, potato growers, our communities and the entire industry will benefit."

. . . .

"This new venture is another in a series of strategic initiatives by United to improve potato grower returns," says Wright. "**The fresh and dehydrator industries work hand-in-hand. By maintaining a fair dehydrator price, fresh grower returns also improve. This new dehydrator company also provides United with an outlet for surplus potatoes.** Through United, growers have access to market data and facts that are crucial to their marketing. Through United II, growers who invest will have the opportunity to earn dividends while having a reliable market for their dehydrator-grade potatoes."

. . . .

"**Potato growers will now be integrated vertically into the overall industry system,**" says Wright. "Through United II, we will create efficiencies from the development of seed to production to marketing. We anticipate greater long-term stability and no more boom or bust cycles." (Emphasis added.)

333. UPGI also discussed the venture in its March 2007 newsletter and stated, "United of Idaho [UPGI] feels that the current dehy strategy being implemented is critical to United's overall mission of supply management." (Emphasis added.)

334. In December of 2007, UPGI announced the new "Idahoan Fresh Potato Plan" as part of this venture and as a means to further control supplies and fix prices where UPGI proposed that growers sell 100% of their potatoes to Idahoan Fresh.

335. Jerry Wright, UPGI's president, outlined the plan as follows:

76

1.  The first step happened when United II entered into partnership with R.D. Offutt Company and purchased Idahoan Foods. Growers now own the largest dehydrator in North America.

2.  Starting in December, United will meet with groups of growers in each district to review the program and ask for your commitment.  To meet the demands of the lender, a majority of growers will need to sign their contract between January and March of next year.  The program will start selling potatoes in September 2008.

3.  Along with grower meetings, United will schedule shed meetings with the goal of consolidating sheds.  Sign up will start in April 2008.  As part of the plan, sheds can join a "merged ownership" pool with full equity ownership in NewCo or join a "lease group" where the shed owners maintains ownership and leases the facilities to NewCo.  The presentation will also cover a fair exit strategy for owners based on a common valuation format offering cash with terms.  NewCo can acquire inefficient sheds and close them, making up the purchase cost through increased efficiencies at the remaining sheds.

4.  The final step involves creating a coordinated sales and marketing system for the Idahoan potatoes.  Growers and shed owners will see, at minimum, a system overview during the group meetings at the beginning of the year.  Growers who commit their potatoes will receive cash payment on a staggered schedule.  For all quality potatoes (based on independent harvest, cellar, and shed inspections), growers will receive $2.00/cwt as a down payment in October.  After a successful holding period, growers will receive an additional $2.00/cwt in December.  Then, based on market returns, growers will receive up to $1.25 in February.  Growers will receive the balance of their returns, based on the market for the year, in September.  Minus administrative expenses, growers will receive 100% of the up, a change from the current grower/shed relationship.

5.  The final settlement will reflect each grower's individual pack out and crop quality.

6.  To join, a grower must be a United member in good standing and adhere to the 2008–09 Acreage Planting Guidelines (reduce 20% off of 2004 acres).  This acreage based contract requires 100% commitment of the fresh crop, with Idahoan Fresh honoring prior process grade and shed commitments.

77

336.    In the PowerPoint entitled, "Pacific Coast National Bargaining Conference & Shermain Hardesty," UPGA COO Buzz Shahan cited this vertical expansion as part of UPGA's philosophy.  The relevant slides read:

Philosophy of UPGA

What is Sustainable Agriculture?

o  Sustainable agriculture produces rational on-farm profitability year after year

What is rational on-farm profitability?

o  Rational on-farm profitability facilitates equity growth

o  **Equity growth does not have to be linear, but can include vertical and horizontal expansion**

An Example of Vertical Expansion!

• **North American Foods**

o  **World's largest supplier of dehydrated potato products**

o  **Rollup included UPGI, called UPGI II, or U II, and included three other entities**

o  **Stock offered to UPGI members** (Emphasis added.)

## ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

337.    The above aggressive anticompetitive practices and illegal exclusionary conduct has had the following effects, among others:

a.      Price competition in the sale of fresh potatoes was restrained and suppressed;

b.      Prices of fresh potatoes purchased by class members were fixed, raised, maintained and/or stabilized at supra-competitively higher, non-competitive levels in each and every state in the continental United States and the District of Columbia;

c.     The supply of fresh potatoes and quantity of fresh potatoes available for purchase has been reduced in each and every state in the continental United States and the District of Columbia; and

d.     Indirect purchasers of potatoes, including Plaintiffs and Class Members, were deprived of the benefits of free and open competition in the purchase of fresh potatoes in each and every state in the continental United States and the District of Columbia.

338.    Defendants' contract, combination and conspiracy consists of a continuing agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to artificially fix, raise, maintain and/or stabilize prices paid by Plaintiff and Class Members for the indirect purchase of potatoes in the continental United States and the District of Columbia.

339.    In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things: agreeing to artificially reduce output and fix, raise, maintain and/or stabilize prices for potatoes purchased by class members and implementing and monitoring the conspiracy among cartel members.

340.    There are no legitimate pro-competitive efficiencies that justify Defendants' conduct or outweigh its substantial anticompetitive effects.

341.    As a result of the contract, combination or conspiracy, Plaintiffs and Class Members have sustained injury because they have paid more for fresh potatoes than they would have in the absence of the conspiracy.

## INJURY TO PLAINTIFF AND CLASS MEMBERS

342.     The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreement to reduce output and fix, raise, maintain and/or stabilize the prices for fresh potatoes sold in each and every state in the continental United States and the District of Columbia.

343.     Defendants' unlawful and anticompetitive agreements with each other and their co-conspirators concerning fresh potatoes restricted fresh potato output and enabled them to fix, raise, maintain and/or stabilize the price they charge their customers for fresh potatoes in excess of what they otherwise would have been able to charge absent their agreements.  These price increases were passed on to indirect purchasers of fresh potatoes at subsequent steps of the distribution chain.  The inflated prices Plaintiffs paid for potatoes are traceable to, and the foreseeable result of, the Defendants' output reduction scheme and the inflated prices Defendants and co-conspirators charged.

344.     As a direct and proximate result of the contract, combination and conspiracy alleged, Plaintiffs and other Class Members were, and continue to be, damaged in their business or property in that they paid supra-competitive prices for fresh potatoes during the Class Period, higher than that which they would have paid in the absence of the contract, combination and conspiracy.

## COUNT ONE

**(Section 1 of the Sherman Act)**
**(For Injunctive Relief Only)**

345.     Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs of this Third Amended Complaint.

346.    Beginning at least as early as 2004 and continuing until present, the exact dates being currently unknown to Plaintiffs, Defendants entered into and engaged in a contract, combination or conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act.

347.    Plaintiffs and the Class as defined have no adequate remedy at law and will suffer irreparable harm unless Defendants are enjoined from continuing to implement their unlawful agreement in the future, and the Court remedies the conditions Defendants created in the potato industry in furtherance of their conspiracy.  Otherwise, Plaintiffs and the Class as defined will continue to pay more for potatoes than they would have in the absence of the conspiracy.

## COUNT TWO

### (Violations of State Antitrust Statutes)

348.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if fully set forth of this Third Amended Complaint.

349.    Defendants' conduct was malicious, flagrant and intended to harm Plaintiffs and the Class or undertaken with a reckless disregard for their rights under the antitrust laws violated in this Third Amended Complaint.

350.    Defendants have violated the following antitrust statutes:

a.      Arizona (Ariz. Rev. Stat. §§ 44-1401, *et seq.*);

b.      California (Cal. Bus. & Prof. Code §§ 16700, *et seq.*);

c.      Iowa (Iowa Code §§ 553.1, *et seq.*);

d.      Kansas (Kan. Stat. Ann. §§ 50-101, *et seq.*);

e.      Michigan (Mich. Comp. Laws Serv. §§ 445.771, *et seq.*);

81

     f.       Minnesota (Minn. Stat. §§ 325D.49, *et seq.*);

     g.       Nevada (Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*);

     h.       New York (N.Y. Gen. Bus. Law §§ 340, *et seq.*);

     i.       North Carolina (N.C. Gen. Stat. §§ 75-1, *et seq.*);

     j.       South Dakota (S.D. Codified Laws §§ 37-1-3.1, *et seq.*);

     k.       Tennessee (Tenn. Code Ann. §§ 47-25-101, *et seq.*);

     l.       Vermont (Vt. Stat. Ann. tit. 9, §§ 2453, *et seq.*);

     m.       Wisconsin (Wis. Stat. § 133.01, *et seq.*).

351.    By reason of Defendants' conspiracy in restraint of trade and unfair and deceptive trade practices, Plaintiffs and each member of the Class paid more for fresh potatoes than they would have paid in the absence of such conduct.  As a result, Plaintiffs and each member of the Class have been injured and damaged in an amount presently undetermined.

## COUNT THREE

### (Violations of State Consumer Protection and Unfair Competition Statutes)

352.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth in this Third Amended Complaint.

353.    Defendants have engaged in unfair competition or unfair, unconscionable, unlawful, deceptive, or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes of California, Florida, Massachusetts, and New York, as alleged in this Third Amended Complaint.

## California

354.     Defendants have engaged in unfair competition or unlawful, unfair or deceptive acts or practices in violation of California Bus & Prof. Code §§ 17200, *et seq.*  Specifically:

a.     Defendants' business acts and practices were centered in, carried out, effectuated, and perfected mainly within the State of California, and Defendants' conduct injured all California indirect purchasers of fresh potatoes during the Class Period.  Therefore, this claim for relief under California law is brought on behalf of the California indirect purchasers of fresh potatoes during the Class Period;

b.     Beginning on a date unknown to California Plaintiffs, but at least as early as October 14, 2004, and continuing thereafter at least up through the filing of this Third Amended Complaint, Defendants committed and continue to commit acts of unfair competition, as defined by §§ 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above;

c.     This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged in this Third Amended Complaint, that violated §§ 17200, *et seq.*  of the California Business and Professions Code, commonly known as the Unfair Competition Law;

d.     The Defendants' conduct as alleged in this Third Amended Complaint violated §§ 17200, *et seq.*  The acts, omissions, misrepresentations, practices and nondisclosures of defendants, as alleged in this Third Amended Complaint, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, §§ 17200, *et seq.*, including, but not limited to, the violations of Section 1 of the Sherman Act, as set forth above;

e.     Defendants' acts, omissions, misrepresentations, practices, and nondisclosures, as described above, whether or not in violation of §§ 16720, *et seq.,* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent;

f.     Defendants' acts or practices are unfair to consumers of fresh potatoes in the State of California within the meaning of §§ 17200, *et seq.* California Business and Professions Code;

g.  California Plaintiffs and each of the California indirect purchasers of fresh potatoes during the Class Period are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices;

h.  The illegal conduct alleged in this Third Amended Complaint is continuing and there is no indication that Defendants will not continue such activity into the future;

i.  The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause the California indirect purchasers of fresh potatoes during the Class Period to pay supra-competitive and artificially-inflated prices for fresh potatoes. California indirect purchasers of fresh potatoes during the Class Period suffered injury in fact and lost money or property as a result of such unfair competition;

j.  The conduct of Defendants as alleged in this Third Amended Complaint violates §§ 17200, *et seq.* of the California Business and Professions Code; and

k.  As alleged in this Third Amended Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. California indirect purchasers of fresh potatoes during the Class Period are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§ 17203 and 17204.

## **Florida**

355.  Defendants have engaged in unfair competition or unlawful, unconscionable, unfair or deceptive acts or practices in violation of Florida Stat. §§ 501.201, *et seq*  Specifically:

a.  Defendants' unlawful conduct had the following effects:  (1) fresh potato potato price competition was restrained, suppressed, and eliminated throughout Florida; (2) fresh potato potato prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida; (3) Florida indirect purchasers of fresh potatoes during the Class Period were deprived of free and open competition; and (4) Florida indirect purchasers of fresh potatoes during the Class Period paid supra-competitive, artificially inflated prices for fresh potatoes;

b.     During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers;

c.     As a direct and proximate result of Defendants' unlawful conduct, Florida indirect purchasers of fresh potatoes during the Class Period have been injured and are threatened with further injury; and

d.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. §§ 501.201, *et seq.,* and, accordingly, Florida indirect purchasers of fresh potatoes during the Class Period seek all relief available under that statute.

## Massachusetts

356.   Defendants have engaged in unfair competition or unfair, unlawful or deceptive

acts or practices in violation of Mass. Gen. Laws chapter 93A §§ 1, *et seq.* Specifically:

a.     Defendants were engaged in trade or commerce as defined by G.L. c. 93A;

b.     Defendants agreed to, and did in fact, unfairly act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and noncompetitive levels, the prices at which fresh potatoes were sold, distributed, or obtained in Massachusetts;

c.     Defendants' unlawful conduct substantially effected Massachusetts' intrastate commerce and had the following effects: (i) fresh potatoes price competition was restrained, suppressed, and eliminated throughout Massachusetts; (ii) fresh potatoes prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts; (iii) Massachusetts indirect purchasers of fresh potatoes during the Class Period were deprived of free and open competition; and (iv) Massachusetts indirect purchasers of fresh potatoes during the Class Period paid supra-competitive, artificially inflated prices for fresh potatoes;

d.     As a direct and proximate result of Defendants' unlawful conduct, Massachusetts indirect purchasers of fresh potatoes during the Class Period were injured and are threatened with further injury;

e.     Plaintiffs tendered a letter of demand to Defendants, identifying the claimant, describing the complained-of acts, and setting forth the suffered injury; and

      f.     By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2. Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling Massachusetts indirect purchasers of fresh potatoes during the Class Period to multiple damages.

### New York

357.    Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New York Gen. Bus. Law §§ 349, *et seq.*  Specifically:

      a.     Defendants engaged in commerce in New York;

      b.     Defendants and their co-conspirators unlawfully agreed to raise prices by direct agreement on artificial supply restraints on the fresh potatoes market;

      c.     New York consumers were targets of the conspiracy;

      d.     The unlawful agreements were not known to New York consumers;

      e.     Defendants made public statements about the price of fresh potatoes that Defendants knew would be seen by New York consumers; such statements either omitted material information that rendered these statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for fresh potatoes; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information;

      f.     Because of Defendants' unlawful trade practices in the State of New York, there was a broad impact on New York consumer class members who indirectly purchased fresh potatoes during the Class Period; and consumer class members have been injured because they have paid more for fresh potatoes than they would have paid in the absence of Defendants' unlawful trade acts and practices;

      g.     Because of Defendants' unlawful trade practices in the State of New York, New York consumers who indirectly purchased fresh potatoes during the Class Period were misled to believe that they were paying a fair price for fresh potatoes or that the price increases for fresh potatoes were for valid business reasons; and similarly situated consumers were potentially affected by Defendants' conduct;

h. Defendants knew that their unlawful trade practices with respect to pricing of fresh potatoes during the Class Period would have an impact on New York consumers and not just Defendants' direct customers;

i. Defendants knew that their unlawful trade practices with respect to pricing of fresh potatoes would have a broad impact, causing consumer class members who indirectly purchased fresh potatoes during the Class Period to be injured by paying more for fresh potatoes than they would have paid in the absence of Defendants' unlawful trade acts and practices; and

j. Defendants' consumer-oriented violations adversely affected the public interest in the State of New York.

## COUNT FOUR

### (Unjust Enrichment)

358. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth in this Third Amended Complaint.

359. Through paying more for fresh potatoes than they would have in the absence of Defendants' wrongful conduct, Plaintiffs and the Class have conferred a benefit on Defendants.

360. As a result of Defendants' wrongful conduct, Defendants were able to charge more for fresh potatoes which overpayments were made by Plaintiffs and the Class.

361. Defendants have been unjustly enriched by overpayments made by Plaintiffs and the Class. Equity demands that Defendants be required to make restitution and return the overpayments to Plaintiffs and the Class.

### Unjust Enrichment: Arizona

362. By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in Arizona than would have been possible absent the illegal conduct.

363.    The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to Arizona indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in Arizona was connected to and due to the increased prices paid for Defendants' fresh potatoes by indirect purchasers in Arizona.

364.    The enrichment of Defendants that occurred because of Defendants' illegal activities was without legally cognizable justification.  To the extent legal remedies do not sufficiently accomplish disgorgement of Defendants' illegal profits from their sales to indirect purchasers in Arizona, Defendants should be ordered to make restitution for the benefit of Arizona indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

**Unjust Enrichment:  California**

365.    By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in California than would have been possible absent the illegal conduct.

366.    The Defendants were able to achieve their increased revenues and profits from their sales of fresh and process potatoes to California indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in California was connected to and due to the increased prices paid for Defendants' fresh potatoes by indirect purchasers in California.

367.     Defendants were enriched by their illegal activities at the expense of California indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of California indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

**Unjust Enrichment:  Florida**

368.     By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in Florida than would have been possible absent the illegal conduct.

369.     The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to Florida indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in Florida was connected to and due to the increased prices paid for Defendants' fresh potatoes by indirect purchasers in Florida.

370.     Defendants were enriched by their illegal activities at the expense of Florida indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of Florida indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

**Unjust Enrichment:  Iowa**

371.     By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in Iowa than would have been possible absent the illegal conduct.

372.     The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to Iowa indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in Iowa was connected to and due to the illegally inflated prices paid for Defendants' fresh potatoes by indirect purchasers in Iowa.

373.     Defendants were enriched by their illegal activities at the expense of Iowa indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of Iowa indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

**Unjust Enrichment:  Kansas**

374.     By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in Kansas than would have been possible absent the illegal conduct.

375.     The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to Kansas indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of

Defendants to profit from their sales of fresh potatoes to indirect purchasers in Kansas was connected to and due to the illegally inflated prices paid for Defendants' fresh potatoes by indirect purchasers in Kansas.

376.   Defendants were enriched by their illegal activities at the expense of Kansas indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of Kansas indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

**Unjust Enrichment:  Massachusetts**

377.   By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in Massachusetts than would have been possible absent the illegal conduct.

378.   The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to Massachusetts indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in Massachusetts was connected to and due to the illegally inflated prices paid for Defendants' fresh potatoes by indirect purchasers in Massachusetts.

379.   Defendants were enriched by their illegal activities at the expense of Massachusetts indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of Massachusetts indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

## Unjust Enrichment:  Minnesota

380.    By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in Minnesota than would have been possible absent the illegal conduct.

381.    The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to Minnesota indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in Minnesota was connected to and due to the illegally inflated prices paid for Defendants' fresh potatoes by indirect purchasers in Minnesota.

382.    Defendants were enriched by their illegal activities at the expense of Minnesota indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of Minnesota indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

## Unjust Enrichment:  Nevada

383.    By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in Nevada than would have been possible absent the illegal conduct.

384.    The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to Nevada indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of

Defendants to profit from their sales of fresh potatoes to indirect purchasers in Nevada was connected to and due to the illegally inflated prices paid for Defendants' fresh potatoes by indirect purchasers in Nevada.

385.    Defendants were enriched by their illegal activities at the expense of Nevada indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of Nevada indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

## Unjust Enrichment:  New York

386.    By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in New York than would have been possible absent the illegal conduct.

387.    The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to New York indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in New York was connected to and due to the illegally inflated prices paid for Defendants' fresh potatoes by indirect purchasers in New York.

388.    Defendants were enriched by their illegal activities at the expense of New York indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of New York indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

93

## Unjust Enrichment:  North Carolina

389.    By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in North Carolina than would have been possible absent the illegal conduct.

390.    The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to North Carolina indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in North Carolina was connected to and due to the illegally inflated prices paid for Defendants' fresh potatoes by indirect purchasers in North Carolina.

391.    Defendants were enriched by their illegal activities at the expense of North Carolina indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of North Carolina indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

## Unjust Enrichment:  South Dakota

392.    By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in South Dakota than would have been possible absent the illegal conduct.

393.    The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to South Dakota indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the

ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in South Dakota was connected to and due to the illegally inflated prices paid for Defendants' fresh potatoes by indirect purchasers in South Dakota.

394.     Defendants were enriched by their illegal activities at the expense of South Dakota indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of South Dakota indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

### Unjust Enrichment:  Tennessee

395.     By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in Tennessee than would have been possible absent the illegal conduct.

396.     The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to Tennessee indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in Tennessee was connected to and due to the illegally inflated prices paid for Defendants' fresh potatoes by indirect purchasers in Tennessee.

397.     Defendants were enriched by their illegal activities at the expense of Tennessee indirect purchasers of fresh potatoes.  Because the parties from whom indirect purchasers bought the fresh potatoes directly were not, so far as indirect purchasers are aware, a party to Defendants' or involved in Defendants' illegal activities which caused the increased fresh potato prices to Tennessee indirect purchasers, Defendants should be ordered to make restitution for the

benefit of Tennessee indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

## Unjust Enrichment:  Vermont

398.    By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in Vermont than would have been possible absent the illegal conduct.

399.    The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to Vermont indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in Vermont was connected to and due to the illegally inflated prices paid for Defendants' fresh potatoes by indirect purchasers in Vermont.

400.    Defendants were enriched by their illegal activities at the expense of Vermont indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of Vermont indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

## Unjust Enrichment:  Wisconsin

401.    By engaging in the unlawful conduct in this Third Amended Complaint, Defendants received higher prices for their fresh potatoes that were sold to indirect purchasers in Wisconsin than would have been possible absent the illegal conduct.

402.    The Defendants were able to achieve their increased revenues and profits from their sales of fresh potatoes to Wisconsin indirect purchasers because the demand for fresh potatoes by indirect purchasers is relatively price inelastic, as Defendants understood.  Thus, the ability of Defendants to profit from their sales of fresh potatoes to indirect purchasers in Wisconsin was connected to and due to the illegally inflated prices paid for Defendants' fresh potatoes by indirect purchasers in Wisconsin.

403.    Defendants were enriched by their illegal activities at the expense of Wisconsin indirect purchasers of fresh potatoes and thus Defendants should be ordered to make restitution for the benefit of Wisconsin indirect purchasers because it would be unjust to allow Defendants to retain the benefits of their sales of fresh potatoes at illegally inflated prices.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that the Court enter judgment as follows:

a)    Determining that this action may be maintained as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure;

b)    Enjoining Defendants from continuing to implement their unlawful agreement and ordering Defendants to take such actions as necessary to remediate the market conditions that Defendants created which would allow them to maintain, or continue to increase, prices above competitive levels;

c)    Awarding Plaintiffs and the relevant Class Members compensatory damages under the state statutes in an amount to be proven at trial, multiple damages according to law against Defendants, jointly and severally;

d)    Awarding Plaintiffs and the relevant Class Members punitive, exemplary, statutory, and full consideration damages under the aforementioned state laws;

e)    Ordering Defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to Plaintiffs and the Class;

f)    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest;

g)     Awarding Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees; and

h)     Granting Plaintiffs and the Class such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable in this case.

Dated: January 24, 2014                    Respectfully submitted,

                                           **GLANCY BINKOW & GOLDBERG LLP**

                                           /s/   Susan G. Kupfer                         _
                                           Susan G. Kupfer
                                           Joseph M. Barton
                                           One Embarcadero Center, Suite 760
                                           San Francisco, CA  94111
                                           Tel:  (415) 972-8160
                                           skupfer@glancylaw.com
                                           jbarton@glancylaw.com

                                           *Interim Co-Lead Counsel for Indirect Purchaser Plaintiffs*

Paul F. Novak                              Elizabeth McKenna
**MILBERG LLP**                            Charles Slidders
One Kennedy Square                         **MILBERG LLP**
777 Woodward Ave, Suite 890                One Pennsylvania Plaza, 49th Floor
Detroit, MI 48226                          New York, NY 10119
Tel:  (313) 309-1760                       Tel:  (212) 594-5300
pnovak@milberg.com                         emckenna@milberg.com
                                           cslidders@milberg.com

*Interim Co-Lead Counsel for Indirect*    *Interim Co-Lead Counsel for Indirect*
*Purchaser Plaintiffs*                     *Purchaser Plaintiffs*

Daniel E. Williams
**THOMAS WILLIAMS & PARK LLP**
PO Box 1776
Boise, ID  83701-2188
Tel: (208) 345-7800
Danw@thomaswilliamslaw.Com

Todd A. Seaver
Joseph J. Tabacco
**BERMAN DEVALERIO**
One California Street, Suite 900
San Francisco, CA  94111
Tel: (415) 433-3200
tseaver@bermandevalerio.com
jtabacco@bermandevalerio.com

Peter Safirstein
Domenico G. Minerva
**MORGAN & MORGAN, P.C.**
28 West 44th Street
New York, NY  10036
Tel: (212) 564-1637
psafirstein@forthepeople.com
dminerva@forthepeople.com

Matthew S. Wild
**WILD LAW GROUP PLLC**
500 Mamaroneck Avenue, Suite 320
Harrison, NY 10528
Tel: (914) 358-6443
mwild@wildlawgroup.com

Shpetim Ademi
David Syrios
**ADEMI & O'REILLY, LLP**
3620 East Layton Avenue
Cudahy, WI 53110
Tel: (414) 482-8000
sademi@ademilaw.com
dsyrios@ademilaw.com

Donald Amamgbo
**AMAMGBO & ASSOCIATES**
6167 Bristol Parkway #325
Culver City, CA 96230
Tel: (310) 337-1137
donald@amamgbolaw.com

Reginald Terrell
**TERRELL LAW GROUP**
P.O. Box 13315, PMB# 148
Oakland, CA 94661
Tel: (510) 237-9700
reggiet2@aol.com

Sharron W. Gelobter
**YURUMEIN LAW FIRM**
1736 Franklin Street, 10th Floor
Oakland, CA 94612
Tel: (510) 288-8686
sgelobter@yurumeinlaw.com

Julio J. Ramos
**LAW OFFICES OF JULIO J. RAMOS**
35 Grove Street, Suite 107
San Francisco, CA 94102
Tel: (415) 948-3015
ramosfortrustee@yahoo.com

Chris Casper
**JAMES, HOYER, NEWCOMER,
SMILJANICH & YANCHUINS, P.A.**
4830 West Kennedy Boulevard, Suite 550
Tampa, FL 33609
Tel: (813) 286-4100
ccasper@jameshoyer.com

Robert K. Finnell, Esq.
**THE FINNELL LAW FIRM**
1 West Fourth Avenue, Suite 200
Rome, GA 30161
Tel: (706) 235-7272
bob@finnellfirm.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO, EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: FRESH AND PROCESS** | : | |
| **POTATOES ANTITRUST** | : | |
| **LITIGATON** | : | **Case No. 4:10-md-02186-BLW** |
| | : | |
| _____ | : | **CERTIFICATE OF SERVICE** |
| | : | |
| **THIS DOCUMENT APPLIES TO:** | : | |
| **ALL ACTIONS** | : | |

      I HEREBY CERTIFY that on the 24th day of January, 2014, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Aaron M Sheanin    asheanin@pswplaw.com, yberry@pswplaw.com

Adrian Fontecilla    afontecilla@crowell.com, bsepulveda@crowell.com, state@crowell.com

Albert P Barker    apb@idahowaters.com, brs@idahowaters.com, sle@idahowaters.com

Allan Steyer    asteyer@steyerlaw.com, amcintosh@steyerlaw.com, aratcliffe@steyerlaw.com, lrorem@steyerlaw.com

Amanda K Brailsford    akb@andersenbanducci.com, ajg@andersenbanducci.com, ask@andersenbanducci.com, sdm@andersenbanducci.com, tpk@andersenbanducci.com

Andrew H Stone (Terminated)    ahstone@email.utcourts.gov

Anthony D Phillips    aphillips@bermandevalerio.com

Arthur N Bailey , Jr    abailey@hausfeldllp.com

Bart M Davis    bartdavis@me.com, theresacarson@me.com

Billie Jean Siddoway (Terminated)    billie@siddowaylaw.com

Bobby Pouya    bpouya@pswplaw.com, egrant@pswplaw.com, mwilliams@pswplaw.com

Bonny E Sweeney    BonnyS@rgrdlaw.com

Brent V Manning    bmanning@mc2b.com, sthurgood@mc2b.com

Brian E McGovern    bmcgovern@mlklaw.com, mercules@mlklaw.com, tchamberlain@mlklaw.com

Bruce S Bistline    bbistline@gordonlawoffices.com

Carmen A Medici    cmedici@rgrdlaw.com, E_File_SD@rgrdlaw.com, mbacci@rgrdlaw.com

Chad V. Bonanni , Esq    cbonanni@essex.bpflegal.com

100

Charles Slidders    cslidders@milberg.com

Christopher Emrich Ondeck    condeck@crowell.com

D Scott Macrae    smacrae@bamlawlj.com

Daniel E Williams    danw@thomaswilliamslaw.com, chris@thomaswilliamslaw.com

Daniel G Swanson    dswanson@gibsondunn.com

Daniel J Vitelli    dvitelli@constantinecannon.com

Daniel M Cohen    danielc@cuneolaw.com, joel@cuneolaw.com

Daniel W Bower    dbower@stm-law.com, suzie@stm-law.com

David A Hickey    hickey@stuevesiegel.com

David Alan Scupp    dscupp@cpny.com

David J Syrios    dsyrios@ademilaw.com

Donald Amamgbo    donald@amamgbolaw.com

Donald Michael Barnes (Terminated)    DBARNES@PORTERWRIGHT.COM

Douglas A Millen    dmillen@fklmlaw.com, mkhamoo@fklmlaw.com, mmoskovitz@fklmlaw.com,
rwozniak@fklmlaw.com

Elizabeth McKenna    emckenna@milberg.com

Eugene A Spector    Espector@srkw-law.com

Gary G Sackett    gsackett@joneswaldo.com

Gregory L Crockett    gregcrockett@hopkinsroden.com, tammytheiler@hopkinsroden.com

Gregory P Hansel    ghansel@preti.com, kwoodman@preti.com

James A Wilson    jawilson@vorys.com, dmchilelli@vorys.com, kjrubin@vorys.com, tmcarter@vorys.com

James E Hartley    jhartley@hollandhart.com, intaketeam@hollandhart.com, lmlopezvelasquez@hollandhart.com,
thall@hollandhart.com

James J Pizzirusso    jpizzirusso@hausfeldllp.com, kryan@hausfeldllp.com, kstubbs@hausfeldllp.com,
ppashai@hausfeldllp.com

James S Lowrie (Terminated)    jlowrie@joneswaldo.com, achavez@joneswaldo.com

Jay L Himes    jhimes@labaton.com, electroniccasefiling@labaton.com

Jay S Cohen    jcohen@srkw-law.com

Jeannine M Kenney    jkenney@hausfeldllp.com

Jeffrey L Spector    jspector@srkw-law.com

John Michael Avondet    javondet@beardstclair.com, gaffney@beardstclair.com, jessica@beardstclair.com

Joseph Michael Barton    jbarton@glancylaw.com, sfreception@glancylaw.com

Julio Joaquin Ramos    ramosfortrustee@yahoo.com

Kathleen Styles Rogers    krogers@kraloweclaw.com

Kenneth J Rubin    kjrubin@vorys.com

Kent Edward Nelson    kentnelson@uidaho.edu

Kimberly A Kralowec    kkralowec@kraloweclaw.com, enewman@kraloweclaw.com, ggray@kraloweclaw.com, krogers@kraloweclaw.com

Lauren Block    lblock@milberg.com

Lauren James Parker    lparker@orrick.com, crose@orrick.com, dcmanagingattorneysoffice@orrick.com, mknutsen@orrick.com

Lionel Z Glancy    lglancy@glancylaw.com

Mark A Griffin    mgriffin@kellerrohrback.com, bspangler@kellerrohrback.com, dmarshall@kellerrohrback.com, rfarrow@kellerrohrback.com

Matthew McBurney    mmcburney@crowell.com, afontecilla@crowell.com

Matthew L. Dameron    dameron@stuevesiegel.com, perez@stuevesiegel.com

Michael Hausfeld    mhausfeld@hausfeldllp.com

Michael D Gaffney    gaffney@beardstclair.com, javondet@beardstclair.com, jeff@beardstclair.com, jessica@beardstclair.com

Michael M Goldberg    mmgoldberg@glancylaw.com

Michael P Lehmann    mlehmann@hausfeldllp.com

Mindee J Reuben    reuben@wka-law.com, micucci@wka-law.com, spiegel@wka-law.com

Monte N Stewart    stewart@stm-law.com, cgtaylor@stm-law.com, dbower@stm-law.com, sarah.paralegal@yahoo.com, suzie@stm-law.com

Neil D McFeeley    nmcfeeley@eberle.com, tsmith@eberle.com

Patrick J Stueve    stueve@stuevesiegel.com, perez@stuevesiegel.com

Paul Novak    pnovak@milberg.com, dgjonaj@milberg.com, hbricker@milberg.com, MAOffice@milberg.com

Peter G.A. Safirstein    psafirstein@forthepeople.com

Peter J Schwingler    peter.schwingler@leonard.com

Philip Howard Gordon    pgordon@gordonlawoffices.com, bbistline@gordonlawoffices.com

Randall B Weill    rweill@preti.com, kwoodsum@preti.com

Reginald Von Terrell    reggiet2@aol.com

Richard A Rinkema    rrinkema@orrick.com, alawson@orrick.com, dsmutny@orrick.com

Richard C Boardman    rboardman@perkinscoie.com, dianebrown@perkinscoie.com, docketboi@perkinscoie.com, shellylee@perkinscoie.com

Robert Rosenfeld    rrosenfeld@orrick.com, fphan@orrick.com, jmann@orrick.com, lhall@orrick.com, lherlinger@orrick.com, mmacdonald@orrick.com, rrinkema@orrick.com, tchurch@orrick.com, wcurtis@orrick.com

Robert Wozniak     rwozniak@fklmlaw.com

Robert A Miller     rmiller@mlklaw.com, tchamberlain@mlklaw.com

Robert W Biederman     rbiederman@steyerlaw.com

Robert W Finnerty     rfinnerty@girardikeese.com, tfaust@girardikeese.com

Ronald J Aranoff     aranoff@bernlieb.com, galletti@bernlieb.com

Salvatore Anthony Romano (Terminated)     sromano@porterwright.com

Samuel G Liversidge     Sliversidge@gibsondunn.com

Sharron Williams Gelobter     sgelobter@yurumeinlaw.com

Stephen Bomse     sbomse@orrick.com, fgarland@orrick.com, mmacdonald@orrick.com, tchurch@orrick.com

Stephen R Thomas     srt@moffatt.com, cld@moffatt.com, czs@moffatt.com, ecf@moffatt.com, kmd@moffatt.com, moffattthomas@hotmail.com, tmh@moffatt.com

Steven A Asher     asher@wka-law.com

Steven A Kanner     skanner@fklmlaw.com

Steven B Andersen     sba@andersenbanducci.com, ask@andersenbanducci.com, cme@andersenbanducci.com, sdm@andersenbanducci.com, tpk@andersenbanducci.com

Susan G Kupfer     skupfer@glancylaw.com

Sylvia M Sokol     ssokol@constantinecannon.com, ascott@constantinecannon.com, jmurphy@constantinecannon.com, jschaefer@constantinecannon.co.uk, mvaccaro@constantinecannon.com

Todd A Seaver     tseaver@bermandevalerio.com

Wendy Butler Curtis     wcurtis@orrick.com

William L Greene     william.greene@stinsonleonard.com

Winston V Beard     winstonbeard@me.com

AND I FURTHER CERTIFY that on such date I served the foregoing on the non-CM/ECF

Registered Participants in the manner indicated:

    Via first class mail, postage prepaid addressed as follows:   [None]

    Via electronic mail:     [None]

/s/ Susan G. Kupfer
_____